1

2  ROB BONTA, State Bar No. 202668
Attorney General of California

3  JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861

4  Deputy Attorney General
1300 I Street, Suite 125

5  P.O. Box 944255
Sacramento, CA  94244-2550

6  Telephone:  (916) 210-7666
Facsimile:  (916) 324-5205

7  E-mail: David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants J. Lynch, D. Garland,*

8  *M. Jordan, W. Lieber, H. Chavez, D. Sykes,*
*J. Gomez, J. Carothers, D. Calderon, E. Baker,*

9  *G. Herrera, M. Saavedra, and P. Brennfleck*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                    FOR THE EASTERN DISTRICT OF CALIFORNIA

13                            SACRAMENTO DIVISION

14

15  **MA ROSARIO BUENO ZARAGOZA, an**          2:21-cv-02294 TLN-JDP
    **individual; ESTATE OF LUIS GIOVANNY**

16  **AGUILAR, deceased, by his successor-in-**
    **interest Ma Rosario Bueno Zaragoza,**

17                                              **MEMORANDUM OF POINTS AND**
                                    Plaintiffs,  **AUTHORITIES IN SUPPORT OF**

18                                              **DEFENDANTS' MOTION FOR**
                    v.                          **SUMMARY JUDGMENT**

19
                                                Date:        May 15, 2025
20  **JEFFREY W. LYNCH, an individual, and**    Time:        2:00 p.m.
    **DOES 1**                                   Dept:        2 (15th Floor)

21  **through 30, inclusive,**                   Judge:       Hon. Troy L. Nunley
                                                Trial Date:  To Be Determined.

22                                  Defendants.  Action Filed: 12/10/2021

23

24

25

26

27

28

---

1

**TABLE OF CONTENTS**

2

**Page**

3

Introduction ............................................................................................................. 1

4

Brief Statement of Facts......................................................................................... 2

Standard for Summary Judgment.......................................................................... 3

5

Argument ............................................................................................................... 4

6

    I.     There Is No Evidence That Defendants Calderon, Saavedra, Lieber,
         Herrera, or Chavez Engaged in a Conspiracy, or Had Any Knowledge of

7

         the Purported Agreement to Violate Aguilar's Rights (Fourth Cause of
         Action)................................................................................................................ 4

8

         A.     Standard for Conspiracy Under 42 U.S.C. § 1983 ..................................... 4

9

         B.     Green's and Rodriguez's Testimony Did Not Implicate Calderon,
              Saavedra, Lieber, Herrera, or Chavez; and the Evidence Does Not

10

              Permit an Inference of Knowledge, Involvement or Agreement. ............... 5

11

    II.    Defendants Did Not Fail to Take Reasonable Measures to Protect Aguilar
         from a Substantial Risk of Serious Harm Or Subject Him to Cruel and

12

         Unusual Punishment (First and Third Causes of Action). ...................................... 8

         A.     Standard for Failure to Protect .................................................................... 8

13

         B.     There Is No Evidence that Defendants Were Deliberately
              Indifferent to a Substantial Risk of Serious Harm to Aguilar

14

              Leading Up to the December 12, 2019, Incident. ..................................... 10

15

              1.     LTRH Policy and Security Protocol Provided
                   Constitutionally Adequate Protection from Risk of Harm............ 10

16

              2.     Defendants Took Reasonable Measures to Address the Risk
                   that Taylor and Rodriguez Could Defeat Restraints Again. ......... 11

17

              3.     There Is No Evidence that Calderon, Saavedra, Lieber,
                   Herrera, or Chavez Knew of a Substantial Risk to Aguilar

18

                   on or Before the December 12, 2019, Incident. ............................ 13

19

    III.   Defendants Did Not Unlawfully Fail to Intervene During the December 12,
         2019, Incident (Second Cause of Action). ............................................................ 14

20

         A.     Standard for Failure to Intervene .............................................................. 14

21

         B.     Defendants Responded Reasonably to a Rapidly Unfolding and
              Dangerous Situation on December 12, 2019, According to Their

22

              Training and LTRH Policy......................................................................... 15

23

    IV.   Defendants Lynch, Calderon, Saavedra, and Baker Did Not Fail to Train or
         Supervise Their Employees (Fifth Cause of Action). ........................................... 17

24

         A.     Standard for Supervisory Liability............................................................ 17

25

          B.     There Is No Evidence that Lynch, Calderon, Saavedra, or Baker
              Knew of Any Constitutional Violations and Failed to Prevent

26

              Them. ......................................................................................................... 18

27

28

i

**TABLE OF CONTENTS**
(continued)

Page

V.    The Conduct of Defendants Does Not "Shock The Conscience," and the
Evidence Does Not Show that They Acted "With a Purpose to Harm
Unrelated to Legitimate Law Enforcement Objectives" (Sixth Cause of
Action)................................................................................................... 20

    A.    Standard for Substantive Due Process Under the Fourteenth
Amendment .......................................................................................... 20

    B.    Defendants Were Not Deliberately Indifferent, but Took
Reasonable Measures to Ensure Aguilar's Safety Leading Up to the
December 12, 2019, Incident. ............................................................. 21

    C.    On December 12, 2019, Defendants Made a Judgment Call in an
Escalating Situation Where No "Actual Deliberation" Was
Practical................................................................................................ 22

VI.    Defendants Are Entitled to Qualified Immunity Because No Constitutional
Violations Occurred and It Would Not Have Been Clear to Every
Reasonable Officer that Their Conduct Was Unconstitutional............................ 23

    A.    Standard for Qualified Immunity ............................................................. 23

    B.    Reasonable Officers in Defendants' Positions Could Have Believed
that Defendants' Conduct Was Lawful. .................................................. 24

        1.    It Was Not Clearly Established that Use of the Restart
Chairs, or Any Policy or Procedure of the LTRH Was
Unlawful................................................................................... 25

        2.    It Was Not Cleary Established that Taylor and Rodriguez
Were Constitutionally Required to Be Separated or to Be
Denied Dayroom After the October 10, 2019, Incident................ 26

        3.    It Was Not Clearly Established that a Control Booth Officer
Must Use Lethal Force When Responding to an Inmate
Stabbing. ................................................................................... 27

        4.    It Was Not Clearly Established that Defendants Were
Required to Enter the Dayroom While Taylor and
Rodriguez Were Unrestrained and Armed. .................................. 28

Conclusion ........................................................................................................... 29

ii

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

**CASES**

4

5    *Abromson v. American Pac. Corp.*
      114 F.3d 898 (9th Cir. 1997)................................................................................. 3

6    *Aldabe v. Aldabe*
7      616 F.2d 1089 (9th Cir. 1980)............................................................................... 4

8    *Ashcroft v. Iqbal*
      556 U.S. 662 (2009) ........................................................................................... 17
9
     *Bell v. Wolfish*
10     441 U.S. 520 (1979) .................................................................................... 9, 26

11   *Berg v. Kincheloe*
12     794 F.2d 457 (9th Cir. 1986)................................................................................. 7

13   *Burns v. County of King*
       883 F.2d 819 (9th Cir. 1989)................................................................................. 4
14
     *Celotex Corp. v. Catrett*
15     477 U.S. 317 (1986) ........................................................................................... 3

16   *City of Canton v. Harris*
17     489 U.S. 378 (1989) ......................................................................................... 18

18   *Clement v. Gomez*
       298 F.3d 898 (9th Cir. 2002)............................................................................... 23
19
     *Cousins v. Lockyer*
20     568 F.3d 1063 (9th Cir. 2009).................................................................... 18, 19

21   *Crowe v. County of San Diego*
22     608 F.3d 420 (9th Cir. 2010)................................................................................. 7

23   *Crowley v. Bannister*
       734 F.3d 967 (9th Cir. 2013)............................................................................... 18
24
     *Cunningham v. Gates*
25     229 F.3d 1271 (9th Cir. 2000)..................................................................... 15, 24

26   *Farmer v. Brennan*
       511 U.S. 825 (1994)..................................................................................... 8, 9
27

28

iii

1
2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3
4

*Fayle v. Stapley*
   607 F.2d 858 (9th Cir. 1979)................................................................. 18

5

*Gilbrook v. City of Westminster*
   177 F.3d 839 (9th Cir. 1999)............................................................... 4, 7

6
7

*Hahn v. Murphy*
   No. CV 07-1153-SVW-MAN, 2011 WL 9378180 (C.D. Cal. Sept. 23, 2011) ...... 9, 26, 27, 28

8
9

*Harlow v. Fitzgerald*
   457 U.S. 800 (1982) ......................................................................... 23

10

*Harris v. Roderick*
   126 F.3d 1189 (9th Cir. 1997)................................................................ 4

11
12

*Hearns v. Terhune*
   413 F.3d 1036 (9th Cir. 2005).............................................................. 8

13
14

*Hudson v. McMillian*
   503 U.S. 1 (1992)......................................................................... 14, 15

15

*Hydrick v. Hunter*
   669 F.3d 937 (9th Cir. 2012)................................................................ 18

16
17

*Jeffers v. Gomez*
   267 F.3d 895 (9th Cir. 2001) .............................................................. 17

18
19

*Jones v. Williams*
   297 F.3d 930 (9th Cir. 2002).............................................................. 18

20

*Lolli v. County of Orange*
   351 F.3d 410 (9th Cir. 2003)............................................................... 15

21
22

*Long v. Cty. of Los Angeles*
   442 F.3d 1178 (9th Cir. 2006)............................................................. 18

23
24

*Longoria v. Texas*
   473 F.3d 586 (5th Cir. 2006).............................................................. 15

25

*Lujan v. National Wildlife Fed'n*
   497 U.S. 871 (1990).......................................................................... 3

