ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
 Telephone:  (916) 210-7666
 Facsimile:  (916) 324-5205
 E-mail: David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants J. Lynch, D. Garland,
M. Jordan, W. Lieber, H. Chavez, D. Sykes,
J. Gomez, J. Carothers, D. Calderon, E. Baker,
G. Herrera, M. Saavedra, and P. Brennfleck*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **MA ROSARIO BUENO ZARAGOZA**, an individual; **ESTATE OF LUIS GIOVANNY AGUILAR**, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza, <br><br> Plaintiffs, <br><br> v. <br><br> **JEFFREY W. LYNCH**, an individual, and **DOES 1 through 30**, inclusive, <br><br> Defendants. | Case No. 2:21-cv-02294 TLN-JDP <br><br> **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  May 15, 2025 <br> Time:  2:00 p.m. <br> Dept:  2 (15th Floor) <br> Judge:  Hon. Troy L. Nunley <br> Trial Date: To Be Determined. <br> Action Filed: 12/10/2021 |

Defendants Lynch, Lieber, Chavez, Sykes, Gomez, Calderon, Baker, Herrera, Saavedra, and Brennfleck submit the following undisputed facts in support of their motion for summary judgment. Defendants reserve the right to present additional or contrary facts in subsequent proceedings or at trial.

I.  **BACKGROUND, PARTIES, AND CLAIMS.**

1. On December 12, 2019, Luis Aguilar, an inmate in the custody of the California Department of Corrections and Rehabilitations (CDCR) was murdered by two other inmates,

1

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

1. Cody Taylor and Anthony Rodriguez, with the help of another inmate Deon Green, while all four were housed at California State Prison, Sacramento, in a security housing unit (SHU) known as the Long Term Restricted Housing (LTRH) unit. (Third Amended Complaint (TAC) at 1, 7-8, ECF No. 33.)

2. Plaintiff Ma Rosario Bueno Zaragoza, Aguilar's mother, brings this action for herself and on behalf of Aguilar's estate, as his successor-in-interest, under 42 U.S.C. § 1983, alleging that the actions of Defendants violated federal law.[1] (TAC at 1, 3-4.)

3. Plaintiff alleges on behalf of Aguilar that Defendants Lieber, Chavez, Sykes, Gomez, Baker, Saavedra, Calderon, Brennfleck, and Herrera failed to protect Aguilar, failed to intervene during the incident on December 12, 2019, inflicted cruel and unusual punishment against Aguilar, used excessive force against Aguilar, and participated in a conspiracy to violate Aguilar's constitutional rights, in violation of the Eighth Amendment. (TAC at 15-27, 35-38.)

4. Plaintiff further alleges on behalf of Aguilar that Defendants Lynch, Baker, Calderon, and Saavedra failed to train and supervise their subordinates and failed to prevent them from engaging in unconstitutional practices of using a restraint chair in the unit. (TAC at 27-32.)

5. Plaintiff alleges that all Defendants interfered with and deprived her of her familial relationship with Aguilar in violation of the Fourteenth Amendment. (TAC at 33-35.)

6. Defendant Lynch was employed by CDCR during the relevant time frame as the warden of California State Prison, Sacramento, and was responsible for general oversight and policy decisions of California State Prison, Sacramento, developing and approving policies and procedures in order to execute housing-unit and staffing directives from headquarters, but was not involved in in the day-to-day implementation and execution of that policy, which was delegated to qualified staff members. (Lynch Decl. ¶¶ 2-4.)

7. Defendant Baker was employed by CDCR during the relevant time frame as a lieutenant assigned to the LTRH and was responsible for oversight of B Facility, including supervision of staff members and inmates, responding to incidents, acting as incident commander

---

[1] Plaintiff brings no state-law causes of action. (TAC at 1-40.)

2

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

when incidents occurred, reviewing incident reports, evaluating staff responses, and ensuring staff followed and acted in accordance with policy. (Baker Decl. ¶ 15; TAC at 5.)

8. Defendant Calderon was employed by CDCR during the relevant time frame as a sergeant assigned to the LTRH and was responsible for coordinating the day-to-day activities of the B-8 LTRH unit; supervising other Facility B officers as they carried out their respective duties; and completing other administrative duties, such as responding to inmate grievances. (Calderon Decl. ¶ 3; TAC at 5-6.)

