1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  JON S. ALLIN, State Bar No. 155069
   Supervising Deputy Attorney General
3  BRIAN S. CHAN, State Bar No. 299926
   Deputy Attorney General
4  DAVID E. KUCHINSKY, State Bar No. 292861
   Deputy Attorney General
5  1300 I Street, Suite 125
   P.O. Box 944255
6  Sacramento, CA  94244-2550
   Telephone:  (916) 210-7666
7  Facsimile:  (916) 324-5205
   E-mail: David.Kuchinsky@doj.ca.gov
8  *Attorneys for Defendants J. Lynch, D. Garland,*
   *M. Jordan, W. Lieber, H. Chavez, D. Sykes,*
9  *J. Gomez, J. Carothers, D. Calderon, E. Baker,*
   *G. Herrera, M. Saavedra, and P. Brennfleck*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                  FOR THE EASTERN DISTRICT OF CALIFORNIA

13                          SACRAMENTO DIVISION

14

15

16  **MA ROSARIO BUENO ZARAGOZA, an**          2:21-cv-02294 TLN-JDP
    **individual; ESTATE OF LUIS GIOVANNY**
17  **AGUILAR, deceased, by his successor-in-**  **DECLARATION OF DAVID E.**
    **interest Ma Rosario Bueno Zaragoza,**     **KUCHINSKY IN SUPPORT OF**
18                                              **DEFENDANTS' MOTION FOR**
                                   Plaintiffs,  **SUMMARY JUDGMENT**
19
              **v.**
20

21  **JEFFREY W. LYNCH, an individual, and**
    **DOES 1 through 30, inclusive,**
22
                                   Defendants.
23

24

25        I, D. Kuchinsky, declare:

26        1)    I am a member of the California State Bar, admitted to practice before this Court, and

27  employed by the Office of the Attorney General of the State of California as a Deputy Attorney

28  General.  I am the attorney of record for all Defendants in this matter.

                                        1

2)    On September 21, 2023, I took the deposition of Dion Green at California Health Care Facility in Stockton, California.  I appeared at this deposition via video conference from my office in Sacramento, California.  True and correct copies of relevant excerpts from Green's deposition transcript are attached hereto as Exhibit A.

3)    On September 28, 2023, I took the deposition of Anthony Rodriguez at California State Prison, Los Angeles County, in Lancaster, California.  I appeared at this deposition via video conference from my office in Sacramento, California.  True and correct copies of relevant excerpts from Rodriguez's deposition transcript are attached hereto as Exhibit B.

4)    On September 30, 2024, I disclosed the expert report of Tony Diaz to Plaintiff's counsel in the course of expert discovery.  A true and correct copy of that report is attached hereto as Exhibit C.

5)    On September 30, 2024, I disclosed the expert report of Phillip Sanchez to Plaintiff's counsel in the course of expert discovery.  A true and correct copy of that report is attached hereto as Exhibit D.

6)    On December 9, 2024, I took the deposition of Plaintiff's expert witness Roger A. Clark, in Santee, California.  I appeared at this deposition via video conference from my office in Sacramento, California.  True and correct copies of relevant excerpts from Plaintiff's deposition transcript are attached hereto as Exhibit E.

7)    Defendants will lodge complete copies of Green's, Rodriguez's, and Clark's deposition transcripts with the Court concurrently with their motion for summary judgment.

1          I declare under penalty of perjury under the laws of the United States of America that the

2     foregoing is true and correct.

3

4          Executed this 23rd day of January, 2025, in Sacramento, California.

5

6                                                          /s/ **David E. Kuchinsky**

7                                              DAVID E. KUCHINSKY
                                               Deputy Attorney General
8                                              *Defendants J. Lynch, D. Garland, M. Jordan,*
                                               *W. Lieber, H. Chavez, D. Sykes, J. Gomez,*
9                                              *J. Carothers, D. Calderon, E. Baker, G. Herrera,*
                                               *M. Saavedra, and P. Brennfleck*

10

11

12

13     SA2022300303

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                       3

EXHIBIT A



# Transcript of **Dion Mahquan Green** **(CDCR# J22161)**

Thursday, September 21, 2023

*Ma Rosario Bueno Zaragoza v. Jeffrey W. Lynch*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 133201

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3

4

5                                        )
      MA ROSARIO BUENO ZARAGOZA,         )
6     as an individual; ESTATE OF        )
      LUIS GIOVANNY AGUILAR,             )
7     deceased, by his                   )   Case No.:
      successor-in-interest Ma           )   2:21-CV-02294-TLN-JDP
8     Rosario Bueno Zaragoza,            )
                                         )
9             Plaintiffs,                )
                                         )
10        vs.                            )
                                         )
11    JEFFREY W. LYNCH, an               )
      individual; DANIEL GARLAND,        )
12    an individual; MARCUS              )
      JORDAN, an individual;             )
13    WILLIAM LIEBER, an                 )
      individual; HENRY CHAVEZ, an       )
14    individual; DEMOND SYKES, an       )
      individual; JOSE GOMEZ, an         )
15    individual; JAMES CAROTHERS,       )
      an individual; and DOES 1          )
16    through 30, inclusive,             )
                                         )
17            Defendants.                )
                                         )
18

19          REMOTE DEPOSITION OF DION MAHQUAN GREEN

20                Thursday, September 21, 2023

21

22    Stenographically Reported by:
      Mechelle S. Gonzalez
23    CSR No. 13250
      Job No. 133201
24

25    PAGES 1 - 175

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3

4

5                                          )
        MA ROSARIO BUENO ZARAGOZA,         )
6       as an individual; ESTATE OF        )
        LUIS GIOVANNY AGUILAR,             )
7       deceased, by his                   ) Case No.:
        successor-in-interest Ma           ) 2:21-CV-02294-TLN-JDP
8       Rosario Bueno Zaragoza,            )
                                           )
9               Plaintiffs,                )
                                           )
10          vs.                            )
                                           )
11      JEFFREY W. LYNCH, an               )
        individual; DANIEL GARLAND,        )
12      an individual; MARCUS              )
        JORDAN, an individual;             )
13      WILLIAM LIEBER, an                 )
        individual; HENRY CHAVEZ, an       )
14      individual; DEMOND SYKES, an       )
        individual; JOSE GOMEZ, an         )
15      individual; JAMES CAROTHERS,       )
        an individual; and DOES 1          )
16      through 30, inclusive,             )
                                           )
17              Defendants.                )
                                           )

18

19

20

21              Remote deposition of DION MAHQUAN GREEN, taken

22      on behalf of Plaintiffs, beginning at 10:00 a.m. and

23      ending at 1:53 p.m. on Thursday, September 21, 2023,

24      before Mechelle S. Gonzalez, Certified Shorthand

25      Reporter No. 13250.

```
 1   A P P E A R A N C E S :

 2

 3   For Plaintiffs:

 4           LAW OFFICES OF CLAUDIA C. BOHORQUEZ

 5           BY: CLAUDIA C. BOHORQUEZ, ESQ.

 6           8383 Wilshire Boulevard

 7           Suite 800

 8           Beverly Hills, CA 90211

 9           (323) 648-6761

10           ccblawyer@gmail.com

11

12   For Defendants:

13           CA Attorney General - Department of Justice

14           BY: DAVID KUCHINSKY, ESQ.

15           BRIAN CHAN, ESQ.

16           1300 I Street

17           Suite 125

18           Sacramento, CA 95814

19           (916) 210-7666

20           david.kuchinsky@doj.ca.gov

21           brian.chan@doj.ca.gov

22

23                       --o0o--

24

25
```

1    and if they're true.

2         A.   Yes, ma'am.

3         Q.   Do you know who Lieutenant Eric Baker is?

4         A.   Yes, ma'am.

5         Q.   Did he tell you that Mr. Aguilar was a child

6    molester/rapist?

7         A.   Yes, ma'am.

8         Q.   And when did he tell you that?

9         A.   I can't remember the exact date, but we were

10   being escorted going through the sally port going to the

11   yard, and it was brought to my attention then with him

12   and Officer Sykes.  It's a black officer named Sykes,

13   and he was escorting me, and he -- that's when he

14   explained that and told me basically what time it is and

15   how it's going to be.

16        Q.   When they told you this, was it -- you don't

17   have to know the exact date, but was it a few days, a

18   week, two weeks before Mr. Aguilar was killed?

19        A.   It was approximately about, let's see... the

20   test run was on the 12/12 -- the test run... it was

21   about maybe two or three weeks -- two weeks, three weeks

22   before the actual incident.

23        Q.   And did Officer Jose Gomez tell you anything

24   about Mr. Aguilar or whether he was a child

25   molester/rapist?



1        A.  Yes, ma'am.

2        Q.  And when did he tell you that?

3        A.  I can't remember the exact date, but him,

4    Sykes, they all was involved.

5        Q.  Okay.  And when they told you, were the three

6    of them together, or was it just Mr. Sykes and Mr. Baker

7    together when they told you?

8        A.  It was different occasions.  They was the floor

9    officers, so they come and do the escorts, they escort

10   me and Rodriguez and Taylor, so it would be various

11   different times, like going to medical, coming back,

12   going to the yard, stuff like that.

13       Q.  Did Lieutenant Eric Baker know that you and

14   Anthony Rodriguez and Cody Taylor were, like, close

15   friends or...

16       A.  Yes, ma'am, he knew that.  Because I had just

17   met the youngster Cody Taylor and Rodriguez, so when I

18   got there, they had already let me know what's going on

19   in the unit, how it runs.  Being that I was the elder,

20   and at the time I had the ranking there, so I was like,

21   okay, this is how the setup is.  Okay.  No problem.  And

22   so he seen that we was close because of -- I was not

23   supposed to go to New Folsom because I had an enemy

24   right there, his name is Britt.  Britt.  So they put me

25   right next door to him because that's how they do.  He



1  came out to the dayroom, we came out the cuffs -- them

2  two came out the cuffs and stabbed him up, and stabbed

3  him.

4       Q.   We'll talk about that too.

5       A.   Yeah.

6       Q.   But did Lieutenant Baker ask you to plan an

7  attack against Mr. Aguilar?

8       A.   Yes, ma'am.  Because, you know what, he gave us

9  the green light.  And he runs that -- the SHU, the

10  long-term housing.  So all this was brought to my

11  attention from him.  He's the overseer.  He's the head.

12  So yes, ma'am.  He gave me the green light, and he knew

13  and planned this terrible murder.

14       Q.   Now, did you find out after Mr. Aguilar was

15  killed that he was not a child molester/rapist?

16       A.   I'm sickened by that.  I'm sickened.  I was

17  even on video saying, "I'm terrible."  Out of all my

18  years, 30 years in prison, this is -- this is the worst.

19  This is -- I live with this every day because this is

20  not valid, you know.  This is not valid.

21       Q.   How did you find out that Mr. Aguilar was not,

22  in fact, a child molester/rapist after the killing?  How

23  did you find out?

24       A.   Well, I found out because I have the stuff.

25  You know, I have his paperwork.



1          MS. BOHORQUEZ:  Back on the record.

2          BY MS. BOHORQUEZ:

3     Q.  Mr. Green, when you were cutting the metal to

4  make the weapons and the shims, you said it made a lot

5  of noise.

6          Which officers would alert you to tell you to

7  stop making noise while higher-up officials would walk

8  by?

9     A.  Cody Taylor was our -- ma'am, Cody Taylor was

10 the one that did the official cutting.  The tool was

11 given to him.  I gave it to him.  But the police would

12 come and let us know if captains, anybody outside of

13 Baker, squad, somebody was coming, they would let us

14 know to stop the cutting for that time.  Yes, ma'am.

15 They would be various different officers.

16    Q.  Do you remember which officers would come and

17 alert you?

18    A.  Yes, ma'am.

19    Q.  Who?

20    A.  It was Sykes, Gomez, Brennfleck.  Various

21 different officers would come and let us know.

22    Q.  Now, do you remember -- let me ask you

23 something.

24          Do you remember inmates Taylor and Rodriguez

25 getting out of their restraints and stabbing Inmate



1    key is made -- the keyhole is made from a pin filler.  A

2    pin filler, that's the actual size.  So we get the

3    actual size maybe with the regular one, the real one

4    that we have, and we actually build and make a handcuff

5    key like this one (indicating).

6         Q.  Okay.  So that one that you're showing me, is

7    that a handcuff key that you made or is that --

8         A.  Yeah.  This is one of the mechanics made extra

9    ones.  I had mine, my real one on me.  You know, the

10   real one stays on us, the real ones.  These is extra

11   ones, duplicates, so we can have.

12        Q.  And when you say your mechanic, who makes them?

13        A.  Oh, that's somebody's job.  Somebody know

14   everybody has a part to play.  Maybe he grew up and his

15   job was to be the mechanic, the builder.  They know how

16   to make stuff, to create.

17        Q.  You're talking about another inmate?

18        A.  Oh, yes.  Somebody that I know that that's what

19   they do.

20        Q.  Okay.

21        A.  You know, some people just make knives, some

22   people just make cutters.  You have to know who is who.

23   You know.

24        Q.  When this attack on Mr. Aguilar took place on

25   December 12, 2019, you noticed that the control booth



1  officer was not Officer Painter.  It was somebody else.

2         Right?

3         A.  Of course.

4         Q.  Right.  And did you bring that to somebody's

5  attention, you know:  "Is he in on this plan?  Does he

6  know he's not to shoot us with the Mini-14 rifle?"

7         A.  The staff took care of that.  The staff took

8  care of their staff.  Bottom line.  I didn't do a

9  communication with him.  That's not my place.  It's for

10 officers involved to tell him what time it is.  That's

11 why, again, we was just out there so cavalier and not

12 worried about nothing.

13        Q.  Okay.  After Mr. Aguilar was killed, you know,

14 were you -- after he was killed and after you realized

15 that he was not a child pedophile, you started --

16        THE REPORTER:  I'm sorry.  I'm having a problem

17 hearing your complete question with the paper shuffling

18 in between.

19        THE WITNESS:  Oh, I'm sorry.  I didn't know

20 that you can hear that.

21        THE REPORTER:  It's okay.  Because it's video,

22 if there's paper right by your microphone, it overrides

23 her question.

24        (Interruption.)

25        (Record read.)



1      Q.   Were you looking at a history of his

2   conviction?

3      A.   After he was dead I got his paperwork, yes.

4      Q.   When he walked by and saw something on the --

5      A.   No.  I'm just saying.  Just like this screen,

6   we walking past and you look at the screen and we like,

7   damn, and you keep going.  We didn't look at no name.

8   We looked at and it said child molester rapist on the

9   screen and kept on going.  It could have been anybody's

10  file.  We made the mistake of not paying attention to

11  the name and what's really going on.  We killed this man

12  for nothing.  This man died for nothing.  For the

13  police.  The police was mad that he assaulted them.

14  Baker wanted him dead and that's what happened.  He gave

15  us the green light, and that's what happened.

16     Q.   So you walked by.  Did Baker show that to you?

17  Was it Baker on the computer?

18     A.   It was somebody at escort.  We know it was

19  somebody else that was escorting.  I can't remember.

20     Q.   Was it a man or a woman?

21     A.   It was a man.

22     Q.   Okay.  What race was the man?

23     A.   Probably black.  White.  Hispanic.

24     Q.   You don't remember one way or the other?

25     A.   No.



1        Q.  Big guy or small?

2        A.  I got -- I got something for you.

3        Q.  Actually, Mr. Green, I would ask you.  Was he a

4   big or a small guy?

5        A.  Man, escorted from the yard is either Sykes or

6   Gomez.  I can't remember.  Skinny dude black.  Man.  You

7   know.

8        Q.  You think it was a skinny black dude?

9        A.  I can't remember who was escorting me.  Gomez,

10  Baker -- no.  You know what?  Baker.

11            One of the floor officers.

12       Q.  Okay.  And you don't know whether what you

13  were -- did that person say, hey, this is Aguilar's

14  thing.  Hey, look, this is Aguilar?  Or you walked by

15  and happened to see something on a computer screen that

16  said rapist and child molester and figured that was

17  Aguilar.  I'm trying to figure out how you connected

18  those two if there was no picture or no name.

19       A.  This is real simple.  They said, Satan, go past

20  and look at the screen, on the screen.  It's going to be

21  somebody's charges.  It's going to be his charges on the

22  screen.  Just like that.  Walked past, we walked past

23  and we took a peek at it, we like, damn, he's a fucking

24  creep.  Just like that.  Other fellas looked at it and,

25  oh, man.  This is fucking crazy, man.



1        A.    Absolutely.

2        Q.    Got it.   Thank you.   I understand.

3            Do you know whether Taylor and Rodriguez when

4    they used those keys to get out of the wrist cuffs,

5    whether they threw those keys away or what they did with

6    them?

7        A.    We don't throw them keys away.   What you mean?

8    We keep it on us.   You know.   We keep it on us.   We

9    don't throw it away.

10       Q.    So they didn't get rid of them.   As far as you

11   know --

12       A.    I can't say because I don't know what they did

13   with them.   I can't say.   Because I don't know.

14       Q.    Okay.   I got a couple other questions about the

15   plan to do this.   I am getting close to being finished.

16       A.    No rush.   No rush.   Ask me anything.

17       Q.    I don't want to take up too much of everyone's

18   time, and I know this is not where you want to be.

19       A.    No, I do want to be here.   Actually I do.   I

20   do.   I want everything to come out.   I want Claudia to

21   know everything.

22       Q.    I want to know everything too, you know.   I

23   would like to know what you have to say.

24            So we talked about the black boxes.   Did that

25   come up with Baker?   Is that how it was phrased?   That



1    you put these black boxes on since Britt, and we have to

2    do a test run to know if we're able to get out of the

3    black boxes?  Is that how that conversation went?

4         A.  Absolutely.

5         Q.  Do you remember where you had that conversation

6    with Baker?

7         A.  I can't -- it was somewhere we were talking.

8    Somewhere we were alone.

9         Q.  Just you and Baker?

10        A.  No.  Not Baker.  Not just me and Baker.  Sykes

11   was with us because he is the escort.

12        Q.  Okay.  So you, Baker and Sykes.  Somewhere.

13   Not in your cell.  Not in the unit.  It's somewhere

14   else?

15        A.  Yes.  We were outside being escorted somewhere,

16   like medical or somewhere, but it was something that we

17   talked about in private.  Because I, "Look, man.  We

18   need to test run," stuff like that.

19             "All right."

20        Q.  Okay.

21        A.  They allowed us to do the test run.

22        Q.  Was that also when you told Baker or Sykes or

23   somebody not to double-lock the cuffs, or was it some

24   other time?

25        A.  No.  It was just talked about all the time.



1    Like if we going come out of these, we need to be

2    single-locked.  Remember that.  That's the only way we

3    can come out so we can get the shimmy in there to pop it

4    open.  If you don't and you double-lock it, it's a --

5    it's a dead issue.  We can't get out.

6         Q.  You talked during that same walk with Sykes and

7    Baker?

8         A.  We talked about probably like, yeah, that day,

9    yeah, it was that day and a bunch of other days.  I was

10   like, Man, be sure you don't do that.

11        And then Sykes made the mistake on the fucking

12   tier and double-locked it, and we had to tell him, hey,

13   man, Cody Taylor told him, "What the fuck you doing?"

14        He said, "Oh, my bad.  I forgot.  I forgot."

15   Real loud.  He got nervous and scared.

16        Man, this shit right here is real TV.  This

17   shit come out of a movie.  This is real TV.  I'm telling

18   you, this is crazy, man.

19        Q.  When you had the conversations with Baker about

20   not using the Mini-14, did he tell you that he would

21   tell the control booth officer not to do it, or how did

22   that conversation end?

23        A.  He said, "I'll take care of it."  Bottom line.

24   It's real simple.  "I'll make sure."

25        "Come on, man.  Make sure I'm not going to get



1    killed.  Come on, man."  You know what I'm saying?

2           "Yeah, I got it."

3       Q.  Why did you care about the Mini-14 if Eric

4    Baker was setting this whole thing up?  Why did you need

5    those assurances from him?  If it's his unit and he told

6    you you can go out, why did you need those specific

7    assurances from him?

8       A.  You have to put assurance on your life.  You

9    have to be sure you don't get shot in the head.  What do

10   you mean?  We got to be careful.  We don't know who's

11   going to be in the tower that day.  We don't know what.

12   We got to be sure we don't get shot in the head, bro.

13   This is serious.  Come on, man.

14      Q.  To do something that would jeopardize --

15      A.  Absolutely.  So we have to make sure.  Hey,

16   man, be sure we don't get shot.  This is serious.  This

17   is kill shots.  They kill you at Folsom.  Come on, man.

18      Q.  Is it true that inside the LTRH dayroom there

19   are no warning shots allowed?  They do not fire warning

20   shots in there?

21      A.  Man, they bust.  They don't do no warning

22   shots.  It's all no warning shots.

23      Q.  Is it, is it your experience, I mean, if an

24   officer points a Mini-14 at you, is it your experience

25   that they threaten to shoot you and then just don't do



1        A.   I showed the weapons to them on Baker, Gomez --

2   I can't remember.  Pretty much all of them.  They seen

3   them.  They used to come and check them out all the

4   time.

5        Q.   So your testimony is that you showed them

6   6 inches or something like that.  7 inches?

7        A.   7 inches?  That was 10-plus.

8        Q.   10-plus?  10 by, like, 2 inches wide or

9   something like that?

10       A.   Of course.  That's the thing.  10 inches,

11  12 inches, 2 inches thick or 3 inches thick.

12       Q.   So you showed these officers these weapons

13  through your cell window and they just didn't do

14  anything about it?

15       A.   What do you mean do anything about it?  They

16  gave us the cutting tools to make it.  They knew we was

17  making it.  What do you mean do anything about it?

18       Q.   So it sounds like that's a "yes," they didn't

19  do anything to take them away from you or stop you?

20       A.   Why would they do that?  They're the one who

21  set us up.

22       Q.   Well, that's my question was whether they did

23  that or not because it sounds like they did.

24       A.   Yeah.  Yeah.  They give us the cutting tool.

25  We already pass that.  We did the test run and



1  back out.  Once they do, we sharpen it.

2      Q.  Okay.  Stop me if I asked you this already, but

3  was Aguilar's killing, did that serve as like an

4  initiation for Taylor into the IR?

5      A.  No.  They said that bullshit because they don't

6  know what the fuck they talking about.  The truth of the

7  matter is he's not IR.  He's NC.  He has nothing to do

8  with IR.  Nothing.  He wanted to kill because he's a

9  creep and he's a 2-5er.  They don't get along.  Period.

10  But they got in his file that this is what he's doing,

11  initiate this, they make it up.  They make stories up.

12  You know what I'm saying.  That's not the truth.  The

13  truth of the matter is he just killing because, number

14  one, he thought he was a fucking child molester, and

15  he's not.  That was -- that was the main motive in our

16  brain.  That's the main thing in our brain we were going

17  off of.  So when he sharpening, it was like fucking

18  creep.  That's what's going on our mind.  Not his gang.

