ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
BRIAN S. CHAN, State Bar No. 299926
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
 Telephone:  (916) 210-7666
 Facsimile:  (916) 324-5205
 E-mail: David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants J. Lynch, D. Garland,
M. Jordan, W. Lieber, H. Chavez, D. Sykes,
J. Gomez, J. Carothers, D. Calderon, E. Baker,
G. Herrera, M. Saavedra, and P. Brennfleck*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **MA ROSARIO BUENO ZARAGOZA, an individual; ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza,**<br><br>Plaintiffs,<br><br>v.<br><br>**JEFFREY W. LYNCH, an individual, and DOES 1 through 30, inclusive,**<br><br>Defendants. | 2:21-cv-02294 TLN-JDP<br><br>**DECLARATION OF W. LIEBER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, W. Lieber, hereby declare:

1. I have personal knowledge of the facts set forth in this declaration. I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

1

2. During the events at issue, I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a relief officer in Facility B at California State Prison, Sacramento, which is located in Represa, California.

3. During the relevant time frame, I worked as a relief control booth officer in various Facility B housing units during first watch, which runs from 10:00 p.m. to 6:00 a.m. During those shifts, inmates were largely inside their cells sleeping. Floor officers would do regular welfare checks and enter the sections frequently, but dayroom time was not offered to inmates during First Watch.

4. As a control booth officer, my duties and responsibilities included providing gun coverage for all staff in the housing unit or section; controlling all cell and sally port doors of the section; keeping updated on the daily movement changes in custody, job assignments, cell placement, and changes in assignment hours and work releases; and confirming ducats prior to releasing or allowing access of inmates to different areas of the prison.

5. Due to the construction and physical layout of the Facility B sections, several Facility B sections contained within the same building would share a single control booth. For example, the control booth that overlooked the B-8 Long Term Restricted Housing Unit (LTRH) also overlooked two other sections, and whenever I was assigned to work in that particular control booth, I would be responsible for monitoring and providing gun coverage for all three sections of that building simultaneously.

6. Because I normally filled in for control booth officers on First Watch, when inmates are usually asleep and not programming, and because I rotated through the Facility B sections as a relief officer, I was unfamiliar with and did not regularly interact with the inmates living in the B-8 LTRH section. Prior to December 12, 2019, I did not know inmates Luis Aguilar, Dion Green, Cody Taylor, or Anthony Rodriguez. Prior to December 12, 2019, I do not recall ever interacting with Aguilar, Green, Taylor, or Rodriguez. Prior to December 12, 2019, I do not recall ever observing these four inmates interacting with one another.

7. Prior to the incident on December 12, 2019, I was unaware there was any risk that Green, Taylor, or Rodriguez would harm Aguilar, I was unaware of any reason why these three

2

inmates would want to harm Aguilar, and I did not have any advance knowledge that Green, Taylor, or Rodriguez would attack Aguilar. I also was not present for, was never informed about, and was otherwise unaware about the October 10, 2019 incident where inmates Taylor and Rodriguez had attacked inmate Michael Britt. I also was not present for, was never informed about, and was otherwise unaware about the December 5, 2019 incident where inmate Taylor escaped his restraints in the B-8 dayroom. I only learned about the October 10 and December 5 incidents after the December 12, 2019 incident occurred.

8. On December 12, 2019, I was assigned to work as the Facility B-8 control booth officer during Second Watch, which ran from 6:00 a.m. to 2:00 p.m. I was the only officer working in the control booth that day, and as explained above, I was also responsible for carrying out control booth duties for two other sections in addition to the B-8 LTRH section.

9. At approximately 10:05 a.m. that day, I provided gun coverage for the B-8 floor staff while they prepared Aguilar, Taylor, and Rodriguez for the dayroom. In order to provide gun coverage, I equipped myself with a 40-millimeter direct impact launcher, which is a special-purpose firearm used to launch less-lethal 40-millimeter foam-baton projectiles. I also had access to a Ruger Mini-14 rifle while in the control booth, but I chose to equip myself with the 40-millimeter launcher instead of the rifle because I found it easier to perform my duties as the control booth officer when equipped with the 40-millimeter launcher. When I made the choice to equip myself with the 40-millimeter launcher instead of the Mini-14 rifle, I was unaware that Taylor and Rodriguez planned to escape their mechanical restraints and attack Aguilar. No staff member ever instructed or suggested that I should use the 40-millimeter launcher instead of the Mini-14 rifle that day in order to enable or facilitate Taylor and Rodriguez's attack on Aguilar.