26
27

*Mattos v. Agarano*
   661 F.3d 433 (9th Cir. 2011) (en banc)................................................ 23

28

iv

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3
4

*May v. Baldwin*
    109 F.3d 557 (9th Cir. 1997)......................................................................... 24

5
6

*Mendocino Envtl. Ctr. v. Mendocino County*
    192 F.3d 1283 (9th Cir. 1999.)....................................................................... 4

7

*Mendoza v. Diaz*
    No. 1:20-cv-01393-KES-CDB, 2024 WL 3276264 (E.D.Cal. July 12, 2024) ...................... 26

8
9

*Mosher v. Saalfeld*
    589 F.2d 438 (9th Cir. 1978).......................................................................... 18

10

*Nwandu v. Bach*
    No. 3:06-cv-0999, 2010 WL 2486771 (S.D. Cal. Apr. 21, 2010) ........................... 4

11
12

*Pearson v. Callahan*
    555 U.S. 223 (2009) ..................................................................................... 23

13
14

*Porter v. Osborne*
    546 F.3d 1131 (9th Cir. 2008)................................................................. 20, 21

15

*Prosser v. Ross*
    70 F.3d 1005 (8th Cir. 1995).................................................................. 15, 28

16
17

*Saucier v. Katz*
    533 U.S. 194 (2001) ..................................................................................... 23

18
19

*Star v. Baca*
    652 F.3d 1202 (9th Cir. 2011)........................................................................ 18

20

*Taylor v. Barkes*
    135 S. Ct. 2042 (2015) ................................................................................. 24

21
22

*Taylor v. List*
    880 F.2d 1040 (9th Cir. 1989)........................................................................ 17

23
24

*Turner v. Safley*
    482 U.S. 78 (1987).............................................................................. 9, 24, 26

25

*United Steelworkers of America v. Phelps Dodge Corp.*
    865 F.3d 1539 (9th Cir. 1989)......................................................................... 4

26
27

*Valencia v. Harris*
    No. 1:10-cv-01725-MSJ PC, 2011 WL 6936388 (E.D. Cal. Dec. 29, 2011) ................ 8

28

v

# TABLE OF AUTHORITIES
### (continued)

Page

*Whitley v. Albers*
    475 U.S. 312 (1986) ................................................................................................ 9, 15

*Wilkinson v. Torres*
    610 F.3d 546 (9th Cir. 2010) ................................................................................... 20

*Winfield v. Bass*
    106 F.3d 525 (4th Cir. 1997) ................................................................................... 28

*Woodrum v. Woodward County, Okl.*
    866 F.2d 1121 (9th Cir. 1989) ................................................................................... 4

*Ziglar v. Abbasi*
    582 U.S.150 (2017) .................................................................................................. 23

STATUTES

42 U.S.C. § 1983 ................................................................................................ 4, 17, 18

CONSTITUTIONAL PROVISIONS

Eighth Amendment .................................................................................................... 8

Fourteenth Amendment.......................................................................................... 3, 20

COURT RULES

Fed. R. Civ. P. 56(c)................................................................................................... 3

# INTRODUCTION

On December 12, 2019, inmates Cody Taylor and Anthony Rodriguez smuggled shims into California State Prison, Sacramento's Long Term Restricted Housing (LTRH) unit's dayroom; defeated high-security restraints; retrieved weapons from a third inmate, Deon Green; approached the dayroom door; and then suddenly ran towards and attacked a fourth inmate, Luis Aguilar, stabbing him to death.  The inmates later claimed that some prison staff had facilitated the murder by intentionally failing to double-lock Taylor's and Rodriguez's restraints and promising not to use lethal force against them.  Plaintiff Zaragoza, Aguilar's mother, pleads alternative theories of liability in this action, with some claims based on the alleged conspiracy asserted by the inmate-assailants and some claims based on inadequate measures to protect LTRH inmates and intervene in the attack on Aguilar.  Because the credibility of the inmate-assailants who murdered Aguilar must be assessed by the trier of fact, Defendants seek summary judgment for all of the Defendants on all of Plaintiff's claims that are not based on the alternatively pleaded conspiracy theory.

Separated from the conspiracy allegations, Plaintiff can present no evidence that any Defendant was deliberately indifferent to a substantial risk of serious harm to Aguilar, as they took reasonable measures to ensure Aguilar's safety leading up to and on December 12, 2019; had no reason to know Aguilar faced a substantial risk of harm; responded reasonably and according to policy during the incident; and had no reason to know of any violation of Aguilar's constitutional rights before the incident.  Each of the Defendants is additionally entitled to qualified immunity from Plaintiff's non-conspiracy claims, as no legal authority would have put them on fair notice that their conduct violated Aguilar's constitutional rights.

The sole dispute of fact in this case concerns the conspiracy alleged by the attacking inmates, that is, whether Defendants Baker, Sykes, Gomez, and Brennfleck allowed, and in fact, participated in killing Aguilar.  There is no evidence to support the claims that Aguilar's placement in the LTRH or the policies and procedures of the LTRH placed Aguilar at a substantial risk of serious harm which Defendants failed to take reasonable measures to address,

1   either leading up to or during the incident on December 12, 2019.  Thus, the Court should dismiss

2   with prejudice all claims against Defendants Lynch, Calderon, Saavedra, Lieber, Herrera, and

3   Chavez.  And the Court should further dismiss with prejudice all claims against Defendants

4   Baker, Sykes, Gomez, and Brennfleck to the extent they are based on any theory other than the

5   disputed conspiracy alleged by inmates Green and Rodriguez.

6                              **BRIEF STATEMENT OF FACTS**

7           Defendants filed their separate statement of undisputed facts as required by local rule

8   concurrently with this motion.

9           On December 12, 2019, inmate Luis Aguilar was murdered by inmates Cody Taylor and

10  Anthony Rodriguez, with the help of a third inmate, Dion Green, while all four were housed in a

11  security housing unit (SHU) that was specifically assigned to house inmates with mental illnesses

12  called the Long Term Restricted Housing (LTRH) unit.

13          The LTRH housed inmates who had been found guilty of disciplinary violations in prison,

14  but required access to mental health treatment and services, including time out of their cells.  The

15  LTRH was formed at the directive of CDCR headquarters, and staff implemented operational

16  procedures based on an existing LTRH unit at a different prison, as well as input from

17  correctional staff and administrators.  Inmates in the LTRH were generally confined to their cells,

18  except for treatment, group therapy, medical appointments, and outdoor recreation time. To

19  ensure the safety of inmates and staff, inmates were thoroughly searched, restrained, scanned with

20  a metal detector, and then escorted by multiple staff any time the inmate left his cell.  The LTRH

21  was also required to offer out of cell time in the dayroom of the building.  In addition to the

22  search and restraint procedure, inmates who went to dayroom were also restrained to metal

23  "restart" chairs that were bolted to the floor.  A control booth officer monitored the inmates in the

24  dayroom from an elevated position and floor staff observed the inmates and frequently entered

25  the section to perform other duties.  The control booth could use both lethal and less-lethal

26  firearms to intervene into any incidents.  The floor officers were trained and it was unit policy not

27  to enter the unit if inmates were unrestrained until it was safe to do so in a coordinated and

28  tactical manner.

1    Evidence establishes that inmates in the LTRH, including Taylor and Rodriguez, had been

2    able to escape their restraints prior to Aguilar's murder, but staff did not know how.  The LTRH

3    began to use high-security black box devices to prevent inmates from accessing the keyhole and

4    picking their restraints.  There was no indication, aside from those alleged to be involved in a

5    conspiracy, that Defendants knew Aguilar was in danger on December 12, 2019.

6    On December 12, 2019, Taylor and Rodriguez were able to escape their restraints and

7    retrieve a weapon from Green's cell before returning to stab Aguilar, who was still in his

8    restraints.  Staff followed policy in responding to the incident by firing less-lethal rounds at

9    Taylor and Rodriguez to stop their attack, and waiting to enter the unit until sufficient staff had

10    arrived and they could do so in a safe and tactical manner.  The inmates subsequently made

11    allegations that staff was involved and Plaintiff, Aguilar's mother, filed suit, alleging conspiracy

12    and various Eighth and Fourteenth Amendment claims based on the design and policies of the

13    unit.

14                    **STANDARD FOR SUMMARY JUDGMENT**

15    Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

16    as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R.

17    Civ. P. 56(c).  The moving party has the initial burden of identifying relevant portions of the

18    record that demonstrate the absence of a fact or facts necessary for one or more essential elements

19    of such cause of action upon which the moving party seeks judgment.  *Celotex Corp. v. Catrett*,

20    477 U.S. 317, 323 (1986).  Then the nonmoving party must identify specific facts to demonstrate

21    that there is a dispute as to material facts on those elements that the moving party has contested.

22    Fed. R. Civ. P. 56(c).  The nonmoving party cannot simply rely on the pleadings and must do

23    more than make "conclusory assertions [in] an affidavit."  *Lujan v. National Wildlife Fed'n*, 497

24    U.S. 871, 888 (1990).  Summary judgment must be granted where the nonmoving party "fails to

25    make a showing sufficient to establish the existence of an element essential to that party's case,

26    and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322;

27    *Abromson v. American Pac. Corp.*, 114 F.3d 898, 902 (9th Cir. 1997).  "[W]hen a defendant

28    moves for summary judgment, the trial court must determine from the record whether 'a fair

3

1  minded jury could return a verdict for the plaintiff on the evidence presented.'" *United*

2  *Steelworkers of America v. Phelps Dodge Corp.*, 865 F.3d 1539, 1541-1542 (9th Cir. 1989)

3  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The possibility that the

4  plaintiff may discredit the defendant's testimony at trial is not enough for the plaintiff to defeat a

5  properly presented motion…." *Id.* at 1542.