9. Defendant Saavedra was employed by CDCR during the relevant time frame as a sergeant assigned to the LTRH, but was on extended leave from November 1, 2019, until January 14, 2020, and was not present for and did not play any role in the December 12, 2019, incident, and did not have any knowledge or reason to know that Aguilar faced any risk of harm on December 12, 2019. (Saavedra Decl. ¶¶ 2-3, 5-10, TAC at 5.)

10. Defendant Lieber was employed by CDCR during the relevant time frame as a correctional officer assigned to the control booth in a different facility of California State Prison, Sacramento, but was working in the LTRH on December 12, 2019, and was responsible for providing gun coverage for all staff in the housing unit or section; controlling all cell and sallyport doors of the section; keeping updated on the daily movement changes in custody, job assignments, cell placement, and changes in assignment hours and work releases; and confirming ducats prior to releasing or allowing access of inmates to different areas of the prison. (Lieber Decl. ¶ 4; TAC at 4.)

11. Defendants Brennfleck, Sykes, Herrera, Gomez, and Chavez were employed by CDCR during the relevant time frame as correctional officers assigned to the LTRH on December 12, 2019, and were responsible for supervising inmates, maintaining order, searching and escorting inmates to programming, services, and activities, providing meals to inmates at their cells, conducting half-hourly welfare checks on each inmate, and responding to and documenting incidents of violence and disruption. (Brennfleck Decl. ¶ 2; Sykes Decl. ¶ 2; Herrera Decl. ¶ 2; Gomez Decl. ¶ 2; Chavez Decl. ¶ 2; TAC at 4-5, 6.)

3

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.  (2:21-cv-02294 TLN-JDP)

## II.   THE LONG TERM RESTRICTED HOUSING UNIT.

12.   The LTRH unit was an security housing unit that was activated at California State Prison, Sacramento, on September 19, 2019, and was designed to house inmates who had committed a disciplinary violation while in prison and had been sentenced to serve a SHU term, but who were diagnosed with psychiatric disorders and required mental health care services on an outpatient basis at a level of care known as CCCMS, or Correctional Clinical Case Management System.   (Lynch Decl. ¶ 5; Baker Decl. ¶ 16.)

13.   Aguilar was appropriately housed in the LTRH on December 12, 2019, because he was serving a SHU term from January 2018, and he was designated as a CCCMS level of care inmate.  (Lynch Decl. ¶ 17; Baker Decl. ¶ 35.)

14.   California State Prison, Sacramento received a directive from CDCR headquarters to open the LTRH program, including the specific number and classifications of officers that were to be assigned to work the unit, and to develop an operational policy to effectively manage the unit and offer programming consistent with the needs of that inmate population.  (Lynch Decl. ¶ 5-8 Ex. A; Baker Decl. ¶ 17.)

15.   Staff at California State Prison, California, did not have control over the staffing or procedures of the LTRH, and were required to follow policy and run the LTRH according to the procedures outlined in Operational Procedure 046.  (Lynch Decl. ¶ 8; Baker Decl. ¶ 17.)

16.   The LTRH was located in B-Facility, Building 8, which was divided into three sections, that each had two levels or "tiers" of ten cells, and housed between twenty and forty inmates.  (Baker Decl. ¶ 18.)

17.   One officer was assigned to the control booth of Building 8, four officers were assigned to the floor, and a sergeant was on duty for each eight-hour shift or "watch" each day, while a lieutenant was assigned to supervise the entire B Facility, including the LTRH.  (Baker Decl. ¶ 20.)

18.   The control booth officer was assigned to monitor the three sections in Building 8 from the control booth, an elevated room with windows looking out into each section, which had a control panel that had buttons to open and close each of the doors into the building, the doors

4

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

into each section, the pocket doors between each section, and each individual cell door. (Baker Decl. ¶ 19.)

19. Officers on the floor of the LTRH could not open or close the section doors on their own, but instead depended on the control booth officer. (Baker Decl. ¶ 19.)