19  We were talking about his fucking status.  Like, he's a

20  fucking creep, man.  And I'm like this whole time, oh,

21  my God, I can't believe this.  Man, you know what I'm

22  saying?  I used to kick it with him, I used to get him

23  coffee.  And in my brain and everybody's brain, it's

24  "creep, creep, creep, creep."  We not thinking about

25  nothing else.  And that's what happened.



1    more.

2           You said Sykes brought you this clipper head.

3    Did he bring it to you or Taylor or Rodriguez?  Who did

4    he bring it to?

5        A.  It all came to me.  Everything came to me.

6        Q.  And Sykes personally brought you the clipper

7    head?

8        A.  Again, it all came to me.  Sykes brought me

9    everything.

10       Q.  Did he -- so my understanding is, you know, you

11   get clipper heads passed out on the yard, Sergeant

12   watches you, you give it back, they do an inspection and

13   all that.

14          Where was it that Sykes gave you the clipper

15   head?

16       A.  It was in my cell, bro.  He gave me the

17   clippers.  They were old clippers that broke, period,

18   and he brought them to me.

19       Q.  Okay.  And what did he say when he brought them

20   to you?

21       A.  He didn't say nothing.  Words don't need to be

22   spoken.  Hand it to me and get on.  There's no talking.

23          THE REPORTER:  I didn't get your question at

24   all.

25                         //



 1          BY MR. KUCHINSKY:

 2      Q.  Do you know about what date it was that Sykes

 3  brought the clipper heads?

 4      A.  No.  It had to be around November sometime.

 5  Right around November.

 6      Q.  And you didn't use the clipper heads to make

 7  the weapon -- or to make the shim.  You used it to make

 8  the weapons, right?

 9      A.  Yeah.  For the cutting of the table or the

10  desk.

11      Q.  All right.  Why was there damage to the cell

12  that you occupied, big chunks cut out if you weren't the

13  one who made the weapon?  Did you give Taylor --

14      A.  Something come out of my cell?

15      Q.  They didn't --

16      A.  Absolutely not.

17      Q.  Oh, okay.

18          THE REPORTER:  So sorry to interrupt.  I really

19  need one person at a time.

20          MR. KUCHINSKY:  Sorry, Mr. Green.  That's my

21  fault.

22          THE WITNESS:  Sorry, ma'am.

23          They didn't find.  Matter of fact, here's my

24  cell right here.  They didn't find nothing in my cell

25  because my cell is actually clean.  That's how I live.

Notice Date: 10/05/2023

Deposition Date: 9/21/2023

Deponent: Dion Mahquan Green (CDCR# J22161)

Case Name: Ma Rosario Bueno Zaragoza v. Jeffrey W.
           Lynch

Page:Line          Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

EXHIBIT B



# Transcript of **Anthony Rodriguez (AW1424)**

Thursday, September 28, 2023

*Ma Rosario Bueno Zaragoza v. Jeffrey W. Lynch*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 134082

 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4

 5                                    )
     MA ROSARIO BUENO ZARAGOZA,       )
 6   as an individual; ESTATE OF      )
     LUIS GIOVANNY AGUILAR,           )
 7   deceased, by his                 )  Case No.:
     successor-in-interest Ma         )  2:21-CV-02294-TLN-JDP
 8   Rosario Bueno Zaragoza,          )
                                      )
 9          Plaintiffs,               )
                                      )
10      vs.                           )
                                      )
11   JEFFREY W. LYNCH, an             )
     individual; DANIEL GARLAND,      )
12   an individual; MARCUS            )
     JORDAN, an individual;           )
13   WILLIAM LIEBER, an               )
     individual; HENRY CHAVEZ, an     )
14   individual; DEMOND SYKES, an     )
     individual; JOSE GOMEZ, an       )
15   individual; JAMES CAROTHERS,     )
     an individual; and DOES 1        )
16   through 30, inclusive,           )
                                      )
17          Defendants.               )
                                      )
18

19          REMOTE DEPOSITION OF ANTHONY RODRIGUEZ

20              Thursday, September 28, 2023

21

22   Stenographically Reported by:
     Mechelle S. Gonzalez
23   CSR No. 13250
     Job No. 133927
24

25   PAGES 1 - 175

```
 1                   UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF CALIFORNIA

 3

 4

 5                                       )
       MA ROSARIO BUENO ZARAGOZA,        )
 6     as an individual; ESTATE OF       )
       LUIS GIOVANNY AGUILAR,            )
 7     deceased, by his                  ) Case No.:
       successor-in-interest Ma          ) 2:21-CV-02294-TLN-JDP
 8     Rosario Bueno Zaragoza,           )
                                         )
 9           Plaintiffs,                 )
                                         )
10        vs.                            )
                                         )
11     JEFFREY W. LYNCH, an              )
       individual; DANIEL GARLAND,       )
12     an individual; MARCUS             )
       JORDAN, an individual;            )
13     WILLIAM LIEBER, an                )
       individual; HENRY CHAVEZ, an      )
14     individual; DEMOND SYKES, an      )
       individual; JOSE GOMEZ, an        )
15     individual; JAMES CAROTHERS,      )
       an individual; and DOES 1         )
16     through 30, inclusive,            )
                                         )
17           Defendants.                 )
                                         )
18

19

20

21           Remote deposition of ANTHONY RODRIGUEZ, taken

22     on behalf of Defendants, beginning at 9:34 a.m. and

23     ending at 1:52 p.m. on Thursday, September 28, 2023,

24     before Mechelle S. Gonzalez, Certified Shorthand

25     Reporter No. 13250.
```

```
 1   A P P E A R A N C E S :

 2

 3   For Plaintiffs:

 4            LAW OFFICES OF CLAUDIA C. BOHORQUEZ

 5            BY: CLAUDIA C. BOHORQUEZ, ESQ.

 6            8383 Wilshire Boulevard

 7            Suite 800

 8            Beverly Hills, CA 90211

 9            (323) 648-6761

10            ccblawyer@gmail.com

11

12   For Defendants:

13            CA Attorney General - Department of Justice

14            BY: DAVID KUCHINSKY, ESQ.

15            BRIAN CHAN, ESQ.

16            1300 I Street

17            Suite 125

18            Sacramento, CA 95814

19            (916) 210-7666

20            david.kuchinsky@doj.ca.gov

21            brian.chan@doj.ca.gov

22

23                         --o0o--

24

25
```

1    lieutenant is he would be like in the tier walking and

2    talking to people trying to, like you said, kind of hear

3    their complaints.

4          Do you know what was your impression of Baker?

5    What was he like?

6      A.   I mean, I think he was pretty cool.  I never

7    had problems with him.

8      Q.   Did he seem -- I know there's some officers

9    who, or staff members, they will go like letter of the

10   law, write you up for every little thing, and that seems

11   to oftentimes create some spite or some strife between,

12   you know, the people that are the staff members and the

13   inmates.  But did Baker do anything like that, or was he

14   kind of understanding and, you know, talk to you guys to

15   try to figure out what was going on first?

16     A.   Yeah.  He try to talk to you, work things out,

17   but yeah, he was kind of by the book and he'll write you

18   up, but he will come talk to you and try to work things

19   out though.

20     Q.   Okay.  Did you ever feel that Baker -- let me

21   ask you -- Baker do anything unfair to you or to anyone,

22   any of the inmates in the units?

23     A.   No.  I never seen.

24     Q.   Okay.  And then I want to ask about some of the

25   sergeants in that unit.  I think during your time there



1    there were two, right?  There was a sergeant named

2    Saavedra.

3            Do you remember him?

4        A.  I think so.  Yeah.

5        Q.  And then there was another sergeant named

6    Calderon.

7            Does he sound familiar?

8        A.  I remember Calderon, yeah.

9        Q.  Can you tell me how do you remember Calderon?

10   What was your impression of him?

11       A.  He was pretty cool.  He had a lot of issues in

12   that unit because, like I said, it was a lot of people

13   and, you know, there would be a lot of problems over

14   there.  He was kind of like Baker.  Yeah, kind of like

15   Baker.

16       Q.  And then I want to ask you about a couple of

17   the other people that work in the unit at the time.

18   There was a control booth officer named Shawn Painter.

19           Do you know him?

20       A.  Yeah, I remember him.  He was a regular guy.

21   Regular tower cop.

22       Q.  How did he strike you?  What was your

23   impression of him?

24       A.  Well, I never had too much interaction with him

25   because he was mostly in the tower.



1      Q.   Do you know whether that was intentional by the

2  staff?

3      A.   Yeah, it was.

4      Q.   And how do you know that?

5      A.   Because we talked about it with them, you know.

6      Q.   Okay.  Do you remember who it was that you

7  talked to?

8      A.   No, I don't.

9      Q.   And what was it that you guys talked about?

10     A.   Just the to not double-lock our legs because we

11  wouldn't be able to come out of them, you know.

12     Q.   Okay.  So you had -- you remember having a

13  conversation with some -- was it one person or more than

14  one person that you had this conversation with?

15     A.   This is what happened.  When the thing happened

16  with Britt, one of the COs told us, Hey man, next time

17  you need to do that, let us know.

18          So when we had the black box, I told Taylor

19  what do you think about this.  Do you think this guy is

20  saying that just trying to, like, get us to say

21  something, and then say, Oh man, you know what I mean?

22  Like trap us.  And Taylor is, like, I don't know.

23          So I remember saying something to somebody on

24  the way to the group, to the yard, to the escort, and

25  basically I was there, and I told them Hey man, on



1       Q.   Okay.  And did he remind -- did he remind them

2   like during the escort from the cell down?  Is that when

3   he did it?

4       A.   Yeah.

5       Q.   Okay.  Do you know those two officers that you

6   talked to about doing this?  Do you know what they did

7   with that information?  Did you ever hear them talk to

8   anybody else about it or report it or do anything like

9   that?

10      A.   No, we didn't.

11      Q.   And did you offer them anything?  Was there a

12  reason that they were willing to do this that you're

13  aware of?

14      A.   Well, like I said, they didn't know we were

15  going to -- they didn't know the severity of what was

16  going to happen.  I didn't tell them, Hey, I'm going

17  to -- I didn't tell them what my intentions were.

18      Q.   Okay.  So you kind of said, hey, I think you

19  can read between the lines at some point.  Don't

20  double-lock us, and bring Aguilar down, but was it your

21  impression that it was just going to be like an assault

22  like Britt, or what did you think?

23      A.   Yeah, kind of like Britt.

24      Q.   Say that one more time.  Kind of like Britt?

25      A.   Kind of like Britt.



1        Q.   Okay.  Did you tell either of those two what

2   your plan was for how it was going to get done or no?

3        A.   No, we didn't.

4        Q.   Was there ever any discussion with any --

5   besides those two officers, any other CDCR staff member,

6   did you ever talk to any of them about the plan for

7   Aguilar?

8        A.   No.

9        Q.   Okay.  And do you remember ever having a

10  discussion about whether the control booth officer would

11  shoot the glock launcher or the lethal rifle?

12       A.   Say that again?

13       Q.   Yeah.  Did you ever have a discussion about the

14  tower booth, the control booth officer, the guy up in

15  the tower, not shooting you with lethal force?

16       A.   Yes.

17       Q.   Okay.

18       A.   We knew that we weren't going to get shot with

19  lethal --

20       Q.   Say that again?

21       A.   We knew we weren't going to get shot with

22  lethal.

23       Q.   How did you know that?

24       A.   We confirmed it.

25       Q.   One of those same two guards?



1          A.   Yes.

2          Q.   You're sure -- there's not any more, right?

3    It's just those two that you're talking about?

4          A.   Yes.

5          Q.   Okay.  Did the guards say Okay, we'll tell the

6    control booth and not wear the "Mini," or how explicit

7    was it?

8          A.   I think most of these questions you already

9    know, I think.

10         Q.   I know a lot of them, but Mr. Rodriguez I'm not

11   trying to put you in a bad spot here and make you feel

12   you know unsafe.  But one of the reasons I'm asking you

13   this is, you know, I know what has been alleged, but I

14   don't know what people are actually willing to actually

15   testify to.  And so that's one of the reasons I'm going

16   through this with you.  I know it's making you

17   uncomfortable, I appreciate -- it sounds like you're

18   being very honest and cooperative with me.

19            So the reason I'm asking you stuff that you

20   know I know at least some of, is to kind of confirm it,

21   right, and to understand.  I've never had to speak with

22   you before.  So whether this is accurate, what's not, or

23   is there anything I'm missing?

24         A.   No, there's nothing you're missing.

25         Q.   Okay.  Okay.  So you knew one of these two



1   guards told you something like, you know, don't worry

2   about the control booth officer.

3          How did you know you weren't going to get shot

4   with lethal force?

5       A.  Basically how you just said it.

6       Q.  Okay.  Did both of them say or just was there

7   like one that was doing more of the talking?

8       A.  Yeah, one.

9       Q.  Okay.  Okay.  All right.  So that conversation

10  happened when you were being escorted to the yard, and

11  then was there any other discussion at all with any

12  other CDCR staff member about what was going to happen

13  the next day?

14      A.  No.

15      Q.  Do you remember ever talking to

16  Lieutenant Baker, Sergeant Calderon or Sergeant Saavedra

17  about what was going to happen with Aguilar?

18      A.  No.

19      Q.  The two officers that you talked to, they were

20  not supervisors, right, they were like correctional

21  officer classification?

22      A.  Yes.

23      Q.  Do you know at any point whether ahead of time,

24  before Aguilar was killed, whether Warden Lynch knew

25  what was going to happen?



1        A.   No, he didn't know.

2        Q.   Was there any -- other than the incident that

3   you told us about, with him writing over your name and

4   you were going to respond because of that, was there any

5   other incidents that happened between you and Aguilar or

6   Taylor and Aguilar before he was killed?

7        A.   There was an incident, it wasn't really an

8   incident, but there was a thing where he would go in the

9   showers one time and he kicked one of the officers,

10  right, and he called my name and that day I didn't

11  answer him because I was, like, I didn't know what was

12  going on, but I just didn't answer him because like I

13  said, we were kind of backup.  We kind of didn't

14  acknowledge him after that.  So but I think Green

15  answered him when he called me from the shower.  Green

16  answered him and I said, "I just kicked a cop in the

17  face."  He told Green that, you know what I mean.  But

18  he was calling me to tell me that.  Like he was trying

19  to boast about it or something like that.  So I pounded

20  on Green's door and told him, like, we don't, like,

21  acknowledge that because we don't do that kind of stuff,

22  you know.  Kicking and gassing and stuff like that, you

23  know.

24        Q.   Right.  Okay.  So that incident I'm aware of.

25  So he called out -- Green obviously heard what was



1    it, he already didn't like him, you know.

2        Q.  I see.  Okay.  Okay.

3            Did either of you ever -- were either of you

4    ever told that Aguilar was a sex offender or had some

5    kind of sex crime on his jacket?

6        A.  No.  For some reason, that was -- somebody was

7    saying something like that, but that's not true.  I

8    really don't know where that came from, but nobody ever

9    came to us and told us that he's a sex offender.  And

10   that's not the reason I attacked him.  I know that

11   because it was on the newspaper report that I read.  And

12   I was, like, I didn't know where that came from to be

13   honest.

14       Q.  So that's not something you guys talked about,

15   but you saw it after the fact when the article came out?

16       A.  Yes.

17       Q.  Did Eric Baker ever tell any of you that

18   Aguilar was a sex offender?

19       A.  No.  That never happened.

20       Q.  Okay.

21       A.  Like I said, I didn't know where that came

22   from, and they just rolled with it, but that never

23   happened.

24       Q.  Okay.

25       A.  Because I'm sure he wasn't even a sex offender

1    them from -- I can't remember.  I can't remember how we

2    got them, but I think we made them ourselves.  We took

3    apart the adapter from the radio.  They actually stopped

4    giving us those adapters, you see, because they found

5    out we had extras that we had stashed away so we already

6    had them.

7         Q.  Okay.  Okay.  All right.  And then walk me

8    through the incident.  I've seen it, I've read all the

9    reports, but from -- can you tell me from when they do

10   the search in your cell, they're about to take you down.

11   Just walk me through how that day went?

12        A.  The day it happened?

13        Q.  Yes.  From when they come to take you down to

14   group, right, it sounds like you had already told him to

15   bring Aguilar out first, right?

16        A.  Yes.

17        Q.  And did that happen that morning?  Did they

18   actually bring Aguilar out first?

19        A.  Yes.  They went to his door first, yes.

20        Q.  Do you think Aguilar had any idea what was

21   going to happen to him that day?

22        A.  No.  To be honest with you, I was the one that

23   called him to go because like I said, before earlier no

24   one really went to dayroom with us before -- after Britt

25   we're not going to dayroom with those guys.  So I



1   happened to be in the showers, which is in the middle of

2   the tier, and he's kind of on that side, and I asked

3   him, Hey, man, can you go to -- I actually got him to

4   come to the dayroom under the guise of us, like you say

5   earlier, like some people would go to the dayroom and

6   hold the dayroom hostage to get to talking about our

7   problem, we need more people because we're going to --

8   because they had just took our phone privileges like a

9   week prior.  So I said, We just need people -- more

10  people to sit in the dayroom with us until they bring

11  somebody to talk to about taking our phones.  So that's

12  the reason -- that's how I got him out there, but that

13  wasn't what we were going to do.

14      Q.  Right.  So he went out under the impression

15  that you guys were all going to hold the dayroom

16  together?

17      A.  Yes.

18      Q.  Did you tell him Hey, we're going to let you

19  out too.  We're going to -- we need lots of people, and

20  didn't go into specifics?

21      A.  He didn't know that we were going to -- no, he

22  didn't know that we were going to do all that.

23      Q.  Okay.

24      A.  Once we're in the dayroom, he seen us coming

25  out of our cuffs, and then I think he had something



1  because I remember seeing him do this (indicating), but

2  before that I had told Taylor "Hey, keep an eye on his

3  hands because he's going to see us coming out of our

4  cuffs."  So we wanted -- so I seen him doing that, doing

5  something like that, and I said, "Don't worry about

6  that.  Just keep" -- I got you.  Like, keep -- while

7  we're doing it, and then we'll take you out.

8          So he stopped, and he was watching the tower

9  for us while we came out of our chains and stuff, but we

10  didn't obviously, you know, do anything we told him.  We

11  just wanted to let his guard down.  He didn't know what

12  was going to happen until it actually happened.

13      Q.  Okay.  All right.  And then when you were being

14  escorted down, so that you get -- you still get searched

15  in the cell the regular way?

16      A.  Yes.

17      Q.  And they walk in, they do the unclothed, you

18  put the clothes back on.  Once they put you -- then you

19  obviously didn't have the knives that day, but you had

20  the shims under your Band-Aid?

21      A.  Yes.

22      Q.  Okay.  And then when they take you out of the

23  cell, that's when they put on the hand restraints first,

24  right?

25      A.  No, they put them -- they put them on the hands



1    have to make your shim longer.  Usually it's short, so

2    you make it longer so it goes into the slide when you

3    take it off, you know what I mean, to open it.

4         Q.  So the black box it mainly covered up that the

5    hole, the keyhole, but it also made that opening in the

6    ratchet opening smaller to cover up some of it?

7         A.  Yeah.

8         Q.  Okay.  All right.  So when you get down there,

9    when is it or how do you guys decide when to jump into

10   action?

11        A.  Basically once we're out, once we're out --

12   once they locked us in, they secure us, they walk out

13   and shut the door.  As soon as they shut the door, then

14   we can come out of our things, I run upstairs, and

15   that's basically how we got started.

16        Q.  When you're getting -- starting to get out of

17   the restraints, do you remember whether any officer said

18   anything to you, like, Stop or what are you doing or

19   anything like that?

20        A.  I came out pretty fast.  Taylor was having a

21   problem with his legs.  So I remember standing up and

22   waiting for him.  But I remember the tower saying, "Hey,

23   what are you guys doing?"  My mind was like something --

24   I remember him yelling up there, yeah.

25        Q.  And at that point did you know that he wasn't



1  remember Lieber other than being up in the tower booth

2  that day.

3          How did you know?  What was the calculation

4  there?

5      A.  I just -- like I said earlier, it just I kind

6  of just knew.  Like I said earlier.

7      Q.  From talking to those two cops?

8      A.  Yeah.

9      Q.  Okay.  And was the plan that it was going to

10 be -- was it the plan that it was going to be

11 Shawn Painter up in the booth, but then he wasn't there

12 that day so you kind of had to have like a non-regular

13 in there?

14     A.  I really don't remember.  No, there was no

15 plan.  I didn't know who was going to be up there to be

16 honest with you.

17     Q.  So that didn't really matter.  I'm telling you,

18 the floor officer, this is going to happen, don't

19 double-lock us and make sure we don't get hit?

20     A.  Yeah.

21     Q.  I also have to ask you.  Did you give them

22 anything in exchange for that?  Like, was there a

23 reason?  Did they like get anything from you out of it,

24 or why did they agree to that?

25     A.  No, they didn't get nothing.  I really don't

1    said earlier that a lot of that was not true, but some

2    of it was, right.

3             So Green says that Eric Baker was sort of told

4    about this and that Baker told you guys that Aguilar was

5    a sex offender.  That's not true, right?

6        A.  That's a lie.  That's a lie.

7        Q.  Okay.  And he said that Baker agreed to bring

8    in dope and phones for you guys if you would kill

9    Aguilar.  Is that true or is that a lie?

10       A.  That's a lie too.

11       Q.  Did -- do you know whether it's true that Baker

12   asked Green to arrange a hit on Aguilar because Aguilar

13   kicked the guard in the shower?

14       A.  No.  That really didn't happen at all because

15   Baker, we didn't really have any interaction with Baker.

16   He would come in once in a while to talk to people, but

17   we didn't have that kind of interaction with him.

18       Q.  Okay.  Green also said that staff would come in

19   and alert you guys if you were making too much noise

20   with the metal when you were cutting the metal or

21   sharpening the metal.

22             You told me that he was actually keeping a

23   lookout and letting you guys know.  Is he telling the

24   truth or is he lying?

25       A.  He's lying about that.  Like I said, most of



1    can look at the notes and give a little chance to rest

2    their hands and stand up?

3            MS. BOHORQUEZ:  Sure.

4            MR. KUCHINSKY:  Okay.  Great.

5            (Recess taken from 12:16 p.m. to 12:20 p.m.)

6            MR. KUCHINSKY:  All right.

7            BY MR. KUCHINSKY:

8        Q.  Mr. Rodriguez, we're back on the record.  We

9    took about a four-minute break.  And I want to finish up

10   asking a couple other questions about some of the things

11   that Deon Green said, and I'm just going to pull up one

12   little note.  I'm going to ask you what's true or not.

13   If we could get some good insight into what is and is

14   not true.

15           Green, you know most of this I think, because

16   you've already obviously seen this discovery stuff in

17   your criminal case, but Green said that we talked about

18   the noise and officers coming around telling you to be

19   quiet.  Green also said that he was given clipper heads

20   or he obtained clipper heads and you used them to make

21   the weapons.

22           Is that true or is that not true?

23       A.  Yeah, that parts's true.

24       Q.  He said that an officer, I think he said an

25   officer named Sykes gave him the clipper heads.