10. While I provided gun coverage with the 40-millimeter launcher, I observed as the B-8 floor staff performed unclothed body searches of Aguilar, Taylor, and Rodriguez; restrained the inmates with waist restraints and leg restraints; scanned the inmates with metal detectors; and escorted and then restrained the inmates to the chairs (known as "restart" chairs) in the dayroom area of the B-8 housing unit. After the inmates were restrained to the restart chairs, the floor

3

Decl. of W. Lieber in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

1  officers left the section and I secured the section door behind them from the control booth, and I
2  resumed my duties in the control booth.

3    11.    Sometime shortly after I secured the section door, I looked into the B-8 LTRH
4  dayroom area and observed Rodriguez and Taylor manipulating their waist restraints and leg
5  restraints. As soon as I observed Rodriguez and Taylor manipulating their restraints, I
6  immediately notified one of the B-8 floor staff members through one of the windows on the floor
7  of the control booth (also known as a port or a grate) that Rodriguez and Taylor were
8  manipulating their restraints. After informing the staff member about what I observed, I
9  immediately went back to the B Section control panel, but by the time I reached the panel,
10 Rodriguez and Taylor had already defeated their mechanical restraints and were running up the
11 stairs towards the second floor (or second tier) of the B-8 housing unit. I did not believe I had
12 justification to use force at this point, as neither Rodriguez or Taylor had done anything to
13 indicate they posed a threat of imminent harm to each other or Aguilar, and in fact were running
14 away from Aguilar towards a tier of locked cells.

15   12.    Rodriguez and Taylor ran up the stairs towards the second tier of the housing unit
16 towards inmate Green's cell, where it appeared Green had slid an object or objects under his cell
17 door. At the same time, I also observed as CDCR correctional staff members began gathering
18 outside of the door for the B-8 LTRH section. After Rodriguez and Taylor began running back
19 down the stairs from the second tier, I activated the controls to open the section door to allow the
20 staff members to enter. However, one of the staff members below shouted up to me to close the
21 door, and I immediately complied and activated the control to close the section door again. I did
22 not feel I had any justification at this point to use force on Rodriguez or Taylor, as they still did
23 not appear to pose an imminent threat of harm to themselves or to Aguilar. They had not made
24 any indication that they were going to harm Aguilar, and Aguilar did not look concerned or
25 scared. At this point, I did not know whether Aguilar was still restrained, had any weapons, or
26 was working in concert with Rodriguez and Taylor. I also did not know what Rodriguez or
27 Taylor had retrieved from the cell.
28

4

Decl. of W. Lieber in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

13. When the section door closed, Rodriguez and Taylor suddenly turned and jogged towards Aguilar, who was still in his restart chair. Neither Rodriguez or Taylor had their hands in an upraised or striking position when they approached Aguilar, and I did not know what their intentions were. However, when they reached Aguilar, Rodriguez quickly raised his hand in a clenched fist to strike Aguilar, holding what appeared to be an inmate-manufactured stabbing instrument. Due to my distance from the incident, I could not accurately see what Rodriguez was holding. I activated my personal alarm upon seeing Rodriguez prepare to strike Aguilar, and after Rodriguez struck Aguilar, I immediately ordered Rodriguez and Taylor to get down onto the ground. When Rodriguez and Taylor did not obey my order, and when I observed Rodriguez and Taylor continuing to attack Aguilar, I immediately aimed at Rodriguez's left shoulder with the 40-millimeter launcher, which I already had on my shoulder, and fired one direct impact round. I believe the round struck Rodriguez in the back, but it had no effect in stopping Rodriguez from attacking Aguilar. I did not feel that using the Mini-14 would have been appropriate, as it would have put Aguilar's life in further danger. With the rapid movement, there was a substantial likelihood that Aguilar would be struck by the lethal round. The round could also have ricochetted off of the concrete floor or walls and struck another inmate in one of the cells immediately behind the dayroom. Instead, I used the 40-millimeter launcher to fire less-lethal rounds that would disable or delay Rodriguez and Taylor while minimizing the risk of harm to Aguilar.