6                                          **ARGUMENT**

7  **I.    THERE IS NO EVIDENCE THAT DEFENDANTS CALDERON, SAAVEDRA, LIEBER,**
        **HERRERA, OR CHAVEZ ENGAGED IN A CONSPIRACY, OR HAD ANY KNOWLEDGE OF**
8       **THE PURPORTED AGREEMENT TO VIOLATE AGUILAR'S RIGHTS (FOURTH CAUSE OF**
        **ACTION).**
9
         **A.    Standard for Conspiracy Under 42 U.S.C. § 1983**
10

11         "To establish a conspiracy, a plaintiff must demonstrate the existence of an agreement or

12  'meeting of the minds' to violate constitutional rights." *Mendocino Envtl. Ctr. v. Mendocino*

13  *County*, 192 F.3d 1283, 1301 (9th Cir. 1999.) "The defendants must have, by some concerted

14  action, intended to accomplish some unlawful objective for the purpose of harming another which

15  results in damage." *Id.* A meeting of the minds may be inferred by circumstantial evidence,

16  including actions by defendants that were "unlikely to have been undertaken without an

17  agreement." *Id.* However, mere conclusory allegations are not sufficient to support a conspiracy

18  claim. *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989); *Woodrum v. Woodward*

19  *County, Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989). A plaintiff must show "which defendants

20  conspired, how they conspired and how the conspiracy led to a deprivation of his constitutional

21  rights." *Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997). Allegations of conspiracy must

22  be supported by material facts, not merely conclusory statements. *Aldabe v. Aldabe*, 616 F.2d

23  1089 (9th Cir. 1980); *see also Nwandu v. Bach*, No. 3:06-cv-0999, 2010 WL 2486771, at *13

24  (S.D. Cal. Apr. 21, 2010). And "the mere similarity of conduct among various persons and the

25  fact that they may have associated with each other and may have assembled together and may

26  have discussed some common aims and interests, is not necessarily proof of the existence of a

27  conspiracy." *Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir. 1999).

28

                                              4

**B.    Green's and Rodriguez's Testimony Did Not Implicate Calderon, Saavedra, Lieber, Herrera, or Chavez; and the Evidence Does Not Permit an Inference of Knowledge, Involvement or Agreement.[1]**

Inmates Green and Rodriguez testified at deposition, providing conflicting versions of events that at most implicates Baker, Sykes, Gomez, and Brennfleck in an agreement that was formed in the days or weeks before the murder.  (DUF ¶¶ 76-90.)  Green testified that Defendants Baker, Sykes, Gomez, and Brennfleck each told him that Aguilar was a child molester two to three weeks before the murder.  (Green Dep. 8:3-22, 8:23-9:1, 77:1-8.)  Green testified that Baker approved the murder because he wanted Aguilar dead for assaulting an officer, and that Baker promised to make sure the control booth officer didn't fire the Mini-14 rifle.  (*Id*. 10:6-13, 75:5-15, 114:19-115:2.)  Green testified that he told Baker and Sykes several times before an earlier "test run" to ensure the restraints were not double-locked.  (*Id*. 112:24-114:15.)  He testified that Sykes brought him clipper heads to make the knives, that Sykes, Gomez, and Brennfleck would alert him to stop making weapons when other staff entered the unit, and that he showed weapons to Baker and Green within his cell but they did not take them away.  (*Id*. 22:6-21, 121:1-4, 122:5-8, 129:6-9, 130:2-4.)  However, Green provided no such testimony or evidence which could show that Defendants Lynch, Calderon, Saavedra, Herrera or Chavez knew of or participated in any plan to attack Aguilar.  Green never mentioned Lynch, Saavedra, Calderon, Herrera, or Chavez in his testimony, never described any discussions he had with them, and provided no basis to conclude that any of these Defendants were aware of the alleged arrangement Green had made, that Green was making weapons, or that Taylor, Rodriguez, and Green intended to attack Aguilar on December 12, 2019, or on any other day.

Rodriguez accused Green of being a liar and contradicted Green's testimony on several key points, but none of his testimony provides any basis to conclude that Lynch, Calderon, Saavedra, Lieber, Herrera, or Chavez had any knowledge of the purported plan to attack Aguilar.  (Rodriguez Dep. 114:7-9, 126:3-10, 141:19-142:15.)  Rodriguez testified that Baker and Calderon

---

[1] The Fourth Cause of Action is not alleged against Defendant Lynch, and none of the inmates implicate Lynch as being involved, either in testimony or hearsay statements.  However, to the extent that Plaintiff may claim that Lynch had some knowledge of staff involvement or complicity, the lack of such knowledge is discussed below.

1    were by-the-book and that he had never seen them do anything unfair to inmates.  (*Id*. 36:16-23,

2    37:8-15, 126:3-10.)  Baker never told Rodriguez that Aguilar was a sex offender.  (*Id*. 97:17-19.)

3    Rodriguez also denied that any officer, including Sykes, brought the clipper heads they used or

4    warned them to stop making weapons in their cells when other officers entered the LTRH.  (*Id*.

5    133:24-134:11.)  Rodriguez testified that only two non-supervisor floor officers from the LTRH

6    were involved, and that he never spoke to any other staff members about Aguilar, expressly

7    including Lynch, Baker, Calderon, and Saavedra.  (*Id*. 91:3-10, 92:4-8, 93:2-4, 94:9-95:1.)

8    Rodriguez testified that on the day before the murder, he told two LTRH floor officers that were

9    escorting him to yard to bring Aguilar out to dayroom not to double-lock the restraints, and not to

10    use lethal force from the control booth, but he claimed he could not remember who those officers

11    were and was not willing to identify them by name.  (*Id*. 87:1-11, 87:23-88:7, 89:12, 91:3, 94:9-

12    95:1, 152:1-4)   Rodriguez did not know what those two officers did after speaking with him

13    during the escort and did not hear them talk to any other staff member about Aguilar.  (*Id*. 91:5-

14    10.)  Rodriguez's testimony also establishes that Aguilar himself was not concerned for his safety

15    on December 12, 2019, but instead played an active role in Taylor and Rodriguez's escaping by

16    helping them watch the control booth officer while they picked their restraints.  (*Id*. 100:20-

17    101:17, 102:5-12.)  Rodriguez also confirmed that the officers who searched him after the

18    incident, Herrera and Garland, were not the two involved officers.  (*Id*. 162:7-10.)  Defendant

19    Herrera conducted the search of Rodriguez, and so Rodriguez's testimony eliminates him from

20    being involved, and Green did not identify Herrera as being involved in any way.  (Herrera Decl.

21    ¶ 13.)

22         At most, the conflicting and vague testimony from Green and Rodriguez could create a

23    triable issue of disputed fact that Defendant Baker, Sykes, Gomez, or Brennfleck was involved in

24    the conspiracy.  There is no evidence to connect Lynch, Calderon, Saavedra, Lieber, Herrera, or

25    Chavez to the conspiracy or to any knowledge that Aguilar faced a substantial risk of serious

26    harm on that day.  Lynch was the warden overseeing the prison who approved and implemented

27    the LTRH policies and procedures, but he did not personally run the day-to-day operations of the

28    unit and was not aware of any constitutional violations occurring.  (DUF ¶¶ 6, 14-15.)  Saavedra

6

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294 TLN-JDP)

1    was on extended leave and not at work after November 1, 2019, well before any purported

2    agreements or conversations occurred.  (DUF ¶ 9.)  Calderon, Herrera, and Chavez were assigned

3    to the LTRH, but there is no evidence showing they were aware of or participated in any

4    agreement to violate Aguilar's rights, and they were not named or implicated by the inmates.

5    (DUF ¶¶ 55, 76-90.)  The fact that they may have associated with each other and worked in the

6    same unit is not proof that they were involved in any purported conspiracy.  *See Gilbrook v. City*

7    *of Westminster*, 177 F.3d 839, 860 (9th Cir. 1999).  And, as discussed in further detail below, the

8    undisputed evidence shows that Calderon, Lieber, and Herrera responded reasonably and in

9    accordance with training and policy to the incident on December 12, 2019.  (DUF ¶¶ 60-75.)

10   Chavez was conducting welfare checks and thus did not respond to the incident, but had he done

11   so, he would have been constrained to follow the same procedures as the rest of staff in

12   assembling by the dayroom door and entering with a coordinated plan when it was deemed safe to

13   do so.  (Chavez Decl. ¶¶ 5-7.)

14           While Green and Rodriguez both provided hearsay testimony that there was an agreement

15   that the control booth officer would not fire the Mini-14 rifle, the evidence shows that the control

16   booth officer Lieber — whom they did not know and never actually spoke with — was not a

17   regular in the unit, had not had any communications with any staff about Green, Rodriguez,

18   Taylor, or Aguilar, and was not aware of any risk to Aguilar on December 12, 2019.  (DUF ¶ 10,

19   55, 90.)  While Lieber chose to use the 40-millimeter direct-impact launcher instead of the Mini-

20   14, there is no evidence that he did so because of any conspiracy.  Instead, the evidence shows

21   that Lieber acted within CDCR's use-of-force policy in using the 40-millimeter under the

22   circumstances, as he judged that firing the Mini-14 into the tight group of three inmates who were

23   moving rapidly would have risked hitting Aguilar or ricocheting and hitting other inmates in the

24   housing unit.  (Lieber Decl. ¶ 13; Baker Decl. ¶ 61.)  The evidence establishes that Lieber's use of

25   the 40-millimeter was consistent with his training and with unit policy in response to a rapidly

26   evolving situation.  *See Crowe v. County of San Diego*, 608 F.3d at 420, 440-440; *Berg v.*

27   *Kincheloe*, 794 F.2d 457, 462 (9th Cir. 1986).