20. The control booth officer was responsible for monitoring all three sections at once, including opening and closing doors for officers, providing gun coverage during searches and escorts, and monitoring staff who were inside the sections conducting twice-hourly welfare checks of every single-cell, providing meals to inmates in their cells, passing out medication and supplies, and preparing inmates for escorts to other areas. (Baker Decl. ¶ 20.)

21. The control booth officer had access to two single-shot weapons in the control booth: a less- lethal 40-millimeter direct impact launcher and a Ruger Mini-14 rifle, which was considered deadly or lethal force. (Baker Decl. ¶ 20; Lieber Decl. ¶ 9.)

22. The control booth officer also had access to additional weapons in the booth, which could be lowered down to officers on the floor through portholes in the control booth in the event of an emergency. (Baker Decl. ¶ 20.)

23. The floor officers in the LTRH were responsible for supervising and managing the inmates and activities in the unit, searching, restraining, and escorting inmates to and from programming, activities, and appointments, including medical appointments, the law library, yard time, and out-of-cell dayroom time, and were armed with pepper spray, an eighteen inch expandable baton, and a stab resistant vest that covered the torso, but not the head, neck, armpits, or anywhere below the waist. (Baker Decl. ¶ 21; Brennfleck Decl. ¶ 2; Sykes Decl. ¶ 2; Gomez Decl. ¶ 2; Herrera Decl. ¶ 2; Chavez Decl. ¶ 2.)

24. The sergeants in the LTRH were responsible for oversight of correctional officers in the unit, including ensuring that search and restraint procedures were followed, that programming ran on time and services were offered to the inmates pursuant to policy, responded to incidents in the unit, and provided additional supervision during the dayroom search, escort, and restraint procedure. (Baker Decl. ¶ 22; Calderon Decl. ¶ 3; Saavedra Decl. ¶ 3.)

5

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

25. The lieutenant was responsible for supervising B-Facility Buildings 7 and 8, worked primarily in the B PSU Treatment Facility about a quarter mile from the LTRH, conducted walkthroughs of the LTRH on a daily basis, and spoke to staff and inmates to ensure all programming was scheduled to run according to plan, as well as to regularly communicate with the inmates to anticipate and address issues that arose to minimize incidents of inmates resorting to violence or disruption. (Baker Decl. ¶¶ 23-24.)

26. Before leaving his cell in the LTRH, an inmate first had to submit to an unclothed body and cavity search, application of restraints, and a search with a metal detector, and was required to be escorted by at least two correctional officers to any programming, service, or activity. (Lynch Decl. ¶ 9 & Ex. A; Baker Decl. ¶ 27.)

27. Staff in the LTRH was required to enter the sections on a continuous basis throughout each shift to conduct welfare and security checks of each inmate in each cell in the LTRH twice an hour and no more than every thirty-five minutes between checks, which included walking up to each cell, visually or physically observing a living, breathing inmate free from obvious danger, and logging each welfare check with an electronic device. (Lynch Decl. ¶ 10; Baker Decl. ¶ 28.)

28. Inmates in the LTRH received all of their meals and medication in their cells and were permitted to have personal property in their cells, including food, books and writing materials, legal property, and appliances, such as televisions, antennas, and radios. (Lynch Decl. ¶ 11; Baker Decl. ¶ 29.)

29. Non-custody staff members, such as medical and mental health personnel, education and vocational staff, and law library staff, entered the sections several times throughout a shift, and were required to be escorted by LTRH custody staff at all times while inside one of the sections. (Lynch Decl. ¶ 12; Baker Decl. ¶ 30.)

30. Inmates in the LTRH were offered a minimum of ten hours of yard time per week, which was conducted in individual caged areas, as well as weekly access to the law library and to therapeutic group activities, and were subject to the same search and restraint procedure that applied to all out-of-cell inmate movement. (Lynch Decl. ¶ 13; Baker Decl. ¶ 31.)

6

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

31. Inmates in the LTRH were required to be offered at least three and a half hours per week of out-of-cell activity in the LTRH dayroom area. (Lynch Decl. ¶ 14; Baker Decl. ¶ 32.)

32. Dayroom was offered on a voluntary basis; staff members asked each inmate whether they wanted to be brought out to the dayroom that day; inmates could refuse or request to be brought back to their cells at any time during the out-of-cell activity time; and staff did not have a list or know ahead of time which inmates would go to dayroom on a given day, but instead would ask each inmate along the tier whether they wanted to go out to dayroom that day. (Baker Decl. ¶ 32.)