 1              Do you know if that's true?

 2       A.   No, that's not true.

 3       Q.   Okay.  Do you know who Sykes is?

 4       A.   Yeah, he's a Black officer that worked there.

 5       Q.   Okay.  He was a floor officer?

 6       A.   Yes.

 7       Q.   Tall, Black guy?

 8       A.   Yes.

 9       Q.   Okay.  So he did not give Green the clipper

10   heads?

11       A.   No.

12       Q.   Okay.  Green, I think we talked about bringing

13   in dope and phones, but you said that didn't happen

14   either that was not an agreement that they had?

15       A.   No.  When officer -- when I was there and he

16   was there, I've never seen that and we never talked.

17   That would have been something we would have all known,

18   you know.

19       Q.   Right.  Right.  Okay.

20              And then were you -- when Green is saying this

21   stuff to Steele, obviously you've seen those videos, but

22   were you also talking to Steele regularly, or did you

23   give him that one note and sort of say No, I don't want

24   to talk at this point?

25       A.   That was it.  I just gave him that one note and

1    because of security reasons?  Are you afraid to mention

2    their names because they might retaliate against you or

3    staff at the prison might retaliate?

4         A.  No.  I just don't remember.

5         Q.  Okay.  Now, let me just go through this.

6              I just want to confirm something you said

7    earlier.  After the Britt incident you said that inmates

8    no longer wanted to go to the dayroom if they saw you

9    and Rodriguez down there.  Right?

10        A.  Me and Taylor, yeah.

11        Q.  Sorry, Taylor.

12        A.  Yes.

13        Q.  So in order to get Aguilar down on

14   December 12th, you had to make something up to get him

15   to agree to go down, right?

16        A.  Yes.

17        Q.  Okay.  And... now, you -- Mr. Kuchinsky

18   mentioned an inmate named Parker.

19              You remember that inmate, right?

20        A.  Yes.

21        Q.  Yes?

22        A.  Yes.

23        Q.  Okay.  So is that an inmate that got attacked

24   in the dayroom before Mr. Aguilar?

25        A.  Say that one more time?



1       Q.   Okay.   I don't think I have much.

2            So when the Britt incident happened, they were

3   not using those black boxes yet, right?

4       A.   No.

5       Q.   So with that incident, you were able to get out

6   of the leg restraints and the hand restraints even if

7   they were double-locked because you had that

8   manufactured key that would undo the double-locking,

9   right?

10      A.   Yes.

11      Q.   You also mentioned that you got the officers,

12  the corrections officers that helped you with making

13  sure your locks were only single-locked on the Aguilar

14  incident to make sure that the control booth officer

15  would not use lethal force against you, right?

16      A.   Yes.

17      Q.   Okay.   So that day of Aguilar's incident, the

18  control booth officer was a different officer than the

19  normal one, right?   It was a guy named Lieber and not

20  Painter.

21      A.   Yeah, it was Lieber.   Yeah.

22      Q.   Okay.   So did you have a concern about that?

23  Did you ask the officers that helped you, Hey, does he

24  know he can't shoot us with the rifle?

25      A.   I never did, no.



1      Q.  Okay.  Did Taylor ask?

2      A.  I don't think so.

3      Q.  Okay.  And did you see the control booth

4  Officer Lieber, did you see him wearing a launcher or

5  was he not wearing anything?

6      A.  He had the launcher, yeah.

7      Q.  So you said the Aguilar incident that you

8  planned with Taylor and Green, that you started planning

9  that two or three weeks before he was killed?

10     A.  Yeah.

11     Q.  Okay.  And when you say that Aguilar wrote over

12  your name, what do you mean?  Was there a plaque with

13  your name on it on your cell or where was that?

14     A.  No.  It was outside in the cage.  I had a habit

15  of writing where the sink's at with a marker, and he had

16  a habit of doing the same thing, but he happened to

17  write over my name and that kind of made me feel --

18  because, you know, before that I would help him out with

19  like soups and coffee.  When he needed something I would

20  help him out.  So when he did that I felt -- I took it

21  personal.

22     Q.  So did that happen, like, maybe a week before

23  you started planning this hit -- this attack on him, or

24  did that happen about three or two weeks earlier?

25     A.  No, it happened after -- no.  Yeah, we didn't



1

2

3

4          I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7  before me at the time and place therein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10 record of the proceedings was made by me using machine

11 shorthand which was thereafter transcribed under my

12 direction; further, that the foregoing is an accurate

13 transcription thereof.

14          I further certify that I am neither financially

15 interested in the action nor a relative or employee of

16 any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date subscribed

18 my name.

19

20 Dated:

21

22                    *Mechelle S. Gonzalez*

23                    _____

24                    Mechelle S. Gonzalez
                       CSR No. 13250

25

EXHIBIT C

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

**Tony Diaz**
custodylitigations@gmail.com

**2345 W. Beech St #4187**
**Visalia, CA 93277**

**559-967-1551 (Office)**

September 23, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

MA ROSARIO BUENO ZARAGOZA, as an individual; ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest MA ROSARIO BUENO ZARAGOZA vs. STATE OF CALIFORNIA; JEFFERY W. LYNCH an individual; DANIEL GARLAND, an individual; MARCUS JORDAN, an individual; WILLIAM LEIBER, an individual; HENRY CHAVEZ, an individual; DESMOND SYKES, an individual; JOSE GOMEZ, an individual; JAMES CAROTHERS, an individual; and DOES 1 through 30, inclusive, et al.

CASE NO: 2:21-CV-02294-TLN-JDP

RULE 26 REPORT

I submit the following report in the matter of Zaragoza vs CA, et al., pursuant to Rule 26 of the Federal Rules of Civil Procedure.

## BACKGROUND AND EXPERIENCE

My name is John Diaz. I am a retired Correctional Lieutenant and Subject Matter Expert relative to reviewing use of force incidents. I was hired by the California Department of Corrections and Rehabilitation (CDCR) in April of 1990 and assigned to California State Prison - Corcoran for approximately 26 years and 10 months. Approximately 23 years of my experience and expertise has been in the capacity of a supervisor and master trainer at Corcoran directly responsible for the training, coordinating, implementing, and supervision of immediate and controlled use of force options in addition to officer, supervisor and administrator daily duty and responsibilities.

These force options have included the use of physical force, restraint techniques, chemical agents, less lethal force options and lethal force options. As the primary team leader in the capacity of a Sergeant or as the incident commander in the capacity of a Lieutenant, I have been directly responsible for logistical planning, tactical planning, deployment, and policy compliance review of these force options within the General Population facilities, Administrative Segregation and the Security Housing Units in excess of 500+ incidents.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

I have approximately 3,388 combined training hours as a supervisor, participant and instructor relative to supervisory responsibilities, Use of Force (UOF) policies, UOF logistical planning, chemical agents, less lethal force, lethal force, report writing, incident commander responsibilities, team leader responsibilities and administrative responsibilities.

These training hours as an instructor include teaching Officers, Sergeants, Lieutenants, and Administrators how to conduct the below listed tasks when dealing with an inmate who poses a threat to staff or institutional security:

- Make incident assessments.

- Determine if the incident is isolated or appears to be a group acting in concert.

- Determine if the issue can be resolved utilizing deescalating techniques, verbal persuasion or mental health / clinical intervention services.

- Determine if there is a need for a controlled or immediate use of force.

- If necessary, create a tactical plan that attempts to resolve the issue utilizing reasonable force (Lethal, Less-Lethal, Expandable Baton, Chemical Agents, Physical Force).

- Ensure the tactical plan for immediate or controlled use of force incorporates force options in combination with cover contact teams and tactical movements that will minimize injuries to staff and inmates.

- Determine the types of chemical agents to use based on area containment, size of area, techniques used by an inmate to defeat chemical agents and weather conditions.

- Ensure all staff are aware of their roles and responsibilities by giving them detailed instruction and training. Conduct training exercises before the actual deployment.

- Determine if the tactical plan and use of force options fall within policy and procedures.

- Provide direct and continuous supervision during the use of force initiation, deployment, restraining, and removal of the inmate from the incident site to include providing medical services.

2

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Provide direct and continuous supervision during victim rescue circles and arrest circles surrounding immediate medical emergencies.

- Conducting incident debrief and report writing assignments.

- Critique reports for clarity, accuracy, and policy compliance for Warden's review.

- Identify inappropriate tactics, excessive force, or unnecessary force.  Determine how to train staff and correct policy violations.  Make recommendations to hiring authority for corrective actions against an employee.

I have not authored any publications within the last ten years.  My fees for services rendered for the review process and this report are provided in the attached fee schedule.  A list of all other cases in which I have testified in the previous four years as an expert either at trial or by deposition, is in the attached documents as well.

## MATERIALS CONSIDERED

- California Department of Corrections and Rehabilitation (CDCR) Department Operations Manual, Section 51020 Use of Force.

- Title 15 of the California Code of Regulations (CCR), Section 3268 Use of Force.

- Plaintiff Zaragoza Second Amended Complaint dated March 25, 2022.

- Incident Report # SAC-FAB-19-10-1228A2 dated October 12, 2019, authored by Lieutenant E. Baker.

- Incident Report # SAC-FAB-19-12-1523A2 dated December 12, 2019, authored by Lieutenant E. Baker (approximately 270 pages).

- Incident Report # SAC-FAB-19-12-1499A1 dated December 06, 2019, authored by Lieutenant S. Saelee.

- CDCR 7219 Medical report of Mr. Aguilar dated December 12, 2019, authored by RN S. Joesph.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- CDCR 7219 Medical report of inmate Taylor, AP-2001 dated December 12, 2019, authored by PT M. Davis.

- CDCR 7219 Medical report of inmate Rodriguez, AW1424 dated December 12, 2019, authored by PT M. Davis.

- Thirty-four (34) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer P. Bettencourt, Badge # 70317, dated December 12, 2019.

- Fifty-four (54) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer C. Drake, Badge # 64369, dated December 12, 2019.

- Fifty (50) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer D. Garland, Badge # 66530, dated December 12, 2019.

- Fifty-Seven (57) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer J. Grove, Badge #86239, dated December 12, 2019.

- Twenty-Three (23) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer K. Lee, Badge # 72086, dated December 12, 2019.

- Fifty-four (54) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer S. Ramirez, Badge #69414, dated December 12, 2019.

- Twenty-four (24) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Sergeant K. Steele, Badge # 63138, dated December 12, 2019.

- Video recording #FBB8 Section dated December 12, 2019 @ 0944 hours.

- Video recording #FAB-1253 dated December 05, 2019 @ 1112 hours.

- Video recording #B Yard HB7 dated October 10, 2019 @ 1114 hours.

- Video recording #B Yard Canteen 16-3 dated October 10, 2019 @ 1114 hours.

- Video recording #B Yard Canteen 16-1 dated October 10, 2019 @ 1114 hours.

- Video recording #B Yard Entry 0022 dated October 10, 2019 @ 1114 hours.

4

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Video recording #B Yard HB1 dated October 10, 2019 @ 1114 hours.

- Video recording #FBB8 Dayroom B 1121 dated October 10, 2019 @ 1114 hours.

- Video recording #FBB8 Dayroom B 1120 dated October 10, 2019 @ 1114 hours.

- Video recording #FBB8 Entry 1114 dated October 10, 2019 @ 1114 hours.

- Video recording #B Breezeway 1013 dated October 10, 2019 @ 1114 hours.

- Video recording Overview dated October 10, 2019 @ 1114 hours.

- Video recording #B Yard PTZ 0017-2 dated October 10, 2019 @ 1114 hours.

- Video recording #FBB8 Dayroom B 1121 dated October 10, 2019 @ 1114 hours.

- Video recording #FBB8 Entry 1115 dated October 10, 2019 @ 1114 hours.

- Video recording #300 Corridor 1138 dated October 10, 2019 @ 1114 hours.

- Video recording #B Yard Breezeway 1012 dated October 10, 2019 @ 1114 hours.

- Video recording #B Yard HB 1 dated October 10, 2019 @ 1114 hours.

- Post Orders 231082 B2 FLR #2 SHU

- Post Orders 231084 B8 FLR #1 SHU

- Post Orders 231085 B8 SP PSU #2

- Post Orders 331081 B8 FLR #1 SHU

- Post Orders 331082 B8 FLR #2 SHU

- Post Orders 331581 B8 SP #1 SHU

- Post Orders 331582 B8 SP #2 SHU

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Email from Sergeant M. Saavedra to Lieutenant E. Baker dated September 19, 2019, at 1144 hours.

- Email from Lieutenant E. Baker to Captain J. Casagrande dated December 17, 2019, at 1152 hours.

- Email chain between Lieutenant E. Baker and Lieutenant R. Couch dated December 15, 2019, ranging from 0734 to 0755 hours.

- Email from Officer Kevin Steele to Michael Kane containing handwritten notes from inmate Rodriguez AW-1424.

- Memorandum to M. Lopes Esq dated October 12, 2021, authored by Jeff Macomber.

- Memorandum deleting OP 046 CCCMS LTRH dated July 01, 2022, authored by Jeff Lynch.

- Sacramento County Coroner's Report Case # 19-06160 dated July 14, 2020, authored by Jason. P. Tovar, M.D.

- NMS Lab Toxicology Report # 19-06160 dated January 24, 2020, authored by William H. Anderson, Forensic Toxicologist.

- CDCR Office of Internal Affairs Digital Forensic Examination Request dated October 14, 2020, authored by Special Agent Dave Biggs.

- Rules Violation Report (Aguilar) Log#6941644 dated December 11, 2019.

- Rules Violation Report (Green) Log#6958204 dated January 23, 2020.

- Orange County Probation Report (inmate Green, J-22161) dated October 23, 2020, authored by R. Leyva.

- Extensive CDCR criminal history and incarceration documents (approx. 3765 documents) for inmate D. Green, J-22161.

- Extensive CDCR criminal history and incarceration documents (approx. 1807 documents) for inmate A. Rodriguez, AW-1424.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Extensive CDCR criminal history and incarceration documents (approx. 4924 documents) for inmate C. Taylor, AP-2001.

- Power point synopsis of Incident Report # SAC-FAB-19-10-1028 & SAC-FAB-19-12-1523 (no date, no author).

- Basic Security for Institution Staff Power Point (no date, no author).

- Operational Procedure #104 EOP dated October 14, 2022.

- Confidential memorandum of statements made by inmate Rodriguez AQ-1424 on May 12, 2021, authored by Officer R. Ehlers dated May 12, 2021.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Lieutenant E. Baker dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer P. Brennfleck dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer H. Chavez dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer J. Gomez dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer G. Herrera dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer W. Lieber dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer C. Painter dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer D. Sykes dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Sergeant D. Calderon dated August 20, 2021, authored by Special Agent Scott Edelen.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Investigative Interview Request (Case # N-SAC-518-20-A) for Sergeant M. Saavedra dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Sergeant K. Steele dated August 20, 2021, authored by Special Agent Scott Edelen.

- Temporary Restriction Memorandum issued to Officer S. Mascardi dated February 22, 2021, authored by Warden Jeff Lynch.

- Miller County Sheriff's Office Report # 21-00972MCSO dated August 20, 2021, authored by Deputy P. Scott, Badge # 5311.

- FBI report interviewing Officer Gomez authored by Agent S. Lawland and Justin Bolden dated August 09, 2021.

- FBI report interviewing Officer Steele authored by Agent S. Lawland and Justin Bolden dated August 16, 2021.

- FBI report interviewing Officer Herrera authored by Agent S. Lawland and Justin Bolden dated August 13, 2021.

- FBI report interviewing Lieutenant Baker authored by Agent S. Lawland and Justin Bolden dated August 09, 2021.

- FBI report interviewing Officer Sykes authored by Agent D. Schmidt and Justin Bolden dated April 22, 2021.

- FBI report interviewing Officer Lieber authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Officer Painter authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Sergeant Calderon authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Officer Brennfleck authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- FBI report interviewing Officer Chavez authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- Plaintiff Stipulated Protective Order dated October 16, 2020.

- Officer D. Garland Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 13, 2023.

- Officer D. Sykes Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated July 21, 2023.

- Lieutenant E. Baker Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 27, 2023.

- Officer G. Herrera Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated July 10, 2023.

- Officer H. Chavez Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 13, 2023.

- Warden J. Lynch Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated August 29, 2023.

- Officer J. Kolb Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 11, 2023.

- Officer J. Gomez Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 01, 2023.

- Officer M. Jordan Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 05, 2023.

- Sergeant M. Saavedra Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 21, 2023.

- Officer S. Painter Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 18, 2023.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Officer W. Lieber Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated August 22, 2023.

- Ma Rosario Zaragosa Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 25, 2023.

- Inmate D. Green #J-22161 Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 21, 2023.

- Inmate A. Rodriguez #AW-1424 Deposition Transcript, Zaragosa et. al. vs. Lynch et. al., 2:21-CV-02294-TLN-JDP, dated September 28, 2023.

- Audio CDCR OIA interview of inmate Puckett, G05549 dated unknown date and time.

- Audio CDCR OIA interview of inmate Taylor, AP2001 unknown date and time.

- Audio CDCR OIA interview of Lieutenant E. Baker dated September 09, 2021.

- Audio CDCR OIA interview of Officer W. Lieber dated September 09, 2021.

- Audio CDCR OIA interview of Sergeant M. Saavedra dated September 09, 2021.

- Audio CDCR OIA interview of Officer S. Painter dated September 09, 2021.

- Audio CDCR OIA interview of Sergeant D. Calderon dated September 14, 2021.

-  Audio CDCR OIA interview of Officer P. Brennfleck dated September 14, 2021.

- Audio CDCR OIA interview of Officer D. Sykes dated September 09, 2021.

- Audio CDCR OIA interview of Officer G. Herrera dated September 15, 2021.

- Audio CDCR OIA interview of Officer H. Chavez dated September 15, 2021.

- Audio CDCR OIA interview of Officer J. Gomez dated September 14, 2021.

- Operational Procedure 046 Long Term Restricted Housing (LTRH) dated November 27, 2019.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

## **STATEMENT OF FACTS**

On December 12, 2019, at approximately 1005 hours, Luis Giovanny Aguilar (AE-4694) was stabbed multiple times by inmates C. Taylor (AP-2001), A. Rodriguez (AW-1424) and killed in a planned attack orchestrated inmate D. Green (J-22161). The attack took place at California State Prison-Sacramento (CSP-SAC) on Facility B, Housing Unit #8, "B" section dayroom floor.

Rodriguez and Taylor were able to free themselves from their restraints and retrieve a weapon from inmate Green who was in his cell (FB8-211). The cell is solely occupied by Green on the upper tier.

Rodriguez and Taylor responded back into the dayroom area and attacked Mr. Aguilar stabbing him repeatedly while Mr. Aguilar was unable to defend himself due to being in restraints and restrained to a security chair that was bolted to the cement floor.

Officer Lieber observed the attack and activated his personal alarm. Officer G. Herrera also used his assigned radio to activate a Code 1 alarm which requests additional staff to respond to the incident site. Repeated orders were issued to "get down" however Rodriguez and Taylor ignored these orders and continued their stabbing assault on Mr. Aguilar. Officer Lieber used five (5) 4557 foam baton rounds but only fired a total of four (4) 4557 foam baton rounds (1 misfire) from his assigned 40mm Less Lethal launcher.

The use of the less lethal force options was eventually effective, and Rodriguez and Taylor stopped their attack on Mr. Aguilar. Rodriguez and Taylor eventually assumed a prone position on the floor. Lieutenant E. Baker was present at the "B" section door and assembled an arrest and rescue team to enter "B" section. The team entered the unit and placed Rodriguez and Taylor in restraints, secured the area to ensure the safety of the medical team. The medical team immediately began life-saving measures on Mr. Aguilar. Life saving measures were performed for approximately thirty (30) minutes until Mr. Aguilar was pronounced deceased by Dr. A. Dhillion.

As a result of this incident, a crime scene was established and an extensive investigation took place by the California State Prison-Sacramento Investigative Services Unit (ISU), CDCR Office of Internal Affairs (OIA) and the Federal Bureau of Investigations (FBI).

The processing of the crime scene by the CSP-SAC ISU team was extensive resulting in the processing of two (2) inmate manufactured stabbing weapons into evidence in addition to numerous other items of evidence collected from the persons of Rodriguez and Taylor.

11

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

Approximately two hundred forty-two (242) photographs were processed into evidence in addition to video recordings from the Audio Video Surveillance Systems (AVSS) located within Housing Unit FB8. The cells assigned to Rodriguez, Taylor and Green were also searched and all evidence collected from these cells was also processed into evidence. All the evidence was processed in the CSP-SAC ISU Evidence Room.

The initial medical examination of Mr. Aguilar noted he sustained six (6) puncture wounds to the chin area, one (1) puncture to the right arm, one (1) puncture to the right stomach area and eighteen (18) puncture wounds to the left chest area. All the puncture wounds were observed to have active bleeding.

An autopsy of Mr. Aguilar was conducted by the Sacramento County Coroner. Refer to the Sacramento County Coroner's Report Case # 19-06160 dated July 14, 2020, authored by Jason. P. Tovar, M.D.

Tests were also conducted by NMS Laboratories. Refer to NMS Lab Toxicology Report # 19-06160 dated January 24, 2020, authored by William H. Anderson, Forensic Toxicologist.

Inmates Green, Rodriguez, and Taylor were subsequently tried and convicted for their individual roles in the murder of Mr. Aguilar.

On March 25, 2022, Rosario Bueno Zaragoza, who is Mr. Aguilar's mother and is in charge of the estate of Mr. Aguilar, filed a complaint with the United States District Court, Eastern District of California, seeking damages from CDCR alleging that as a result of this incident, CDCR failed to protect, failed to intervene, cruel and unusual punishment, conspiracy to violate civil rights, failure to train and supervise, interference with familial relationships/substantive due process and excessive force.

The complaint alleges that correctional staff observed and allowed Rodriguez and Taylor to practice how they would escape their restraints and carry out the attack.

The complaint alleges staff released information that Mr. Aguilar was a child sex offender knowing this would cause him physical harm.

The complaint alleges there are inconsistencies in the reports of the defendants.

The complaint alleges the defendants facilitated the murder of Mr. Aguilar based on their deliberate indifference to his safety, failure to protect and handcuffing Mr. Aguilar to a fixed chair.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The complaint alleges the defendants turned a "blind eye" while Rodriguez and Taylor freed themselves from their restraints and left the dayroom area without any custodial interference to retrieve the weapons used to stab Mr. Aguilar.

The complaint alleges the defendant restrained Mr. Aguilar to a fixed object as a form of punishment and left him unsupervised, which is a violation of CDCR policies.

The complaint alleges staff who were on duty during the incident were subsequently reassigned to the mailroom pending an investigation into wrongdoing.

The complaint alleges the defendants purported to control the inmates they considered problematic by restraining them with leg cuffs and handcuffs and cuffing them to a chair or fixed object when outside of their cells in common areas and this is a violation of CDCR policies and the law.

The complaint alleges the defendants should have known this was dangerous where violence among inmates is a common practice.