14. As I reloaded the 40-millimeter launcher, I reassessed the situation and observed that Aguilar had been knocked onto the ground and was bleeding. I also observed that Rodriguez and Taylor were attempting to hide behind the restart chairs and the plexiglass barriers attached to the restart chairs. I also observed that Rodriguez was hiding behind the plexiglass of the chair immediately to the right of Aguilar, and was attempting to continue stabbing Aguilar from behind the plexiglass. I ordered Rodriguez and Taylor to get down onto the ground again while taking aim at the only available target I could observe, Rodriguez's right arm, and when Rodriguez and Taylor failed to obey my order again, I fired a second direct impact round at Rodriguez's right

5

Decl. of W. Lieber in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

arm. However, due to the movement of Rodriguez's arm, the second round missed the intended target and hit the concrete behind Rodriguez.

15. As I reloaded the 40-millimeter launcher again, I reassessed the situation and observed that Rodriguez was continuing to stab Aguilar from behind the plexiglass. In order to subdue the attack, I again took aim and fired a third direct impact round at Rodriguez's right arm. However, due the movement of Rodriguez's arm, the third round missed the intended target and struck the concrete again.

16. As I reloaded the 40-millimeter launcher again, I reassessed the situation and observed as Taylor stood up and kicked Aguilar. I ordered Taylor to get down and took aim at Taylor's right thigh, and when Taylor failed to obey my order and in order to subdue the attack, I attempted to fire a fourth direct impact round at Taylor's right thigh. However, this fourth round failed to fire when I pulled the trigger. When the round still failed to fire after I pulled the trigger a second time, I reloaded a new round into the launcher, took aim, and fired the fifth round at Taylor. Due to Taylor's movement, the fifth round struck Taylor in his right hand. Taylor shook his right hand and yelled, "You fuckin' got me!" After Taylor was struck in the hand by the round, both Taylor and Rodriguez stopped their attack on Aguilar and began to get down on the floor. I then responded to the calls of Lieutenant Baker to open the B section dayroom door to allow the responding staff into the section.

17. I did not refrain from using the Mini-14 rifle against Rodriguez and Taylor in order to enable Taylor and Rodriguez's attack on Aguilar. Although I had a Mini-14 close at hand during the incident, and I could have switched from the 40-millimeter direct impact launcher to the Mini-14 at any time, I do not recall ever having an opportunity to use the Mini-14 within the limits of my training and understanding of CDCR policies and procedures during this incident. I do not believe I could have used the Mini-14 on either Rodriguez or Taylor at the beginning of their attack because from my vantage point, I could not observe whether Aguilar had escaped his own restraints or was actively defending himself at that point of the attack. Rodriguez and Taylor did not appear to pose an imminent threat of harm or death to themselves or to Aguilar, nor did I believe I was justified in using force because they had escaped restraints and run up the stairs.

6

Even when Rodriguez and Taylor came back down the stairs and I closed the section door, they had made no indication that they were going to harm Aguilar, so I did not feel I was justified in using force.

18. After I shot Rodriguez with the first round from the 40-millimeter launcher, Rodriguez and Taylor took cover behind the restart chairs' plexiglass barriers, and I no longer had any target or clear shot of Rodriguez and Taylor. I chose to use and to continue using the 40-millimeter launcher during the incident because, given the circumstances and based on my training, it appeared to be the most effective and appropriate use-of-force option for stopping Rodriguez and Taylor's attack on Aguilar.

19. Using the Mini-14 rifle would also have had a great risk of unintended collateral damage to Aguilar or to other inmates in the housing unit. Due to the rapid movements of Taylor and Rodriguez directly over Aguilar, I did not have the ability to fire at Taylor or Rodriguez without a great risk of hitting Aguilar as I would be firing lethal, conventional-bullet ammunition into the group of three people. All of the cells in the LTRH are positioned directly behind the area where the attack was occurring, and had I fired the Mini-14 in that direction, there was also a great risk that the shot would strike an unintended inmate inside of his cell. Based on my observations and the circumstances, I did not feel that use of the Mini-14 was appropriate, and instead continued to use my 40-millimeter launcher, which ultimately stopped the attack.

20. My actions on December 12, 2019, were based on my training and understanding of CDCR policies and procedures, and I acted in good faith and to the best of my ability during this incident. I did not take any action, refrain from taking any action, or intentionally delay taking any action to enable Taylor and Rodriguez's attack on Aguilar. I did not have any prior knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

/ / /

/ / /

/ / /

/ / /

7

Decl. of W. Lieber in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: January 23, 2025, at Sacramento, California.

__/s/ William Lieber_____

W. Lieber

(Original retained by counsel)

SA2022300303
Lieber Declaration.docx

8

Decl. of W. Lieber in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)