28

1    Green and Rodriguez testified that they recognized that the regular control booth officer

2    was not in the control booth, but that none of the inmates spoke to officers about it and continued

3    with their plan without confirming whether this replacement control booth officer would use only

4    less-lethal force.  (Green Dep. 29:24-30:10; Rodriguez Dep. 109:14-16, 163:17-164:12.)  Indeed,

5    Rodriguez testified that they recruited Aguilar to help them watch Lieber while they were picking

6    the restraints, and that when Rodriguez got out of his restraints, Lieber yelled, "Hey, what are you

7    guys doing?" and activated the alarm.  (Rodriguez Dep. 102:5-12, 105:16-24.)  Thus, there is no

8    evidence that Lieber had agreed or had any knowledge of an agreement not to use the Mini-14,

9    but instead that he responded as policy and his training dictated by verbally contacting the

10   inmates, assessing their behavior, and using the force option he deemed appropriate in light of the

11   risks to Aguilar and to uninvolved inmates of firing the Mini-14 during the incident.  (DUF ¶¶ 61;

12   Lieber Decl. ¶¶ 11-13; Baker Decl. ¶ 61.)  Accordingly, the Court should dismiss with prejudice

13   the Fourth Cause of Action against Calderon, Saavedra, Lieber, Herrera, and Chavez.

14   **II.    DEFENDANTS DID NOT FAIL TO TAKE REASONABLE MEASURES TO PROTECT
         AGUILAR FROM A SUBSTANTIAL RISK OF SERIOUS HARM OR SUBJECT HIM TO
15       CRUEL AND UNUSUAL PUNISHMENT (FIRST AND THIRD CAUSES OF ACTION).**

16       **A.    Standard for Failure to Protect**

17       Prison officials have a duty to protect prisoners from violence at the hands of

18   other prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Hearns v. Terhune*, 413 F.3d

19   1036, 1040 (9th Cir. 2005).  However, not "every injury suffered by one prisoner at the hands of

20   another ... translates into constitutional liability for prison officials."  *Farmer* at 834.  A prison

21   official violates the Eighth Amendment only when their act or omission results in the "denial of

22   the minimal civilized measure of life's necessities" and when the official is deliberately

23   indifferent "to inmate health or safety."  *Id.*  To be deliberately indifferent, the official must know

24   of and disregard an excessive risk to inmate health or safety.  *Id.* at 837.  Then the official

25   must fail to take reasonable measures to abate the substantial risk of serious harm.  *Id.* at 847.

26   Negligent failure to protect an inmate from harm does not violate the Eighth Amendment, and

27   "[m]ere negligence in discovering [an] attack, or responding to it, will not support a constitutional

28   claim for deliberate indifference."  *Valencia v. Harris*, No. 1:10-cv-01725-MSJ PC, 2011 WL

8

6936388, at *3 (E.D. Cal. Dec. 29, 2011).  Although the Constitution requires prison officials to protect prisoners, it does not require any specific action by prison officials in ensuring this safety. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm was not averted." *Id.* at 844. This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* (citing *Spain v. Procunier,* 600 F.2d 189, 193 (9th Cir. 1979)).

The security decisions of prison officials are entitled to considerable deference.  *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (courts are "ill-equipped" to deal with issues pertaining to prison administration as "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government"); *see also Bell v. Wolfish*, 441 U.S. 520, 547, (1979) (we accord prison administrators wide-ranging deference in adoption of policies that "in their judgment are needed to preserve internal order and discipline and to maintain institutional security").  "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventative measures intended to reduce the incident of these or any other breaches of prison discipline." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).  A prison official can avoid Eight Amendment liability by showing that: (1) "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent; or (3) they responded reasonably to the risk." *Hahn v. Murphy*, No. CV 07-1153-SVW-MAN, 2011 WL 9378180, at *14 (C.D. Cal. Sept. 23, 2011).

9

**B.    There Is No Evidence that Defendants Were Deliberately Indifferent to a Substantial Risk of Serious Harm to Aguilar Leading Up to the December 12, 2019, Incident.**

**1.    LTRH Policy and Security Protocol Provided Constitutionally Adequate Protection from Risk of Harm.**

Apart from the alternatively pleaded conspiracy theory, there is no evidence that Defendants were deliberately indifferent to inmates' safety in running the LTRH.  Due to its specialized nature as a security housing unit for inmates with diagnosed mental illnesses and treatment needs, the LTRH had an extensive and thorough safety and security policy that was designed to address the risks of housing such an inmate population.  Every inmate housed in the unit had committed a disciplinary violation that resulted in a punitive term, but each was also required to have access to mental health services.  (DUF ¶ 12.)  The requirements and staffing for the LTRH unit were determined at CDCR headquarters and unit-specific policy was developed by California State Prison, Sacramento based upon CDCR's operating guidelines and procedures, the recommendations and experience of correctional staff and administrators, as well as mental health and other service providers to this unique inmate population, and was modeled on an existing LTRH unit at California State Prison, Corcoran, and then approved by the warden.  Staff at the prison was required to activate and run the LTRH according to the staffing and procedures they were provided.  (DUF ¶¶ 14-15.)  The LTRH employed multilayered and constitutionally appropriate security measures that were specifically designed to address safety risks in the unit.

The LTRH was monitored by an officer in an elevated control booth, who controlled the doors into the buildings, within the sections, between the sections, and into cells, monitored the activities in the sections, and had access to both lethal and less-lethal force, including the 40-millimeter direct impact launcher.  (DUF ¶¶ 17-22.)   A sergeant and multiple floor officers also supervised and managed unit, and were armed with pepper spray, an eighteen-inch expandable baton, and a stab resistant vest that covered the torso, but not the head, neck, armpits, or anywhere below the waist.  (DUF ¶¶ 19, 23-24.)

Inmates in the LTRH were confined to their cells a majority of the time, but were required to be offered programming and weekly recreational yard time, and were escorted to appointments.

10

1    (DUF ¶¶ 26, 28-29, 30.)  Staff was required to conduct half-hourly welfare checks on each cell,

2    and before any inmate could leave their cell in the LTRH, they first had to submit to an unclothed

3    body and cavity search, the application of restraints, and a search with a metal detector, before

4    being escorted by at least two correctional officers.  (DUF ¶¶ 27, 26, 33.)  The LTRH offered

5    inmates at least three and a half hours of weekly of out-of-cell activity in the dayroom.  (DUF

6    ¶ 31.)  Dayroom was voluntary; staff did not know who would go to dayroom ahead of time, and

7    inmates could request to be brought back to their cells at any time.  (DUF ¶ 32.)  Inmates who

8    chose to attend dayroom were subjected to the LTRH search procedures for leaving the cell and

9    then were secured in "restart chairs," metal desks which were bolted to the floor, with plexiglass

10   dividers.  (DUF ¶ 33.)  Inmates were secured to the "restart chairs" by a metal bar that locked

11   around their leg restraints, and officers were trained and refreshed often on how to apply the

12   restraints to the inmate and secure the inmate to the restart chairs.  (DUF ¶¶ 33-34.)  Use of the

13   restart chairs was modeled on an existing LTRH unit and was mandated by LTRH policy.  (DUF

14   ¶ 35.)

15        Prison officials used their judgment and experience to determine a policy that reasonably

16   addressed the risks of running a SHU unit for high-risk inmates who were entitled to services and

17   treatment.  Inmates could not remain in their cells indefinitely and were entitled to services, so the

18   heightened security procedures described above were in place to ensure that inmates did not bring

19   contraband with them when they were in the dayroom with other inmates and that they were

20   reasonably prevented from coming into physical contact with another inmate by being secured to

21   the restart chair and separated by plexiglass.

22              **2.    Defendants Took Reasonable Measures to Address the Risk that
                        Taylor and Rodriguez Could Defeat Restraints Again.**
23

24        The undisputed evidence shows that reasonable and appropriate security and safety

25   measures were put in place in the LTRH to protect inmates participating in dayroom from other

26   inmates and to prevent all inmates from escaping restraints, including Taylor and Rodriguez.

27        On October 10, 2019, Taylor and Rodriguez defeated their restraints and attacked a non-

28   party inmate in the dayroom, while Green was present.  (DUF ¶¶ 48-49.)  Green claimed

11

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294-TLN-JDP)

1    responsibility for the attack and explained that it was based on a previous incident between him

2    and the non-party inmate, who was later removed from the section.  (DUF ¶ 50.)  Staff did not

3    know exactly how Taylor and Rodriguez had defeated their restraints.  However, they were aware

4    that inmates can manufacture picks and shims, which could be inserted through the handcuff's

5    keyhole to unlock it.  (DUF ¶ 51.)  To prevent access to the keyhole, LTRH staff was trained on

6    and began to apply "black boxes" which covered the keyhole and prohibited the inmate from

7    defeating the restraints with that method.  (DUF ¶ 52.)  The black boxes are frequently used and

8    commonly relied upon in custodial settings and were considered the most secure way to restrain

9    an inmate.  (DUF ¶¶ 53.)  In addition, a sergeant was required to be present for any escorts to

10    dayroom.  (DUF ¶ 24.)  Use of the black boxes constituted a reasonable and proactive measure to

11    address the risk that Taylor and Rodriguez could defeat the restraints as they had done on October

12    10, 2019.  (DUF ¶ 54.)