33. Inmates who chose to attend dayroom were subjected to an unclothed body search, restrained, searched with a metal detector, and escorted down to the dayroom floor where they were secured in "restart chairs," metal desks which were bolted to the floor, with plexiglass dividers and restraint devices to secure the inmates to the chairs. (Baker Decl. ¶ 33.)

34. Inmates were secured to the "restart chairs" by a metal bar that locked around their leg restraints, and officers were trained and refreshed often on how to apply the restraints to the inmate, and on how to secure the inmate to the restart chairs. (Baker Decl. ¶ 34.)

35. Use of the restart chairs was approved and mandated, and the unit was required to use them when offering inmates the mandatory out-of-cell time they were entitled to. (Lynch Decl. ¶ 15; Baker Decl. ¶ 33.)

### III. USE OF FORCE AND ALARM RESPONSE POLICY AND TRAINING IN THE LTRH.

36. CDCR's use-of-force policy requires staff to accomplish departmental functions with minimal reliance on the use of force and staff is trained to use only reasonable force, which is the force that an objective, trained, and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance. (Baker Decl. ¶ 5; Diaz Report at p. 22.)

37. CDCR employees are only permitted to use lethal or deadly force under the following circumstances: (1) Defend the employee or other persons from an imminent threat of death or GBI; (2) Apprehend a fleeing person for any felony that threatened or resulted in death or great bodily injury (GBI), if the officer reasonably believes that the person will cause death or GBI to

7

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts; and (3) Dispose of seriously injured or dangerous animals when no other disposition is practical.  (Baker Decl. ¶ 7; Cal. Code Regs. tit. 15, § 3268.)

38.   Staff are trained to assess the totality of the circumstances to make their own determination in each of these situations of what force is reasonable; however, they cannot use lethal force if they only have a suspicion that an inmate might harm another inmate, or if an inmate has harmed another inmate in the past, but staff must observe an imminent threat of great bodily injury or death to justify the use of deadly force.  (Baker Decl. ¶ 7.)

39.   Use of deadly force when it is not justified is a terminable offense in CDCR and could result in a criminal charge, and staff would never be permitted to use lethal force on an unarmed inmate who is running away from officers and other inmates, even if that inmate has committed substantial acts of violence in the past.  (Baker Decl. ¶ 7.)

40.   CDCR staff have access to various use-of-force options, including chemical agents, hand-held batons, physical strength and holds, less-lethal weapons, including the 40-millimeter direct impact launcher, and lethal weapons, such as the Mini-14 rifle, and are trained that use-of-force options do not have to be used in any particular sequence, but that they should use the option they reasonably believe is sufficient.  (Baker Decl. ¶ 6.)

41.   When determining whether to fire a Mini-14 rifle, or other lethal weapon, staff are taught to assess their target, their backstop, and beyond, to assess the likelihood that they will hit their target or others around the target, what is located directly behind the target, such as other inmates or cells, and what is beyond the backstop, and to consider whether they have the ability to use lethal force without hitting the victim, or whether less-lethal rounds would be more appropriate, such as in situations where multiple inmates are attacking one victim and the victim is very likely to be struck by the lethal round, or where bystanders are likely to be harmed by the use of deadly force.  (Baker Decl. ¶ 6; Diaz Report at p. 34.)

8

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

42. Even where lethal or deadly force can be justified, there is no policy, procedure, or training that mandates that an officer must use lethal force in any given situation, as incidents in the prison setting often develop rapidly and without the opportunity to spend time deliberating about a course of action, so officers must use their training and experience to make judgment calls in the moment, based on the information they have available to them at that time. (Baker Decl. ¶ 8.)

43. No policy in CDCR dictates exactly which force option must be used in a given situation, as each and every situation presents unique challenges and variables that have to be taken into account, and officers are trained to assess each incident independently and in an ongoing fashion using an "OODA Loop" in which they observe the incident, orient themselves to the situation, decide on a course of action, and act, often times repeating the OODA loop dozens of times in very short incidents as they assess and reassess potential threats, attempt to interpret the erratic and unpredictable behavior of inmates, and determine when it is safe and effective to use force or respond in another fashion. (Baker Decl. ¶ 9.)