The complaint alleges Officer V. Rodriguez reported potential violations of the CDCR Code of Conduct at CSP-SAC to Officer Garland but was met with repeated hazing, harassment, name calling and retaliation by members of the unit including Officer Garland.

The complaint alleges Officer Rodriguez notified Sergeant B. Stormaier that the ISU team was "broken" and there is shit they do, say, or don't do that can cause everyone from the Warden down to get the boot". Officer Rodriguez also claimed that Sergeant D. Anderson also threatened to fire him from the ISU team if he told anyone what was going on inside the unit. Officer Rodriguez also made entries in the Notes app on his phone on January 22, 2020, titled "Reasons to leave" including whistle blower violations along with threats, harassment, and other reasons.

The complaint alleges on February 08, 2021, Sergeant Steele communicated to CDCR Secretary Kathlen Allison that leaders at CSP-SAC including Warden Lynch responded to "indifference" to his reports of misconduct by prison guards including Officers Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20. Sergeant Steele further wrote, "I was witness to an ISU which became engulfed in corruption and watched as integrity was forced to cower in terror and fear of retaliation." A memorandum was subsequently issued on February 12, 2021, posted at the prison gate banning Sergeant Steele from its premises without indicating why.

The complaint alleges Plaintiff's believe Sergeant Steele and Officer Rodriguez were harassed and threatened by officers of the ISU ultimately driving the men from their jobs and damaging their mental health based on notes left by Sergeant Steele and Officer Rodriguez.

13

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The complaint alleges Officer Rodriguez died of an accidental drug overdose on October 21, 2020, a week after meeting with Warden Lynch about the mistreatment he was receiving from members of the ISU to include harassing phone calls. Sergeant Steele was found dead of an apparent suicide on August 20, 2021, just as he was set to give a deposition in another guard misconduct case.

The complaint alleges as of October 2021, the entire ISU team at CSP-SAC was replaced and approximately 20 staff had been replaced and 10 of the members are facing discipline relating to Mr. Rodriguez' death.

The complaint alleges the Plaintiff's believe an FBI investigation is pending centering on allegations prison guards including Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20 covered up their roles in at least two inmate deaths including Mr. Aguilar's.

The complaint alleges Mr. Aguilar dies as a direct and proximate result of the actions by defendants Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20 and are directly liable for violations of Aguilar and Zaragoza's constitutional rights.

The complaint alleges Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20, were obligated and charged by their respective duties to respond to reports of threats to the life and the safety of Mr. Aguilar including orders for protective segregation, as they knew or had reason to know Mr. Agular was mentally ill and or had behavior issues which necessitated the he be protected from violent inmates who would attack, maim, or kill him.

The complaint alleges Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20, were obligated and charged by their respective duties to segregate Mr. Aguilar and house him with other similarly classified inmates and keeping him away from inmates who were obviously perceived, known, suspected, or believed to be a potential threat to his life and safety.

The complaint alleges inmates Taylor and Rodriguez were involved in a similar assault of an inmate who was cuffed to a chair or other objects a few weeks or months before their assault on Mr. Aguilar. Defendants Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20, were aware of this. Yet through their knowing or reckless conduct, the defendants and each of them, allowed, permitted, and or otherwise facilitated these inmates' access to Mr. Aguilar, allowing Taylor, Rodriguez and or Green to be in such proximity to him as to facilitate their vicious stabbing of him while he was cuffed to a chair resulting in his death.

14

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

### <u>USES OF FORCE</u>

There are no video recordings or photographs of staff using force against Mr. Aguilar. There are multiple video recordings of Officer Lieber using less lethal force (40mm Single Launcher) against inmates Taylor and Rodriguez to stop the attack upon Mr. Aguilar. I determined based on my review of video recording FBB Dayroom B #1121, the attack by Taylor and Rodriguez upon Mr. Aguilar starts at (10:05:14 hours).

Both Taylor and Rodriguez refused to adhere to Officer Lieber's repeated orders to "get down" and continued to stab Mr. Aguilar. A total of four (4) 4557 rounds were fired (discharged) from the 40mm Launcher by Officer Lieber.

The first round, fired by Officer Lieber at approximately (10:05:20 hours) struck inmate Rodriguez in the back but had no effect on stopping inmate Rodriguez from stopping his attack upon Mr. Aguilar.

The second round fired by Officer Lieber at approximately (10:05:33 hours) missed Rodriguez' right arm, its intended target. What should be noted is Officer Lieber was issued a single shot launcher which requires a speed reload after each shot is fired thus explaining the delay of approximately thirteen seconds to unload, reload, and regain a sight picture to fire the next round.

The third round fired by Officer Lieber at approximately (10:05:43 hours) missed Rodriguez' right arm, its intended target. It should also be noted that inmates Taylor and Rodriguez were working in unison during the stabbing attack, taking turns stabbing Mr. Aguilar while subsequently hiding behind the Plexiglas dividers in an effort to shield themselves from the impact of the rounds being fired by Officer Lieber.

In addition, inmates Taylor and Rodriguez were tactically working together in an effort to continue their attack while Officer Lieber was in the process of reloading their weapon by having inmate Taylor watch Officer Lieber during the reloading process and advising inmate Rodriguez when it was safe for him to continue his stabbing attack against Mr. Aguilar and when to prepare to hide behind the chairs and Plexiglas to avoid being struck again by the 4557 foam rounds.

Prior to the fourth round being fired, Officer Lieber experienced a misfire requiring a reload. Both Taylor and Rodriguez were also taking cover behind the chairs and Plexiglas preventing Officer Lieber from being able to aim and obtain a sight picture. The fifth and final round was fired at approximately (10:06:24 hours) and struck inmate Taylor in the right hand and had the desired effect which was to stop inmate Taylor from his continued physical attack upon Mr. Aguilar.

15

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

Upon inmate Taylor being struck in the hand by the 4557-foam round, both inmates Taylor and Rodriguez stopped their attack upon Mr. Aguilar and began to get down on the floor.

The reaction time from when the attack started to when the first shot was fired by Officer Lieber was approximately six (6) seconds. The second shot was fired approximately fourteen (14) seconds later to include a reload and obtaining a new sight picture by Officer Lieber.

The third round was fired approximately nine (9) seconds later to include a reload and obtaining a new sight picture by Officer Lieber. As a result of the misfire, attempt refire and ultimately an additional reload and the tactics by Taylor and Rodriguez to take cover behind the chairs and Plexiglas, there was a delay of approximately forty-one (41) seconds before Rodriguez and Taylor moved from behind cover allowing for Officer Lieber to obtain a new sight picture and fire the final round.

The attack upon Mr. Aguilar was over at approximately 10:06:24 hours. The attack lasted approximately seventy (70) seconds. There were no lethal force options deployed during this incident.

At approximately 10:06:36 hours, inmate Rodriguez throws the stabbing weapon he was using on Mr. Aguilar onto the dayroom floor.

Rodriguez and Taylor do not immediately submit to the application of restraints by assuming a prone position. Instead, they both turn and face the cells within the section. It appears based on their body language and physical gestures they are soliciting responses from the inmates in the cell. They eventually get on the floor but do not assume a prone position and continue to crawl about on the floor congratulating each other with a handshake and rolling around on their backs while laughing with one another.

At approximately 10:07:19 hours, inmate Rodriguez begins moving towards the section door in preparation to submit to restraints. Inmate Taylor continues to roll around on the floor but does not show any indicators he is ready to submit to restraints.

This behavior directly impacted the ability of correctional officers and medical staff to enter the section quickly and be able to safely provide medical services and subsequently life-saving measures to Mr. Aguilar.

Prior to both Taylor and Rodriguez submitting to the application of restraints, there is a clear and present danger, coupled with a very high probability of success by either Taylor, Rodriguez or both Taylor and Rodriguez acting in concert, to assault emergency responders including medical staff. This absolutely prohibited an entry into the section any sooner than what took place.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

In the video recording, you can clearly see responding correctional officers are present at the "B" section door and windows preparing for an entry into the section when it is safe to do so.

The positioning of the stabbing attack where Mr. Aguilar was sitting within housing unit FB8 is visible to other inmates housed within FB8. There are no witness generated video recordings (inmate cell phones) of staff using excessive or unnecessary force towards inmates Taylor and Rodriguez.

## INITIATION OF LIFE SAVING MEASURES

At approximately 10:08:58 hours, correctional officers and supervisors open the "B" section door and entered the section to place Taylor and Rodriguez in restraints. At that moment in time, when staff entered the section, they were unaware of the location of all the stabbing weapons thus the emphasis on placing both Taylor and Rodriguez in restraints as quickly as possible. Failure to do so could have compromised the medical staff who are entering the section to render life-saving measures.

Once Taylor and Rodriguez were in restraints, Lt. D. Holbert and RN S. Peters immediately responded to the location of Mr. Aguilar at 10:09:41 hours, checked for a pulse and subsequently initiated life saving measures in the form of CPR and other medical services until additional medical staff and equipment joined in the efforts to assist.

Life saving measures continued by medical and custody staff in the housing unit on Mr. Aguilar as documented in the numerous custody and medical reports that are corroborated by the video recording until Mr. Aguilar was transported to the Triage treatment Area (TTA) at 10:14:03 hours.

While enroute to the TTA via an ambulance, life saving measures continued on Mr. Aguilar. Upon Mr. Aguilar's arrival at the TTA, life saving measures continued until Mr. Aguilar was pronounced deceased by Dr. Dhillion.

This is corroborated by the reports of:

- Dr. A. Dhillion dated December 12, 2019.
- RN L. Bowen dated December 12, 2019.
- RN A. Dimaculangan Jr dated December 12, 2019.
- RN J. Joby dated December 12, 2019.
- RN J. King dated December 12, 2019.
- RN A. Omelchuk dated December 12, 2019.
- RN S. Peters dated December 12, 2019.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- LVN T. Thorpe dated December 12, 2019.
- PT. L. Crist dated December 13, 2019.
- PT M. Davis dated December 12, 2019.
- Medical Assistant K. Garcia dated December 12, 2019.
- PT B. Oconnell dated December 12, 2019.

## **CRIME SCENE PRESERVATION**

The Investigative Services Unit (ISU) responded to the incident and made all necessary contacts associated with a death in custody incident. ISU members initiated an investigation by establishing a crime scene and generating photographs / video recordings.

A search of the dayroom and the cells occupied by Mr. Aguilar, inmate Taylor, inmate Rodriguez and inmate Green was also conducted, and all evidence gathered from these searches was processed into the CSP-SAC Evidence Room.

The processing of the entire crime scene that was located within housing unit FB8 and the TTA was extensive. Items of evidence processed into the CSP-SAC evidence room including the following:

- Weapons provided by Green used by Taylor and Rodriguez to stab Mr. Aguilar.

- Bloody clothing and items removed from the body of Rodriguez.

- Bloody clothing and items removed from the body of Taylor.

- Bloody clothing and items removed from the body of Mr. Aguilar.

- Thirty-four (34) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer P. Bettencourt, Badge # 70317, dated December 12, 2019.

- Fifty-four (54) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer C. Drake, Badge # 64369, dated December 12, 2019.

- Fifty (50) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer D. Garland, Badge # 66530, dated December 12, 2019.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Fifty-Seven (57) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer J. Grove, Badge #86239, dated December 12, 2019.

- Twenty-Three (23) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Officer K. Lee, Badge # 72086, dated December 12, 2019.

- Fifty-four (54) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken   by Officer S. Ramirez, Badge #69414, dated December 12, 2019.

- Twenty-four (24) crime scene photographs (Incident # SAC-FAB-19-12-1523) taken by Sergeant   K.   Steele,   Badge   #   63138,   dated   December   12,   2019.

- Video recording #FBB8 Dayroom B Section 1121 & 1120 dated December 12, 2019, beginning @ 0944 hours.

## CDCR INTERNAL AFFAIRS INVESTIGATION (Case # N-SAC-518-20-A & N-SAC-518-20-C)

As a result of the death of Mr. Aguilar, the CSP-SAC Investigative Services Unit, the  CSP-SAC Office of Internal Affairs, CDCR Office of Internal Affairs, the Sacramento County Coroner's Office and the Federal Bureau of Investigations,  initiated an investigation as to how the death occurred, if there were violations of departmental policies directly related to the death of Mr. Aguilar and finally if there were any validity to information provided during the initial investigation indicating Taylor, Rodriguez and Green were allowed by staff to conduct practice runs weeks prior to Mr. Aguilar's death and that staff assigned to Facility B were active co-conspirators in the attack and death of Mr. Aguilar on December 12, 2019.

Although I have not reviewed the completed investigative reports authored by the CDCR Office of Internal Affairs-Special Investigations Unit or the FBI, I am aware the below listed staff were part of an investigation by both agencies based on individual interview reports authored by FBI Agents Agent S. Lawland, D. Schmidt, Justin Bolden and Office of Internal Affairs Special Agent Scott Edelen:

- Investigative Interview Request (Case # N-SAC-518-20-A) for Lieutenant E. Baker dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer P. Brennfleck dated August 20, 2021, authored by Special Agent Scott Edelen.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer H. Chavez dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer J. Gomez dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer G. Herrera dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer W. Lieber dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer C. Painter dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Officer D. Sykes dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Sergeant D. Calderon dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Sergeant M. Saavedra dated August 20, 2021, authored by Special Agent Scott Edelen.

- Investigative Interview Request (Case # N-SAC-518-20-A) for Sergeant K. Steele dated August 20, 2021, authored by Special Agent Scott Edelen.

- Temporary Restriction Memorandum issued to Officer S. Mascardi dated February 22, 2021, authored by Warden Jeff Lynch.

- FBI report interviewing Officer Gomez authored by Agent S. Lawland and Justin Bolden dated August 09, 2021.

- FBI report interviewing Officer Steele authored by Agent S. Lawland and Justin Bolden dated August 16, 2021.

- FBI report interviewing Officer Herrera authored by Agent S. Lawland and Justin Bolden dated August 13, 2021.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- FBI report interviewing Lieutenant Baker authored by Agent S. Lawland and Justin Bolden dated August 09, 2021.

- FBI report interviewing Officer Sykes authored by Agent D. Schmidt and Justin Bolden dated April 22, 2021.

- FBI report interviewing Officer Lieber authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Officer Painter authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Sergeant Calderon authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Officer Brennfleck authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

- FBI report interviewing Officer Chavez authored by Agent D. Schmidt and Justin Bolden dated April 23, 2021.

On July 14, 2020, at approximately 1042, a forensic examination (Case # 19-06160) of Mr. Aguilar's body was completed by Dr. Jason P. Tovar of the Sacramento County Department of the Coroner. Refer to the report (approximately 14 pages) authored by Dr. Tovar for more detailed information. The report corroborates the cause of death was a direct result of the stabbing attack by Taylor and Rodriguez.

## ADMINISTRATIVE AND CRIMINAL CHARGES

Because of Mr. Aguilar's death, no criminal charges or administrative action was taken against Mr. Aguilar.

Inmates Taylor, Rodriguez, and Green were issued a rules violation report for the murder of Mr. Aguilar. I ascertained RVR's were issued based on the information in the incident report authored by Lieutenant Baker on December 12, 2019.

Inmates Taylor, Rodriguez, and Green were charged criminally with the murder of Mr. Aguilar.

Green plead nolo contendere to the charge of willful attempted murder on September 22, 2020, and received a sentence of 14 years to Life in state prison.

21

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

Rodriguez plead guilty on October 03, 2022, to the attempted murder of inmate Britt and the murder of Mr. Aguilar (both cases SAC-FAB-19-10-1228 & SAC-FAB-19-12-1523 consolidated by the DA) and received a sentence of 07 years to life and 25 years to life.

Taylor plead guilty on May 22, 2020, to attempted murder of inmate Britt and the murder of Mr. Aguilar (both cases SAC-FAB-19-10-1228 & SAC-FAB-19-12-1523 consolidated by the DA) and received a sentence of 102 years.

## CDCR USE OF FORCE POLICY

The CDCR use-of-force policy as outlined in Ca. Code of Regulations, Title 15, § 3268 contains the following definitions related to the use of force:

- Reasonable force: The force that an objective, trained, and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.

- Unnecessary force: The use of force when none is required or appropriate.

- Excessive force: The use of more force than is objectively reasonable to accomplish a lawful purpose.

## USE OF FORCE OPTIONS

The choices available to an employee when selecting a reasonable force option include, but are not necessarily limited to:

- Verbal persuasion or orders
- Physical strength and holds
- Chemical agents and/or other immobilization devices
- Handheld batons
- Less-lethal weapons or firearms
- Lethal Weapons and Firearms

Employees are trained that use of force options do not have to be utilized in any particular sequence but should be the force option staff reasonably believe is sufficient. When behavior of the inmate constitutes an immediate/imminent threat to the safety of staff, visitors, or other inmates, employees may also respond without first employing verbal persuasion or orders in order to control the immediate/imminent threat that justified the response.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

My opinions in this case are formed from the review of the documents listed above. I am satisfied they are true and correct copies of the originals based on having reviewed well over ten thousand plus (10,000+) of these documents throughout my career. My review of these documents focused on the uses of force, report-writing procedures, witness statements, the accuracy of the reports and ultimately the use of force review process.

The foundation for making these assessments to form an opinion is based on twenty-six plus (26+) years of correctional experience in these types of uses of force within the Administrative Segregation (Ad-Seg), Security Housing Units (SHU), Short Term Restricted Housing (STRH) and Long-Term Restricted Housing Units (LTRH), CTC Units, SNY Facilities and General Population Facilities.

My perspective is based on my experiences in these particular types of uses of force / death in custody situations as an Officer, Sergeant, Lieutenant, and Captain (A).

I also draw opinions based on over twenty-four plus (24+) years as a supervisor in the following capacity:

- First Responder to well over five thousand (5000) types of these incidents directing staff what to do prior, during, and after such incidents based on my assessments.

- Incident Commander to well over five thousand (5000) types of these incidents directing staff what to do prior, during and after such incidents based on my assessments.

- Reviewer of documented and video recorded use of force incidents in their entirety in the capacity of a Response Supervisor, Incident Commander, Manager's Reviewer First Level, and at the level of Institutional Executive Review Committee (IERC).

- Use of Force instructor responsible for the institutional training curriculum relative to immediate and controlled uses of force.

## ALARM RESPONSE TO HOUSING UNIT FB8

On December 12, 2019, Lieutenant E. Baker was assigned as the Facility Lieutenant overseeing Facility B to include Housing Unit #8 where the murder of Mr. Aguilar took place.
I was able to establish the role of Lieutenant Baker at the time of the incident as the incident commander and the alarm response coordinator for the emergency entry into the FB8 "B" section where the murder occurred. My source documents included the incident report and individual 837-C report authored by Lieutenant Baker and the audio recorded investigative interview of Lieutenant Baker by the CDCR Office of Internal Affairs.

23

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The tactical assessments, tactical planning, and the tactical deployment of correctional staff by Lieutenant Baker was detailed and representative of a well-trained supervisor during high stress/high risk emergency situations.

Considerations were given to evolving factors in real time with the emphasis of not impeding the actions of Officer Lieber and his force options while anticipating a potentially continued deadly confrontation with Taylor and Rodriguez who had just demonstrated extreme disregard for human life (Mr. Aguilar) and a willingness to inflict violence upon someone or a group of officers (response team) that could lead to death. Both Taylor and Rodriguez had the physical strength, tactical planning skill sets as demonstrated, and multiple deadly weapons to inflict great bodily injury or death upon responders if they entered the "B" section prematurely.

Based on all these circumstances as corroborated by the video recordings, Lieutenant Baker assigned responders individual tactical responsibilities as part of the arrest team to place Taylor and Rodriguez in restraints so medical staff could safely enter the section and initiate life saving measures for Mr. Aguilar and the ISU team could begin the establishment of a crime scene. At 10:08:56 hours, Lieutenant Baker and the arrest team, followed by medical staff initiate entry into "B" section.

## INCARCERATED DISCIPLINARY HISTORY

Green is an Independent Rider Sensitive Needs Yard (SNY) prison gang member (RVR dated October 15, 2019, Log # 06925247) who was a multi-termer. Green was incarcerated for murder in the 2nd degree serving a sentence of 15 years to Life. Green's disciplinary history related to acts of violence or being resistive while incarcerated is as follows:

- January 14, 2020, RVR Log # 06958204, Charge of Murder

- October 15, 2019, Solicitation of Battery Causing Serious Injury

- May 17, 2019, Possession of a Weapon

- June 08, 2018, Battery on an Inmate with a Weapon

- March 15, 2018, Fighting Resulting in the Use of Force

- May 16, 2017, Possession of a Weapon

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- December 19, 2016, Fighting Resulting in the Use of Force

- December 05, 2015, Possession of a Weapon

- May 29, 2012, Battery on an inmate with a weapon

- June 14, 2010, Possession of a weapon

- March 27, 2009, Fighting

- June 26, 2008, Promoting Gang Activity

- November 29, 2007, Promoting Gang Activity

- April 16, 2007, Mutual Combat

- October 17, 2006, Mutual Combat

- September 02, 2004, Battery on an Inmate

- June 23, 2004, Possession of a weapon

- January 01, 2003, Possession of a Weapon/ Reduced to Resisting a Peace Officer

- November11, 2000, Battery on an Inmate with an unknown liquid

Rodriguez is an Independent Rider Sensitive Needs Yard (Mexican Mafia Dropout) prison gang member (STG-II Validation Chrono Notice dated March 19, 2019) who was a multi-termer. Rodriguez was incarcerated for possession of a controlled substance, possession of a stolen vehicle and possession of a firearm Rodriguez' disciplinary history related to acts of violence or being resistive while incarcerated is as follows:

- July 01, 2020, Possession of a Deadly Weapon

- April 06, 2020, Threatening Great Bodily Injury or Death

- March 02, 2020, Possession of a Deadly Weapon

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- February 27, 2020, Possession of a Deadly Weapon

- January 14, 2020, Murder with a STG Nexus

- January 01, 2020, Possession of a Deadly Weapon

- October 11, 2019, Battery on an Inmate with a Deadly Weapon Resulting in SBI

- November 28, 2017, Possession of a Weapon

- December 01, 2016, Possession of a Deadly Weapon

- September 30, 2016, Assault with a Deadly Weapon
- July 20, 2016, Assault with a Deadly Weapon

- June 22, 2016, Possession of a Weapon

- June 22, 2016, Battery on a Peace Officer with a Weapon

- May 20, 2016, Possession of a Weapon

Taylor is a Northern Ryders Sensitive Needs Yard prison gang member (STG-II Classification Notice dated June 20, 2016). Taylor was initially incarcerated for burglary and possession of a controlled substance. Taylor's disciplinary history related to acts of violence or being resistive while incarcerated is as follows:

- April 27, 2021, Possession of an Inmate Manufactured Weapon

- June 03, 2020, Possession of a Weapon

- January 14, 2020, Murder with a Nexus to a STG (Aguilar)

- October 10, 2019, Battery on a Prisoner with a Deadly Weapon

- April 22, 2019, Possession of Dangerous Contraband

- March 27, 2019, Possession of a Deadly Weapon

26

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- March 20, 2018, Attempted Murder of an Inmate

- July 22, 2017, Fighting

- April 17, 2017, Fighting

- March 20, 2017, Attempted Murder

- March 13, 2017, Fighting

- September 10, 2016, Fighting

- August 29, 2013, Attempted Homicide on an Inmate

- August 24, 2013, Cell Fight

- June 05, 2013, Possession of a Weapon

## PRIOR TO THE USE OF FORCE INCIDENT # SAC-FAB-19-12-1523A2

Based on a review of the video recording on December 12, 2019, it appears that an unclothed body search of inmate Taylor was conducted prior to removal from his cell and the application of waist chains and leg restraints were applied correctly prior to removal from his cell. Inmate Taylor was subsequently placed in additional restraint safeguards (Black Box) designed to cover the handcuff key access hole and locking mechanism. The process starts at 9:45:06 hours and is completed at 9:52:56 hours. It appears to be done in a slow and methodical manner.