13        The evidence establishes that the October 10, 2019, incident was not a crime of opportunity

14    by Taylor and Rodriguez, but was instead a dispute between specific inmates that had been

15    addressed.  (Baker Decl. ¶ 43.)  CDCR inmate-housing policy did not require Defendants to

16    rehouse Taylor, Rodriguez, or Green, given the targeted, victim-specific nature of the attack.  The

17    LTRH was already the most restrictive and high-security setting available and was specifically

18    designed to house mentally ill inmates who committed acts of violence in prison.  (DUF ¶ 12;

19    Baker Decl. ¶ 44.)  No other unit could accommodate their mental health level of care and

20    security requirements at the time, and the evidence shows that moving a problematic inmate to

21    another section would not address concerns that an inmate could escape restraints, since similar

22    restraints and methods were used in high-security levels of custody.  Similarly, denying Taylor

23    and Rodriguez their mandatory out-of-cell time on a temporary or permanent basis was not a

24    feasible option, as the unit was specifically established to provide those constitutionally mandated

25    services, and doing so would have violated LTRH policy.  (DUF ¶¶ 12; Lynch Decl. ¶ 20; Baker

26    Decl. ¶ 45.)

27        The evidence shows that Defendants took reasonable and proactive measures to address the

28    risk that Taylor and Rodriguez could escape their restraints in light of what they knew of the

12

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294-TLN-JDP)

1   October 10, 2019 incident.  The inmate-victim targeted in the attack had been removed from the

2   unit.  Extensive, heightened security measures were in place, and restraint and escort policy was

3   upgraded to mitigate the risk of further escape while still performing the functions of the unit.

4   Defendants' security determinations must be assessed based on the information known to them at

5   the time and should be given great deference, especially in light of the complex and challenging

6   nature of the unit.

7            **3.    There Is No Evidence that Calderon, Saavedra, Lieber, Herrera, or**
             **Chavez Knew of a Substantial Risk to Aguilar on or Before the**
8            **December 12, 2019, Incident.**

9            Apart from the alternatively pleaded conspiracy theory, there is no evidence that

10  Defendants knew of any particular risk to Aguilar.  There is no evidence that Calderon, Saavedra,

11  Lieber, Herrera, or Chavez were party to or knew of any agreement to violate Aguilar's rights or

12  facilitate Taylor and Rodriguez escaping and attacking Aguilar.  They were not implicated by the

13  inmates, and none received any information on or before December 12, 2019, which would have

14  indicated that Aguilar was at risk or that Taylor and Rodriguez could or would escape the

15  heightened-security restraints.  (DUF ¶¶ 55, 76-90.)

16           Saavedra left work on November 1, 2019, and did not return until January 2020.  (DUF

17  ¶ 9.)  The evidence shows that the purported agreement is alleged to have occurred a couple of

18  weeks before December 12, 2019, after Saavedra was already on leave.  (DUF ¶¶ 76-90.)  Lieber

19  was not a regular in the unit and was only covering for that shift, had not spoken to anyone about

20  Taylor, Rodriguez, Green, Aguilar, or not using the Mini-14 on December 12, 2019, did not know

21  what the inmates were doing when they escaped their restraints, and responded according to

22  policy and protocol, as discussed in more detail below.  (DUF ¶¶ 55, 90.)

23           No evidence connects Calderon, Herrera, or Chavez to any purported agreement, and there

24  is no evidence they knew Taylor or Rodriguez had not been restrained correctly or had been

25  enabled in escaping the restraints.  Based on the extensive, and recently upgraded, search and

26  restraint procedure, they had no reason to think Taylor or Rodriguez could escape their restraints

27  on December 12, 2019, or that they had any reason to harm Aguilar on that day or any other day.

28  There is no evidence that Calderon, Herrera, or Chavez knew before or on the day of the incident

                                                      13

1  that other officers had allegedly not double-locked the restraints.  Instead, the evidence shows that

2  Taylor and Rodriguez were searched and restrained upon leaving their cells, they were escorted

3  down to the dayroom floor, black boxes were applied to their leg restraints, and they were then

4  restrained to their respective chairs.

5       There is evidence that Taylor was able to escape his restraints an additional time, on

6  December 5, 2019, before black boxes were in place.  (Baker Decl. ¶ 47.)  However, the risk that

7  Taylor or Rodriguez could again escape restraints after the December 5, 2019, incident, whether

8  Defendants knew about the incident or not, had been addressed on December 12, 2019, by the

9  established heightened-security precaution of adding black boxes.

10       Because there is no evidence that Calderon, Lieber, Herrera, and Chavez knew of the

11  purported agreement or of any reason Taylor, Rodriguez, or any other inmate would want or be

12  able to harm Aguilar, and because of the extensive, and recently enhanced, security and safety

13  procedures, there is no evidence that any of them were aware of a substantial risk of serious harm

14  to Aguilar or failed to take reasonable steps to protect him from harm leading up to or on

15  December 12, 2019.  The Court should dismiss the First and Third Causes of Action against

16  Calderon, Lieber, Herrera, and Chavez.  The Court should similarly dismiss the First and Third

17  Causes of Action against Baker, Sykes, Brennfleck, and Gomez, to the extent they are premised

18  on anything other than the allegations that they participated in or facilitated the attack.

19
20  **III.   DEFENDANTS DID NOT UNLAWFULLY FAIL TO INTERVENE DURING THE DECEMBER 12, 2019, INCIDENT (SECOND CAUSE OF ACTION).**

21      **A.   Standard for Failure to Intervene**

22       "[O]fficials confronted with a prison disturbance must balance the threat unrest poses to

23  inmates, prison workers, administrators, and visitors against the harm inmates may suffer if

24  guards use force.  Despite the weight of these competing concerns, corrections officials must

25  make their decisions in haste, under pressure, and frequently without the luxury of second

26  chance."  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal citations omitted).  "[C]orrections

27  officers must balance the need to maintain order and discipline through force against the risk of

28  injury to inmates.  Both situations may require prison officials to act quickly and decisively.

14

1  Likewise, both implicate the principle that prison administrators should be accorded wide-ranging

2  deference in the adoption and execution of policies and practices that in their judgment are

3  needed to preserve internal order and discipline and to maintain institutional security."

4  *Id.* (internal citations omitted).  "In making and carrying out decision involving the use of force to

5  restore order in the face of a prison disturbance, prison officials undoubtedly must take into

6  account he very real threats the unrest presents to inmates and prison officials alike, in addition to

7  the possible harms to inmates against whom force might be used."  *Whitely v. Albers*, 475 U.S.

8  312, 319-320.

9       An officer can only be held liable for failing to intervene if he had a realistic opportunity to

10  intervene and failed to do so.  *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000);

11  *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003).  The Constitution does not require

12  prison guards to put themselves at risk of serious physical harm.  *See Longoria v. Texas*, 473 F.3d

13  586, 593-94 (5th Cir. 2006) (plaintiff was stabbed twenty-eight times by two inmates armed with

14  shanks; unarmed officers who ran away to alert other guards and obtain weapons and tear gas

15  were entitled to qualified immunity, because "no rule of constitutional law requires unarmed

16  officials to endanger their own safety in order to protect a prison inmate threatened with physical

17  violence"); *see also Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) ("[P]rison guards have

18  no constitutional duty to intervene in the armed assault of one inmate upon another when

19  intervention would place the guards in danger of physical harm.")

20       **B.    Defendants Responded Reasonably to a Rapidly Unfolding and Dangerous**
          **Situation on December 12, 2019, According to Their Training and LTRH**
21          **Policy.**

22       Here, there is no evidence that Defendants unlawfully failed to intervene during the attack.

23  Instead, they assessed and decided upon a plan of action in the moment, according to policy and

24  their training, with the limited information they had.

25       Staff were trained never to rush into an unknown and potentially dangerous situation

26  without a coordinated plan, but to assess the situation in the moment and as it develops, observing

27  and interpreting the inmates' behavior and deciding on a course of action with the information

28  available.  (DUF ¶ 45.)  Staff are trained to protect their own safety and to use the force option

15

1    that will be effective while maintaining a safe distance from the threat, as the danger and potential

2    harm to staff and uninvolved inmates will increase if they are injured or taken hostage during an

3    incident, and can impede other staff from responding.  (DUF ¶¶ 45-47.)  In SHU's in particular,

4    staff are trained not to enter the dayrooms or tiers when inmates are unrestrained or armed until a

5    plan is established and they can enter housing units in a tactical, coordinated manner, with

6    specific roles designated.  (DUF ¶ 47.)  And when staff do make entry, they must first restrain the

7    assailant-inmates and ensure they do not have any other weapons that could be used to injure staff

8    or other inmates.  (DUF ¶ 47.)

9        Lieber observed Taylor and Rodriguez manipulating their restraints, alerted officers on the

10    floor, and returned to the control panel to find that they were out of their restraints.  (DUF ¶ 61.)

11    Calderon first observed Taylor and Rodriguez when they had already escaped their restraints and

12    were ascending the stairs toward the tiers, so he alerted Herrera and other officers in the rotunda,

13    and they immediately began to assemble at the dayroom door and evaluate the appropriate

14    response.  (DUF ¶ 62.)  Lieber saw Rodriguez retrieve an object from Green's cell and come back

15    down the stairs, so he began to open the section door, but Calderon ordered the section door

16    closed, as it was not safe to enter and physically engage with Taylor and Rodriguez under the

17    circumstances.  (DUF ¶ 64.)  The decision not to enter, but to close the section door was

18    consistent with CDCR's policy and training; and at this point in the incident, there was no

19    indication to Calderon, Lieber, or Herrera that Aguilar was in danger, as they did not believe he

20    was enemies with Taylor and Rodriguez, did not know whether he was involved in the incident

21    and whether he was unrestrained himself, did not perceive Aguilar to be concerned or afraid of

22    Taylor or Rodriguez, and saw no indication from Taylor and Rodriguez that they were going to

23    attack Aguilar or each other.  (DUF ¶ 55, 63, 65-67.)