44. Staff are not extensively trained to engage in hand-to-hand or weapons-based combat with inmates, but instead to use the force option that will be effective while maintaining maximum distance from the threat, ensuring their own safety so that they are not injured or taken hostage during an incident response, which would increase the danger of potential harm. (Baker Decl. ¶ 10.)

45. Staff are trained never to rush toward an unknown or potentially violent situation, especially in security housing units, where staff are trained not to enter the dayrooms or tiers when inmates are unrestrained or armed until a tactical plan is established and it is safe to execute, as entering a security housing unit when inmates are unrestrained exposes staff to danger, and prevents the control booth officer from using his 40-millimeter launcher or Mini-14 to quell an incident from a safe distance, prevents the use of chemical munitions to quell an incident, as the officer who entered the dayroom would likely be exposed to the effects and be unable to defend himself, and increase the overall response time. (Baker Decl. ¶ 11.)

46. Staff are not trained to engage in physical combat with unrestrained, armed inmates, especially in the LTRH, where the inmate's mental health may be playing a substantial role in the incident, and they are very frequently erratic and unpredictable. (Baker Decl. ¶ 12.)

47. When staff make entry into a security housing unit to respond to a violent incident, the first priority, even if there is an injured victim, is to secure the inmate-assailants and ensure they do not have any other weapons that could be used to injure staff or other inmates, because if inmates have access to additional weapons, or are left unrestrained near weapons, they could resume their attack against the victim or staff. (Baker Decl. ¶ 13.)

## IV. THE OCTOBER 10, 2019, INCIDENT, AND INSTALLATION OF BLACK BOXES.

48. On October 10, 2019, inmates Cody Taylor and Anthony Rodriguez were participating in out-of-cell time in the dayroom when they were able to escape their restraints and stab a non-party inmate who was still in a restraint chair in the dayroom. (Lynch Decl. ¶ 19; Baker Decl. ¶ 36; Saavedra Decl. ¶ 4; Brennfleck Decl. ¶ 4; Gomez Decl. ¶ 4; TAC at 8.)

49. Defendants Baker, Saavedra, Brennfleck, Gomez, and other non-party custody staff assembled outside the LTRH dayroom while a non-party control booth officer fired multiple less-lethal direct impact rounds, intermittently striking Taylor and Rodriguez and ending the attack. (Baker Decl. ¶ 36; Saavedra Decl. ¶ 4; Brennfleck Decl. ¶ 4; Gomez Decl. ¶ 4; TAC at 8.)

50. After the incident, Green stated he had ordered the attack on the other inmate because of a previous incident between the two of them, and the other inmate was removed from the building to avoid any further issues. (Baker Decl. ¶¶ 38, 43.)

51. After the October 10, 2019, incident, staff did not know how Taylor and Rodriguez escaped their restraints but believed they most likely used inmate-manufactured picks and shims to access the keyhole on the restraints and unlock them. (Baker Decl. ¶ 39; Calderon Decl. ¶ 10; Saavedra Decl. ¶ 4.)

52. Black boxes are hard plastic or metal devices that close and lock over the keyhole to the restraints once they have been secured on the inmate, preventing access to the keyhole and that method of defeating the "double-locking mechanism." (Baker Decl. ¶ 39-41; Sanchez Report at pp. 11-13.)

53. Black boxes are frequently used and relied upon in correctional settings, often to transport inmates in public settings, such as to medical appointments or court appearances. (Baker Decl. ¶ 41; Sanchez report at pp. 11-13.)

54. Implementation of the black boxes was a reasonable and proactive response, consistent with established statewide law enforcement practices, to the risk posed by securing inmates in the dayroom chairs when Taylor and Rodriguez had previously escaped restraints without the black boxes. (Sanchez Report at p. 13; Clark Dep. 150:13-152:17.)

**V.   THE DECEMBER 12, 2019, MURDER.**

55. On the day of December 12, 2019, there is no evidence Defendants Lynch, Calderon, Saavedra, Lieber, Herrera, or Chavez knew that Aguilar was in danger from Taylor or Rodriguez, as they had not received any complaints or reports of issues between them, and none of the inmates, including Aguilar, had expressed any safety or security concerns. (Lynch Decl. ¶¶ 17-23; Calderon Decl. ¶ 9; Saavedra Decl. ¶¶ 6-8; Leiber Decl. ¶¶ 6-7; Herrera Decl. ¶ 3; Chavez Decl. ¶ 4.)