Based on a review of the video recording on December 12, 2019, it appears that an unclothed body search of inmate Rodriguez was conducted prior to removal from his cell and the application of waist chains and leg restraints were applied correctly prior to removal from his cell. Inmate Rodriguez was subsequently placed in additional restraint safeguards (Black Box) designed to cover the handcuff key access hole and locking mechanism.

The primary means of manipulating any locking mechanism on handcuff restraints is to enter the locking mechanism through the keyhole area or through the push down locking mechanism area located on each cuff of the restraints.

27

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The intent of the Black Box is to impede or prevent someone (based on an individual's skill set) from utilizing a product manufactured key, inmate manufactured key, or inmate manufactured shim, to manipulate and unlock the double lock mechanism, or actual key lock mechanism, by having access to these areas.

The process starts at 9:54:25 hours and is completed at 10:02:54 hours. It also appears to be done in a slow and methodical manner.

The escorting officers and supervisor begin to exit the unit and at 10:03:01 hours, inmate Rodriguez begins to remove what was suspected to be a band-aid from his right-hand index finger. It appears this is where Rodriguez had the inmate manufactured handcuff key hidden during unclothed body search.

At 10:03:28 hours, inmate Rodriguez begins to use the suspected handcuff key to unlock the left handcuff from his wrist.

At 10:04:01, inmate Rodriguez removed the handcuffs from his wrists and proceeded to start removing the left leg restraints. At 10:04:45 hours, inmate Rodriguez freed himself from the leg restraints.

At 10:03:19 hours, inmate Taylor appears to begin to use the suspected handcuff key to unlock the handcuffs. I was not able to determine from watching the video which hand he freed first.

At 10:03:26, inmate Taylor removed the left handcuff from his wrist and proceeded to remove something from his mouth.

At 10:04:30 hours, inmate Taylor has both of his hands free and proceeds to unlock the left leg restraint.

At 10:04:30 hours, inmate Taylor freed himself from the left leg restraint.

At 10:05:51 hours, inmate Taylor freed himself from the right leg restraint.

At 10:04:52 hours, both Taylor and Rodriguez stand up and proceed to the upper tier to the cell solely occupied by inmate Green. Rodriguez retrieves the two weapons passed to him under the cell door by inmate Green. As Rodriguez travels back down the stairs, Taylor continues to maintain watch on the location of Officer Lieber. Rodriguez hands Taylor a weapon and both Taylor and Rodriguez start the stabbing attack upon Mr. Aguilar at 10:05:15 hours.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

## EXPERT OPINION #1

I utilized the individual reports contained within incident report SAC-FAB-19-12-1523A2, video recordings, audio recordings of investigative interviews, reports authored based on investigative interviews and crime scene preservation reports.

It is my opinion there were no policy violations for Operational Procedure # 046, Long-Term Restricted Housing (LTRH) relevant to security protocols for removing an inmate from his cell, conducting unclothed body searches, or securing an inmate to the restart chairs located within the "B" section dayroom.

However, page 23 indicates eye protection is to be worn when entering the section and when waist chains are applied, they must be applied in a holding cell. Based on the video recording and photographs of the section where the incident occurred, the showers would most closely resemble a holding cell. This may have been an oversight while revising or authoring the operational procedure for the housing unit as there would be questions regarding what would be considered best practice.

Leg restraints were applied, and it appears additional security apparatuses (Black Box) are applied to the restraints as well.

## EXPERT OPINION #2

The operational procedures for the LTRH and the Post Orders (#231080) did not mandate that Officer Lieber stand at the window and maintain a constant observation of Taylor, Rodriguez, and Mr. Aguilar. On the date and time of the incident in question, Officer Lieber had multiple duties and responsibilities in multiple sections of the housing unit and by design of the housing unit, there is not a location where Officer Leiber could stand that would allow him to view all three sections of the housing unit simultaneously.

Therefore, it is my opinion that Officer Lieber's absence during the application of restraints (Taylor and Rodriguez), and at the section windows and gun ports prior to the use of force was not a departmental or operational policy violation based on departmental training during emergency situations and the policies written and approved by the Hiring Authority (Warden) relative to the LTRH.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

As an instructor in the application of restraints and the techniques used to apply the handcuffs, waist chains, and leg restraints, I instructed staff that the process of "double locking" handcuffs and leg restraints or using Black Box HRT units is not fool proof and does not guarantee that the restraints cannot be manipulated and unlocked using makeshift handcuff keys and shims or other unlocking devices.

The standard law enforcement issued handcuff key has not changed in design over my 26+ years as a peace officer and trainer of peace officers. This locking mechanism design patented by Peerless Handcuff Company has been mimicked and copied by most handcuff and leg restraint companies since the expiration of the patent issued to Peerless Handcuff Company.

The design of the Peerless brand restraints and restraints of similar design have not changed significantly over the 34 years of my correctional experience while employed or retired. This design of restraints is what was considered the industry standard by most law enforcement agencies nationwide to include CDCR prior to these incidents in question and the relevance is the inmates who wear these restraints have not had to change their training tactics to escape from their restraints due to a lack of mechanical design by the manufacturer of the restraints.

As of the date of this report, a cursory search of the Peerless Handcuff Company website will display several variations of handcuff key design however the actual design of the portion of the key that unlocks the mechanism is unchanged from the design of the early 80's or older.

The NLETC–NIJ–Metallic Handcuff Standard 0307.01 authored by the Department of Justice dated March 1982 is the continued industry standard and stipulates that the double lock mechanism is only designed to prevent the restraint mechanism from advancing further in the closed position. It is not designed as a fool proof way of locking the locking mechanism.

This information discredits the belief that the only way Rodriguez and Taylor could have escaped from their restraints is if staff failed to double lock the handcuffs and leg restraints. A search of internet websites and videos show how even while double locked, handcuffs and leg restraints can be manipulated and unlocked using something other than a legitimately designed and manufactured standard handcuff key from a restraint company.

Although the video review may not be definitive of exactly what technique or techniques were used by Taylor and Rodriguez to escape from the restraints, what is definitive and cannot be disputed is both Rodriguez and Taylor have been incarcerated for a significant amount of time at the local, county and state level of correctional facilities.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

**Within that amount of time of incarceration, the result is the repeated placement in restraints using the Peerless copyrighted locking mechanisms. It is my opinion both Taylor and Rodriguez have each been placed in and out of these type of restraints at a minimum of 5000 times or more prior to the incident. Each of those times allowed for Taylor and Rodriguez to gather information about the restraints and to practice their techniques for escaping until they were able to perfect it. The deposition of Mr. Rodriguez dated September 28, 2023, (pages 44-48), corroborates my opinion. Specifically, Mr. Rodriguez details during his deposition, how he and other inmates would manipulate staff into placing them in restraints and place them in a holding cell for an extended period of time to practice defeating the restraints without staff having knowledge of what they (Rodriguez, Taylor and other inmates) were doing. Refer to page 45 lines 21-25, page 46 lines 1-25, page 47 lines 1-25, and page 48 lines 1-6.**

**It is also my opinion based on the condition of the restraints, the number of years the restraints were in service and what tools Taylor and Rodriguez may or may not have been in possession while practicing their techniques all could have factored into whether they used a single technique or multiple techniques in unison to defeat the restraints during the attack on Mr. Aguilar.**

## PRIOR TO THE USE OF FORCE INCIDENT # SAC-FAB-19-10-1228A2

Based on a review of the video recording on October 10, 2019, did not show any of the security protocols being performed by staff prior to Taylor and Rodriguez being removed from their cells.

At 11:14:13 hours, inmates Rodriguez and Taylor begin to use the suspected handcuff keys to unlock the handcuffs from their wrists.

At 11:14:19, both Taylor and Rodriguez removed the handcuffs from their wrists and proceeded to start removing the left leg restraints.

At 11:14:41 hours, Taylor and Rodriguez are no longer in the leg restraints.

At 11:14:43 hours, both Taylor and Rodriguez stand up and walk towards the chair occupied by inmate Britt. Rodriguez appears to retrieve the two weapons hidden in his jumpsuit and passes one of the weapons to Taylor.

Both Taylor and Rodriguez start the stabbing attack upon inmate Britt at 11:14:50 hours.

The stabbing assault stops at 11:15:19 hours upon Officer Painter firing three (3) 4557 foam rounds from the 40mm launcher.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

## INITIATION OF FORCE OPTIONS INCIDENT # SAC-FAB-19-10-1228A2

Once the stabbing assault started, both Taylor and Rodriguez refused to comply with the order by Officer Painter to "get down". Based on his training and experience, Officer Painter made an assessment there was an imminent threat requiring an immediate action without delay and subsequently requiring the discharge of three 4557 foam preceded with a verbal warning to "get down" to stop the stabbing attack on inmate Britt.

The actions by Taylor and Rodriguez at this point would be considered an imminent threat and an active attack, with the risk of being a continued attack if force were not deployed by Officer Painter or any other reasonable officer.

A reasonable officer would perceive the actions by Taylor and Rodriguez as life threatening or indicative of a violent person with the intent to inflict continued harm upon someone.   The need for some type of immediate reaction from Officer Painter other than the verbal de-escalation technique was required per CDCR UOF policy. Officer Painter chose the less-lethal force, and the less-lethal force was appropriate.

## EXPERT OPINION #3

**I have reviewed the video recordings, individual investigative reports/audio recordings and incident report # SAC-FAB-19-10-1228A2. It is my opinion there is no evidence of staff negligence or complicity.**
**There are no indicators to link any of the Defendants as co-conspirators or collaborators working in partnership with inmates Green, Taylor, and Rodriguez. It is clear during the stabbing attack against inmate Britt, inmates Taylor and Rodriguez are using tactics to avoid being shot by the less-lethal impact rounds to avoid injury and to be aware if Officer Painter transitions to lethal force. These behaviors are not conducive or synonymous with partners who are working in unison with a "teammate" mentality.**

## INITIATION OF FORCE OPTIONS INCIDENT # SAC-FAB-19-12-1523A2

Once the stabbing assault started, both Taylor and Rodriguez refused to comply with the order by Officer Lieber to "get down". Officer Lieber made an assessment there was an imminent threat requiring an immediate action without delay and subsequently requiring the discharge of five (5) 4557 foam preceded with a verbal warning to "get down" to stop the stabbing attack on inmate Mr. Aguilar

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The actions by Taylor and Rodriguez at this point would be considered an imminent threat that could lead to life threatening injuries based on the locations they were stabbing Mr. Aguilar if force were not deployed by Officer Lieber or any other reasonable officer.

A reasonable officer would perceive the actions by Taylor and Rodriguez as life threatening and indicative of a violent person with the intent to inflict continued harm upon someone. The need for some type of immediate reaction from Officer Lieber other than the verbal de-escalation technique was required per CDCR UOF policy. Officer Lieber chose the less-lethal force, and the less-lethal force was appropriate based on the totality of the circumstances surrounding the attack (obstructions and body placement of multiple attackers). Officer Lieber continued with the less-lethal option until he was able to quell the stabbing attack.

A review of the multiple video recordings of the incident are of good quality and the elevated mounting position of the cameras accurately depicts the incident as it took place.

## EXPERT OPINION #4

**I have reviewed the video recordings, individual investigative reports/audio recordings and incident report # SAC-FAB-19-12-1523A2. There are no indicators to link any of the Defendants as co-conspirators or collaborators working in partnership with inmates Green, Taylor, and Rodriguez to murder Mr. Aguilar.**

**It is clear during the stabbing attack against Mr. Aguilar, inmates Taylor and Rodriguez have evolved in their tactics (in comparison to incident # SAC-FAB-19-10-1228A2) on how they orchestrated the stabbing attack against Mr. Aguilar and how they used rapid movements and obstructions to try and defeat the direct impact rounds.**

**What I also noted during the attack against Mr. Aguilar in comparison to the attack against inmate Britt, is how much more aware Taylor and Rodriguez are in their positioning during the attack on Mr. Aguilar and how they both are using tactics to avoid being shot by the less-lethal impact rounds or lethal rounds had Officer Lieber transitioned to the Mini-14. Specifically, both Taylor and Rodriguez worked in tandem more effectively than during the attack against inmate Britt.**

**Taylor and Rodriguez utilized the restart chairs as cover to avoid injury and to be aware if Officer Lieber transitioned to lethal force. Taylor did this by observing Officer Lieber during the loading and unloading process of the 40mm launcher and prompting Rodriguez when it was safe for him to continue the stabbing attack against Mr. Aguilar. Each time Officer Lieber fired a shot and had to reload, this allowed for the attack to continue.**

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

An additional delay during the course of fire by Officer Lieber was contributed to a misfire on the 4th impact round necessitating for an additional reload and the discharge of a 5th impact round. The physical design of the control booth windows, and the position of the gun ports prohibit Officer Leiber from acquiring a sight picture of the target and discharging the weapon any faster than what is reasonably expected of a peace officer trained to fire the 40mm launcher. I found no negligence or lack of proficiency on the part of Officer Lieber during the speed reloads and firing of the 40mm launcher.

The use of a single shot launcher in this type of attack was a tactical advantage for Taylor and Rodriguez. Officer Lieber had no choice but to use the single shot launcher as no other launcher was assigned to his post. A multi-launcher in this type of situation would have provided a tactical advantage by allowing for rapid and continuous firing of the 4557 impact rounds while maintaining a sight picture of Taylor and Rodriguez.

It is alleged by the Plaintiff's that Officer Lieber agreed to not use lethal force against Taylor and Rodriguez during the attack. It is my opinion that the actions of Taylor and Rodriguez indicate this is not true as both Taylor and Rodriguez were very focused on only continuing the stabbing attack while Officer Lieber was reloading and preparing to take aim with less lethal force.

The choice by Officer Lieber to not transition to lethal force was appropriate based on the totality of circumstances which include fast moving targets (Taylor and Rodriguez), the positioning of both Taylor and Rodriguez over Mr. Aguilar while they were stabbing him, the potential to place noninvolved inmates in the line of fire who were in the cells behind the incident location, and the potential ricochets off items Taylor and Rodriguez were using for cover (chairs and metal frames).

All these factors greatly can contribute to the difficulty of obtaining a sight picture with the Mini-14 at close distances due to the design of the Ruger Mini-14 and the barrel length. A poor sight picture will result in missing the intended target. A round that does not strike its intended target can ricochet and strike an unintended target. It could have also struck Mr. Aguilar. The use of lethal force fell within the use of force policy for justification of lethal force but that is superseded by the high probability of a lethal injury to a noninvolved participant in this situation.

It should also be noted that correctional officers are trained to obtain a sight picture and shoot a qualifying course of fire at a distance of 50 to 100 yards. Correctional officers do not train to shoot the Mini-14 at a distance of less than 50 yards and when they do shoot a course of fire to obtain their quarterly or yearly qualifications, it is at a stationary target, not a fast-moving target (DOM 32010.19.6.1).

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

**The less-lethal rounds are fired at a distance of 25 yards for qualification and are typically fired at a life size "dummy" ensuring that when the officer fires the 3 rounds, the rounds strike the Zone 1 (lower extremities) (Dom 32010.19.6.3).**

**Supreme court decision 1989 Graham vs Connor states force used will be judged based on the objective reasonableness standard. It will be examined through the eyes of the officer on scene at the time forced was used. It will be judged based on knowledge the officer acted properly, and last that will be judged based on facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation.**

**Objective reasonableness is defined as:**
**Establishes the necessity of the use and level of force based on the officer's evaluation of the situation considering the totality of the circumstances. It is judged from the perspective of a reasonable officer on scene rather than 20/20 vison of hindsight.**

**Officer Lieber is trained to continuously make assessments utilizing the O.O.D.A. Loop (Observe, Orient, Decide and Act) based on what he knows at the time the incident is happening in real time without the use of played back video recordings, photographs, triangulations, and measurements.**
**It is my opinion Officer Lieber utilized his O.O.D.A. Loop assessments in fractions of a section as the incident was fluid and fast, constantly changing based on the tactics used by Rodriguez and Taylor to impede the force used by Officer Leiber. Officer Leiber was in compliance with all CDCR training mandates relative to assessing force option and using force within an acceptable time frame.**

## AFTER THE USE OF FORCE

The tactical decisions by all staff present outside of "B" section door to not enter were appropriate and within the training guidelines established in the use of force training and arrest and control technique training.

All the reports and video recordings I have reviewed corroborate that Officer Lieber made the correct assessments to immediately stop all force options when a threat was no longer present.
The assessment by Lieutenant Baker to assemble a response team, assign duties to response team members was appropriate. The decision by Sergeant Calderon and the other responders to not enter the unit until Taylor and Rodriguez were no longer in possession of their stabbing weapons was appropriate and is conducive with arrest circle techniques and the alarm response training.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

As the response team (Officers Leatherman, Moore, Brennfleck, Herrera, Jordan, Sykes, Harrington, and Garland) entered the unit and placed Taylor and Rodriguez in restraints, simultaneously custody and medical staff approached Mr. Aguilar at 10:09:41 hours, and transitioned to initiating and performing life saving measures (Officer J. Gomez, Lt. D. Hobart, RN S. Peters) on Mr. Aguilar. This also falls within the guidelines of medical training / basic first aid training that correctional officers receive in addition to the code of ethic training that correctional officers receive.

A team of medical staff joined in the life-saving measures on Mr. Aguilar and continued the life-saving measures (approximately 29 minutes and 52 seconds) until Mr. Aguilar was pronounced deceased by Dr. Dhillion at approximately 1040 hours.

The timelines for entry into the "B" section dayroom deployed throughout this incident was appropriate and would have been deemed reasonable by another supervisor with similar tactical training and on the job experience.

It is reasonable that a supervisor with similar tactical training and on the job experience would perceive the actions of Taylor and Rodriguez (while they had stabbing weapons in their hands) as an effort to injure and incapacitate the onsite responders and continue forward with the intent to assault other staff members based on previous documented behavior while incarcerated.

The threat perception by involved responders from Taylor's and Rodriguez' actions should not only be categorized as a threat to those trying to medically treat or remove Mr. Aguilar from the dayroom, but also a threat to those who were trying to restrain Taylor or Rodriguez at the time of the incident.

Lieutenant Baker and Lieutenant Hobart made multiple assessments throughout the incident to minimize potential injuries to the response team and the medical staff. The stabbing incident was initiated at 10:05 hours. The response team made entry into the "B" section dayroom at approximately 10:09 hours. This would not have been enough time to outfit staff in riot/extraction gear consisting of riot helmets, protective neck rolls, throat protection, shin guards, arm pads, elbow pads, knee pads, and shoulder pads.

All of these are items are designed to reduce injuries from a stabbing attack, slashing attack, or physical assault, however the protective equipment is not guaranteed to prevent an injury from a slashing, stabbing or physical attack. The incident was not in an area that could be controlled or isolated. It allowed ample room for Taylor and Rodriguez to split apart from each other, run up or down the stairs to the upper tier and divide the resources of an entry team all while being in possession of stabbing weapons that could inflict a lethal injury to responders.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

These assessments included de-escalation techniques by means of verbal orders to stop and to get down. Both orders are very basic commands to understand and are taught to staff by the Department of Corrections and Rehabilitation (CDCR) during arrest and control techniques.

The de-escalation techniques proved to be ineffective. Because the de-escalation techniques were ineffective, this forced Officer Lieber to escalate the force option to less-lethal force while continuing to give verbal orders to stop and/or stop resisting etc.

## EXPERT OPINION #5

**Officer Lieber was out of compliance with is post orders by not having the Mini-14 rifle slung on his body while there were inmates in the dayroom however, consideration should have been taken into account if Officer Lieber had transitioned from a Mini-14 to the less-lethal 40mm launcher, he more than likely would have unslung the Mini-14 to safely handle, load, fire and unload the launcher without taking a chance of dropping the Mini-14 rifle or having a negligent discharge. This could have resulted in a slower response to the less lethal force used by Officer Leiber.**

**It should also be noted that correctional officers are not trained to fire the 40mm launcher while having the Mini-14 rifle slung simultaneously. In the depositions by Plaintiff's counsel of several defendants, there are several inferences that just the presence of a Mini-14 rifle being slung by the officer serves as a deterrent for violence among the inmate population and had Officer Lieber had his assigned Mini-14 rifle slung, the attack on Mr. Aguilar could have been prevented.**

**It is my expert opinion there is no evidence to support this, and correctional officers are trained to not fall into a false sense of security because there is a lethal force option present. Inmates are also trained among themselves to not fall into a false sense of security because a lethal force option is always present inside a housing unit or on an exercise yard in a Level III or Level IV setting.**

**CDCR has had armed gun coverage positions inside housing unit and outdoor on exercise yards since the inception of corrections in California as well as other correctional departments nationwide and internationally, yet stabbing attacks, slashing attacks and batteries against correctional staff or other inmates continue to occur even when a lethal force option is present. These attacks are well documented and are used as a foundation for training staff on correctional awareness and officer safety.**

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

Lethal force options are present in all Level III and Level IV facilities within CDCR, yet riots continue to take place among the inmate population. These riots are well documented and are used as a foundation for training staff on correctional awareness and officer safety.

In my expert opinion, all the tactics and actions by Officer Lieber in regard to less-lethal force, and the tactical planning by Lieutenant Hobart, and Lieutenant Baker of the role each response team member would play, are a required necessity and did not cause delays to initiating life-saving measures to Mr. Aguilar and are transparent with no hidden agendas and are within the CDCR Use of Force policy (Title 15, Section 3268, and DOM Section 51020) and the arrest and control techniques lesson plan. These policies and procedures are in place to prevent injuries to staff and other inmates, when possible, by using proven tactics and safety precautions.

Lieutenant Baker is ultimately responsible for the injuries he can prevent to staff and inmates moving forward upon making his initial assessment and tactical plan.

Had Lieutenant Baker acted in hast and entered the section prematurely while Taylor and Rodriguez still had weapons in their hands or if not in their hands but in close proximity to retrieve the weapons and stab responders, Lieutenant Baker would have been held accountable for the injuries sustained by staff as well as any injuries that may have been sustained by Taylor or Rodriguez as a result of force deployed to stop the attack verses the tactical plan deployed by Lieutenant Baker that resulted in restraining Taylor and Rodriguez without injuries to correctional staff or medical staff.