24        However, as the door closed, Taylor and Rodriguez suddenly ran toward Aguilar and began

25    stabbing him repeatedly.  (DUF ¶ 68.)  Believing that he could not safely fire lethal rounds

26    without risking killing Aguilar or striking another inmate by a ricochet, Lieber immediately began

27    firing 40-millimeter direct impact rounds, intermittently striking both Taylor and Rodriguez, as

28    they alternated hiding behind plexiglass dividers and attacking Aguilar. (DUF ¶¶ 70-73; Lieber

16

Decl. ¶¶ 13-19.)  After Lieber fired the final round that struck Taylor, the inmates stopped their attack, threw away their weapons, and began to comply with staff's orders.  (DUF ¶¶ 72-75.) Staff then made entry pursuant to policy and their training, in a coordinated manner with assigned roles and responsibilities, when it was safe to do so.  (DUF ¶ 75.)

Saavedra was not on duty on December 12, 2019, and had not been at work since the beginning of November.  (DUF ¶ 9.)  Chavez was conducting welfare checks and did not respond to the incident, but like any other officer who was present, had Chavez responded, he could not and would not have made entry, as Calderon had ordered the door to be closed, and Chavez would have been required to respond consistently with the other staff members on the floor. (Chavez Decl. ¶¶ 5-8.)

Calderon, Lieber, and Herrera had to make judgment calls in a rapidly unfolding situation, without knowing Taylor's or Rodriguez's intentions that day either before the event or even as it rapidly developed.  Their assessment of the situation and immediate reactions in accordance with their training and CDCR policies were reasonable as a matter of law in light of the circumstances and were not an unlawful failure to intervene.

The Court should dismiss the Second Cause of Action against Calderon, Lieber, Herrera, and Chavez.  The Court should similarly dismiss the Second Cause of Action against Baker, Sykes, Brennfleck, and Gomez, to the extent it is premised on a failure to respond to the incident according to protocol or on any other theory than the allegations that they participated in or facilitated the attack.

## IV.   DEFENDANTS LYNCH, CALDERON, SAAVEDRA, AND BAKER DID NOT FAIL TO TRAIN OR SUPERVISE THEIR EMPLOYEES (FIFTH CAUSE OF ACTION).

### A.   Standard for Supervisory Liability

"There is no respondeat superior liability under 42 U.S.C. § 1983.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001) ("[S]upervisory officials are not liable for the actions of subordinates on any theory of vicarious liability under 42 U.S.C. § 1983.").  Officials cannot be held liable solely for unconstitutional conduct of their subordinates.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Instead, an official

17

can only be held liable under § 1983 if there is a showing that the official personally participated in the constitutional deprivation alleged. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Accordingly, a supervisor is only liable under § 1983 if: (1) the supervisor was personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Star v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013). The identified deficiency in the policy must be closely related to the ultimate injury. *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006).

When a named defendant holds a supervisorial position, the causal link between the defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978), *cert. denied*, 442 U.S. 941 (1979). It is insufficient to assert generally that a defendant created policies and procedures that led to the violation, without alleging a specific policy created by him that led to the constitutional violation. *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012); *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program ...."); *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (a violation of a departmental policy or regulation does not establish a constitutional violation).

### B. There Is No Evidence that Lynch, Calderon, Saavedra, or Baker Knew of Any Constitutional Violations and Failed to Prevent Them.

Plaintiff alleges that Lynch, Baker, Calderon, and Saavedra were responsible for ensuring inmates were appropriately housed, adopting policies and prescribing rules affecting the operation of the LTRH, devising and implementing security protocols and procedure for safely housing inmates, and training their correctional staff and that their actions deprived Aguilar of his constitutional rights. (TAC at 28-29.) Plaintiff claims that Defendants failed to supervise and

18

1   train their subordinates to ensure they were implementing and complying with policy to protect

2   the reasonable safety and security of inmates.  (TAC at 29.)  She claims that Defendants failed to

3   train their subordinates not to use restraints as punishment, to use restart chairs only as a "last

4   resort," to use restart chairs only when an inmate is exhibiting threatening behavior, and to never

5   leave restrained inmates unsupervised.  (*Id.*)

6        She also alleges that Defendants failed to properly house and classify inmates to ensure

7   access to indicated mental healthcare, housed Aguilar in the LTRH without valid basis or

8   consideration for his mental well-being, failed to adequately monitor inmates with mental

9   disabilities or behavioral issues, and failed to establish procedures to correct past violations of

10  Aguilar's constitutional rights, by condoning ratifying or encouraging them.  (TAC at 29-30.)

11  Plaintiff alleges that Defendants "knew or should have known" their subordinates were engaging

12  in dangerous practices.  (TAC at 30.)

13       To the extent Plaintiff's supervisory claims are based on the procedures and protocols for

14  dayroom in the LTRH, including the offering of dayroom and the use of the restart chairs, there is

15  no evidence that this policy violated the constitution.  Instead, the evidence shows that the LTRH

16  policy was modeled on an existing unit at another prison, and the use of the restart chairs were an

17  established and effective effort by prison officials to offer dayroom to LTRH inmates.  (DUF ¶¶

18  12, 14-15.)  The restart chairs were not used as punishment or to restrain an inmate when he was

19  acting threatening or agitated.  (DUF ¶¶ 33-35; Lynch Decl. ¶ 15.)  Nor is there evidence that

20  inmates in the LTRH were left "unsupervised."  A control booth officer was tasked with

21  observing the inmates in dayroom from his elevated position, while officers and staff were

22  frequently entering the units to provide food, medication, and escorts, and to conduct twice-

23  hourly welfare checks of every inmate in the unit.  (DUF ¶¶ 27-30.)  The evidence demonstrates

24  that the officers were not leaving inmates unsupervised, and there is no evidence that Lynch,

25  Baker, Calderon, or Saavedra knew inmates were being left unsupervised.

26       There is similarly no evidence that Aguilar was inappropriately housed in the LTRH.  The

27  LTRH was specifically designed to house inmates who required a CCCMS level of care, but had

28  been sentenced to a SHU term for a disciplinary violation.  (DUF ¶ 12.)  Aguilar's mental health

19

1    care level was CCCMS during the relevant time frame, and he was serving a SHU term, so he

2    was required to be placed in the LTRH.  (DUF ¶ 13.)  Despite the allegations in the complaint,

3    there is no evidence that Aguilar was improperly housed, as his case factors, disciplinary

4    conviction, and mental health level of care made him appropriate for the LTRH.  (DUF ¶¶ 12-13.)

5    And despite claims that Aguilar's mental health would deteriorate in the LTRH, the evidence

6    shows that this was a unit specifically designed to accommodate the needs of inmates with

7    CCCMS levels of care, such as Aguilar.  (DUF ¶¶ 12.)

8        Setting aside the allegations that Baker was involved in a conspiracy, which is a separate

9    claim, there is no evidence that any supervisor knew of any constitutional violations occurring in

10   the policies and operation of the LTRH and failed to prevent them as the LTRH unit was

11   specifically designed to house inmates like Aguilar, and the restart chairs were employed not as

12   punishment, but as an enhanced security measure to allow the inmates to participate in the out-of-

13   cell time they were legally entitled to.  Accordingly, the Court should dismiss the Fifth Cause of

14   Action as to Defendants Lynch, Calderon, and Saavedra. And the Court should dismiss the Fifth

15   Cause of Action as to Baker to the extent it is based upon the policies and procedures of the unit,

16   and not upon the purported conspiracy with the inmates.

17   **V.    THE CONDUCT OF DEFENDANTS DOES NOT "SHOCK THE CONSCIENCE," AND THE
         EVIDENCE DOES NOT SHOW THAT THEY ACTED "WITH A PURPOSE TO HARM
18       UNRELATED TO LEGITIMATE LAW ENFORCEMENT OBJECTIVES" (SIXTH CAUSE OF
         ACTION).**

19
20       **A.    Standard for Substantive Due Process Under the Fourteenth Amendment**

21       Parents and children may assert Fourteenth Amendment substantive due process claims if

22   they are deprived of their liberty interest in the companionship and society of their incarcerated

23   child or parent through official conduct.  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

24   Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as

25   a violation of due process.  *Porter v. Osborne*, 546 F.3d 1131, 1137 (9th Cir. 2008).  In

26   determining whether conduct shocks the conscience, the court must first ask "whether the

27   circumstances are such that actual deliberation [by the officer] is practical."  *Id.* at 1137 (quoting

28   *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation

20

1    marks omitted)).  Where actual deliberation is practical, then an officer's "deliberate

2    indifference" may suffice to shock the conscience.  *Id.*  On the other hand, where a law

3    enforcement officer makes a judgment call in an escalating situation, his conduct may only be

4    found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law

5    enforcement objectives.  *Id.* at 1140.  In *Porter,* the Ninth Circuit found that actual deliberation

6    was not practical where a five-minute altercation between the officers and victim evolved quickly

7    and forced the officers to make "repeated split-second decisions."  *Id.* at 1139.  The court noted

8    that "deliberation" should not be interpreted in the narrow, technical sense, reasoning that the

9    Supreme Court had rejected the deliberate indifference standard even in cases where an officer

10   giving chase could have deliberated while pursuing the suspect.  *Id.* at 1139-40.  Instead, the

11   heightened purpose-to-harm standard applies where a suspect's evasive actions force the officers

12   to act quickly.  *Id.* at 1140.