56. On December 12, 2019, at approximately 10:00 a.m., Defendants Calderon, Brennfleck, Sykes, Herrera, and Gomez brought Aguilar, Taylor, and Rodriguez, out to the dayroom of the LTRH for regularly scheduled out-of-cell time after following unit procedure of asking each inmate on the tier whether they wanted to attend dayroom. (Lieber Decl. ¶ 8-10; Calderon Decl. ¶ 11; Brennfleck Decl. ¶¶ 5-9; Sykes Decl. ¶¶ 4-8; Herrera Decl. ¶¶ 4-10; Gomez Decl. ¶¶ 5-6.)

57. Defendants Brennfleck, Sykes, and Herrera participated in conducting, and Calderon Supervised, an unclothed body and cavity search of Aguilar when he was still in his cell, securing him in restraints, checking Aguilar with a metal detector, and escorting him to the dayroom floor, where Gomez applied the black boxes to his leg restraints, and then Aguilar was restrained to one of the restart chairs on the dayroom floor as Lieber, who was in the control booth, provided coverage with his 40-millimeter direct impact launcher while continuing to observe the three sections of the B8 building. (Lieber Decl. ¶¶ 9-10; Calderon Decl. ¶ 11; Sykes Decl. ¶¶ 6-7; Brennfleck Decl. ¶¶ 7-8; Gomez Decl. ¶ 5; Herrera Decl. ¶¶ 4-8.)

11

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

58. Defendants Calderon, Brennfleck, Sykes, Herrera, and Gomez then repeated this process with Taylor and then with Rodriguez: searched them while they were in their cells, secured them in restraints, checked them with the metal detectors, escorted them to the dayroom floor, applied the black boxes to their leg restraints, and then restrained them to the restart chairs on the dayroom floor. (Lieber Decl. ¶¶ 9-10; Calderon Decl. ¶ 11; Sykes Decl. ¶ 7; Brennfleck Decl. ¶¶ 6-9; Gomez Decl. ¶ 5; Herrera Decl. ¶¶ 4-8.)

59. During the search, escort, and restraint process, Aguilar did not express any safety concerns to staff about Taylor, Rodriguez, or any other inmate, and there did not appear to be any hostility by Taylor or Rodriguez toward Aguilar or any indication that they were going to attack Aguilar. (Herrera Decl. ¶ 3.)

60. Once all three inmates were secured in their chairs, Defendants Calderon, Brennfleck, Sykes, Herrera, and Gomez exited the dayroom and Lieber closed the section door. (Lieber Decl. ¶ 10; Calderon Decl. ¶ 12; Sykes Decl. ¶ 8; Brennfleck Decl. ¶ 9; Gomez Decl. ¶ 5; Herrera Decl. ¶ 8.)

61. Lieber looked back into B-section through the control booth window, saw Taylor and Rodriguez manipulating their restraints, immediately notified floor staff through ports on the control booth floor a few feet from the control panel, and then returned to the control panel and saw that Taylor and Rodriguez had escaped their restraints and were out of their chairs, and Rodriguez ascended the stairs to the second tier while Taylor stood on the stairs below. (Lieber Decl. ¶¶ 11-12.)

62. Calderon was talking to Sykes in the rotunda area of the building when he looked into the LTRH dayroom and saw that Taylor and Rodriguez were out of their restraints, that Taylor was on the stairwell, and Rodriguez was heading up to the second tier, so he immediately notified the other officers in the unit and returned to the rotunda window with the other staff, including Sykes, Herrera, Brennfleck, and Gomez to assess the situation and prepare to respond. (Calderon Decl. ¶ 14; Sykes Decl. ¶ 9; Brennfleck Decl. ¶ 10; Gomez Decl. ¶ 6; Herrera Decl. ¶ 9.)

12

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

63. When Taylor and Rodriguez escaped from their restraints, Aguilar did not call for help or make any statement or physical indication he believed he was about to be attacked. (Lieber Decl. ¶ 12; Herrera Decl. ¶ 9.)