The less-lethal force by Officer Lieber stopped the stabbing attack by Taylor and Rodriguez in less time that what would be reasonably necessary to properly outfit enough response team member in the appropriate riot gear to engage multiple threats with a deadly weapon (Taylor and Rodriguez).

It is my opinion chemical agents would have been counterproductive in this incident as the attack did not take place in an isolated and controlled area. It would have been easy for Taylor and Rodriguez to defeat the effects of chemical agents with their clothing or by relocating to other areas inside the dayroom.

The only person who would have been negatively impacted by the chemical agents would have been Mr. Aguilar. It would also have prevented medial staff from being able to enter the section and begin life-saving measures on Mr. Aguilar in the dayroom until the extraction team could corner both attackers into a corner and force them into a prone position and into restraints.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

**It is also my opinion tactical decision by staff to enter the section using only their expandable batons to defend themselves against a stabbing attack would have compromised staff safety and resulted in injuries to staff had Taylor and Rodriguez decided to attack the responders.**

**The baton when expanded is approximately 21" long. The baton is an effective tool in defending someone from a physical attack. However, it is not effective when trying to defend against a stabbing or slashing attack because to effectively use the baton, an officer has to be in close proximity to the inmate. During annual recertification of the expandable baton, staff are trained that if they are close enough to utilize a baton strike, they are also close enough to the inmate for the inmate to strike them, grab them or try and grab the baton away from the officer.**

**It is also my expert opinion that there are no indicators in the video recordings, investigative audio recorded interviews, depositions, and written reports, that the Defendants "turned a blind eye" while Taylor and Rodriguez committed the stabbing attack upon Mr. Aguilar.**
**It is my expert opinion none of the Defendants are directly responsible for the death of Mr. Aguilar as alleged by the Plaintiffs.**

## REPORT WRITING TIMELINES

It appears all reports authored by those who used force or witnessed force were submitted prior to the conclusion of their shift, which adheres to CDCR's policies and procedures.

It also appears all reports authored by medical staff who responded to the incident site and either rendered life saving measures or gave direction while life saving measures were being performed submitted their reports as well on the date of the incident or before the conclusion of their shift.

## REVIEW OF INCIDENT REPORT# SAC-FAB-19-12-1523A2

When reviewing reports, I question how the force used is described in the individual reports and if witness reports and video recordings / photographs corroborate it. I also determine if the reports match the escalation of force or the behavior of the attackers.

Lastly, I look to see if evidence of collaboration has taken place among the authors of the reports or if the reports appear to be transparent as to what has taken place. Incident report # SAC-FAB-19-12-1523A2 consists of approximately 267 pages of individual reports from correctional staff, evidence reports from correctional staff, and medical reports from staff who performed life-saving measures on Mr. Aguilar. There are eleven videos I reviewed consisting of a total of 189.5 minutes of video recording. There are approximately 346 evidence photographs that I reviewed directly related to the incident of December 12, 2019.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

A review of the documents and individual reports contained within the Incident Report does not show any conspiracy or intent to commit writing violations by any of the involved staff as claimed by the Plaintiffs. There are no intentional and misleading statements intended to misrepresent what took place during the incident.

When reviewing reports, I utilize comparisons to determine what the training curve is on how well reports are written and what is considered an acceptable report by the supervisor and administrators who reviewed this incident.

Reports containing typos, failed punctuation, and some lack of detailed information were accepted by the supervisors and resulted in some clarification reports being requested.

The tactics deployed and the manner in which each use of less-lethal force is in greater detail in some reports in comparison to others.
This is common in reportable incidents as some staff are better report writers than others based on several factors to include on the job experience, education, previous employment skill sets or being information technology (IT) challenged.

Although there are some slight inconsistencies in the reports regarding positioning, distances, estimations of time and repetitive movements, there are no signs of collaboration.

## EXPERT OPINION #6

**In my opinion, the review of all the reports from involved staff by Lieutenant Baker and any other supervisors assigned to report writing review duty post incident on December 12, 2019, would have been challenging at best based on all the additional responsibilities associated with the initiation of the death notifications associated with a homicide and the subsequent investigative protocols that followed the incident.**

**As part of the report writing review process, a request for clarification procedure exists. The "report writing request for clarification process" was created and designed so additional information could be requested and submitted in a documented chronological order. It does not appear that clarification reports were issued to all staff members who were responders to the incident on December 12, 2019. There were some clarification requests issued.**

**It appears all clarification requests were answered by involved staff and responses did not appear to be intended to omit or mislead the supervisor requesting the clarification.**

**Upon reviewing the individual reports of all involved staff who were present during the attack and after the attack, I found no conflicting or misleading information.**

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The reports clearly detail the level of violence Taylor and Rodriguez inflicted on Mr. Aguilar and all the efforts deployed by responders to stop the attack and to try and place Taylor and Rodriguez in restraints as quickly as possible. The reports as written do not reflect any collaboration that was utilized to ensure accuracy. This is corroborated by all the video recordings and evidentiary photographs.

There is nothing within any of the reports that would lead me to believe any staff other than the ones who submitted reports were present at the incident and utilized force. My review determined there are no red flags consistent with someone failing to document a failure to act or work in collaboration with Taylor or Rodriguez in the murder of Mr. Aguilar. My review also determined there are no red flags consistent with someone failing to document timelines and medical services provided during this incident.

My review of the individual reports by custody and medical staff who witnessed force and the custody staff who used force, matched the resistive and assaultive behavior described of Taylor and Rodriguez by the involved staff.

In my opinion, additional clarification requests could have been issued to Lieutenant Baker and Lieutenant Hobart to paint a clearer picture of their assessment of why it was not safe to immediately enter the section during the stabbing attack or clarify if the attack was over upon the arrival of Lieutenant Baker to the section door.

It is my experience as a first responder to these types of situations, just based on an initial assessment of what is taking place there are still many unknown factors. These factors could include; are there other cell doors that have been unlocked, are there other inmates in these cells who are lying in wait before they exit their cell to attack first responders, do these inmates have inmate manufactured weapons, are there inmate manufactured weapons located at different areas within the section where the incident takes place? Is the motives of Taylor and Rodriguez to try and force Lieutenant Baker or Lieutenant Hobart to circumvent their tactical training and the safety of their staff and enter the section without considering these unknowns.

Furthermore, why it was not safe to try and physically overpower Taylor and Rodriguez while they still had stabbing weapons in their hands; in order to show completeness however, the clarifications were not required to establish compliance with policy and procedure or identify unprofessional or criminal acts.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

## REVIEW OF UOF CRITIQUE REPORTS

The purpose of the Incident Commander Critique, the Manager's First Level Critic and ultimately the Institutional Executive Review Committee (IREC) report is to review all documents, evidence and statements made by involved staff gathered at the supervisor level of review and investigative level of review and determine if policies and procedures were adhered to and if they were not adhered to, what corrective action is necessary to address violations or poor tactics.
These reports were not provided for my review.

## REVIEW OF DEPOSITIONS

I reviewed the following depositions in forming my opinion as to whether the actions by involved staff were reasonable and in accordance with CDCR trainings and procedures relative to officer and inmate safety:

- D. Garland dated September 13, 2023 (59 Pages).

- Officer D. Sykes dated July 21, 2023 (153 Pages).

- Lieutenant E. Baker dated September 27, 2023 (217 Pages).

- Officer G, Herrera dated July 10, 2023 (217 Pages).

- Officer H. Chavez dated September 13, 2023 (100 Pages).

- Warden J. Lynch dated August 29, 2023, (163 Pages).

- Officer J. Kolb dated September 11, 2023 (61 Pages).

- Officer J. Gomez dated September 01, 2023 (124 Pages).

- M. Jordan dated September 05, 2023 (63 Pages).

- Sergeant M. Saavedra dated September 21, 2023 (36 Pages).

- Officer S. Painter dated September 18, 2023 (122 Pages).

- Officer W. Lieber dated August 22, 2023 (171 Pages).

- Inmate D. Green J-22161 dated September 21, 2023 (209 Pages).

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Inmate A. Rodriguez AW-1424 dated September 28, 2023 (207 Pages).

- Ma Rosario Zaragosa dated September 25, 2023 (80 Pages).

The depositions did not provide any information that the staff who participated in the depositions participated in a code of silence, withheld information during any investigation, or provided any proof any of the Defendants had an active role in the murder of Mr. Aguilar on December 12, 2019, or that the Defendants had any part of negligence in the death of Mr. Aguilar.

The deposition of Mr. Garland revealed he is no longer employed by CDCR. There was no information revealed in the deposition that Mr. Garland violated any CDCR policies as a result of his duties when responding to the murder of Mr. Aguilar.

The deposition of Officer Gomez revealed he violated security protocols by bringing his telephone into the secured perimeter of the institution and utilized his cell phone to video record the video recording of the murder of Mr. Aguilar. This was post incident date.

The deposition of Officer Chavez did not reveal he violated report writing protocols or that he was present in the rotunda during the murder of Mr. Aguilar. The deposition did reveal that his testimony is in direct conflict with the information provided by Officer Lieber during his deposition. Specifically, Officer Lieber claims he notified Officer Chavez the inmates were manipulating their restraints, Officer Chavez denies this.

The deposition of Lieutenant Baker was extensive, however there was no information revealed that indicates Lieutenant Baker violated departmental policies when responding to the stabbing attack and subsequent murder of Mr. Aguilar. Nor did Lieutenant Baker's actions when coordinating the entry into "B" section result in any negligence or delays in providing life-saving measures to Mr. Aguilar.

The deposition of Officer Lieber revealed Officer Lieber failed to have the Mini-14 rifle slung on his person when the attack upon Mr. Aguilar was initiated by Taylor and Rodriguez. Officer Lieber explained throughout his deposition that he did not feel that the use of lethal force was possible based on the totality of the circumstances surrounding the attack and less-lethal force was better suited to stop the stabbing attack. The deposition did not reveal that Officer Lieber violated any other CDCR policies or procedures.

The deposition of Officer Sykes did not reveal Officer Sykes violated any CDCR policies or procedures prior to responding into "B" section or during the murder of Mr. Aguilar.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

At the time of completion of this report, inmate Taylor has continued to refuse to participate in the deposition process. An amended report may follow upon the deposition of inmate Taylor.

## <u>REVIEW OF AUDIO RECORDED INVESTIGATIVE INTERVIEWS</u>

I reviewed the following audio recorded investigative interviews in forming my opinion as to whether the actions by involved staff were reasonable and in accordance with CDCR training and procedures relative to officer and inmate safety.

I also used the recording to help determine if there was any validity to staff participating in a code of silence or having an active role in the murder of Mr. Aguilar:

• Audio CDCR OIA interview of inmate Puckett, G05549 (unknown date and time) (14 Min).

• Audio CDCR OIA interview of inmate Taylor, AP2001 unknown date and time (12.5 Min).

• Audio CDCR OIA interview of Lieutenant E. Baker dated September 09, 2021, (1.75 Hr).

• Audio CDCR OIA interview of Officer R. Ehler dated September 09, 2021, (7.75 Min).

• Audio CDCR OIA interview of Officer W. Lieber dated September 09, 2021, (44 Min).

• Audio CDCR OIA interview of Sergeant M. Saavedra dated September 09, 2021, (36 Min).

• Audio CDCR OIA interview of Officer S. Painter dated September 09, 2021, (50 Min).

• Audio CDCR OIA interview of Sergeant D. Calderon dated September 14, 2021, (30.75 Min)

• Audio CDCR OIA interview of Officer P. Brennfleck dated September 14, 2021, (30.5 Min).

• Audio CDCR OIA interview of Officer D. Sykes dated September 09, 2021, (49 Min).

• Audio CDCR OIA interview of Officer G. Herrera dated September 15, 2021, (41.5 Min).

• Audio CDCR OIA interview of Officer H. Chavez dated September 15, 2021, (35.5 Min)

• Audio CDCR OIA interview of Officer J. Gomez dated September 14, 2021, (34 Min).

44

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The recordings did not provide any information the staff who participated in the investigative interviews participated in a code of silence, withheld information during any investigation, or provided any proof any of the Defendants had an active role in the murder of Mr. Aguilar on December 12, 2019, or that the Defendants had any part of negligence in the death of Mr. Aguilar.

The investigative interview of Officer Gomez revealed he violated security protocols by bringing his telephone into the secured perimeter of the institution and utilized his cell phone to video record the video recording of the murder of Mr. Aguilar.

The investigative interview of Officer Chavez revealed he violated Code 1 responder protocols per his post orders by not responding to the alarm, rotunda, or incident during the murder of Mr. Aguilar.

The investigative interview of Officer Ehler did not provide any information that Officer Ehler violated any CDCR policies, procedures or investigation protocols related to the murder of Mr. Aguilar. Officer Ehler confirmed that he had authored a memorandum detailing statements by inmate Rodriguez that there was no truth to the Defendants being actively involved in the murder of Mr. Aguilar.

The investigative interview of Officer Lieber revealed Officer Lieber did not have the Mini-14 rifle slung on his person. This was a violation of his post orders for the Control Booth Officer position.

When the attack by Taylor and Rodriguez upon Mr. Aguilar started, Officer Lieber states he notified Officer Chavez of what was happening; Officer Chavez denies this. Officer Lieber states he did not activate an audible alarm when Taylor and Rodriguez were manipulating their restraints but did activate his personal alarm device (PAD) once the attack started and began firing the 40mm launcher at Rodriguez to stop the stabbing attack.

Officer Lieber clearly articulates that had he had the Mini-14 rifle slung, he still would not have used lethal force. Officer Lieber would have transitioned to the less lethal 40mm due to not being authorized to fire warning shots in the housing unit, not having a clear shot at Rodriguez or Taylor without possibly striking Mr. Aguilar or someone else if he missed his intended target, and not being able to shoot a lethal round through obstructions.

The investigative interview of Lieutenant Baker did not reveal that Lieutenant Baker himself violated any CDCR policies or procedures and Lieutenant Baker was cleared of any wrongdoing by the FBI and CDCR investigations.

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

The investigative interview of Sergeant Calderon did not reveal that Sergeant Calderon himself violated any CDCR policies or procedures. The actions of Sergeant Calderon while at the "B" section door instructing Officer Lieber to close the section door was appropriate. Waiting to safely respond into the section with an adequate number of staff was not negligent.

The investigative interview of Officer Sykes did not reveal that Officer Sykes himself violated any CDCR policies or procedures. Officer Sykes was cleared of any wrongdoing during the FBI and CDCR investigations.

### Exhibits In Support of Expert Opinions:

At trial, I may use a 40MM Launcher, 40mm training ammunition, a Ruger Mini-14 rifle, a training magazine and other range associated training tools to demonstrate how each weapon is worn by the officer on post, how the weapons are shouldered / used to obtain a sight picture on a target, how each weapon is loaded and reloaded, and how to sling or unsling each weapon inside a control booth type setting.

### Closing Summary:

Forming an expert opinion is based on a totality of the information provided by all participants in the allegation regardless of their role in the allegation. The exhibits I used to from my opinion were extensive. I reviewed approximately 13000 pages of documents, approximately 8.5 hours of audio recordings, approximately 296 evidentiary photographs, approximately 1775 pages of depositions and numerous video recordings. The information contained within the exhibits whether documented or made via a video or audio-recorded verbal statement must be accurate and transparent. It must be corroborated by other information or evidence and most importantly be consistent and credible.

The complaints made by Plaintiff Zaragoza alleges the following:

That correctional staff observed and allowed Rodriguez and Taylor to practice how they would escape their restraints and carry out the attack. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety. Staff were aware Taylor and Rodriguez demonstrated the ability to escape from their restraints and notified the appropriate supervisors and administrators of the security breaches.**

That staff released information that Mr. Aguilar was a child sex offender knowing this would cause him physical harm. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety.**

46

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

That there are inconsistencies in the reports of the defendants. **I did not note any inconsistencies in the reports of the involved witnesses or responders that would lead me to believe the violated policies during the times of both incidents.**

That the defendants facilitated the murder of Mr. Aguilar based on their deliberate indifference to his safety, failure to protect and handcuffing Mr. Aguilar to a fixed chair. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety. Staff adhered to the departmentally approved policy and security precautions in place at the time of the incidents for the programs Aguilar, Rodriguez and Taylor were assigned on the dates in question. Furthermore, inmate Rodriguez subsequently admitted to Officer Ehlers (refer to memorandum authored by Officer R. Ehlers dated May 12, 2021) that correctional staff played no role in the death or Mr. Aguilar.**

That the defendants turned a "blind eye" while Rodriguez and Taylor freed themselves from their restraints and left the dayroom area without any custodial interference to retrieve the weapons used to stab Mr. Aguilar. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety.**

That the defendant restrained Mr. Aguilar to a fixed object as a form of punishment and left him unsupervised, which is a violation of CDCR policies. **No evidence has been provided to me that would corroborate this allegation of punishment towards Mr. Aguilar partially or in its entirety. The policies in place did not mandate staff have constant and uninterrupted supervision of Mr. Aguilar, Rodriguez or Taylor. The policy in place at the time of the incident approved and authorized the restraining of Mr. Aguilar to a fixed object while participating in dayroom activities.**

That the staff who were on duty during the incident were subsequently reassigned to the mailroom pending an investigation into wrongdoing. **This allegation is partially true however this is part of the investigative process and does not corroborate that inappropriate or illegal behavior took place by the staff who were reassigned as a direct result of their involvement in either incident.**

That the defendants purported to control the inmates they considered problematic by restraining them with leg cuffs and handcuffs and cuffing them to a chair or fixed object when outside of their cells in common areas and this is a violation of CDCR policies and the law. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety.**

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

That the defendants should have known this was dangerous where violence among inmates is a common practice. **The inside of a prison such as CSP-SAC which houses some of the most violent offenders by nature is extremely dangerous everyday and staff are trained to be aware of this. Anytime inmates are in close proximity to each other restrained or unrestrained is always a dangerous opportunity for an attack against each other or against correctional staff. No evidence has been provided to me that would corroborate staff willingly acted in a way that further increased the danger level of being an incarcerated felon within a correctional setting.**

That Officer V. Rodriguez reported potential violations of the CDCR Code of Conduct at CSP-SAC to Officer Garland but was met with repeated hazing, harassment, name calling and retaliation by members of the unit including Officer Garland. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety.**

That Officer Rodriguez notified Sergeant B. Stormaier that the ISU team was "broken" and there is shit they do, say, or don't do that can cause everyone from the Warden down to get the boot". Officer Rodriguez also claimed that Sergeant D. Anderson also threatened to fire him from the ISU team if he told anyone what was going on inside the unit.

Officer Rodriguez also made entries in the Notes app on his phone on January 22, 2020, titled "Reasons to leave" including whistle blower violations along with threats, harassment, and other reasons. **No evidence has been provided to me that would corroborate this allegation had any direct or indirect influence on the murder of Mr. Aguilar.**

That on February 08, 2021, Sergeant Steele communicated to CDCR Secretary Kathlen Allison that leaders at CSP-SAC including Warden Lynch responded to "indifference" to his reports of misconduct by prison guards including Officers Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20.

Sergeant Steele further wrote, "I was witness to an ISU which became engulfed in corruption and watched as integrity was forced to cower in terror and fear of retaliation." A memorandum was subsequently issued on February 12, 2021, posted at the prison gate banning Sergeant Steele from its premises without indicating why. **No evidence has been provided to me that would corroborate this allegation had any direct or indirect influence on the murder of Mr. Aguilar.**

That Plaintiff's believe Sergeant Steele and Officer Rodriguez were harassed and threatened by officers of the ISU ultimately driving the men from their jobs and damaging their mental health based on notes left by Sergeant Steele and Officer Rodriguez. **No evidence has been provided to me that would corroborate this allegation had any direct or indirect influence on the murder of Mr. Aguilar.**

48

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

That Officer Rodriguez died of an accidental drug overdose on October 21, 2020, a week after meeting with Warden Lynch about the mistreatment he was receiving from members of the ISU to include harassing phone calls. Sergeant Steele was found dead of an apparent suicide on August 20, 2021, just as he was set to give a deposition in another guard misconduct case. **No evidence has been provided to me that would corroborate this allegation had any direct or indirect influence on the murder of Mr. Aguilar.**

That as of October 2021, the entire ISU team at CSP-SAC was replaced and approximately 20 staff had been replaced and 10 of the members are facing discipline relating to Mr. Rodriguez' death. **No evidence has been provided to me that would corroborate this allegation had any direct or indirect influence on the murder of Mr. Aguilar.**

That the Plaintiff's believe an FBI investigation is pending centering on allegations prison guards including Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20 covered up their roles in at least two inmate deaths including Mr. Aguilar's. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety.**

That Mr. Aguilar dies as a direct and proximate result of the actions by defendants Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20 and are directly liable for violations of Aguilar and Zaragoza's constitutional rights. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety.**

That Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20, were obligated and charged by their respective duties to respond to reports of threats to the life and the safety of Mr. Aguilar including orders for protective segregation, as they knew or had reason to know Mr. Agular was mentally ill and or had behavior issues which necessitated the he be protected from violent inmates who would attack, maim, or kill him. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety. Mr. Aguilar attended an Institutional Classification Committee comprised of the Hiring Authority and senior classification representatives who reviewed Mr. Aguilar's case factors and ensured Mr. Aguilar was in the appropriate housing unit and rehabilitative program for his security level.**

That Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20, were obligated and charged by their respective duties to segregate Mr. Aguilar and house him with other similarly classified inmates and keeping him away from inmates who were obviously perceived, known, suspected, or believed to be a potential threat to his life and safety. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety or that any of the listed staff members failed to protect Mr. Aguilar from a known and confirmed threat that would result in his murder.**

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

That inmates Taylor and Rodriguez were involved in a similar assault of an inmate who was cuffed to a chair or other objects a few weeks or months before their assault on Mr. Aguilar. Defendants Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers and DOES 1-20, were aware of this. Yet through their knowing or reckless conduct, the defendants and each of them, allowed, permitted, and or otherwise facilitated these inmates' access to Mr. Aguilar, allowing Taylor, Rodriguez and or Green to be in such proximity to him as to facilitate their vicious stabbing of him while he was cuffed to a chair resulting in his death. **No evidence has been provided to me that would corroborate this allegation partially or in its entirety that the listed staff willing and knowingly facilitated access for Taylor, Green and Rodriguez to Mr. Aguilar so he could be murdered.**

It is my expert opinion based on the photographs, video recording and documents I have reviewed, the security protocols, force options, and tactics used by Defendants Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers, Lieutenant Baker and DOES 1-20 were reasonable, appropriate and within the departmental security and use of force guidelines.