13       **B.    Defendants Were Not Deliberately Indifferent, but Took Reasonable**
            **Measures to Ensure Aguilar's Safety Leading Up to the December 12,**
14          **2019, Incident.**

15          As discussed in detail above, the evidence in this case does not show that Defendants were

16   deliberately indifferent to a substantial risk to Aguilar's safety, but instead took reasonable

17   measures to address the safety risks present in the challenging LTRH unit, including adapting

18   policies to address risks as they arose.  Based on the then-known circumstances of the October

19   incident, staff acted reasonably as a matter of law in assessing the risk to inmate safety and

20   determining what response to take.

21          There is no evidence that staff knew of an ongoing, substantial risk of serious harm after

22   they responded to the October incident by removing the specifically targeted inmate-victim and

23   implemented additional, heightened-security restraint devices, rather than simply separating

24   Taylor or Rodriguez, which they did not believe would address the risk of them escaping.  The

25   nature of the attack indicated that it was an issue between specific inmates that had been resolved

26   by moving the victim-inmate out of the unit.  (DUF ¶ 50.)  The evidence indicates that, aside

27   from the allegations of direct complicity, staff took reasonable measures to address the risk that

28

21

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294 TLN-JDP)

1    Taylor and Rodriguez could escape restraints and harm another inmate.  Whether other measures,

2    in hindsight, could have been undertaken is purely speculative.

3        **C.    On December 12, 2019, Defendants Made a Judgment Call in an Escalating**
         **Situation Where No "Actual Deliberation" Was Practical.**
4

5        The attack on December 12, 2019, escalated and evolved rapidly, before any actual period

6    of deliberation was practical for any Defendant.  Defendants Calderon, Lieber, and Herrera saw

7    Taylor and Rodriguez escape their restraints, but did not know what their intentions were, and

8    Taylor and Rodriguez had made no indication they were going to hurt Aguilar.  (DUF ¶¶ 61-73.)

9    Taylor first approached the dayroom door, not Aguilar, and Calderon ordered it closed, which

10   was consistent with policy, and reasonable under the circumstances, to avoid facing, and

11   potentially escalating, an unknown threat without proper safety equipment and weapons or any

12   coordinated response.  (DUF ¶ 65.)  When Lieber closed the door, Taylor and Rodriguez

13   suddenly turned and attacked Aguilar.  (DUF ¶¶ 68.)  Lieber immediately began to fire direct

14   impact rounds while staff, including Calderon and Herrera assembled outside.  (DUF ¶¶ 70-73.)

15   Staff made entry as soon as it was safe to do so, securing Taylor and Rodriguez and the scene,

16   and attempting life saving measures on Aguilar.  (DUF ¶¶ 75.)  Defendants had to make split-

17   second decisions based on their training and experience in a rapidly escalating situation where no

18   actual deliberation was practical and their acts were not done with a purpose to harm unrelated to

19   legitimate law enforcement objectives.  Instead, they coordinated response in accordance with

20   established procedures and training for precisely such situations.

21       Further, neither Lynch nor Saavedra were involved in the incident at all.  (DUF ¶¶ 6, 9.)

22   Lynch did not play a role in the day-to-day operation of the unit, and there is no evidence

23   connecting him to the alleged agreement.  (DUF  ¶¶ 6, 76-90.)  Saavedra was on leave for six

24   weeks before the incident and there is no evidence connecting him to an alleged agreement.

25   Chavez was conducting welfare checks in another section, which were required in the unit and

26   served a legitimate law enforcement objective, and did not respond; but had he done so, he would

27   have been faced with the same rapidly escalating situation and procedures for a coordinated

28   response as Calderon, Lieber, and Herrera.

22

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294 TLN-JDP)

1  The conduct of Defendants Lynch, Calderon, Saavedra, Lieber, Herrera, and Chavez did

2  not shock the conscience, and the Court should dismiss with prejudice Plaintiff's Fifth Cause of

3  Action against them.  The Court should similarly dismiss the Fifth Cause of Action against Baker,

4  Sykes, Brennfleck, and Gomez, to the extent they are premised on anything other than the

5  allegations that they participated in or facilitated the attack.

6  **VI.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE NO**
   **CONSTITUTIONAL VIOLATIONS OCCURRED AND IT WOULD NOT HAVE BEEN**
7  **CLEAR TO EVERY REASONABLE OFFICER THAT THEIR CONDUCT WAS**
   **UNCONSTITUTIONAL.**

8  **A.   Standard for Qualified Immunity**

9

10  Qualified immunity shields government officials "from liability for civil damages insofar as

11  their conduct does not violate clearly established statutory or constitutional rights of which a

12  reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The rule

13  permits officials to undertake their responsibilities without fear that they will be held liable in

14  damages for actions that appear reasonable at the time but are later held to violate statutory or

15  constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); *Mattos v. Agarano*, 661

16  F.3d 433, 440 (9th Cir. 2011) (en banc).  Qualified immunity prohibits second-guessing prison

17  officials, even where it is plausible that the situation could have been handled differently.  *See*

18  *Ziglar*, 582 U.S. at 150-51 (stating that qualified immunity gives officials "the breathing room to

19  make reasonable but mistaken judgments").

20  Courts consider, in either order, whether the alleged facts constitute a constitutional

21  violation and whether the constitutional right at issue was "clearly established" at the time of the

22  violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A favorable determination for the

23  defendants on either establishes qualified immunity. *Pearson*, 555 U.S. at 236.  "The proper

24  inquiry focuses on whether 'it would be clear to a reasonable officer that [the defendant's]

25  conduct was unlawful in the situation confronted' … or whether the state of the law [at the

26  relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional.'"

27  *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 731

28  (2002)).  To overcome qualified immunity, "existing precedent must have placed the statutory or

23

1   constitutional question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per

2   curiam) (quoting *al-Kidd*, 563 U.S. at 741).  Plaintiff bears the burden of demonstrating that the

3   constitutional right in question was clearly established at the time officials acted.  *May v.*

4   *Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997).

5          The right at issue must be framed specifically and the focus is "whether the violative nature

6   of *particular* conduct is clearly established," and whether the unlawfulness of the official's

7   conduct was apparent.  *Ziglar*, 582 U.S. 150-151 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308

8   (2015). (emphasis in original).  "To subject officers to any broader liability would be to disrupt

9   the balance that our cases strike between the interest in vindication of citizens' constitutional

10  rights and in public officials' effective performance of their duties.  For then, both as a practical

11  and legal matter, it would be difficult for officials reasonably to anticipate when their conduct

12  may give rise to liability for damages." *Ziglar*, 582 U.S. at 151-52.)  The Court must conduct "an

13  individualized analysis of to determine whether each moving defendant [is] entitled to qualified

14  immunity based on his or her actions." *Cunningham v. Gates*, 229 F.3d 1271, 1282 (9th Cir.

15  2000).  "A court must carefully examine the specific factual allegations against each individual

16  defendant …." *Id.* at 1287.  "[A] district court must decide whether a reasonable public official

17  would know that his or her *specific conduct* violated clearly established rights." *Id.* at 1286-87

18  (emphasis in original).

19          **B.    Reasonable Officers in Defendants' Positions Could Have Believed that**
                    **Defendants' Conduct Was Lawful.**
20

21          Defendants are entitled to qualified immunity from Plaintiff's claims in this case on all but

22  the alleged conspiracy theory.  Courts have repeatedly stressed the wide-ranging deference that

23  must be afforded to prison officials' decisions to preserve order and discipline and maintain

24  security. *Turner v. Safley*, 482 U.S. at 84-85.  The evidence in this case shows that the LTRH

25  policies and procedures, the subsequent security decisions, and staff's response to the incident on

26  December 12, 2019, did not violate clearly established law.  No controlling legal authority, or

27  robust consensus of persuasive authority, would have put every reasonable official in Defendants'

28  position on fair notice that their actions were, beyond debate, unlawful.

24

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294 TLN-JDP)

1

        **1.      It Was Not Clearly Established that Use of the Restart Chairs, or Any Policy or Procedure of the LTRH Was Unlawful.**

2

3        Defendants are entitled to qualified immunity for the use of the restart chairs, as it was not

4  clearly established that restraining an inmate in such a manner to afford him an opportunity to

5  access services violated his constitutional rights.  Rather than being used as punishment, the

6  restart chairs were used as a measure to protect the inmates from harm.  (DUF ¶¶ 32-35.)  LTRH

7  policy required staff to use the restart chairs for out-of-cell activity time, and the evidence shows

8  that staff followed were following policy in providing them dayroom.  (DUF ¶¶ 32.35.)  The

9  LTRH was based upon an existing unit at California State Prison, Corcoran, which also used the

10  restart chairs to offer dayroom to its inmates.  (Lynch Decl. ¶ 14.)  Plaintiff can cite no legal

11  authority that using restart chairs as a safety measure, not as punishment, is unlawful, and in light

12  of the existing unit at California State Prison, Corcoran, a reasonable official in Defendants'

13  position would not have known that such policies violated Aguilar's constitutional rights.

14        To the extent Plaintiff's First, Second, Third, Fifth, and Sixth Causes of action are based

15  upon the contention that the LTRH design or operational policy itself put Aguilar at a substantial

16  risk of harm, as opposed to the alleged intentional participation and involvement of certain

17  Defendants, Defendants are entitled to qualified immunity.  The evidence shows that the LTRH

18  policies and procedures were enacted with input from experienced correctional staff and modeled

19  off an existing unit.  (DUF ¶¶ 12, 14-15; Lynch Decl. ¶ 14.)  The security decisions of

20  correctional officials are entitled to deference.