64. Rodriguez reached the second tier, retrieved an object from beneath the second-tier cell occupied by inmate Deon Green, and then ran back down the stairs towards Taylor, who had waited on the stairwell. (Lieber Decl. ¶¶ 11-12; Calderon Decl. ¶14; Sykes Decl. ¶ 9; Gomez Decl. ¶ X; Herrera Decl. ¶ 9.)

65. Lieber began to open the section door to allow staff to enter the dayroom, but Taylor began to move in an aggressive manner toward the section door, so Calderon shouted to Lieber to close the door and Lieber immediately did so. (Lieber Decl. ¶ 12; Calderon Decl. ¶¶ 14-15.)

66. At the point that Taylor and Rodriguez returned to the dayroom floor, Defendants Calderon, Lieber, and Herrera did not know that Taylor and Rodriguez intended to attack Aguilar, and did not know whether Aguilar was also free of his restraints or working with Taylor and Rodriguez in the incident. (Lieber Decl. ¶ 12; Calderon Decl. ¶¶ 14-16; Herrera Decl. ¶ 9.)

67. When Taylor and Rodriguez returned to the dayroom floor, Aguilar did not call for help or make any statement or physical indication which led Defendants to think he believed he was about to be attacked, but was watching Taylor and Rodriguez. (Herrera Decl. ¶ 9.)

68. Rodriguez reached the dayroom floor as the door was closing, handed an object to Taylor, and the two ran over toward Aguilar and suddenly began to strike him repeatedly with what turned out to be inmate manufactured weapons. (Lieber Decl. ¶ 13; Calderon Decl. ¶ 14-15; Sykes Decl. ¶ 9; Brennfleck Decl. ¶ X; Herrera Decl. ¶ 10.)

69. Neither Taylor or Rodriguez approached Aguilar with the objects raised in a striking position, and Aguilar did not call for help before he was stabbed. (Lieber Decl. ¶ 13; Herrera Decl. ¶ 11.)

70. When Taylor and Rodriguez attacked, staff activated the alarm and Lieber immediately fired a direct impact round striking Rodriguez in the back, but Rodriguez did not stop attacking. (Lieber Decl. ¶ 13; Calderon Decl. ¶¶ 16-17; Gomez Decl. ¶ 6; Herrera Decl. ¶ 11.)

13

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

71. Taylor and Rodriguez hid behind the restart chairs and continued to intermittently stab Aguilar while Lieber fired two additional direct impact rounds at Taylor and Rodriguez, and staff issued verbal orders and prepared to make entry into the unit. (Lieber Decl. ¶¶ 14-16; Calderon Decl. ¶¶ 16-17; Gomez Decl. ¶ 6; Herrera Decl. ¶¶ 11-13.)

72. Baker arrived at the LTRH to see staff gathered in front of the section door shouting commands, and saw that Taylor and Rodriguez were pacing around the dayroom while Aguilar appeared unconscious and covered in blood, so he immediately called for an ambulance and ordered Taylor and Rodriguez to get on the ground in a prone position. (Baker Decl. ¶ 51.)

73. Taylor moved towards Aguilar to kick him, and Lieber fired a fourth direct impact round which struck Taylor in the right hand, causing him to yell out in pain, move away from Aguilar, and lay on the floor. (Lieber Decl. ¶ 16; Calderon Decl. ¶¶ 16-17.)

74. Due to the inmate's proximity to each other and to the weapons in the dayroom, Baker issued an additional order for Rodriguez to move closer to the dayroom door and then lay down again, to which Rodriguez complied. (Baker Decl. ¶ 51.)

75. Baker quickly formulated a tactical plan, assigned roles to staff, and ordered Lieber to open the section door, and staff entered the unit to secure and remove Taylor and Rodriguez and provide aid to Aguilar. (Baker Decl. ¶ 52; Lieber Decl. ¶ 16; Calderon Decl. ¶ 17; Sykes Decl. ¶ 10; Brennfleck Decl. ¶ 11; Gomez Decl. ¶ 8; Herrera Decl. ¶ 13.)