I have provided an expert opinion in the following cases:

## **FEDERAL COURT CASES:**

- Robinson vs Adams, et al. USDC-Eastern District of California, 1:08-cv-1380, AWI BAM (PC)
  Testified as Use of Force Expert

- Bealer v R, Brannum, et al., USDC-Eastern District of California, No. 1:12-cv-1516 DAD-EPG (E.D. Cal) Testified as Use of Force Expert

- Jones v Woodward, et al., USDC-Eastern District of California, No. 1:14-cv-02084 LJO-SAB (E.D. Cal) Use of Force Expert

- Padilla v Beard, et al. USDC-Eastern District of California, 2:14-cv-1118 (E.D. Cal.) Use of Force Expert

- Rangel v LaTraille, et al. USDC-Eastern District of California, 1:10-cv-01790BAM (E.D. Cal) Use of Force Expert

- Rodgers vs Martins, et al. USDC-Eastern District of California, 1:12-cv-1686, AWI MJS (PC) Chemical Agents Expert (Deposition Only)

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.

vs

STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Cauthen vs Rivera, et al. USDC-Eastern District of California, 1:12-cv-1747, DLB Use of Force Expert (Case Settled)

- Chavez vs Castro, et al. USDC-Eastern District of California, 1:13-cv-0342, AWI SKO Use of Force Expert Report (Case Settled)

- Gilmore vs Lockard, et al. USDC-Eastern District of California, 1:12-vc-00925, SAB (PC)Testified as Use of Force Expert

- Calloway vs Hayward, et al. USDC-Eastern District of California, 1:13-cv-01896, LJO-GSA (PC)Testified as Use of Force Expert

- Williams v Harrington, et al. USDC-Eastern District of California, 1:12-cv-00226, LJO-DLB Use of Force Expert (Case settled)

- Flowers vs B. Johnson, et al. USDC-Eastern District of California, 1:15-cv-01778-JLT Testified as a Use of Force Expert

- Aguirre vs Diaz, et al. USDC-Eastern District of California, 2:16-cv-01297 Use of Force Expert (Case Settled)

- Coniglio vs Sigala, et al. USDC-Eastern District of California, 3:20-cv-00544-MMA-DEB Use of Force Expert (Case Settled)

- Castaneda vs Yates, et al. USDC-Eastern District of California, 15CECG01086 Use of Force Expert (Case Settled)

- McCoy vs Holguin, et al. USDC-Eastern District of California, 1:15-cv-0768-DAD-HBK Use of Force Expert

- Pearson vs CA, et al. USDC-Northern District of California, 3:20-cv-05726-CRB Use of Force Expert

- Correa vs Braudvick, et al. USDC-Eastern District of California, 1:19-cv-00369-DAD-BAK Use of Force Expert

- Campbell vs Tanton, et al. USDC-Eastern District of California, 2:18-cv-00671-KJM-CKD Use of Force Expert

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Espinoza vs Tegtmeyer, et al. USDC-Eastern District of California, 1:19-cv-00345-ADA-CDB Use of Force Expert

- Hawkins vs Shearer, et al. USDC-Eastern District of California, 2:19-cv-02295- CKD Use of Force Expert

- Ottele vs Collier, et al. USDC-Eastern District of California, 1:22-cv-00187-JLT-BAK Use of Force Expert

- Wilbanks vs Tappen, et al. USDC-Eastern District of California, 2:21-cv-00026-KJM-KJN Use of Force Expert

- Rojas vs Brown, et al. USDC-Eastern District of California, 1:17-cv-01514-ADA-CDB Use of Force Expert

- Calloway vs Nieves, et al. USDC-Eastern District of California, Case No. 2:19-cv-01792-KJM-CKD Use of Force Expert

- Brown vs Reilly, et al. USDC-Eastern District of California, Case No. 2:20-CV-01709-WBS-AC (PC) Use of Force Expert

- Melendez et al. vs Ralph Diaz, et al. USDC-Eastern District of California, Case No. 1:20-CV-01393-ADA-CDB (PC) Use of Force Expert, Emergency Response Expert

## STATE PERSONNEL BOARD HEARINGS:

- Pierce vs CDCR, State Personnel Board, Case # C-WSP-298-16-A Use of Force Expert, IST Instructor

- Mercado vs CDCR, State Personnel Board, Case # C-CCWF-197-17-A Use of Force Expert

- Perez vs CDCR, State Personnel Board, Case # SPB-18-0877 Report Writing Expert

- Madden vs CDCR, State Personnel Board, Case # SPB-19-0060 Use of Force Expert

- Quintero vs CDCR, State Personnel Board, Case # SPB-19-0060 Use of Force Expert

- Castagnola vs CDCR, State Personnel Board, Case # SPB-N-PBSP-773-17-A Use of Force Expert (Settled)

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Gonzalez vs CDCR, State Personnel Board, Case # SPB-19-1944 Use of Force Expert

- Garcia / Negrete vs CDCR, State Personnel Board, Case # SPB-19-0573 Use of Force Expert (Settled)

- Dias vs CDCR, State Personnel Board, Case # SPB-19-1507 Use of Force Expert (Settled)

- Reilly vs CDCR, State Personnel Board, Case # SPB-21-0729 Use of Force Expert

- Sando vs CDCR, State Personnel Board, Case # SPB-21-1086 Use of Force Expert

- Heu vs CDCR, State Personnel Board, Case # SPB-21-0358 Use of Force Expert (Settled)

- Rai, DeSha, Smith vs CDCR, State Personnel Board, Case # N-CHCF-308-20-A Use of Force Expert (Settled)

- Brown, Medina vs CDCR, State Personnel Board, Case # N-CMF-728-21-A Use of Force Expert (Settled)

- Molina, Speiker vs CDCR, State Personnel Board, Case # N-HDSP-010-21-A Use of Force Expert (Settled)

- Pierce, Larson, Haynie, Britton vs CDCR, State Personnel Board, Case # N-SAC-122-21-A Use of Force Expert

- Cook vs CDCR, State Personnel Board, Case # SPB-21-1349 Use of Force Expert

- Smith vs CDCR, State Personnel Board, Case # SPB-22-0621 Use of Force Expert

- Galvan vs CDCR, State Personnel Board Case # N-HDSP-547-21-A Use of Force Expert (Settled)

- Macias vs CDCR State Personnel Board, Case # N-MCSP-455-21-S Use of Force Expert

- Williams vs CDCR, State Personnel Board, Case # N-MCSP-455-21-S Use of Force Expert

- Bautista, Le, Delargo, vs CDCR, State Personnel Board, Case # N-SQ-843-21-C, Use of Force Expert

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

- Gomez vs CDCR, State Personnel Board, Case # N-SCC-108-22-S, Use of Force Expert

- Denlay vs CDCR, State Personnel Board, Case # C-COR-541-22-D, Use of Force Expert

  Barajas, Valdiva, Gonsalez, vs CDCR, State Personnel Board, Case # C-WSP-549-20-A, Use of Force Expert

- Lopez vs CDCR, State Personnel Board, Case # SPB-23-1067, Use of Force Expert

- Jimenez vs CDCR, State Personnel Board, Case # SPB-23-1330, Use of Force Expert

- Moreno vs CDCR, State Personnel Board, Case # SPB -24-0526, Use of Force Expert

- Vega vs CDCR, State Personnel Board, Case # SPB-24-0324, Use of Force Expert

- Rodriguez vs CDCR, State Personnel Board, Case # SPB-23-1511, Use of Force Expert

My fee schedule is as follows:

| | |
|---|---|
| Documentation Review | $220.00 Per Hour |
| Research / Report Preparation | $250.00 Per Hour |
| Video Evidence Review | $200.00 Per Hour |
| Site Visit / Tour | $220.00 Per Hour |
| Travel | $125.00 Per Hour |
| Mileage | $.62 Per Mile |
| Hearing Interviews/Depositions | $300.00 Per Hour |
| Telephonic Case Conference | $220.00 Per Hour |
| Hearing Testimony | $300 Per Hour (4 Hour Min) |
| Lodging | Actual Costs |

# C.L.C.
## CUSTODY LITIGATION CONSULTANTS

ROSARIO BUENO ZARAGOZA, et al.
vs
STATE OF CALIFORNIA

CASE NO: 2:21-CV-02294-TLN-JDP

In the event additional documentation is provided relative to these allegations, I will review them and provide additional expert opinion if necessary. If I can be of any further assistance, please contact me.

*John Diaz*

John "Tony" Diaz
Subject Matter Expert for Correctional Operations, Use of Force and Emergency Tactical Responses

EXHIBIT D

September 27, 2024

David Kuchinsky
Deputy Attorney General
California Department of Justice
Correctional Law Section
1300 I Street, Sacramento, CA 95814

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report
**MA ROSARIO BUENO ZARAGOZA, an individual; ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza, Plaintiffs,**

**Vs.**

**JEFFREY W. LYNCH, an individual; DANIEL GARLAND, an individual; MARCUS JORDAN, an individual; WILLIAM LIEBER, an individual; HENRY CHAVEZ, an individual; DESMON KYKES, an individual; JOSE GOMEZ, an individual, JAMES CAROTHERS, an individual, ERIC BAKER, an individual; MATTHEW SAAVEDRA, an individual; DAVID CALDERON, an individual; PHILLIP BRENNFLECK, an individual; GUILLERMO HERRERA, and individual; DOE 1, an individual, inclusive, Defendants.**

### USDC Case No. 2:21-cv-01890-TLN-JDP

Mr. Kuchinsky:

Thank you for retaining me to review, examine, and render opinions on this matter.  I have studied and analyzed interviews, policies, and procedures, video and audio recordings, reports, photographs, memorandums, and associated material (listed in the Materials Reviewed Section of the Federal Rules of Civil Procedures 26 (a) (2) (B) report) provided thus far in this case.

I understand that this matter is still evolving.  If you provide additional documents, data, or materials to review, I may need to author a supplemental report to underscore current opinions or express other opinions.  I am not making credibility determinations when identifying my opinions or conclusions in this report.

Phillip L. Sanchez

## EXPERT REPORT OF PHILLIP L. SANCHEZ

My name is Phillip L. Sanchez. I authored this report at the request of defense counsel David Kuchinsky, Esq, Deputy Attorney General, California Department of Justice, Correctional Law Section.

I was a peace officer in California for 38 years, serving with the Santa Monica and Pasadena Police Departments. My career included numerous assignments as a police officer, field training officer, investigator, task force liaison officer, Sergeant, lieutenant, captain, deputy chief, interim police chief, and chief of police.

I attended the Rio Hondo Police Academy in 1980. I graduated third overall in my class and was ranked 1st in physical fitness and practical application, including arrest and control tactics. The Santa Monica Police Department hired me in April 1980. I served the community for 30 years, rising to deputy chief (the first deputy chief in the department's history). I also served as interim police chief for the same agency in 2005.

The City of Santa Monica is approximately 9.2 square miles and has about 85,000 people. It is a popular international destination that requires unique police resources to serve a diverse population. The City hosts numerous large-scale events yearly, requiring additional police services, strategic planning, and sometimes mutual aid with other law enforcement agencies. During my tenure, the Santa Monica Police Department maintained a multi-million-dollar budget and was a full-service municipality. The agency employed approximately 215 sworn peace officers and 200 professional staff and operated a Type 1 jail facility (capacity for 80 inmates, pre-arraignment). The department provided its employees with various police services, youth programs, and professional development.

As a police officer, I was familiar with the departmental rules, regulations, policies, customs, and practices governing the Santa Monica jail, use of force, and general orders. I arrested, processed, or had direct contact with hundreds of inmates in a custody environment. As a peace officer, I conducted field investigations, custody and witness interviews, collected and processed evidence/property, and participated in numerous major incident scenes. I served as a patrol officer and field training officer. I was chosen for the Crime Impact Team, vice/narcotics undercover operator, and investigator before my promotion to police sergeant in 1988. As a police detective, I investigated numerous criminal matters and presented the cases to the appropriate prosecutor for filing consideration. I conducted criminal investigations, managed informants, and undercover, covert, and high-risk operations. I was familiar with investigative strategies and custody protocols (use of the detoxification and safety cells and restraining devices).

I served as a certified firearm (pistol, sub-machine gun, police rifle), defensive tactics, and arrest and control instructor. I had knowledge and experience in field operators, patrol protocols, mass casualty response, unusual occurrences, canines, and small unit tactics.

As a California peace officer, I qualified as an expert in State Court numerous times, involving undercover operations, narcotics sales, possession for sales, distribution, control, and identifying subjects under the influence of opioids, methamphetamine, phencyclidine, the use of force, SWAT, and patrol tactics. I served on several professional panels providing expert opinions on various topics, including police-community relations, use of force, officer-involved shootings, administrative and internal affairs investigations, audits and inspections, evidence tracking, and jail operators. I also managed the department's Emergency Operations Center (EOD) as necessary.

As a police sergeant in the Office of Operations, I was the acting watch commander, patrol, and tactical unit supervisor. I supervised field investigations, approved arrests, and investigated the use of force incidents and misconduct allegations involving sworn and non-sworn employees. I led, managed, or participated in warrant service and civil unrest incidents and served as the Officer in Charge (OIC) for the Democratic National Convention hosted in Santa Monica.

I served in the Technical Services Division as an Adjutant. My duties included supervising the Records Section, Communication Section, and jail and monitoring the department's budget. I completed Title 15 and jail operations training for a Type 1 facility as the jail manager. I was responsible for ensuring the current jail policy, ordering supplies, and ensuring inmate safety. I authorized medical treatment for inmates, prisoner transportation to local hospitals, the Los Angeles County Central Jail, legal representatives or family visitations, and release from custody, among other duties. I coordinated or consulted on the transportation of inmates from the Santa Monica Police Department to the County of Los Angeles Central Jail or other custody facilities (state and federal).

I developed and implemented the Santa Monica Police Department's Metro Crime Unit and the Special Weapons & Tactics Team (SWAT). The team started with nine operators and later increased to over 30 tactical specialists. The Metro/SWAT team was responsible for warrant service, high-risk tactical entries, mitigating barricaded suspect situations, and hostage rescue. The Metro/SWAT team conducted more than 70 incidents annually, including high-risk area searches with the canine unit. I supervised the department's canine unit, defensive tactics unit, and firearms cadre. I also developed and implemented the Santa Monica Police Department's Patrol Rifle Team, frequently assisting the SWAT Team with high-risk incidents.

As a police lieutenant, I served as a watch commander and supervised subordinate personnel. I managed field investigations and approved reports and other official documents. I conducted audits and investigated use-of-force incidents and misconduct allegations involving sworn and non-sworn employees.

I supervised over 50 sworn and professional staff as the Criminal Investigation Division Executive Officer. I led complex criminal investigations, approved reports, and conducted high-profile investigations. I managed undercover operations involving large amounts of narcotics and U.S. Currency. I liaised with the Federal Bureau of Investigations-Joint Terrorist Task Force (JTTF), addressing issues associated with homeland security and terrorism. I also worked closely with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force (LA-IMPACT) to mitigate major narcotics distribution. I investigated misconduct allegations,

disciplined employees (as the circumstances warranted), and recommended divisional commendations.  I reported the division's work efforts and crime statistics to my superiors, the Federal Bureau of Investigations (FBI), and the California Attorney General's Office.  I managed the Uniform Code Reporting (UCR) and criminal case management system.

I served as the Jail Administrator and supervised all aspects of jail operations.  I conducted administrative audits and internal affairs investigations and evaluated employees' performance.  I participated in the Title 15 training and directly supervised jail staff, ensuring the department complied with the Board of State Community Corrections (BSCC) and Standards and Training for Corrections (STC) regulations.  I implemented a contemporary use of force and a critical incident evaluation process.  I served as an original member of the department's Liability Assessment Team, responsible for investigating officer-involved shootings, in-custody deaths, and other high-risk incidents.

I commanded the department's Internal Affairs Section, where I managed and conducted administrative investigations, allegations of criminal misconduct, and related incidents.  I implemented an early warning tracking system to monitor officers' and non-sworn employees' performance.  I managed or assisted with investigating officer-involved shootings, categorical use of force, and other sensitive matters, reporting my findings directly to the Santa Monica police chief.

As a police captain, I supervised police lieutenants, sergeants, offices, and professional staff assigned to the Operations Division.  My duties included managing the most significant budget within the Santa Monica Police Department, reviewing misconduct allegations, and making policy and discipline recommendations to the police chief.  I also developed deployment strategies, planned for large-scale events in the city, managed civil unrest incidents, and monitored the Field Officer's Training Program and other units assigned to patrol.  I participated in the department's Mutual Aid Program/response, collaborating with local, state, and federal officials.

I served as the Santa Monica Police Department's Jail Administrator and was responsible for developing policy recommendations for the police chief, ensuring compliance with Titles 15 and 24.  I frequently met with representatives from the Board of State Community Corrections and Standards and Training for Corrections concerning training plans, the physical plant (jail), regulatory compliance, and routine audits.  I reviewed employee performance, completed administrative reports, and initiated Internal Affairs investigations.  I served as the Incident Commander when critical events occurred in the jail, including in-custody deaths and the unconditional use of force.

As the Santa Monica Police Department's deputy chief, I assumed command of the organization in the police chief's absence.  I was responsible for the department's daily operations, and my subordinates included four (4) police captains, three (3) civilian managers, and twelve (12) lieutenants.  I also supervised the department's Internal Affairs, Jail Operations, special events, and professional standards sections.

I led the department's Internal Affairs and Audit/Inspections Sections and was the liaison for local, state, and federal law enforcement agencies. I frequently met with jail supervisors concerning employee performance, budget, staffing, scheduling, the physical plant, and suicide prevention for inmates or prisoners requiring special accommodations. I participated in or initiated jail audits with the Board of State Community Corrections and the Los Angeles County Civil Grand Jury. I collaborated with local hospitals and nonprofit organizations' professional representatives regarding inmates' medical and mental health services. I served as the Incident Commander in several high-risk incidents, including the Santa Monica Pier Hostage incident and the Third Street Promenade Mass Casualty Incident.

As deputy chief, I managed several large projects, including the department's transition into the new Public Safety Facility (police headquarters). The move to the Public Safety Facility involved coordinating logistics, purchasing supplies, the police radio cut-over (transferring communications and telephone lines from the old police building to the Public Safety Facility), identifying workspaces for all four divisions, and ensuring the custody area met BSCC requirements-related issues. I managed the police technology projects, including the department's communications upgrade (patrol cars, mobile radios, and the base station). I led the department's effort to purchase less-lethal devices (conductive electronic weapons) and implemented the associated training and governing policies.

I frequently reviewed the use of force policies, practices, and protocols for the entire department, including the jail section. I managed the department's budget and approved significant acquisitions.

I served as the Santa Monica interim police chief and was responsible for all aspects of the department. I developed and approved policies, disciplined employees, approved budget acquisitions, and worked closely with the city's leadership team (City Manager, City Attorney, and department executives). I met with the Los Angeles County Police Chiefs and South-Bay Police Chiefs Associations. I resigned from the Santa Monica Police Department after 30 years of professional service when selected to lead the Pasadena (C.A.) Police Department as chief in July 2010.

The City of Pasadena is approximately 26 square miles and has about 152,000 people. The city is a popular international destination with iconic historical venues like the Norton Simon and USC Pacific Asian Museums, the Rose Bowl Stadium, the Pasadena Tournament of Roses House, and the Jet Propulsion Laboratory (JPL). Several prestigious educational institutions are in the city, including Caltech, Fuller Theological University, and Pasadena City College (PCC). More than 900 nonprofit organizations operate in the city and provide various nongovernmental services, including housing, social services, mental health outreach, and crisis intervention. Pasadena hosts several major events annually, including the Rose Parade and Rose Bowl Game, NCAA athletic events, International Soccer matches, UCLA and PAC 12 Football Games, and iconic entertainers. The events draw more than a million people to the city yearly, which requires additional police resources and strategic security planning.

As the Pasadena Police Chief, my direct subordinates included the deputy police chief, four police commanders, the Air Support Captain, five civilian commanders, the internal affairs and

professional standard unit, and the audit/inspection unit. I was responsible for more than 383 full-time employees (250 peace officers) and maintained an annual budget of approximately 80 million dollars. I was responsible for all aspects of the department, such as public safety, crime reduction, and building community trust. The police department operated a Type 1 jail facility (capacity for 100 inmates, pre-arraignment). I frequently inspected the jail and evidence room to ensure compliance with state regulations.

As the chief executive, I approved hiring jail staff and sworn peace officers. I managed technology enhancements, training, and the purchase of specialized equipment (SCBA, Cameras, PPE, AEDs). I initiated jail inspections and audited in coordination with the BSCC and the Los Angeles County Civil Grand Jury. I frequently met with BSCC and STC representatives regarding the department training plans for custody staff and sworn personnel assigned to the jail.

I served as the Incident Commander at all the major events hosted in the city, including those at the Rose Bowl Stadium, Tournament of Roses Parade, International Sporting Events, and Entertainment Events, providing police resources, identifying local and homeland security risks, and working collaboratively with state and federal law enforcement agencies. I selected Pasadena peace officers to serve with the Federal Joint Terrorism Task Force (JTTF), High-Intensity Drug Traffic Areas (HIDTA), and United States Marshal Services (USMS) as task force officers. I also worked closely with the United States Secret Service (USSS), United States Military (Marines, Navy – Special Ops, Army – Special Ops, Coast Guard, and Air Force), and other Homeland Security & Defense agencies. I maintained a high-level security clearance and frequently attended secret briefings by the FBI, DEA, USSS, and other federal agencies. I identified, implemented, and coordinated security measures with the United States Secret Service during visits from the President of the United States (POTUS), international leaders, or other high-ranking officials.

As the Pasadena Police Chief, I served two terms as the Foothill Air Support Team (FAST) President. I was responsible for the department's Air Support Program, which maintained a fleet of seven helicopters (3rd largest in Los Angeles County) and provided aerial resources for municipalities in the San Gabriel Valley. I approved significant acquisitions through the Federal Government's 1033 Program, which offers the opportunity to secure surplus equipment, reducing the department's budget impact. I also served as the President of the San Gabriel Police Chiefs Association and was an active member of the Los Angeles County Police Chiefs Association. As police chief, I received notifications regarding all critical incidents in the city, including the jail. The reports involved in-custody deaths, categorical use of force by jail staff or peace officers, significant injuries sustained by department personnel, officer-involved shootings, and related incidents.

I developed, approved, and implemented the BWC policies with community groups and stakeholders. I reviewed and approved plans allowing medical and mental health professionals to assess inmates in custody. I also met with the City Manager and City Attorney regarding high-risk incidents, civil litigation, community concerns, budget, and other related items. I served as the Pasadena Police Department's project manager to help select, purchase, and implement the Body-Worn Camera program (one of the first in Los Angeles County) and

upgrade the In-Car Video system.  I implemented an electronic tracking program to preserve the integrity of evidence.

I designed and implemented the department's rifle program, authorizing officers to care for and use (if necessary) the urban police rifle at the Rose Bowl Stadium during significant events, which helped reduce the homeland security threat.  I frequently met with the department's firearm cadre to design and implement progressive use of force and range training, which included contemporary tactics (three-gun system), decision-making, cover and concealment, and de-escalation.  I served as the Pasadena Police Chief for nearly eight years, retiring in April 2018.

During my career, I collaborated closely with the City of Pasadena Public Health Department, the Los Angeles County Department of Public Health, Councils of Governments (COGs), Subregions in Los Angeles County, and nonprofit and governmental organizations to address concerns associated with mental health illness among the unhoused population.  I also work with the Department of Housing and Livability to identify transitional, temporary, and permanent housing for homeless families, emancipated adults, and at-risk people.