21        Moreover, while the Third Amended Complaint does not allege or make any mention of

22  cell searches, there is evidence in this case that Green, Taylor, and Rodriguez's cells were not

23  searched consistent with policy.  However, in light of the extensive and multilayered security

24  procedures in the LTRH, there is no evidence that a failure to search Green, Taylor, or

25  Rodriguez's cell exposed Aguilar to a substantial risk of harm when they brought the inmates to

26  the dayroom, as they were subjected to unclothed body and cavity searches, their clothes

27  searched, restrained, scanned with a metal detector, had additional restraints applied, and then

28  were secured to chairs.  (DUF ¶¶ 55-60.)  Defendants took reasonable measures to ensure safety

25

in the dayroom , and it is speculative that the contraband or weapons that were used during the incident would have been found.  Moreover, it is not clearly established that a failure to search cells, especially where other security measures were in place, even in the face of a known threat to an inmate, was a constitutional violation.  *Mendoza v. Diaz*, No. 1:20-cv-01393-KES-CDB, 2024 WL 3276264, at *8 (E.D.Cal. July 12, 2024).  Though not pleaded in the operative complaint, Defendants are entitled to qualified immunity on any claim that failure to search Green's, Taylor's, or Rodriguez's cell violated Aguilar's constitutional rights.

        **2.     It Was Not Cleary Established that Taylor and Rodriguez Were Constitutionally Required to Be Separated or to Be Denied Dayroom After the October 10, 2019, Incident.**

The security decisions of prison officials are entitled to considerable and wide-ranging deference.  *Turner v. Safley*, 482 U.S. at 84-85; *Bell v. Wolfish*, 441 U.S. at 547.  The Courts recognize the "inordinately difficult" task facing prison administrators and should defer to their judgment, expertise, planning, and the commitment of resources.  *Turner*, 482 U.S. at 84.

Here, after Taylor and Rodriguez were able to escape restraints and attack an inmate on October 10, 2019, staff investigated the incident, removed the inmate-victim from the unit, and implemented black boxes to prevent further escapes.  (DUF ¶¶ 48-54.)  Whether or not other options may have been available to address the incident, the evidence shows that staff made a considered judgment call to address the risk posed.  (DUF ¶¶ 48-54.)  There is no consensus of case law that requires inmates to be separated after an incident they commit together, that staff was constitutionally required to rehouse Taylor or Rodriguez in different cells or units, or to deny them legally and policy-mandated dayroom.

Even housing inmates who pose a known and identified risk to another inmate in the same administrative segregation unit where they would be escorted to recreational yard together in restraints, and where the two inmates attacked the at-risk inmate during the escort, is not deliberately indifferent.  *Hahn v. Murphy*, No. CV 07-1153-SVW-MAN, 2011 WL 9378180, at *7-10, 21 (C.D. Cal. Sept. 23, 2011).  There, despite an official knowing that the two inmates had a reason to hurt the third, the Court found that housing the two inmate-assailants in the same area as the inmate-plaintiff did not pose a substantial risk of harm to the plaintiff because the plaintiff

26

1    was on a cell-alone, recreation-alone status in administrative segregation, and there was "no risk

2    that he would encounter [the inmates] in an unsupervised setting." *Id.* at *21. "[T]he risk – that

3    [the inmate-assailant] would be able to slip off his handcuff, get away from his escorting officer,

4    and attack plaintiff – was far from obvious; indeed plaintiff himself maintains that [the inmate-

5    assailant] was only able to do so with the help of [a defendant-officer]." *Id.*

6         Here, there was no known threat to Aguilar, aside from those alleged to be involved in the

7    conspiracy, but even had there been, it was not clearly established that keeping Taylor and

8    Rodriguez in the LTRH after the October 10, 2019, incident, violated the constitution.

9    Accordingly, Defendants are entitled to qualified immunity as to Causes of Action One, Two, and

10   Three to the extent they are based on a failure to take different action after the incident on

11   October 10, 2019, including rehousing Taylor or Rodriguez, or denying them future dayroom

12   activity time.

13             **3.**    **It Was Not Clearly Established that a Control Booth Officer Must**
                    **Use Lethal Force When Responding to an Inmate Stabbing.**

14

15        Similarly, there is no consensus of case law that a control booth officer, or any officer, must

16   use lethal force when responding to an incident of inmate violence, even where there exists the

17   threat of great bodily injury or death. While officers are certainly *authorized* to use deadly force

18   in circumstances such as those on December 12, 2019, policy does not *require* the officer to use

19   force, but instead mandates that an officer assess all of the surrounding circumstances and risks,

20   and assess the appropriate force option for those circumstances. (DUF ¶¶ 36-43.) No such

21   bright-line requirement exists because it would contravene the well-established principle that the

22   safety and security decisions of prison officials must be afforded great deference. A multitude of

23   variables could exist in any violent situation in prison which could change an officer's response

24   and make lethal force inappropriate or unjustified. It was not clearly established that Lieber's use

25   of the 40-millimeter instead of the Mini-14 was constitutionally deficient, and the Court should

26   grant qualified immunity on that ground.

27

28

1

**4.     It Was Not Clearly Established that Defendants Were Required to**
**Enter the Dayroom While Taylor and Rodriguez Were Unrestrained**
**and Armed.**

2

3          Nor does the constitution require officers to put their own lives in danger to protect an

4    inmate.  In *Hahn v. Murphy*, discussed above, an inmate was attacked in administrative

5    segregation by another inmate when he escaped restraints with the alleged help of a guard.  *Hahn*

6    *v. Murphy*, 2011 WL 9378180, at *10-12.  The escorting officers requested backup on the prison

7    radio, and two of the three did not immediately intervene into the fight because they saw a metal

8    object in the inmate-assailant's hand and thought it was a weapon.  *Id.*  However, the third

9    escorting officer grabbed the assailant from behind and pulled him to the ground.  *Id.*  The Court

10   granted summary judgment to the officers who watched the attack and did not immediately

11   intervene, finding an unarmed prison official has no constitutional obligation to intervene in an

12   armed assault on an inmate when doing so would endanger his own safety."  *Id.* at 26-27.  The

13   Court found true as a general proposition that "when officers witness an inmate-on-inmate

14   assault, the failure to intervene may be justified if their response is in line with the prison's policy

15   for responding to an attack."  *Id.* at 27.  The Court noted, "[o]fficers who respond to an inmate

16   fight by immediately requesting backup are generally not deemed deliberately indifferent."  *Id.*

17   And where one officer knows another officer has made a call for backup, there is no need for him

18   to duplicate those efforts.  *Id.  See also Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)

19   ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon

20   another when intervention would place the guards in danger of physical harm.")  *Winfield v. Bass*,

21   106 F.3d 525, 532 (4th Cir. 1997) ("[A]ll of the authority of which we are aware leads to the

22   conclusion that such heroic measures are not constitutionally required.")

23          Defendants responded to the incident according to unit policy, which dictated against

24   rushed entries into unknown and potentially violent situations, by assembling at the door,

25   ordering it closed when Taylor approached, and then waiting until it was safe to enter the unit

26   while Lieber fired multiple rounds at Taylor and Rodriguez.  (DUF ¶¶ 61-75.)  There is no

27   consensus of case law that required them to enter the unit immediately, and the officers are

28   entitled to qualified immunity for their response to the December 12, 2019, incident.

1    The Court should grant qualified immunity to all Defendants on all claims except as to

2    Defendants Baker, Brennfleck, Gomez, and Sykes to the extent their liability is premised on

3    Plaintiff's alternatively pleaded conspiracy theory.

4                                        **CONCLUSION**

5        Defendants were tasked with the unenviable task of keeping dangerous men safe, while still

6    providing them access to activities, services, and programming they were entitled to.  The LTRH

7    was specifically designed to address the challenges and unique needs of mentally ill inmates with

8    disciplinary problems, and the unit policies and procedures, including the use of the restart chairs

9    and dayroom procedures, and the steps officers took to address escapes and to maintain order in

10   the prison as incidents occurred, were reasonable as a matter of law and appropriate under the

11   circumstances.  And there is no evidence that Defendants were deliberately indifferent to

12   Aguilar's safety, failed to protect or intervene on his behalf, or in any way violated his

13   constitutional rights.  There is no evidence that the unit policy, or any actions of the Defendants

14   violated Aguilar's constitutional rights, and the Court should dismiss those defendants and any

15   claims that the unit policy itself violated the Constitution.

16       The only triable issues in this case come down to a dispute over inmates Green's and

17   Rodriguez's belated allegations that certain, but not all, staff members assisted them in escaping

18   restraints to kill Aguilar, not whether the policy governing the unit or execution of that policy was

19   constitutionally deficient.  Defendants are additionally entitled to qualified immunity on all but

20   the alleged conspiracy theory, because reasonable officials in their position could have believed

21   their conduct to conform to the constitution.

22       The Court should dismiss all claims against Defendants Lynch, Calderon, Saavedra, Lieber,

23   Herrera, and Chavez as well as all claims against Defendants Baker, Sykes, Gomez, and

24   Brennfleck to the extent they are based on any theory other than the conspiracy alleged by

25   inmates Green and Rodriguez.

26

27

28

1    Dated:  January 23, 2025                    Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California
3                                                JON S. ALLIN
                                                 Supervising Deputy Attorney General

4

5

6                                                */s/ David E. Kuchinsky*
                                                 DAVID E. KUCHINSKY
7                                                Deputy Attorney General
                                                 *Attorneys for Defendants J. Lynch,*
8                                                *D. Garland, M. Jordan, W. Lieber,*
                                                 *H. Chavez, D. Sykes, J. Gomez,*
9                                                *J. Carothers, D. Calderon, E. Baker,*
                                                 *G. Herrera, M. Saavedra, and P. Brennfleck*

10

11
     SA2022300303
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mem. P. & A. in Supp. of Defs' Mot. for Summ. J.  (2:21-cv-02294 TLN-JDP)