## VI. SUBSEQUENT ALLEGATIONS OF STAFF INVOLVEMENT.

76. After the murder, the involved inmates later began to make claims that staff were involved. (TAC at pp. 17-18, 20, 23, 25-26; Green Dep; Rodriguez Dep.)

77. Green testified that Defendants Baker, Sykes, Gomez, and Brennfleck each told him that Aguilar was a child molester two to three weeks before the murder. (Green Dep. 8:3-22, 8:23-9:1, 77:1-8.)

78. Green testified that Baker gave him the green light to do the murder because he wanted Aguilar dead for assaulting an officer, and that Baker told Green he would make sure the control booth officer didn't fire the Mini-14. (Green Dep. 10:6-13, 75:5-15, 114:19-115:2.)

14

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)

79. Green testified he told Baker and Sykes about the "test run" and told them several times to ensure the restraints were not double-locked. (Green Dep. 112:24-114:15.)

80. Green testified that Sykes brought him clipper heads to make the knives, that Sykes, Gomez, and Brennfleck would alert him to stop making the weapons when other staff was going to enter the unit, and that he showed the weapons to Baker and Green within his cell but they did not take them away. (Green Dep. 22:6-21, 121:1-4, 122:5-8, 129:6-9, 130:2-4.)

81. Rodriguez testified that Baker and Calderon were by the book and that he had never seen them do anything unfair to inmates. (Rodriguez Dep. 36:16-23, 37:8-15, 126:3-10.)

82. Rodriguez testified that Baker never told Rodriguez that Aguilar was a sex offender. (Rodriguez Dep. 97:17-19.)

83. Rodriguez also denied that any officer, including Sykes, brought the clipper heads they used or warned them to stop making weapons in their cells when other officers entered the LTRH. (Rodriguez Dep. 133:24-134:11.)

84. Rodriguez testified that only two non-supervisor floor officers from the LTRH were involved and that he never spoke to any other staff members about Aguilar, explicitly including Lynch, Baker, Calderon, and Saavedra. (Rodriguez Dep. 91:3-10, 92:4-8, 93:2-4, 94:9-95:1.)

85. Rodriguez testified that on the day before the murder, he told two LTRH floor officers that were escorting him to yard to bring Aguilar out to dayroom, not to double-lock the restraints, and not to use lethal force from the control booth. (Rodriguez Dep. 87:23-88:7, 89:12, 94:9-95:1)

86. Rodriguez claimed he could not remember who those officers were and was not willing to identify them by name. (Rodriguez Dep. 87:1-11, 91:3, 152:1-4.)

87. Rodriguez testified that he did not know what those two officers did after speaking with him during the escort and did not hear them talk to any other staff member about Aguilar. (Rodriguez Dep. 91:5-10.)

88. Rodriguez testified that Aguilar himself was not concerned for his safety on December 12, 2019, but instead played an active role in Taylor and Rodriguez's escaping their restraints by helping them watch the tower officer while they picked their restraints, and that

15

when Rodriguez got out of his restraints, Lieber yelled, "Hey, what are you guys doing?" and activated the alarm. (Rodriguez Dep. 100:20-101:17, 102:5-12, 105:16-24.)

89. Rodriguez testified the officers who searched him after the incident, who were Herrera and Garland, were not the two involved officers. (Rodriguez Dep. 162:7-10; Herrera Decl. ¶ 13.)

90. Both Green and Rodriguez testified that they recognized the regular officer was not in the control booth, but that none of the inmates spoke to officers about it and continued with their plan without confirming whether this replacement control booth officer would use only less-lethal force. (Green Dep. 29:24-30:10; Rodriguez Dep. 109:14-16, 163:17-164:12.)

Dated: January 23, 2025

ROB BONTA
Attorney General of California
JON S. ALLIN
Supervising Deputy Attorney General

/S/ **DAVID E. KUCHINSKY**

DAVID E. KUCHINSKY
Deputy Attorney General
*Attorneys for Defendants J. Lynch, D. Garland, M. Jordan, W. Lieber, H. Chavez, D. Sykes, J. Gomez, J. Carothers, D. Calderon, E. Baker, G. Herrera, M. Saavedra, and P. Brennfleck*

SA2022300303

16

Defs.' Sep. Statement of Undisp. Facts in Supp. of Mot. for Summ. J.   (2:21-cv-02294 TLN-JDP)