I supervised and managed the Santa Monica and Pasadena Police Department's Homeless Outreach Teams, which collaborated with professional mental health caregivers to increase access to social service programs, housing resources, case management, and shelter for the unhoused.  I actively recruited experienced mental health clinicians and social workers, integrating them into the outreach police teams and increasing the department's immediate intervention capacity.

I coordinated with the other city departments (housing, public works, fire, and community resources) in Pasadena and Santa Monica in the collective efforts to address the impact of homelessness on the community.  I implemented Mental Health Awareness and Response Training for the Santa Monica and Pasadena Police Departments.
As a professional law enforcement officer, I instructed hundreds of law enforcement officers (local, state, federal, and international) and personnel assigned to military special operations units.  I lectured on various topics, including the use of force, special weapons tactics, patrol tactics, weaponless defense de-escalation techniques, incident command and control, crowd dynamics, civil unrest, discipline and accountability, mass casualty response, leadership, civil liability, personnel investigations, community policing, community partnerships, audits, managing jail facilities, officer survival, managing significant scale events, homeland security, fusion center leadership, information sharing, and related topics.

I authored several articles on the impact of stress during critical incidents, police training, firearms training, cognitive decision-making, security and wellness for peace officers, published in police periodicals and professional journals.  I led the research efforts and approved and implemented various firearms, impact devices, less-lethal weapon systems, and ammunition for various police organizations, including the Pasadena and Santa Monica police departments.

As a police instructor, I refined the officer survival mindset, including de-escalation tactics and communication skills, firearms and less-lethal devices, ground fighting techniques, defensive

tactics, and arrest and control tactics for peace officers and military operators. I studied and taught on the topic of decision-making for first responders under extreme stress and, in conjunction with the fire service, implemented the Tactical Emergency Medical Support (TEM) protocols to mitigate the impacts of the active shooter threat at the Pasadena and Santa Monica Police Departments.

I earned a master's from the United States Naval Postgraduate School, Center for Homeland Defense and Security (with honors, class speaker), and an undergraduate Degree from the University of Redlands (with honors). I also earned several prestigious professional certificates, including the Harvard University, John F. Kennedy School of Government, Senior Management Institute for Police, the Federal Bureau of Investigation, National Academy, Federal Bureau of Investigations, Southwest Command College, Leadership Los Angeles, and the California Peace Officer Standard and Training (POST), Command College (with honors, class speaker). I received California Peace Officer Standards and Training Executive, Management, Supervisory, Advanced, Intermediate, and Basic certificates. I earned instructor credentials in firearms, arrest, and control tactics, military operators in urban terrain, defensive tactics, and impact weapons.

As a police practice consultant, I have assisted other law enforcement agencies in developing best practices governing the use of force, investigative protocols, evidence collection and preservation, audits, and technology. I have served individuals, law enforcement agencies, and municipalities in Los Angeles, Orange, Fresno, Monterey, San Diego, Santa Barbara, San Bernardino, Riverside, and Imperial counties. My education, training, and experience are in my attached resume (CV).

In the past five years, as a police practice expert, I have testified at the following sworn depositions: Terresa Perkins v. the City of Anaheim, USDC Case No: 8:19-CV-00315-JLS-JDE; 2021; A.I.P. Padilla v. City of Santa Ana, USDC Case No: 30-2019-01087075-CU-PO-CJC; Joseph Perez v. American Ambulance, USDC Case No: 1:18-cv-00127-AWI-EPG; Wolfgang Montford v. The City of Santa Monica, USDC Case No: 2:20-CV-7220-MS-Ex; The City of Santa Ana v. Mental Health Association of Orange County, Case No. OCSC: 30-2020-01124174-CU-MC-JC; Joseph L. Garces v. The City of Santa Paula, Case No. USDC 2:21-cv-6730-FLA(PVCx), Angelina Atabeckova and Vardoui Michaelidis v. the City of Los Angeles, Case No. USDC 2:22-CV-05620-MCS-MAA; F. Rodriguez v. the Los Angeles Dodgers, LLC, Case No. BC714498; D. Antunez v. the Los Angeles Dodgers, LLC, Case No. 19STCV13057; M. Flores v. the Los Angeles Dodgers, Case No. 198TCV43535; Stewart v. the City of Los Angeles, Case No. USDC 2:22-cv-04922-SPG0AFM; Hereford v. the City of Hemet, Case No. USDC 5:22-cv-00394-JWH-SHK; Holland v. the County of San Bernardino, Case No. USDC 5:23-cv-01028-JGB-SHK and S. Garcia v. the County of Los Angeles, Case No. LASC LASC: 20STCV00867.

I have provided trial testimony in E. Rodriguez v. City of Santa Monica, Case No: OAH 2020090173, and the City of Santa Ana v. Mental Health Association of Orange County, Case No. OCSC: 30-2020-01124174-CU-MC-JC.

In the matter of MA ROSARIO BUENO ZARAGOZA, an individual, ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza,

Plaintiffs vs. JEFFREY W. LYNCH, an individual; DANIEL GARLAND, an individual; MARCUS JORDAN, an individual; WILLIAM LIEBER, an individual; HENRY CHAVEZ, an individual; DESMOND SYKES, an individual; JOSE GOMEZ, an individual; JAMES CAROTHERS, an individual; ERIC BAKER, an individual; MATTHEW SAAVEDRA, in individual; DAVID CALDERON, an individual; PHILLIP BRENNFLECK, an individual, GUILLERMO HERRERA, an individual; DOE 1, an individual, inclusive, Defendants I reviewed the following material, recordings, reports, videos, and documents to form the basis of my conclusions and opinions:

- CDCR Incident Report, SAC-FAB-19-12-1523, October 19, 2019.
- CCDR Incident Report, SAC-FAB-19-12-1523, December 12, 2019.
- Letter from Inmate Taylor to CSP – Sacramento Warden.
- Letter from Inmate Taylor to CDCR Secretary Ralph Diaz.
- Letter from inmate Cody Taylor to Sacramento County DA.
- Journal entries of Inmate Rodriguez, December 11, 2019.
- Letter from Inmate Anthony Rodriguez, July 9, 2020
- Various CDCR security videos

## INCIDENT SUMMARY

On December 12, 2019, at about 10:05 a.m., Inmates Rodriguez and Taylor were escorted to the Long-Term Restricted Housing (LTRH), Building 8, "B" Section, Dayroom by several CDCR officers. Inmates Rodriguez and Taylor were then restrained (mechanical restraints) to Restart Chairs located in the dayroom.

A short time later, CDCR Officer Lieber (assigned to the Control Room overlooking the "B" Section Dayroom) observed that Inmates Rodriguez and Taylor had separated from their mechanical restraints and were mobile within the "B" Section Dayroom.

Inmate Rodriguez used the stairs to access the lower tier while Inmate Taylor remained on the dayroom floor. Inmate Rodriguez walked up to cell FB8-211 (solely occupied by Inmate Green) and appeared to retrieve an item(s) from the base of the cell door. Inmate Rodriguez returned to the dayroom floor and handed one of the items to Inmate Taylor.

Inmates Rodriguez and Taylor quickly approached Inmate Aguilar, who was seated in a Restart Chair and restrained by mechanical devices. Inmates Rodriguez and Taylor began to strike Inmate Aguilar repeatedly (downward motions) in the face, chest, and upper back. Inmates Rodriguez and Taylor continued their attack on Inmate Aguilar by pulling him out of the Restart Chair (near the chair's base) onto the dayroom floor.

Officer Lieber (assigned to the Control Room) observed Inmates Rodriguez and Taylor attacking Inmate Aguilar. He (Lieber) activated an alarm and radioed for assistance (Code 1). Officer Lieber verbally ordered Inmates Rodriguez and Taylor to "stop and get down;" the orders were ignored.

To stop the assault on Inmate Aguilar (and following his verbal orders), Officer Lieber fired four 40mm Foam Baton Rounds (from a less-lethal launcher) from the Control Room window located

above the dayroom.  The use of the less-lethal device eventually forced Inmates Rodriguez and Taylor to retreat and stop their attack on Inmate Aguilar.

Inmates Rodriguez and Taylor were ordered into a prone position on the dayroom floor, and they complied with the directive.  Officers entered the "B" Section Dayroom.  Inmates Rodriguez and Taylor were taken into custody without incident or the use of force and placed in mechanical restraints.  CDCR Officers and medical attendants (a doctor, registered nurses, and assistants) then rendered assistance (CPR) to Inmate Aguilar.

Inmate Aguilar was escorted to the Central Health Building (#56), Triage Treatment Area. Despite the efforts of the medical staff and CDCR officers, Aguilar succumbed to his injuries. Inmates Rodriguez and Taylor were also medically evaluated.[1]

## OPINIONS AND CONCLUSIONS:

My Opinions and conclusions are based on my 38-year law enforcement career as a police officer, detective, supervisor, executive, or police chief.  I conducted, reviewed, or managed hundreds of force cases (including officer-involved shootings), high-risk incidents, and field and administrative investigations.  I taught weaponless defense, arrest and control techniques, less-lethal devices, de-escalation techniques, firearms, and tactical operations to municipal and county peace officers, military personnel, and international police officials.

I designed, implemented, and trained the Santa Monica Police Department Special Weapons (SWAT) and Patrol Rifle Teams.  I supervised the Santa Monica Police Department's Crisis Negotiation Unit and frequently interacted with them during critical incidents, including area searches, barricaded suspects, and hostage rescue events.  I served as a special weapons team leader and tactical operator during hundreds of critical incidents.  I also served as a tactical and incident commander at high-risk incidents, civil unrest, and mass protest events, including a venue for the Democratic National Convention hosted in the City of Santa Monica.  I frequently interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies implementing security measures and emergency protocols during presidential (POTUS) or other high-ranking officials while they were visiting Santa Monica.

I served in the Technical Services Division as an Adjutant.  My duties included supervising the Records Section, Communication Section, and jail and monitoring the department's budget.  I completed Title 15 and jail operations training for a Type 1 facility as the jail manager.  I was responsible for ensuring the current jail policy, ordering supplies, and ensuring inmate safety.  I authorized medical treatment for inmates, prisoner transportation to local hospitals, the Los Angeles County Central Jail, legal representatives or family visitations, and release from custody, among other duties.  I also coordinated or consulted on the transportation of inmates from the Santa Monica Police Department to the County of Los Angeles Central Jail or other custody facilities (state and federal).

As the Pasadena police chief, I was the Incident Commander for the Tournament of Roses Parade, the Rose Bowl Game, and numerous athletic, entertainment, and international events.

---

[1] CDCR Incident Report, SAC-FAB-19-12-1523, December 12, 2019.

The events required police intervention and resources to mitigate civil unrest and protests and manage large groups. My responsibilities included security, event planning, crowd management and control, group dynamics, and civil unrest preparation. I interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies, implementing security measures and emergency protocols during presidential (POTUS) or other high-ranking officials while they were visiting Pasadena.

As the police chief, I reviewed and evaluated officer-involved shootings, use-of-force incidents, vehicle pursuits, police helicopters as a tactical platform, and other high-risk incidents involving sworn and non-sworn personnel. I chaired the Pasadena Police Department's Use of Force Review Board and determined the level of culpability (if any) in matters alleging misconduct, the misuse of force, tactics, or equipment.

**Opinion 1:**
During this event, CDCR officers used mechanical restraints consistent with statewide law enforcement officials and custody officers (local, county, and state). Based on my review of the material, the evidence shows that the officers were experienced and knowledgeable, understood the functionality of the mechanical restraints (wrists and ankles), and followed established security protocols.

Based on the material, the officers used metal mechanical restraints (handcuffs and ankle restraints) to secure Inmates Rodriguez and Taylor to the Restart Chairs in the dayroom. The restraints (Peerless handcuffs) were affixed to waist and ankle chains and then locked to the base of the Restart Chairs. Once Inmates Rodriguez and Taylor were restrained in the chairs, the officers vacated the dayroom.

Moments later, Officer Lieber (working in the Control Room above the dayroom floor) observed that Inmates Rodriguez and Taylor had separated from their mechanical restraints and were moving about the dayroom without restrictions. Inmates Rodriguez and Taylor subsequently attacked Inmate Aguilar despite Officer Lieber's efforts to stop the event.

It is essential to understand the functionality of a mechanical restraint when considering how Inmates Rodriguez and Taylor separated from the device (handcuffs and the HRT black box). Regardless of the manufacturer, a mechanical restraint typically consists of several components:

Handcuff Restraint:

- Double-Strand. The body consists of two metal plates riveted together to hold the other components in place. The double strands encase the locking mechanisms between its two halves.

- Single-Strand. The single-strand is an arm hinged to the double-strand and swings between the two metal halves. The end of the single strand has a series of teeth that engage with the teeth on the locking bar (located in the device's body). The teeth perform two primary functions. First, they ratchet into place, allowing the handcuff to tighten around the wrist. Second, once engaged, the teeth lock and do not allow the handcuff to loosen (this keeps the person restrained).

- Lock Bar Teeth:  Contained within the handcuff double-strand.  The lock bar has several teeth that engage with the teeth of the single strand.

- Lock Bar Spring:  The lock bar spring presses up on the lock bar, engaging the lock bar teeth with the teeth on the single strand.

- Key and Keyhole:  The key to the handcuff is engaged with a handcuff key.  When turned, the keyhole's key depresses the lock bar, disengaging it from the single-strand teeth.  When the key is engaged with the lock bar, the single strand can be backed out of the handcuff body (double strand), releasing the pressure on the wrist.  When the key is turned in the opposite direction, it disengages the device that is double locked.

- Key:  The key engages the lock bar within the body (double strand) and pushes the lock bar teeth away from the teeth on the single strand.  Usually, the key can rotate in two directions (clockwise and counterclockwise).  One direction disengages the device that is double-locked.  The other direction disengages the teeth on the single strand.  If the double lock on the handcuff has been set, it must be disengaged before the key will rotate to unlock the teeth on the single strand. **The handcuff key is universal and can unlock mechanical restraints regardless of the manufacturer.**

- Double Lock:  The double lock on the mechanical restraints engages the lock bar and prevents it from disengaging from the teeth on the single strand.  The double lock is engaged to keep the single strand from becoming tighter or looser.

Each of the mechanical restraint's components is susceptible to defeat.  Non-traditional objects such as plastic keys, shims, or picks can defeat mechanical restraints.

- Plastic keys.  The object looks like a large button (about the size of a penny) and has a raised knob at one end.  The plastic key operates in the same fashion as a standard or original handcuff metal key.

- Shims:  Shims typically consist of metallic material and are easy to manufacture from bobby pins, barrettes, or other materials.

- Picks:  Picks typically consist of metallic material and are easily shaped into a "makeshift key." The key is placed into the keyhole and rotated clockwise or counterclockwise to defeat the device.

The Black Box Restraint:

- Regardless of the manufacturer, the black box restraint device typically consists of a hard plastic or metal shell.

- The restraint prevents immediate and unauthorized access to the handcuff's keyhole.  A metal slide clamps the box shut, and a metal fixture attached to the inmate's waist then slides through the box and clamp.

12

- When the black box is in place, a chain is wrapped snugly around the prisoner's waist or ankles and looped through the metal fixture.

- The device allows the officer to use the security chain to restrict the movement of the inmate's hands.

CDCR officers placed mechanical restraints on Inmates Rodriguez and Taylor while in their prison cells. In my view and based on the videos, the officer's actions were consistent with the movements associated with double-locking a device (handcuffs). Based on the material in this case, it is possible the officers double-locked the restraints on Inmates Rodriguez and Taylor (At their cells and when preparing and securing them to the Restart Chair); however, the videos are inconclusive.

Shimming or picking handcuffs requires little skill. However, it does require practice and sufficient time to defeat a mechanical restraint.[2] A double-locked mechanical restraint does not guarantee that the inmate will remain restricted.

Based on my experience, an inmate can defeat the device using a shim (usually fabricated from a metallic material such as a bobby pin, barrette, or solid material). The shim must be narrow enough to fit into the groove between the double strand and single strand of the handcuff. When sufficient forward pressure is applied, the shim compresses the locking bar spring, releasing the locking bar teeth, which allows the single-strand arm to loosen or move freely.

Similarly, a pick (usually fabricated from a metallic material such as a bobby pin or other solid material) can be shaped into a "makeshift key." The pick is placed into the keyhole (located on the face of the double strand) and rotated clockwise or counterclockwise. When rotated in one direction, the pick unlocks the double-locked restraint. When the pick is rotated in the opposite direction, it releases the single strand, which allows the arm to loosen or move freely.

**Opinion 2:**
CDCR administrators, supervisors, and officers were reasonable and proactive and followed established statewide law enforcement practices when implementing an additional security device (a commercially manufactured "HRT" black box). The "HRT" black box is designed to be placed over the mechanical restraint to prevent inmates from immediately accessing the keyhole on the face of the double-strand section.

Based on the reports and videos I reviewed in this case, the CDCR officers escorting Inmates Rodriguez and Taylor from their cells to the dayroom floor and using the additional security device were attentive, professional, and knowledgeable about applying the "HRT" black box.

---

[2] Based on my experience and observations over a 38-year law enforcement career, which included working or supervising custody facilities, the amount of time necessary to defeat a mechanical restraint depends on the skills, knowledge, and experience of the person restrained.

Inmates Rodriguez and Taylor were escorted separately from their cells to the dayroom floor. Inmate Rodriguez was handcuffed in his cell and escorted to the dayroom floor.

When the CDCR officers and Inmate Taylor arrived on the dayroom floor, he (Inmate Taylor) assumed a kneeling position atop a padded chair. Inmate Taylor's legs and ankles were extended beyond the edge of the padded chair and accessible to the officers.

Based on the videos I watched, CDCR officers then placed mechanical restraints on Inmate Taylor's ankles. In the videos, I could see the application of the "HRT" black box on the ankle restraint device. Inmate Taylor stepped away from the padded chair and was escorted to the Restart Chair. The videos, in this case, show the CDCR officers locking Inmate Taylor's ankles to the Restart Chair by securing the metal chain to its base. I could see the "HRT" box was in place.

Once Inmate Taylor was secured to the Restart Chair, the CDCR officers walked to Inmate Rodriguez's cell. Inmate Rodriguez was handcuffed in his cell and then escorted to the floor of the dayroom. Like Inmate Taylor before him, Inmate Rodriguez was placed atop a padded chair on the dayroom floor. Inmate Rodriguez's legs and ankles were extended beyond the edge of the padded chair and accessible to the officers.

Based on the videos, CDCR officers then placed mechanical restraints on Inmate Taylor's ankles. In the video, I could see the application of the "HRT" black box on the ankle restraints. Inmate Rodriguez stepped away from the padded chair and was escorted to the Restart Chair. The video shows the CDCR officers locking Inmate Rodriguez's ankles to the Restart Chair by securing the metal chain to its base. I could see the "HRT" box was in place.

Adding the "HRT" black box was reasonable, proactive, and consistent with established statewide law enforcement practices. Based on the totality of the circumstances, the CDCR officers applying the "HRT" black box appeared to be knowledgeable. They understood the device's functionality (based on the videos, the officers using the "HRT" black box did not appear perplexed, confused, or hesitant when applying the device to the mechanical restraints).

CDCR officers placed the black box device onto the ankle chains worn by Inmates Rodriguez and Taylor and locked the ankle chain onto the base of the Restart Chair. Based on the videos, the officer's actions appeared consistent with the movements associated with the appropriate use of the black box restraint.

Based on the totality of the circumstances and the evidence, the CDCR officers demonstrated they were knowledgeable, competent, and efficient when securing Inmates Rodriguez and Taylor with mechanical restraints. They followed established security procedures when using mechanical restraints (handcuffs, ankle restraints, and the Restart Chair) to secure Inmates Rodriguez and Taylor.

PHILLIP L. SANCHEZ

9-27-2024
DATE

**14**

EXHIBIT E

1       A.   Yes.

2       Q.   But you don't disengage a double lock by

3    repushing in the button, right?  That has to be done

4    with a key anyways.

5       A.   Yeah.  The key to release the double lock goes

6    counterclockwise and to release the ratchet clockwise.

7       Q.   Right.  So it's just covering the one.  That's

8    the same keyhole.  It's not like a separate keyhole to

9    undo the double lock, unless I'm mistaken.

10       A.   You're right.

11       Q.   Okay.  So the black box, then, is intended to

12    prevent a double-locked restraint from being open,

13    right, because one of the known ways that that can be

14    done is through a key role.  Is that correct?

15       A.   Yes.

16       Q.   So assuming that the black box is put on

17    correctly and blocking that keyhole, I mean, there

18    really shouldn't -- you're saying that there should not

19    be a way that these cuffs can be defeated if that black

20    box is on there?

21       A.   Correct.

22       Q.   Okay.  And is that sort of common knowledge in

23    law enforcement that when these black box -- I mean, I

24    guess this is your first interaction, but just through

25    this case, I mean have you learned that that black box

1    is intended to -- to stop any access to that keyhole to

2    prevent people from getting out of restraints?

3         A.   Well, that was exactly what was testified in

4    the record, that this is why they -- this crew of these

5    deputies -- or excuse me, officers, correctional

6    officers, knew about the black box and installed it as

7    part of the restraint procedure for the dayroom.

8         Q.   And I think it's fair to say that the timeline

9    is that that black box was not -- was put on after at

10   the very least the October incident but potentially

11   after the December 5th video that you talked about?

12        A.   Yes.

13        Q.   Based on your experience, I mean, do you feel

14   that that was a proactive or a reasonable measure in

15   trying to prevent these inmates from getting out of

16   their restraints?

17        A.   Well, from what I read and saw, that wouldn't

18   prevent using a shim to get out of a -- and a key

19   because there would be no access, no able access to the

20   key, to release the double-lock feature.  That was the

21   purpose of the black box.

22        Q.   Okay.  Is there any -- is there any way to --

23   to pop the double -- well, let me ask it this way:  Is

24   there any way to release the ratchet without first

25   undoing the double lock?  Like from a physical -- just



1    physically, is there any way to do that?

2         A.  If there's double lock, the ratchet would not

3    release.  It will not go in any direction.

4         Q.  Okay.  And so the idea being that to shim this

5    device, you need to first release the double lock

6    because you have to push it in to be able to get it out

7    first?

8         A.  Yeah.  The shim won't work without the double

9    lock being released.

10        Q.  Okay.  Okay.  So do you disagree with me, then,

11   that the black box being placed over the keyhole to the

12   cuffs that were being used, that appears to be an

13   attempt to prevent inmates from being able to release

14   themselves from these restraints, right?

15        A.  Yes.

16        Q.  Okay.  Do you have an opinion about whether

17   that was reasonable or not, that the implementation of

18   that black box was a reasonable measure to try to

19   prevent further escapes?

20        A.  Yes.  It's a reasonable precaution.

21        Q.  And I guess the other thing that probably

22   assumes though, right, is that officers are going to be

23   properly restraining and applying those restraints,

24   right?

25        A.  Well, it's fundamental to success.  Otherwise