1  Rob Bonta, State Bar No. 202668
   Attorney General of California
2  Jon S. Allin, State Bar No. 155069
   Supervising Deputy Attorney General
3  Brian S. Chan, State Bar No. 299926
   Deputy Attorney General
4  David E. Kuchinsky, State Bar No. 292861
   Deputy Attorney General
5  1300 I Street, Suite 125
   P.O. Box 944255
6  Sacramento, CA  94244-2550
   Telephone:  (916) 210-7666
7  Facsimile:  (916) 324-5205
   E-mail: David.Kuchinsky@doj.ca.gov
8  *Attorneys for Defendants J. Lynch, D. Garland,*
   *M. Jordan, W. Lieber, H. Chavez, D. Sykes,*
9  *J. Gomez, J. Carothers, D. Calderon, E. Baker,*
   *G. Herrera, M. Saavedra, and P. Brennfleck*

10

11                 IN THE UNITED STATES DISTRICT COURT

12                FOR THE EASTERN DISTRICT OF CALIFORNIA

13                        SACRAMENTO DIVISION

14

15

16 | **MA ROSARIO BUENO ZARAGOZA, an individual; ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza,** | 2:21-cv-02294 TLN-JDP
17 | | **DECLARATION OF E. BAKER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
18 |                                          Plaintiffs,
19 |                    **v.**
20 |
21 | **JEFFREY W. LYNCH, an individual, and DOES 1 through 30, inclusive,**
22 |                                          Defendants.

23

24       I, E. Baker, hereby declare:

25       1.    I have personal knowledge of the facts set forth in this declaration.  I am competent to

26 testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

27       2.    I have been employed by the California Department of Corrections and Rehabilitation

28 (CDCR) for more than seventeen years in various capacities, from a correctional officer to my

                                           1

1  current role as a correctional captain on the Mental Health Compliance Team.  In that capacity, I

2  oversee and direct the implementation and ongoing operation of CDCR's Mental Health Services

3  Delivery System (MHSDS), which provides mental health care and related services to inmates

4  throughout CDCR.  I am familiar with past and current litigation, including the *Coleman* class-

5  action lawsuit, through which federal courts have mandated specific changes and requirements for

6  CDCR's treatment of, and the services that must be offered to, inmates with mental health

7  diagnoses.

8       3.     I have had extensive training and experience with CDCR's use-of-force policies and

9  their alarm-response policies.  I attended the academy as a correctional officer, attended annual

10  training and recertification at the prison, and teach other staff about the use of force and alarm

11  response policies.  I have instructed in these areas both at individual prisons and at CDCR's

12  Lieutenant's academy.

13       4.     In the course of my career, I have responded to violent incidents that required officers

14  to intervene and use force on hundreds of occasions.  I have responded in an officer capacity, in

15  which I was the first responder to an incident, in a sergeant capacity, in which I was the response

16  supervisor and directed the actions of my staff in response to an incident, and as a lieutenant, in

17  which I was the incident commander in incidents, forming tactical plans, assigning staff to

18  various roles, and determining, in ongoing and often extremely dangerous situations, when staff

19  should take action.

20       5.     CDCR's use-of-force policy requires staff to accomplish departmental functions with

21  minimal reliance on the use of force.  Staff is trained to use only reasonable force, which is the

22  force that an objective, trained and competent correctional employee, faced with similar facts and

23  circumstances, would consider necessary and reasonable to subdue an attacker, overcome

24  resistance, effect custody, or gain compliance with a lawful order.

25       6.     Staff has access to various use-of-force options, including chemical agents, handheld

26  batons, physical strength and holds, less-lethal weapons, including the 40mm direct impact

27  launcher, and lethal weapons, such as the Mini-14 rifle.  Staff are trained that use-of-force options

28  do not have to be used in any particular sequence, but that they should use the option they

1    reasonably believe is sufficient.  When determining whether to fire a Mini-14 rifle, or other lethal

2    weapon, staff are taught to assess their target, their backstop, and beyond.  They are trained to

3    assess the likelihood that they will hit their intended target or others around the target, what is

4    located directly behind the target, such as other inmates or cells, and what is beyond the backstop.

5    Staff are trained to consider whether they have the ability to use lethal force without hitting the

6    victim, or whether less-lethal rounds would be more appropriate, such as in situations where

7    multiple inmates are attacking one victim and the victim is very likely to be struck by the lethal

8    round, or where bystanders are likely to be harmed by the use of deadly force.

9        7.    CDCR employees are only permitted to use lethal or deadly force under the following

10   circumstances: (1) Defend the employee or other persons from an imminent threat of death or

11   GBI. (2) Apprehend a fleeing person for any felony that threatened or resulted in death or great

12   bodily injury (GBI), if the officer reasonably believes that the person will cause death or GBI to

13   another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of

14   force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly

15   force may be used, unless the officer has objectively reasonable grounds to believe the person is

16   aware of those facts. (3) Dispose of seriously injured or dangerous animals when no other

17   disposition is practical.  Deadly force shall not be used against a person based on the danger that a

18   person poses to themselves if an objectively reasonable officer would believe the person does not

19   pose an imminent threat of death or GBI to the peace officer or to another person.  However, staff

20   are trained to assess the totality of the circumstances to make their own determination in each of

21   these situations of what force is necessary.  Staff cannot use lethal force if they only have a

22   suspicion that an inmate might harm another inmate or based only on an inmate having harmed

23   another inmate in the past.  Staff must observe an imminent threat of great bodily injury or death

24   to justify the use of deadly force.  Use of deadly force when it is not justified is a terminable

25   offense in CDCR and could result in criminal charges.  Staff would never be permitted to use

26   lethal force on an unarmed inmate who is running away from officers and other inmates, even if

27   that inmate has committed substantial acts of violence in the past.

28

3

8.      Even where lethal or deadly force can be justified, there is no policy, procedure, or training that mandates that an officer must use lethal force in any given situation.  Because incidents in the prison setting often develop rapidly and without the opportunity to spend time deliberating about a course of action, officers must use their training and experience to make judgment calls in the moment, based on the information they have available to them at that time.

9.      No policy in CDCR dictates exactly which force option must be used in a given situation, as each situation presents unique challenges and variables that have to be taken into account.  A stabbing inside a housing unit would likely require a very different response than a stabbing on a recreational yard.  Similarly, the weather, time of day, available staff, number, demeanor and behavior of the inmates, and dozens of other variables can come into play in each incident.  Officers are trained to assess each incident independently and in an ongoing fashion using an "OODA Loop" in which they observe the incident, orient themselves to the situation, decide on a course of action, and act.  Oftentimes, officers will repeat the OODA loop dozens of times in very short incidents as they assess and reassess potential threats, try to interpret the erratic and unpredictable behavior of inmates, and determine when it is safe, effective, and necessary to use force or respond in another fashion.  All these decisions must be made in split-seconds, with severe consequences at stake, and often with inmates deliberately manipulating or obscuring their intentions.

10.     While staff are trained to use various force options when circumstances require, they are not extensively trained to engage in hand-to-hand or weapons-based combat with inmates. Staff are trained to use the force option that will be effective while maintaining a safe distance from the threat.  Staff are trained that they must ensure their own safety, and that if they are injured or taken hostage during an incident response, it will only increase the danger and potential harm that will occur to responding staff members.

11.     Staff are trained never to rush into an unknown or potentially violent situation, especially within a housing unit, without a coordinated tactical plan.  In security housing units (SHU) or administrative segregation units in particular, staff are trained not to enter the dayrooms or tiers when inmates are unrestrained or armed until a tactical plan is established and it is safe to

4

Decl. of E. Baker in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

execute. Entering a SHU when inmates are unrestrained exposes staff to danger and prevents the control booth officer from using his 40mm launcher or Mini-14 to quell an incident from a safe distance. It also prevents the use of chemical munitions to quell an incident, as the officer who entered the dayroom would likely be exposed to the effects and be unable to defend himself. If an officer were to be rendered unconscious or his movement or vision impeded, the risk of danger and the duration of the incident, could both escalate dramatically. The additional response time could also delay the victim from receiving medical care.

12.     Instead, staff are trained to enter housing units in a tactical, coordinated manner, with specific roles designated, when it is safe to enter. When inmates are unrestrained, actively disobeying orders, or are in possession of weapons, staff are not trained to physically engage with the inmates directly. This is especially so in a SHU that houses mentally ill inmates, whose mental health may be playing a substantial role in the incident, and who are very frequently erratic and unpredictable.

13.     When staff make entry into a SHU to respond to a violent incident, the first priority, even if there is an injured victim, is to secure the inmate-assailants and ensure they do not have any other weapons that could be used to injure staff or other inmates. If inmates have access to additional weapons, or are left unrestrained near weapons, they could resume their attack against the victim or staff, which would further delay lifesaving measures by medical responders.

14.     During the incident at issue in this case, I was a correctional lieutenant at California State Prison, Sacramento, which is located in Represa, California. During the events at issue, I was assigned to the Facility B-7 Psychiatric Services Unit (PSU) and the Facility B-8 Long Term Restricted Housing (LTRH) section at California State Prison, Sacramento.

15.     As a correctional lieutenant for the PSU and LTRH, my responsibilities included supervision of staff members and inmates in the housing units, the treatment center located behind Facility B, responding to incidents, acting as incident commander when incidents occurred, and ensuring staff followed and acted in accordance with policy.

16.     The LTRH unit was a security housing unit that was activated at California State Prison, Sacramento, on September 19, 2019, and was designed to house inmates who had

5

1   committed a disciplinary violation while in prison and had been sentenced to serve a SHU term,

2   but who were diagnosed with psychiatric disorders and required mental health care services on an

3   outpatient basis or level of care, known as CCCMS or Correctional Clinical Case Management

4   System.

5          17.    The operational policy for the LTRH, Operational Procedure 046, was developed by

6   the warden and administrative staff at California State Prison, Sacramento. The staffing package,

7   the specific number and classifications of officers that would be assigned to work the unit, were

8   determined at the headquarters level. I had no control over the design or procedures of the

9   LTRH, nor did I have any control over how many officers would be assigned to work in the unit.

10  I was provided directive from the warden of California State Prison, Sacramento, to activate and

11  run the unit with the procedures that we were provided. I was tasked with the implementation of

12  policy, but did not have authority to alter that policy without warden approval. A true and correct

13  copy of Operational Procedure 046 is attached hereto as Exhibit A.

14         18.    The LTRH was located in B-Facility, Building 8, and was divided into three sections,

15  separated by pocket doors, that each had two levels or "tiers" of inmate cells. Each section had

16  approximately ten cells on each tier, all of which looked out onto a dayroom. Each section would

17  house between twenty and forty inmates, all of whom were CCCMS and had been sentenced to

18  SHU terms for disciplinary violations. Each of the inmates presented unique challenges, had

19  exhibited violent behavior in the past, and had mental health treatment needs that the unit was

20  required to provide.

21         19.    There was one control booth that looked out onto all three sections from an elevated

22  position. There was a control panel in the control booth that had buttons to open and close the

23  doors into the building, the doors into each section, the pocket doors between each section, and

24  each individual cell door. Officers on the floor could not open or close the doors in the section.

25         20.    One officer was assigned to the control booth of B8, four officers were assigned to

26  the floor of the building, and a sergeant was on duty for each eight-hour shift or "watch." The

27  control booth officer had access to both a less-lethal 40mm direct impact launcher and a Mini-14

28  rifle that fired conventional bullets and that is considered to be deadly or lethal force. The control

6

booth officer also had access to additional weapons in the booth, which could be lowered down to officers on the floor through portholes in the control booth in the event of an emergency.  The control booth was responsible for monitoring all three sections at once, including opening and closing doors for officers, providing gun coverage during searches and escorts, and monitoring staff who were inside the sections conducting twice-hourly welfare checks of every single cell, providing meals to inmates in their cells, passing out medications and supplies, and preparing inmates for escorts to other areas. Furthermore, the control booth officer was in charge of monitoring the yard and dining room door, both areas which are highly trafficked by staff members coming in and out of the building.

21.     The floor officers were each equipped with an eighteen-inch expandable baton, an MK-9 oleoresin capsicum pepper-spray device, and a stab-resistant vest, but no other weaponry or armor.  The floor officers had continuous duties throughout the shift, including conducting twice-hourly welfare checks of every inmate in the building, feeding inmates in their cells, escorting medical staff to provide medication and mental health care, passing out supplies, and preparing inmates for escort to other areas of the prison. The same floor staff would also be required to respond to other alarms that occurred within Facility B (yard and buildings) on a regular basis.

22.     The sergeant of B8 was actively involved in the day-to-day operation of the LTRH and supervised staff when they searched, restrained, and escorted inmates.  The sergeant also attempted to maintain communication with the inmates housed in the unit to try to address and diffuse any problems within the unit.  I had frequent communication with the LTRH sergeants to discuss issues in the unit.

23.     As lieutenant, I was responsible for supervising B-Facility Buildings 7 and 8, and worked primarily in the B PSU Treatment Center office about a quarter mile from the LTRH located off the facility.  I went to the LTRH on a daily basis, usually between 6:00 a.m. and 6:30 a.m., and walked through the unit to speak with staff and inmates and to ensure all programming was properly scheduled. I would generally walk the tier and address any pertinent issues amongst the population and discuss any relevant concerns that may come up with my staff.

7

24.  The nature of the unit and the types of inmates who were housed there, made it a very challenging environment.  Inmates who were housed in this unit not only had committed violence in prison but had been formally diagnosed with a mental illness and were entitled to court-mandated services.  I made a continuous effort to meet with and establish rapport with the inmates housed in the LTRH.  Developing rapport with inmates often provided them with an avenue to discuss their issues and air grievances without resorting to disruptive or violent conduct.  My goal as a lieutenant was to ensure that my facility was offering the programming and services it was designed and required to offer to the inmates, while maintaining order and efficient operation. I made it a point to be fair and impartial with everyone housed within my units and did my best to ensure my staff operated the same way.

25.  In walking through the unit, I spoke with the inmates to try to anticipate and address any issues in the unit before they escalated.   I have never had any conversations with inmates Green, Taylor, or Rodriguez about Aguilar, I did not know at the time and did not tell anyone the nature of Aguilar's conviction, nor did I ever tell Green or any other inmate that I wanted someone to commit violence or any other wrongful conduct against Aguilar or any other person. I had no issues with Aguilar and had no reason to want any harm to come to Aguilar. I had very limited interactions with him during his stay and he was always very respectful during our interactions.

26.  Aguilar was not a known enemy of Taylor, Rodriguez, or Green before the incident on December 12, 2019.  I had never received any information that Taylor, Rodriguez, or Green intended to harm Aguilar, or that Aguilar had any concerns for his safety in the LTRH or in the dayroom.  Had I received any information that Aguilar was at risk, I would have investigated that risk and potentially removed Aguilar from the section. I would have also followed up with my immediate supervisor and made the Investigative Services Unit aware of it.  Aguilar had never raised any safety concerns about Taylor, Rodriguez, Green, or any other inmate in the LTRH. Nor had any other inmates or staff told me that Aguilar was at risk.  On December 12, 2019, I did not know or have any reason to know that Aguilar was at risk of harm from Taylor, Rodriguez, or Green.

8

27.     Operational Procedure 46, which governed the LTRH, required that no inmate was to be permitted out of their cell unrestrained. To leave the cell, an inmate first had to submit to an unclothed body search, a search by a metal detector, and then the application of restraints. They were then escorted by at least two correctional officers to whatever programming or activity they had to go to.

28.     Staff in the LTRH was required to conduct welfare and security checks of each inmate in each cell in the LTRH twice an hour and no more than thirty-five minutes between checks, including visually observing a living, breathing inmate free from obvious physical danger, and to log each welfare check with an electronic device. This required staff to enter each of the sections on a continuous basis throughout each shift.

29.     Inmates in the LTRH received all of their meals and medication in their cells and were permitted to have personal property in their cells, including food, books and writing materials, legal property, and appliances, such as televisions, antennas, and radios.

30.     Non-custody staff, such as medical personnel entering the unit to dispense medication, were never permitted to be alone in the LTRH without a custody staff member escorting them at all times. Throughout the shift, non-custody staff would enter the sections frequently, requiring custody escorts.

31.     Inmates in the LTRH were offered a minimum of ten hours of yard time per week, which was conducted in individual exercise-yard areas. The inmates were subjected to an unclothed body search before leaving their cells, scanned with a metal detector, then restrained and escorted to the yard modules by multiple officers, and then searched and scanned with a metal detector before being returned to their cell. Inmates in the LTRH were also provided access to the law library and to therapeutic group activities on a weekly basis. The same search and restraint procedure applied to all out-of-cell inmate movement.

32.     Unit policy and a recent order in the *Coleman* class-action lawsuit, mandated that inmates in the LTRH be offered three and a half hours per week of out-of-cell activity in the unit's dayroom area. Dayroom was offered on a voluntary basis, and staff members asked each inmate whether they wanted to be brought out to the dayroom that day. Inmates could refuse or

9

request to be brought back to their cells at any time during the out-of-cell activity time.  Staff did not have a list or know ahead of time which inmates would go to dayroom on a given day. Instead, they would ask each inmate along the tier whether they wanted to go to dayroom that day.  The offering of dayroom was on a constant rotational basis and would pick up where left off on the previous day; attendance was not required, just the offering of access to the service.

33.    Inmates who chose to attend dayroom were subjected to an unclothed body search, restrained, searched with a metal detector, and escorted down to the dayroom floor where they were secured in "restart chairs," metal desks that were bolted to the floor that had plexiglass dividers and restraint devices to secure the inmates to the chairs.  Use of the restart chairs was approved and mandated, and the unit was required to use them when offering inmates the mandatory out-of-cell time they were entitled to.

34.    Inmates were secured to the "restart chairs" with a metal bar that locked around their leg restraints.  Officers were trained and refreshed often on how to apply the restraints to the inmate and on how to secure the inmate to the restart chairs.  I had no reason to believe that staff was not applying restraints in accordance with policy, as this was something that was done countless times a day, seven days a week.

35.    Inmates Aguilar, Taylor, Rodriguez, and Green were all appropriately housed in the LTRH on and before December 12, 2019.  Each inmate was serving a SHU term for disciplinary violations and was designated as a CCCMS inmate.  Each inmate met the criteria to be housed in the LTRH and had been approved to be housed in the LTRH based on their history and case factors by the prison's Institutional Classification Committee (ICC), which consisted of the warden, mental health and programming staff, and assigned custody staff.  I did not play a role in classifying Aguilar, Taylor, Rodriguez, or Green; however, I was aware of each of their housing in the LTRH and confirmed they were appropriately classified by reviewing their case factors and histories.

36.    On October 10, 2019, Taylor, Rodriguez, Green, and another inmate were participating in out-of-cell time in the dayroom of the LTRH.  All four inmates had been searched, escorted, and restrained to the restart chairs pursuant to policy.  At approximately 11:10

10

a.m., a control booth officer heard yelling in the section and observed Taylor and Rodriguez out of their restraints, striking the fourth inmate with what turned out to be inmate manufactured weapons in the face and upper torso. The control booth officer activated his alarm, gave orders to get down, and fired three rounds from his 40mm direct impact launcher. I heard the incident announced on the radio from my program office and responded to the LTRH, where staff was assembling outside the unit to make entry pursuant to policy and training.

37.    I ordered Taylor and Rodriguez to get down on the ground in a prone position, and they complied. The control booth officer lowered weapons from the booth, and I formulated a tactical plan, assigned staff to different roles, and directed them to enter the unit. The inmates were restrained and taken for medical attention without further incident.

38.    Green, who had been in the dayroom during the incident but remained in his restart chair, did not make any statements on October 10, 2019. However, at a classification committee meeting on October 15, 2019, Green stated that he was the shot caller for the Independent Riders prison gang and had ordered the attack on the fourth inmate because of a previous incident between the two of them at a different prison, California State Prison, Lancaster, in 2018. The fourth inmate was rehoused in a different section after the incident.

39.    While Green's statement at the meeting indicated that the motivation behind the attack was personal between the two, it was unclear to staff and to myself exactly how Taylor and Rodriguez had freed themselves from the restart chairs. However, it is understood within the correctional setting, and I am personally aware, that handcuffs can be defeated using inmate manufactured keys and shims. One of the most common ways inmates defeat restraints, is to slide a small, thin piece of metal (a shim) into the base of the handcuff where the metal loop, or ratchet is inserted, tighten the handcuffs slightly to lift the internal locking mechanism, and then press the piece of metal between the teeth and the locking mechanism, which prevents the mechanism from engaging and allows the cuff to be opened.

40.    A "double-lock mechanism," which prevents a handcuff from tightening any further by locking the ratchet in place, is intended to obstruct the ability to shim by not allowing the locking mechanism to lift. The double-lock mechanism can be disengaged by inserting a small

11

piece of metal, commonly called a pick, through the handcuff keyhole and pressing against the mechanism. Once the double-lock is disengaged, the cuff can be opened by rotating the piece of metal in the other direction.

41.    Based on my review of the incident and my training and experience, I believed it was most likely that Taylor and Rodriguez had defeated the double-lock mechanism through the keyhole on October 10, 2019. For additional security precautions, there is a device known as a "black box" which is a clamshell-hinged metal cover that locks in place over the handcuff keyhole with a padlock after the handcuff is applied to the inmate's leg or wrist. The device blocks access to the keyhole so that a pick cannot be used. Black boxes are very often used when transporting inmates to and from public areas, such as hospitals and court appearances. They were regularly used and relied upon as an increased safety measure in that time frame and would be considered the most secure way to restrain an inmate.

42.    Based on my training and experience, I believed adding the black box devices to the restraint protocol was a reasonable and proactive measure to address the risk that Taylor, Rodriguez, or any other inmate would be able to defeat restraints in while participating in out-of-cell activity time in the dayroom. I had never witnessed nor had I ever been aware of any inmate that had ever defeated the black box or was able to free themselves from restraints when the black box was utilized. Staff was trained on the application and use of the black boxes during annual training. I also required the unit sergeant to be present when inmates were searched, restrained, and escorted to dayroom, to ensure that policy was being followed and restraints were being appropriately applied. The unit sergeant was present and actively supervising on the date of the incident.

43.    The October 10, 2019, incident, did not appear to be the result of Taylor's and Rodriguez's proximity to each other, or to Green. Instead, it appeared to be related to a previous issue between Green and the other inmate, as a result of which Green, as a "shot caller," ordered Taylor and Rodriguez to attack that specific other inmate. It did not appear to be a crime of opportunity by Taylor and Rodriguez. While we had taken reasonable measures to try to prevent further escape, I did not believe that Taylor and Rodriguez were going to try to escape to harm a

12

1   random inmate in the future, in part because that was not the nature of or reason behind the

2   October 10, 2019, incident.  Instead, it appeared to be a dispute between inmates that had been

3   remedied by moving the other inmate to a different section.

4          44.     Nor did I feel it was necessary, or even beneficial, to try to rehouse or separate Taylor

5   or Rodriguez.  The LTRH was the most restrictive and high-security setting within CDCR at the

6   time and was specifically designed to house mentally ill inmates who committed violent acts in

7   prison.  There was no higher level of custody that they could be sent to, nor was there any other

8   unit that accommodated their mental health level of care and security requirements at the time of

9   the incident.  I did not believe that moving Taylor and Rodriguez to different sections would have

10  a meaningful effect on the safety of the unit.  And, by its nature, the LTRH houses violent,

11  mentally ill inmates with unique housing needs and personalities.  Moving one problematic

12  inmate to another section, would not address concerns that an inmate could escape their restraints.

13  Instead, I took reasonable steps to prevent further escapes by implementing the black boxes,

14  training staff, and insuring additional supervision during search, restraint, and escort procedures.

15  I also continued to conduct walk-throughs of the unit on a daily basis, and speak with inmates to

16  try to anticipate and resolve any issues before they escalated.

17         45.     Because Taylor and Rodriguez were CCCMS inmates in the LTRH, I also did not

18  have the authority to terminate their dayroom privileges.  There is a "confined to quarters"

19  sanction, which can be imposed on inmates after disciplinary violations, but in light of the

20  mandatory out-of-cell time and unique mental health challenges the inmates faced in the LTRH, it

21  was not a reasonable alternative to use, as it is deemed extremely detrimental to confine one to

22  the cell for extended periods of time.  I believe that confining Taylor and Rodriguez to their cells

23  and denying them out-of-cell time on even a temporary basis would have violated unit policy and

24  the *Coleman* court order to provide out-of-cell time to the inmates.  I believed it would have been

25  unlawful to confine them in their cells indefinitely.

26         46.     Between October 10, 2019, and December 12, 2019, Taylor, Rodriguez, and other

27  inmates continued to use the dayroom.  I was not aware of any further incidents in which Taylor

28  and Rodriguez were able to escape their restraints, or any incidents in which they harmed another

13

Decl. of E. Baker in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

1   inmate. I did not receive any information or see any indication that they would try to escape from

2   their restraints or that they were intending to harm another inmate.

3         47. I was not aware of the incident on December 5, 2019, in which Taylor is on video

4   defeating his restraints until after December 12, 2019. No one had communicated this

5   information to me, and my understanding is that the video footage was located after December

6   12, 2019, while staff was looking for footage of an unrelated incident. Had I known about the

7   December 5, 2019, incident, I would have ordered an investigation to determine how Taylor and

8   Rodriguez were able to escape restraints and would have taken appropriate action based on the

9   circumstances. Because I was unaware of the incident, I had no reason to impose any remedial

10   measure between December 5, 2019 and December 12, 2019. However, we had not yet

11   implemented the black boxes on the leg restraints on December 5, 2019, but they were in place on

12   December 12, 2019.

13         48. Leading up to the incident on December 12, 2019, I had no reason to think that

14   Aguilar was at risk of harm, or that Taylor and Rodriguez posed a substantial risk of harm to

15   Aguilar. There had been no reports of issues between them, and none had expressed any safety

16   concerns to me during my daily walk-throughs of the unit. I was not aware of and had no reason

17   to think that the incident would take place. I did not know who would go to dayroom that day,

18   nor did I know as I responded to the incident, who was in the dayroom or who was involved.

19         49. On December 12, 2019, at approximately 10:05 a.m., I was in the B PSU Treatment

20   Center, when I heard a radio transmission stating that inmates in B8 were out of their restraints

21   and calling for a Code 1 response. I immediately left my office and ran to B8, arriving in less

22   than two minutes. I did not know who was involved in the incident or any other details of the

23   incident.

24         50. When I arrived, staff were gathered at the section door shouting commands. I went to

25   the section door and saw Taylor and Rodriguez pacing around the dayroom out of their restraints.

26   I saw that Aguilar was laying on the ground behind his restart chair. His face and torso were

27   covered in blood and I could observe multiple stab wounds. He appeared to be unconscious.

28

51.    I immediately called for an ambulance on my radio and ordered Taylor and Rodriguez to get on the ground in a prone position.  Taylor and Rodriguez complied with my orders and proned out.  Taylor and Rodriguez were still in reach of weapons on the dayroom floor, and I did not know if they had any additional weapons hidden on them, so I ordered Rodriguez to come back to the section door and then prone out on the ground.  Rodriguez complied.

52.    I quickly formulated a tactical plan for entry and instructed staff members on their roles.  I had control booth officer Lieber open the section door, and staff moved in with weapons, personal protective equipment, and extraction shields.  Staff first approached and restrained Taylor and Rodriguez to ensure that they were secure and could not resume their attack. Once the scene was made safe, staff then attempted lifesaving measures on Aguilar in the dayroom until a gurney arrived.  Aguilar was escorted out of the building by medical staff.

53.    I never instructed any staff member in the LTRH, including, Calderon, Brennfleck, Herrera, Gomez, or Sykes to not double-lock Rodriguez's and Taylor's mechanical restraints.  I do not know or have reason to believe that any other supervising officer ever instructed Officers Brennfleck, Herrera, Gomez, or Sykes to not double-lock Rodriguez's and Taylor's mechanical restraints.  I do not know and have no reason to believe that Officer Sykes or any other officer intentionally failed to secure Rodriguez's and Taylor's mechanical restraints.  If I knew or had reason to believe that Rodriguez and Taylor were not properly restrained to their restart chairs, I would have personally inspected and ensured that Rodriguez and Taylor were properly restrained to their restart chairs before I permitted them to participate in out-of-cell activity.  If I could not ensure they were secure, I would not have permitted them to remain in the dayroom.

54.    My actions on December 12, 2019, were based on my training and understanding of CDCR policies and procedures, and I acted in good faith and to the best of my ability during this incident.  I did not take any action, refrain from taking any action, or intentionally delay taking any action to enable Taylor and Rodriguez's attack on Aguilar.  I did not have any prior knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

15

55. As lieutenant, I reviewed the reports of all staff involved in the incident and issued requests for clarifications. I also reviewed video footage of the incident. Based on my review of the footage and reports, staff followed policy in responding to the incident. When officer Lieber saw Taylor and Rodriguez manipulating their restraints, he followed policy by immediately notifying floor staff and then returning to position where he observed Taylor and Rodriguez had escaped restraints and Rodriguez was running up to the second tier.

56. At this point in the incident, CDCR's use-of-force policy did not permit Lieber to fire his 40mm direct impact launcher or Mini-14 rifle at either Taylor or Rodriguez. While Taylor and Rodriguez had escaped their restraints, there was no indication that they had weapons or were going to commit violence against each other or Aguilar. Rodriguez was running up the stairs and Taylor was standing in the stair well. Aguilar was watching Taylor and Rodriguez, and he appeared calm and was not calling for help. Had Lieber used lethal force, it would have been a violation of policy, and potentially subjected him to criminal charges, because there was no indication at that time that Taylor and Rodriguez were going to cause great bodily harm or death to Aguilar. There was no evidence of any pre-existing issues between the inmates, and nothing Taylor or Rodriguez had done was directed at or indicated they intended to harm Aguilar.

57. My review of the video and reports also indicates that floor staff followed policy when they assembled at the section door instead of entering to physically engage Taylor and Rodriguez when they defeated the restraints. Staff is not trained to engage in hand-to-hand combat with inmates, and rushing into the section, especially without any additional protective equipment, could escalate the inmates' behavior, subject the officer to a substantial risk of harm, prevent the control booth officer from using his weapons from a distance, and could lead to a hostage situation or to the inmate escaping into the rotunda through the open section door. Were the inmate to escape, they would pose an enormous risk to the safety of staff in the rotunda and offices who are unarmed, and untrained to handle unrestrained inmates in this setting.

58. When Taylor and Rodriguez first escaped restraints, the section door was closed. Lieber began to open the section door as the inmates came back down the stairs, but Sergeant Calderon appropriately and reasonably ordered Lieber to shut the section door. It appears Taylor

16

1  was making an aggressive movement toward the section door, and staff had not had time to equip

2  and prepare themselves for entry as they were trained.  Calderon followed CDCR and LTRH

3  policy, which does not permit officers to enter the sections when inmates are unrestrained unless

4  it is safe to do so, by ordering Lieber to shut the section door so staff could make entry safely.

5      59.    Had Calderon not ordered the door shut and staff entered, they would have had to

6  engage in direct combat with Taylor and Rodriguez, who were armed with seven- and nine-inch

7  blades, while staff had only expandable batons and pepper spray.  Stab resistant vests are not

8  intended for combat, and have several vulnerable points, including the entire head, face, neck,

9  both armpits, and the entire lower body of the officer. The control booth officer would have been

10  prevented from firing into the dayroom.  There was a substantial likelihood that entry into the unit

11  at this point would have escalated the situation and exposed all involved to greater risk, without

12  reliably preventing harm to Aguilar, as it was not initially clear that he was the target of Taylor

13  and Rodriguez's actions.  The decision to shut the section door while Lieber fired rounds from the

14  control booth to try to quell the incident, was consistent with CDCR policy and training for the

15  LTRH unit.

16      60.    It was not clear from my review of the video and reports that any staff member was

17  aware that Taylor and Rodriguez were going to attack Aguilar until seconds before Taylor first

18  stabs Aguilar.  Taylor and Rodriguez appear to converse with Aguilar, and when Taylor and

19  Rodriguez escape restraints, Aguilar does not call for help or alert officers, and appears to remain

20  calm.  Taylor first appears to walk aggressively towards the section door, and then when the door

21  closes, he and Rodriguez quickly approach Aguilar.  Neither Taylor or Rodriguez has his hand

22  raised in a stabbing position and it is not clear what they are doing until they start to stab Aguilar.

23      61.    Based on my review of the video and staff reports, and my training and experience,

24  the decision to fire the 40mm direct impact launcher, as opposed to the Mini-14 rifle, was

25  appropriate and within CDCR policy and training.  Lieber was firing from an elevated position,

26  into a group of three rapidly moving inmates, and there was a great likelihood that he would

27  strike Aguilar inadvertently.  There was also a likelihood that there would be ricochet from a live

28  round, or that the round would hit an inmate in one of the twenty cells directly behind the

17

Decl. of E. Baker in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

dayroom. The use of the 40mm also appeared to be effective, as once it struck Taylor in the hand, the attack stopped. Lieber was faced with a rapidly unfolding situation, in which he did not know the intent of Taylor, Rodriguez, or Aguilar, and made a decision to use the 40mm direct impact launcher, which was an approved use of force in this situation. Lieber had to make an in-the-moment decision and one that was in line with the use of force policy, while recognizing the sanctity of human life of not only those in the dayroom, but those in the cells beyond the incident.

62.    I have never had any conversations with Green, Taylor, Rodriguez, any inmate, or any staff member in which I instructed or agreed to violate Aguilar's rights. I have never instructed any inmate or staff member or agreed with any inmate or any staff member to harm another inmate. I did not orchestrate or play any role in Aguilar's murder. I am not aware of any of my staff members orchestrating or playing any role in Aguilar's murder. Taylor, Rodriguez, and Green are responsible for Aguilar's murder.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: January 23, 2025, at Sacramento, California.


_____
        **/s/ E. Baker**

E. Baker

(Original retained by counsel.)

SA2022300303
Baker Declaration.docx

Decl. of E. Baker in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

EXHIBIT A

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

I.      **OP INFORMATION**

OP No. 046
OP Title: Long Term Restricted Housing (LTRH)
Reviewed By: Facility B Captain
Review Month: July
Date of Last Review: July 2019

II.     **PURPOSE**

The purpose of Operational Procedure 046 is to establish specific operational guidelines for the
approved program within the Long Term Restricted Housing (LTRH) in B Facility, as mandated
by the California Code of Regulations (CCR), Title 15, Division 3, Chapter 1; Rules and
Regulations and California Department of Corrections Operations Manual (DOM). The objective
of this procedure is to establish an Operational Procedure (OP) that clearly delineates the LTRH
missions within B Facility 8 Block LTRH. To achieve this goal, the Mental Health Services
Delivery System (MHSDS) procedures have been interfaced into this plan to ensure the overall
function of the LTRH.

III.    **REFERENCES**

California Code of Regulations, Title 15 and Department Operations Manual (DOM).
Coleman vs Brown Case#2:90-cv-00520-LKK-DAD

IV.     **REVIEW AND APPROVAL**

This procedure will be reviewed and updated annually in the month of July by the B-Facility
Captain, B Facility Associate Warden and submitted to the Warden for approval.

V.      **RESPONSIBILITY**

A.      The Warden has the overall responsibility for this OP.

B.      The Chief Deputy Warden and the Associate Warden of B Facility are responsible for the
        administrative operation of this procedure.

C.      The Captain assigned to B Facility is responsible for full compliance within the LTRH.

VI.     **METHODS**

A.  Purpose of the Long Term Restricted Housing

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

The LTRH is designed for inmates whose conduct endangers the safety of others or the security of the institution. This specialized unit is designated for extended term programming of inmates not suited for general population as well as interfaced programs such as MHSDS, Communicable Infectious Disease/Human Immunodeficiency Virus Syndrome (CID/HIV).

B.  Procedure

Housing will be per this procedure:

1.  A Classification Staff Representative (CSR) endorsement and/or the Health Care Placement Oversight Program.

2.  Alternate housing admission may be a:

    a)  Layover temporarily being housed.

    b)  A safe keeper

    c)  A Warden-to-Warden agreement

    d)  A court order

    e)  Deputy Director; or

    f)  Director placement

3.  In all instances of this nature, the case will be reviewed by Initial Classification Committee (ICC).

C.  Physical Admission into LTRH

1.  All inmates will be escorted to LTRH in hand and leg restraints.

2.  The inmate will be given an unclothed body search, conducted in a safe manner and in an area that allows the inmate to preserve some measure of dignity and self-respect. Two staff will be present to conduct the search. Any confiscated property will be inventoried and a receipt will be given to the inmate.

3.  The inmate will be given a clean jumpsuit, handcuffed, removed from the holding cell, scanned with the hand-held metal detector, and escorted to his assigned cell.

4.  Upon a LTRH inmate's admission into his assigned housing unit cell, the housing unit officer shall initiate an Inmate Segregation Record (CDCR 114-A) (Attachment A). Once unit staff have inspected and searched the cell as previously noted, the inmate will be housed. The following items will be issued to the inmate and noted on the 114A:

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

   a) 1 LTRH Unit orientation booklet
   b) 1 pillow
   c) 1 mattress
   d) 2 towel
   e) 1 pillowcase
   f) 2 sheets
   g) 1 blanket
   h) 1 bar of soap
   i) 1 envelope of cleanser (3 ounces)
   j) 1 roll of toilet paper
   k) 2 jumpsuits
   l) 3 pair of socks
   m) 3 pair of boxer shorts
   n) 3 t-shirts
   o) 1 toothbrush (handle cut to 2" maximum)
   p) 1 envelope of tooth powder (1 ounce)
   q) 1 dental floss (plastic tip cut)
   r) 1 palm comb
   s) 1 pen filler
   t) 1 white plastic spoon
   u) 1 paper cup

1. All LTRH inmates' property arriving by CDCR Transportation vehicle or arriving via any other means will be processed by the LTRH Property Officer.

2. The LTRH housing unit officer will enter the new arrival's name on the Isolation Logbook located within the block (CDCR Form 114/Attachment B is included as an example ONLY), identifying the cell number assigned and time of arrival to the unit and review the completed CDCR 114-A.

3. The LTRH housing unit officer will ensure the inmate's photograph is posted on the unit picture board. In lieu of a recent photograph, the inmate's name and number will be annotated on a tag and posted on the picture board in the Officer's Station and Control. There will be a name tag placed on the cell door containing the inmates name and CDCR# in order for staff to properly verify they are housing the appropriate inmate in the appropriate cell.

4. On the date of admission into LTRH, an inmate will be issued:

   • One Jumpsuit
   • Two T-shirts
   • Two pairs of boxer shorts
   • Two pairs of socks
   • One shoe request form
   • Two towels

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

- One tooth brush (LTRH approved)
- Tooth powder
- One cup
- One spoon
- One roll of toilet paper (center, cardboard roll removed)
- Two half bars of soap
- Two sheets
- Two blankets
- One pen filler
- Five sheets of writing paper

Note: The remaining compliment of clothing will be issued once the inmate is housed and the Clothing Shortage/Fish Slip (Attachment C) has been submitted to the facility clothing room.

5. Metered envelopes will be provided per DOM Section 54010.1, Inmate Mail.

D. Inmate Placement and Cell to Cell Movement

1. Initial cell placement for LTRH inmates will be based on the information obtained by the reviewing Lieutenant during the Inmate Housing Report as described.

2. The inmate will be allowed to retain all life-sustaining medications, durable medical equipment including but not limited to: ambulatory prosthetics metal prosthetics, and prescription glasses, after review and concurrence by the on duty LVN. All items retained by the inmate, will be recorded on his Inmate Segregation Profile CDCR 114-A1 (Attachment D).

NOTE: Inmates shall not be denied immediate access to prosthetic devices, unless there is documented evidence the inmate utilized the prosthetic appliance as a weapon or any other purpose other than design intent. Any restrictions or confiscations must be approved through the appropriate medical personnel and Facility Captain.

E. Developmental Disability Program (DDP)

1. All New Arrivals to LTRH (from inside and outside the institution) who are included in the DDP must be seen within 24 hours by a Psychiatrist/Psychologist to determine what special needs they have that require accommodation.

2. The evaluating mental health clinician shall complete the DDP New Arrival Contact Form and file it in the Electronic Unit Health Record (eUHR). The mental health clinician shall also provide a copy of the CDCR MH-7230L (Attachment E), Interdisciplinary Progress Notes – Developmental Disability Program, to the DDP Coordinator and to the Sr. Psychologist for LTRH.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

     3. Custody staff shall ensure a CDCR 128-C3 Medical Classification Chrono (Attachment F) prompt sheet is present in the housing unit. Refer to OP 105 for specific DDP program information.

F.     Procedures to be Followed During Classification

     1. Departmental Double Cell/Single Cell and yard placement criteria will be followed. Upon review of the case factors, the inmate will be informed of the departmental Use of Force Policy.

     2. SAC LTRH has one yard group designation identified as Individual Exercise Yard (IEY).

     3. Inmates designated as members/associates of recognized Security Threat Groups (STG) requesting to debrief, will be referred to the Institution Gang Investigator's (IGI) office. The inmate will be placed on "single cell/walk alone" status pending IGI review and ICC action.

     4. Any and all other changes in yard group designation shall be by ICC only.

     5. When an inmate is moved from one secured housing unit to another, he/she will continue their IEY status in his/her new housing unit. They will be referred to ICC if an alternative yard placement is necessary.

CDCR Forms 114, CDCR 114-A and CDCR 114A-1 are to be used to record the movement or activities of custodial, medical, maintenance, official visitors and inmates. As these forms are legal documents, all *entries shall be accurate and legible.* All *errors will be corrected by single line strikeouts and initialed by the correcting person. At no time will correction tape, white out, or any other form of correction, which obliterates the original entry, be used.*

G.     Isolation Log Book CDCR Form 114

     1. When an inmate enters LTRH for purposes of housing, his name, CDCR number, date, time, and the cell he is being assigned to will be neatly printed in the designated place in the logbook.

     2. All inmate movement will be recorded in this logbook. If an inmate is escorted to dental, medical, visiting, or inter-unit movement (cell change); it will be noted in the Isolation Logbook.

     3. All correctional staff assigned to the LTRH unit will sign in and out of the logbook, under "Officer's Roster" on the right side of the book.

     4. The medical staff, when entering the LTRH unit, will sign the logbook in the section titled "Doctor's Roster." The time they enter and the time they leave the unit will be logged.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

5. All personnel or visitors entering the unit will sign the logbook in the designated place titled "Official Visitors." They will also note the time entered and the time they leave.

6. The Isolation Log will be initiated daily by First Watch staff. First Watch staff will enter the inmates names, CDCR number and housing accurately. They shall ensure correctness in date, housing, spelling, and correct CDCR number.

H.    Inmate Segregation Record CDCR Form 114-A,

The CDCR 114-A is a daily chronological record of an individual inmate's activities in LTRH. All significant information relating to the inmate, during the course of his assignment in LTRH, from reception to release will be entered on the form in chronological order. A CDCR 114-A will be maintained on each inmate housed in LTRH. Officers shall maintain accurate CDCR 114-A files on all inmates within their assigned area. The CDCR 114-A's will be initiated and used in the following manner.

Form Header
1. DATE: Date inmate was initially received by SAC LTRH Facility

2. NUMBER: Inmate's full and complete CDCR prison number

3. CELL: Enter inmate's cell location in full, facility, housing unit, cell (*08-101*), bed (*upper* or *lower*).

Record of Daily Activity
1. DATE: Actual date that activities or action occurred or were afforded.

2. Appropriate Symbols to be used in columns 1 through 15:

   - *X*  Item completed (applicable to; cell inspection, shower, supplies, all meals and trash removal)
   - *R*  Refused
   - *Q*  Confined to Quarters
   - *N*  Pending ICC, UCC, Review
   - *L*  Linen exchange
   - *C*  Clothing exchanged
   - *B*  Blankets exchanged
   - *S*  Lockdown/security, inclement weather
   - *Time Out To Yard and Time In From Yard ( Last two columns14 & 15)*

3. All entries within the columns utilizing symbols *R*, *Q*, or *S* will be accompanied with an explanation in the "Staff Comment Section", i.e.: refused yard due to weather, sick; refused lunch not hungry, food strike; refused to step to back of cell; confined to quarters due to date of incident; confined to quarters due to search of facility; etc.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

4. Staff Comments
The area denoted as staff comments will be used to record the following:

a) Medical/Dental
- Time of visit
- Issuance of medication
- Seen by LVN, Psychiatrist, Doctor, etc.
- Issued medications

b) Visits = Time out and return from visit

c) Law Library = Time out and return from Law Library

d) Classification Committee Action = Entered by Class. Committee

e) Canteen = Indicate time of issuance

f) Maintenance = Time and type of repair

g) Cell Search = List of confiscated items

h) Cell Move = Time and cell inmate was moved to

i) Property = Issued property

j) Supplies = Specifically list supplies issued

k) Clipper (*hair, face, finger-nail and toe-nail)* = Note issuance and return

l) Interview = All behavioral counseling will be logged and purpose of interview.

m) Disruptive Behavior = All acts of misbehavior will be recorded.

n) All documents served (CDCR 115, etc.)

o) Disciplinary Hearing Results.

p) Interviews, inmate appeals etc.

5. Maintenance of CDCR Form 114-A; Isolation Folders

a) Upon receipt of an inmate into the housing unit, a CDCR Form 114-A folder will be prepared for the maintenance of all documents relating to the inmate's custody, behavior, and cell. The folder shall be maintained in the Block Officer's Station. ***NOTE:*** All Exhibit B forms will remain in chronological order within the folder. This form is not to be purged with the CDCR Form 114-A. There will be an Exhibit B complete anytime an inmate moves in or out of a cell.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

6. Purging, Storage and Routing of CDCR 114-A Records
Second Watch Block staff is vested with the responsibility of purging the CDCR 114-A folders every six months. The purging shall be as follows:

a) On the first day of every month, Floor Block Officers will purge appropriate CDCR 114-A forms from the CDCR 114-A folders, leaving the last six months of records in the folder.

b) The purged CDCR 114-A forms will be maintained in chronological order and placed into a manila folder, and secured with a clasp. The inmate's name and CDCR number will be clearly printed on the outside of the folder.

c) The folders containing the purged CDCR 114-A's shall be collected and delivered to records by the Second Watch staff.

I.   CDCR Form 114 A-1, Inmate Segregation Profile

On the date of an inmate's arrival to SAC LTRH placement, a review of the inmate on SOMS, and or ERMS File will be performed by the Housing Sergeant receiving the inmate and or Watch Commander if the inmate is received during First Watch. The reviewing supervisor will complete a CDCR Form 114 A-1 for each inmate received and ensure every box and section is completed. The Facility Captain will make random reviews of CDCR 114 A-1's to ensure they are being updated every 90 days.

J.  SOMS, Initial Housing Review

This form is to be completed by the Lieutenant or Sergeant on all inmates being housed into LTRH. The Facility Sergeant or higher-ranking staff will review and screen SOMS and ERMS file of all inmates transferring into the LTRH for proper placement and housing assignment.

K.  Searches

1. Cell Searches/Inspection of LTRH

Prior to an inmate's placement into a cell or departure from the unit, a search of the cell will be conducted with cell conditions and discrepancies annotated on a Cell Search Exhibit B (Attachment G.) During all cell searches, the universal precaution policy will be followed. When a cell move occurs, both inmates entering and exiting the cells will be fully searched, including all property and unclothed body search. The following areas will be searched:
   - Cell Light and Light Switch
   - Cell Windows
   - Cell Door/Food Port
   - Cell Sink and Cell Toilet

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

- Mattress and Pillows
- All Walls and Floors

2. A metal detection wand will be used to search all non-metallic items within the cell.

3. A minimum of three cell searches will be conducted per shift. No cell will go an entire month without being searched at least once.

   a) Inmates will be issued a Cell Search Worksheet (Attachment H) for all items confiscated during a search.

   b) The Unit Sergeant will be notified immediately of any confiscated items that constitutes a threat to the safety of staff, inmates, and/or the security of the institution. If the discovery results in the issuance of a Rules Violation Report or a Counseling Chrono (CDCR 128-A), this documentation will serve as the inmate's receipt.

4. Unclothed Body Searches of LTRH Inmates

   a) All LTRH inmates prior to exiting the cell, inclusive of yard release and classification, will submit to an unclothed body search.

   b) Care is to be taken in the course of the body search, ensuring a comprehensive visual inspection of the inmate's entire body inclusive of all body cavities, hair, and extremities. All oral and physical prosthetic appliances must be removed and physically examined and searched prior to being returned to the inmate.

5. Yard Searches

   a) The yard and sally port doors will be inspected for proper operation and structural integrity on each Watch (*beginning and ending*). This inspection includes testing of the control booths electronic door operation, inclusive of proper operation of the override function. The Unit Sergeant must be notified of any discrepancies immediately. The Unit Sergeant shall ensure all yard searches are logged in the Unit Isolation Log Book.

   b) The yard sink and toilet will be inspected for proper operation.

   c) Yard sally ports, concrete yards, and exercise modules shall be searched (*fencing/straps*) for missing material, weapons and contraband, prior to initiating yard release of any and all yard groups without exception. These inspections will be logged in the Unit Isolation Log Book. The first line supervisors shall ensure the completion and documentation of these searches and inspections.

6. Common Areas

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

All common areas accessible or used by inmates, (i.e., showers, tiers, etc.), shall be searched/inspected on a daily basis and logged in the Unit Isolation Log Book and Daily Housing Unit inspection form on both Second and Third Watch.

7. Unit Securities/ Inmate Wellness Checks

Officers will use the Guard One Rounds Tracker "PIPE" to record all Security/Welfare Checks. The assigned officer shall conduct a Security/Welfare check on each cell, twice an hour, not to exceed 35 minutes between checks (refer to Operational Procedure #35 Guard One Security/Welfare Check Procedure Guideline.)

A Security/Welfare Check is defined as a personal observation, by a correctional officer, of the welfare of the inmate and the security of the cell, in which an inmate is housed in ASU, LTRH, or Psychiatric Service Unit (PSU), to include a visual/physical observation of a living, breathing inmate, free from obvious injury ensuring there is a clear and unobstructed view into the cell looking for damage to the cell and/or signs of any misconduct or self-injurious behavior.

The "PIPE" captures two levels of information, the time the Security/Welfare Check was made and the location where the Security/Welfare Check was conducted. The officer will touch the "PIPE" to the button that is affixed to each cell in their unit. This will electronically validate the officer was at a specific cell, at a specific time. During times when an inmate is out of his assigned cell for (yard, classification committee, appointments, visiting, etc.), the assigned officer will continue to conduct Security/Welfare Checks looking for damage and potential security concerns to that inmate(s) cell.

During First Watch hours, officers shall conduct all Security/Welfare Checks using a pre-programmed silenced "First Watch PIPE". The "First Watch PIPE" does not omit an audible beep during use and only flashes a red Light Emitting Diode (LED). Officers conducting Security/Welfare Checks using the "First Watch PIPE" must ensure they observe the flashing red LED when conducting their Security/Welfare Checks. The "First Watch PIPE" shall be marked identifying it as equipment for First Watch use only.

In the event Guard One Rounds Tracker software or equipment is not functioning properly, staff will immediately notify the custody supervisor for follow up. For any technical assistance regarding the Guard One Rounds Tracker System staff will contact Enterprise Information Services staff and submit a Remedy Service Request. If staff cannot return the Guard One Rounds Tracker software or equipment to service in a timely manner, staff will utilize the manual methods detailed on the Security/Welfare Check Manual Tracking Sheet (Attachment I).

L.    Inmate Property

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

1. All personal and legal property items of inmates assigned to LTRH will be issued and handled pursuant to SAC OP 02, Inmate Property, Article 43 of the DOM, and the Authorized Personal Property Schedule.

2. State Clothing/Bedding/Personal Property Limits
   a) State Clothing/Bedding: Each inmate assigned to LTRH will be issued the following state clothing and bedding items in quantities as listed:
      - 2 Jumpsuit
      - 3 Socks
      - 3 Underwear
      - 3 Undershirts
      - 1 Pair State Shoes
      - 2 Towels
      - 1 Jacket (Issued upon release to yard and returned at yard recall-November 31-March 31)

   b) Bedding:
      - 1 Mattress
      - 2 Sheets
      - 2 Blankets
      - 1 Pillow
      - 1 Pillowcase

   c) Property Limits:

      Appliances and Electronic Devices (Either television, radio, or television/radio combination)
      - Television--Description:  13" or less. Clear case only, no remote controls. Must be manufactured with earplug jack. Antenna must be removed. Value of TV not to exceed $300. No Coaxial Adapter, No AC Adapter, non-detachable cord.
      - 1 Digital Antennae--Description: Artec Digital Antenna (Item 51556010N)
      - 1 Radio-- Description:  electrical only. Must have non-detachable cord. Portable AM/ FM with built in antenna and earplug jack. Value of radio not to exceed $150.

      **NOTE FOR ALL APPLIANCES**-They must be manufactured without recording capabilities; no alterations are permitted. **NO BATTERIES ALLOWED IN LTRH.** No adapters allowed.

      An inmate housed in LTRH may receive or order only one of the two appliances listed. Personal Hygiene/Body Care: Refer to LTRH Canteen and Annual Package lists.

   d) Food Items: Refer to LTRH Canteen and Annual Package lists.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

 

    e) Miscellaneous Items:
- 10 Newspapers, Books, Magazines, Legal/Religious/Educational (combined, paperback only – staples removed)
- 20 Letters, excluding legal (staples and stamps removed)
- 14 Pen Filler (colored)
- 4 Legal Paper/Writing Tablet (No spiral bound)
- 15 Envelopes (10 blank, 5 metered, combined)
- Prescription Glasses
- 1 Palm Comb
- 1 Soft Back Dictionary
- 1 Soft Back Bible
- 1 Soft Back Address Book (3 x 5)
- 1 California Code of Regulations, Title 15 (no staples, no paper clips)
- 1 Roll of Toilet Paper
- 1 Paper Bag for Trash

**NOTE**: Tobacco products and flame-producing devices are prohibited. Books may not depict or instruct the manufacture or use of explosive devices, firearms, dangerous weapons, or fighting techniques. Property in excess of limits will be confiscated and disposed of per institutional procedure. **NOTE** for all clothing-no zippers, hoods, logos, emblems, names or design. No silk or velour materials. No slingshots or fishnet design. No pockets.

    f) Legal Property:

      1. Legal materials consisting of any inmate's own trial transcript, legal pleadings, legal research notes, and attorney-client communications, in excess of the six cubic feet limit, may be retained in the inmate's un-issued property. The property must be indexed by the inmate and will be stored in a secure place in the designated property rooms.

      2. Upon written request of the inmate, the Property Officer will assist the inmate by exchanging items of legal property held in storage for that retained within the cell.

      3. Inmates shall retain no more than six cubic feet of personal property, inclusive of legal material. **Television or radio is exclusive to this six cubic feet limit. (The six cubic feet limit does NOT apply to the inmate's un-issued legal property.)**

      4. All property in excess of that allowed and not specified above, will be donated to the institution, mailed out of the institution (at the inmate's expense), and/or confiscated per Title 15 Section 3191 Property Registration and Disposition.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

> Confiscation and disposition of the property or article(s) will be properly documented

g) Canteen Items Allowed in LTRH-See approved LTRH Canteen Order Form (Attachment J)

h) Annual Packages-Pursuant to CCR, Title 15, Section 3044(g) (4) (F), LTRH housed inmates may receive one special package, not to exceed 30 pounds, per year. The content of the package shall be restricted to the SAC LTRH approved package list from approved vendors. All prohibited items shall be disposed of pursuant to OP 02, Inmate Property.

1. Eligibility to receive an annual package for LTRH inmates is as follows, disciplinary free for a period of 1 year, this will be based on the date the initial LTRH term started, refer to the CDCR 629-A, LTRH Term Assessment Worksheet. Thereafter, 1 year disciplinary free from each serious rules violation.

2. Verification of eligibility to receive a package will be conducted by the LTRH Property Officer.

3. The Property Officer will review the restriction list and ensure that he/she is not currently serving a suspension of privileges. If he/she is, they will not be eligible until the privilege suspension has expired, at which time the inmate may reapply.

4. Forms shall be provided for the inmate to send to his/her correspondents, which indicate allowable items, weight, limit, and special requirements (i.e., no glass, cans, etc.).

5. Packages allowed must have the address label from the package form attached to the package.

6. All items not authorized in LTRH will be confiscated and disposed of in accordance with Title 15 Section 3191 Property Registration and Disposition:

7. Property Officers will maintain a log detailing the inmate's name, number, housing and date special package was received and delivered.

i) State issued tennis shoes and shoes explicitly recommended for orthopedic reasons, when approved by a staff doctor, are permitted in LTRH. All orthopedic reasons will be documented on a CDCR Form 128-C, Medical Chrono, and signed by a staff doctor. Inmates who are required to wear "soft shoes" will be issued a pair of state manufactured shoes.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

j) In accordance with the annual special purchase package program, inmates may purchase and possess one pair of white tennis shoes. Tennis shoes: No shades of red or blue. Low, mid, or high tops are permitted. Shoes must be predominantly white in color. No K-Swiss, Bugle Boys, Joy Walkers, Pumps Gels, British Knights, DC, or Airlifts. Shoelaces must be white only. Not to exceed $75 dollars. No hidden compartments, zippers, or laces that are covered or concealed. No metal components including the eyelets.

k) In accordance with the annual special purchase/package program, inmates may purchase and possess one (1) pair of white sweat pants (no pockets, logos or drawstrings and no dark grey).

M.    Key, Tool and Equipment

1. All keys, tools, and equipment shall be inventoried at the beginning and end of each shift, issued only to authorized personnel, not used in a manner inconsistent with its designed purpose (DOM Sections 52040 and 55020).

2. All keys, tools, and equipment when not in physical possession by correctional personnel shall be maintained in its designated and approved storage area located in the control booth.

3. Equipment which is authorized for inmate use, i.e.: nail clippers and barber equipment shall be inspected prior to issuance and immediately upon return. Inmates will not be allowed to vacate the area from which the equipment was used prior to the inspection.

4. Food port locks shall be secured at all times when not in physical possession of correctional personnel. At no time will the lock be left unsecured beyond the control of correctional personnel.

5. All keys, tools, and equipment will be issued only upon receipt of a chit bearing the name of the recipient. Chits shall be surrendered individually and placed separately on the issued equipment's retention hook.

6. In the event any keys, tools, or equipment is not accounted for, the first line supervisor will be immediately notified at the moment of discovery. All inmate movement will cease. A comprehensive search will be conducted. At the conclusion of the search, a memorandum completely describing the circumstances surrounding the occurrence and the action taken will be prepared for the Facility Captain's review prior to the end of the respective shift.

N.    Escorting Inmates

1. General Information

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

    a) All LTRH inmate escorts within the housing unit, dining room, and Individual Exercise Yard (IEY) area shall be under direct officer escort (one Officer per inmate).

    b) All Inmates housed within the LTRH shall submit to an unclothed body search prior to being removed from their cell or escorted outside of the block.

2. Multiple Inmate Escorts

    a) Inmates escorted outside of the LTRH unit will be conducted with the following inmate to staff ratios:

| NUMBER OF INMATES | NUMBER OF CORRECTIONAL STAFF |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |

    b) Inmates whose past behavior is deemed a threat/assaultive towards staff or inmates, will be escorted separately.

    c) Inmates will not be escorted with known enemies or rival STG's.

    d) Escorts of inmates out of the unit will be entered in the CDCR 114 and the CDCR 114-A.

3. Shower Program and Escorts

    a) Each inmate assigned to the LTRH shall be afforded three (3) opportunities to shower per week. Inmates will be showered in accordance with the shower schedule. Weekly schedule, alternating upper and lower tier weekly.

    b) Showers will be conducted on Third Watch, commencing at approximately 1430 hours and concluding at approximately 1700 hours.

LTRH inmates will be physically escorted to and from showers at all times. Escorting procedures shall be followed; One officer per inmate unless otherwise noted.

- 1 pair Prescription Glasses
- 1 pair Reading Glasses
- 1 bar of Soap
- 1 Towel
- 1 Wash Cloth
- 1 pair Undershorts
- 1 plastic bag of Shampoo

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

- 1 plastic bag of Conditioner
- 1 pair of Shower Shoes
- 1 pair of Canvas Shoes
- 1 Soap Dish
- 1 T-Shirt
- All Medical Appliance(s)

c) The inmate will surrender his towel and personal hygiene items prior to exiting his cell, wearing only their undershorts, shirt and shower shoes.

d) The inmate will be escorted individually to the shower, on their respective tiers and within their respective sections.

4. Classification Committee Escorts.

a) One Correctional Officers will escort inmates individually into the Classification Room remaining behind or to the side(s) of the inmate throughout the classification process.

b) The inmate will assume a straddled seated position.

c) At conclusion of inmate's appearance before the Classification Committee, he/she will be returned to his/her cell or holding cell.

5. Exercise Yard Escorts

All LTRH inmates will be offered a minimum of 10 hours of yard time per week Monday through Sunday.

a) All inmates will be subject to an unclothed body search in their cells prior to being escorted to the yard. Prior to exitig the yard, the inmates will be subject to an additional unclothed body search and scanned by the handheld metal detector prior to returning to their assigned housing unit.

b) The LTRH Exercise Yard program may be impacted during heavy fog. The Facility Captain or Watch Commander, via fog line notification, shall evaluate the weather conditions and then make the decision to continue or discontinue yard.

c) Inmates may only possess the following items for use on the yard:
- 1 Jumpsuit
- 1 pair Prescription Eye Glasses
- 1 pair Socks
- 1 pair Shoes
- 1 Towel
- 1 Underwear

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

- 1 Undershirt
- 1 Jacket (issued at yard release and returned at yard recall, November 1 thru March 31)
- 1 Thermal Shirt
- 1 Thermal Pants
- Medically authorized prosthesis
- 1 pair Sweat Pants
- 1 Sweat Shirt
- 1 Watch Cap
- 1 Athletic Shorts
- 1 pair Gloves

6. Escorting or Removal of Inmates under Adverse Circumstances

If it is necessary to remove an inmate from any area of confinement for an escort, and it is anticipated that a conflict may occur between the inmate(s) and staff, supervisory personnel responsible for the area will be informed of the situation. The inmate will not be removed from the cell without a supervisor present, accompanied by no less than two Correctional Officers.

7. Non-Custody

A custody staff member shall be present on the tier if a non-custody staff member requires access to an inmate through the food port. No custody staff escort is required for verbal interactions between non-custody staff and inmates through a closed and secured cell door.

O. Weekly Schedule

1. Laundry

Subject to change due to lockdowns.

| DAY | FACILITY | ACTIVITY/LOCATION |
|---------|----------|------------------------------------------------|
| Sunday | B LTRH | Delivery/Pickup of Laundry Carts for laundry bag collection. |
| Thursday | B LTRH | Delivery/Pickup of Laundry Carts for laundry bag collection. |
| Friday | B LTRH | Delivery/Pickup of sheets/linen. |

2. Supplies

Subject to change due to lockdowns.

| DAY | FACILITY | ACTIVITY/LOCATION |
|---------|----------|------------------------------------------------|
| Sunday | B LTRH | Delivery of supplies to be issued by |

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

|  |  | second watch. |
|---|---|---|

3.  Law Library

| DAY | FACILITY | TIME |
|---|---|---|
| Wednesday | B LTRH | 0800-1400 |
| Make Up | B LTRH | As Needed |

4.  Medical/Doctor's Line
    Emergency doctor nurse and dental lines will be conducted pursuant to the posted ducat list.

5.  Canteen
    As scheduled by the Canteen Manager and will be received/ issued by second watch.

6.  Institution Classification Committee

| DAY | FACILITY |
|---|---|
| Monday | B LTRH ICC |

P.  Clothing

1.  Exchange Procedure:

    a)  Clothing exchange will be conducted on Third Watch.

    b)  Clothing items will be laundered once a week by the bag system. Linen items will be exchanged one for one weekly. Any surplus of clean linens will be placed in clear plastic bags on top of the soiled laundry carts and returned to the Facility Clothing Room. Maximum allowable state-issued items for laundering is:
        - Jumpsuit
        - Boxers
        - towels
        - 2 T-shirts
        - 2 pair of socks

    c)  Blankets will be exchanged one for one bi-annually according to DOM 54090.9.4. Inmates requesting an exchange prior to the scheduled exchange will be required to utilize the laundry request procedure.

    d)  **Universal precautions** will be followed when handling all clothing/bedding.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

e) All clean laundry bags will be returned to the inmate population per the laundry schedule. Prior to returning a clean laundry bag to an inmate, the contents will be searched for weapons and/or contraband.

2. Shoe Request Forms

a) Shoe Request Forms will be collected by housing unit custody staff during collection of soiled laundry bags and forwarded to the Facility B Clothing Room. This request will be placed in the laundry mailbox located in the Program Office.

b) Clothing Room staff will check each inmate's Clothing Record Card and issue shoes accordingly to the Housing Unit Custody Staff for distribution to inmates.

c) Housing Unit custody staff will be required to sign the Clothing Room logbook to verify receipt of shoes.

3. Replacement of State-Issued Items

Inmates requiring replacement of clothing items, shoes, or towels will notify their housing unit officer and submit a Clothing Shortage/Fish Slip.

4. Accountability:

Inmates will be responsible for destruction/alteration of all State Property. Upon discovery that an inmate has altered/destroyed State Property, a RVR will be issued. He will be ordered to sign a CDC 193 for reimbursement to the State of California. In the event that the inmate is unwilling to sign a CDC 193, a hold will be placed on the Inmate's Trust Account (per OP #79 Accounting and Trust Office Procedures).

Q. Supply Procedure

1. Supplies will be issued weekly by second watch in quantities as listed below:
   - Roll Toilet Paper
   - 30 per Month Dental Floss
   - 1 Palm Brush (1 for 1 exchange)
   - 1 Ounce Tooth Powder per week
   - 1 Tooth Brush (1 for 1 exchange)
   - 1 Bar Soap per week
   - 1 Pen Filler (1 for 1 exchange)
   - 1/3 pad Green scrub pad (1 for 1 exchange)
   - 1 Ounce Concentrated Cleaner per week
   - 5 Sheets Writing Paper per week (*indigent inmates only*)
   - 5 Envelopes per week (*indigent inmates only*)
   - 1 Cleaning Rag (1 for 1 exchange)

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

**NOTE:** Indigent inmate will request envelopes as per DOM Section 54010.1, Inmate Mail.

2. Supplies will be ordered by LTRH designated Security Patrol Officer, with approving signature of the LTRH Lieutenant, and stored in the designated supply storage area.

R. General Housekeeping

1. Housing unit custody staff are responsible for the general cleaning on a regular basis (sweeping, mopping, scrubbing), of the following areas: control booth, stairwell to the control booth, the mechanical room sally port, section tiers and cell door exterior.

   a) Each watch will ensure that these areas are maintained in a clean and sanitary condition.
      - Second watch will clean the section Tiers on Wednesday.
      - Third watch will clean the section Tiers on Sunday.

2. All supplies stored in the housing unit will be kept orderly.

3. To ensure a clean, sanitary working/living environment in all areas within the LTRH, periodic inspections will be conducted by the assigned housing unit Sergeants.

S. Visiting Procedures

1. Visiting will be permitted with persons approved in accordance with the regulations set forth in the CCR, Title 15, and Visiting Operational Procedures.

2. Methods

   a) Every inmate in LTRH will be reviewed by Classification Committee and will be placed on non-contact visits.

   b) Inmates in LTRH will be allowed to visit with approved visitors.

   c) All visits must be by prior appointment due to the limited space available. Appointments will be made at least 24 hours in advance.

   d) Attorney and investigator visits will be on a non-contact basis. The only exception will be when a court orders contact visits. The court order will be processed through the Litigation Coordinator and the LTRH Facility Captain for review.

3. Attorney Visiting

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

Attorneys of record shall make appointments and arrangements for visits through the Litigation Coordinator, who will submit the appropriate notification indicating the specifics and limitations of the visit.

T.    Attorney Telephone Calls

1.    Attorney/inmate consultation, by telephone, is coordinated by the Litigation Coordinator who will submit the appropriate documentation of authorization to the affected facility.

2.    The inmate must give his consent for the telephone call prior to arrangements being made.

3.    The unit staff will immediately notify the Litigation Office of any circumstances which prevents or interferes with the accomplishment of this process (i.e., inmate refuses, no answer when call is connected, unit incident that prevents staff assistance, etc.).

U.    Meals

1.    Inmates housed in the LTRH will be cell fed. All meals will be served by unit staff and will consist of all regular menu items. Food temperatures will be recorded on the standard food temperature report. Random temperature samples will be taken for meals served throughout the feeding process.

2.    Meal service will utilize the standard food trays. Inmates may be fed temporarily on paper trays if it is determined the use of a plastic food tray poses an unusual risk. Such action must be reviewed by the LTRH Sergeant and documented, explaining the reasons for the actions. Each case will be referred to the Facility Lieutenant who will review and make a recommendation as to the length of restriction to the Facility B Captain. The LTRH Facility B Captain must approve the restrictions.

3.    Feeding Schedule. The serving schedule for meals in the LTRH will conform to the following:
      • **Breakfast** - Feeding will begin at approximately 0600 hours, seven days per week.
      • **Lunch** - Inmates will receive sack lunches for the noon meal upon collection of the breakfast tray.
      • **Dinner** - Feeding will begin at approximately 1630 hours, seven days per week.

4.    Feeding Procedure. The Kitchen/Dining Officer will monitor tray preparation and placement on to food trays. This will ensure proper portions, sanitation, and security are maintained during serving.

      a)    Upon entering the housing section with the food trays, one officer push a food cart with a stack of trays while a second officer unlocks the food/cuff port, and places a

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**CALIFORNIA STATE PRISON, SACRAMENTO**
**OPERATIONAL PROCEDURE (OP)**

food tray on the food port for the inmate to retrieve. Once the inmate takes the tray, the officer will close and lock the food port before moving to the next cell.

b) It is mandatory all kitchen and unit staff involved in the serving process wear hats and gloves throughout the serving process.

c) For security purposes, cell lights will be on and in the bright position prior to the inmate receiving his tray.

d) A reasonable amount of time will be given for the inmate to consume his meal.

e) Unit officers, starting with the first section, will pick up food trays, disposable beverage containers, and trash from each cell. At this time, inmates will also be allowed to throw away trash.

f) Upon receiving the food tray, disposable beverage containers, and trash from each cell, the tray slots will be padlocked LTRH. All items will be accounted for and checked for alterations. Any damaged trays or trays contaminated by the inmate will be kept separate from the returning trays for investigation and/or disposal. All trays will be emptied, checked, neatly stacked, and counted before being returned to the pantry. This procedure will be utilized during both the breakfast and dinner meals.

5. Meal Sample Reports. The LTRH Sergeant or designee will complete meal sample reports. Only staff designated as samplers may eat State food.

a) One tray shall be sampled from each meal served. Second Watch will sample lunches. The samples provide a means for checking the overall quality, quantity, and appearance of food being served.

b) Entries on the Meal Sample Report will include the time food arrived, when serving begun and completed, temperature of food items, overall conditions of food (i.e., ample portions, good flavor, etc.) and any substitutions or deletions.

c) Any items served in an unsatisfactory condition will immediately be reported to the LTRH pantry staff and necessary steps will be taken to rectify the problem. An entry will be made on the Meal Sample Report explaining the problem and any action taken to resolve it.

6. If an inmate refuses food, a notation of such shall be made on his CDC-114A. Refer to the Hunger Strike OP 106 for other required procedures.

V. Cell Cleaning Procedure

1. LTRH inmates are expected to keep their cells neat and clean at all times.

2. Towels, blankets, and clothing are not to be used as rugs or decorative icons.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

3. Cells are to be swept and scrubbed as needed.

   a) A ½ green scrub pad and 1 ounce concentrated cleaner issued to be used as a cleaning agent on supply day by third watch staff.

   b) Photographs of an offensive nature or obstructive material are prohibited on walls (outside designated area), cell windows, and/or cell lights.

   c) Cell windows will be unobstructed.

W. Protective Vests

1. All CDCR employees, entering the LTRH, shall wear a Stab Resistant Vest when the employee is:

   a) In direct contact with inmates within the LTRH.

   b) Escorting inmates housed within the LTRH anywhere on institution grounds.

   c) On the LTRH unit tiers.

2. Protective vests shall be worn only in the manner prescribed by the manufacturer and the departmental guidelines. Protective vests shall **not** be worn in any manner that might reduce their designed level of effectiveness. Protective Vests are maintained and available for issuance in B Facility Control and 8 Block Control.

X. Protective Eyewear

Protective Eyewear will be worn by all persons when entering any section area of a housing unit and approaching a tier or cell (optional for Mental Health practitioners), within 15 feet.

Y. Mechanical Restraints

1. Only departmentally approved and issued mechanical restraints will be utilized by LTRH custodial personnel.

2. Types of restraint equipment.
   - Handcuffs
   - Waist chains
   - Leg Irons
   - Lead Martin chains
   - Flex cuffs

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

3. Application of restraint equipment will comply with CCR Section 3278.

4. Waist chains will only be applied or adjusted when a LTRH inmate is secured in a holding cell. The application will be done through the food port opening.

Mechanical restraints shall not be used in an excessive manner that would intentionally inflict injury or render the inmate helpless.

Z.   LTRH Inmate Cell Placement/Movement

1. Upon date of arrival to LTRH, inmates will be assigned to cells based on the following criteria:

- Bed/cell availability
- Unit needs relative to ethnic balance
- Physical/medical restrictions
- Integrated Housing Code (IHC)

2. LTRH Inmate Cell Move Justification Criteria.

- All cell moves *__require__* the approval of the Lieutenant with his/her digital signature in SOMS. Cell moves *__may__* be made for the following reasons:
- Enemy/Safety concerns of an inmate who is isolated to a section in which an inmate is living in and a move out of the section will alleviate the concern.
- Disperse an identified group of inmates being disruptive.
- CCCMS LTRH inmates shall normally transfer directly from a CCCMS Short Term Restricted Housing (STRH) to a LTRH. Should and inmate become CCCMS while in an existing SHU, that inmate shall transfer to a CCCMS LTRH within 30 calendar days. A CCCMS inmate in any LTRH who is identified as needing Enhanced Outpatient Program (EOP) level of care will be transferred to a PSU within 30 days of the identification. When clinically necessary Mental Health Crisis Bed (MHCB) transfers deemed will be completed within 24 hours from the time the placement was ordered.

3. Any movement from the CCCMS LTRH requires the sending facility generate an IPTR149 (Attachment K) signed by the Facility Lieutenant. In addition, the IPTR149 will also include a space for the sending and receiving nursing staff to print and sign their name indicating whether they sent or received a Medication Administration Records Sheet (MARS) bag for each respective inmate.

If a MARS bag is not necessary, the sending nursing staff member will indicate this on the IPTR149 by marking "N/A" and sign accordingly.

4. All medical staff will comply with the directive to sign for the inmate MARS upon receiving the inmate. In the event, medical staff fails to sign for the MARS; the LTRH Lieutenant will be contacted immediately for further direction. Upon obtaining a

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

signature, the escorting officers will retrieve the signed IPTR149 and return it to the Program Office. The IPTR149 will be copied and filed for future reference. (These copies will be maintained in the Program Office for a period of six months prior to being archived.)

AA.    Accompanying Staff Escorts

Custody staff will escort all non-custody staff entering any section within a LTRH. This means that custody staff shall walk ahead of the escort, ensuring all cell coverings are down and staff safety is not compromised. At no time shall non-custody staff be left alone on a tier/section without custody staff escort. Mental Health interviews will be conducted within the interview booths located in B2 Dining Hall.

BB.    Legal Services

1.    Inmates assigned to LTRH will be provided legal materials and library services through the law library per CCR 3122, 3123, 3343(k), and DOM Sections 101120.1 and 101120.16.

2.    Law Library: The library schedule is posted throughout the housing unit (per Title 15, Article 3, Section 3120(a) and OP# 50 Education Programs & Services.

    a)    The LTRH building officers will collect and send to the library the Priority Legal Users (PLU) (Attachment L) and General Legal Users (GLU) (Attachment M) for processing.

    b)    LTRH Law Library Services.
- Legal Law Books
- Periodicals
- Journals
- Research manuals
- Writing instruments and paper
- Photocopy service, as per DOM Sections 14010.19 through 14010.27
- Stapler and hole punch (service provide by Law Library Staff)

3.    Prior to receiving the requested materials/services, the inmate will sign a CDCR 193; to pay for any damage/loss should it occur. The CDCR 193 will be returned to the inmate if he requests it, after the following has been ascertained:

    a)    The inmate has not received any payable services.

    b)    The inmate has not damaged any library materials.

4.    With each transmittal of mail to an attorney of record or a court requiring addition of postage, the inmate must submit a CDCR Form 193, which will

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

accompany the transmittal. The cost of postage and envelopes will not be charged to the inmates account if the inmate is without funds at the time the material is submitted for mailing and remains without funds for 30 days after the documents are mailed.

5. Categories of library users (PLU and GLU identifiers will comply with DOM Section 53060).

  a) PLU will be scheduled to come to the Law Library within 7 calendar days of receipt of a written request for a minimum of two hours unless documented safety/security/limited resources prevent providing this level of service.

  b) GLU will receive Law Library service within 7 calendar days of receipt of a written request for a minimum of two hours unless documented safety/security/limited resources prevent providing this level of service. PLU receive priority scheduling for physical access. In the event a PLU cannot be scheduled for physical access within seven calendar days, paging services will be provided until physical access is possible.

  c) PLU or GLU inmates refusing to attend Law Library at their scheduled time shall sign a refusal form, which will also be signed by the building staff. If the inmate refused to sign the form (Attachment M), the LTRH Sergeant must co-sign the refusal. The signed refusal will be delivered to the Law Library the same day.

  d) Inmates assisting other inmates in the preparation of legal documents will comply with CCR, Title 15, Section 3163.

CC. Leisure Library Services

  a) Inmates assigned to LTRH will be provided leisure library services in the housing units through the law library per CCR 3120 (a)(b)(c), 3121 (a)(b)(c), and 3343 (k).

  b) Library services shall be maintained within LTRH by the facility librarian with the assistance of the assigned housing unit staff.

  c) The librarian shall stock sufficient reading materials (paperback books and newspapers only) within the units for distribution by the assigned housing unit floor staff. The housing unit floor staff shall rotate the selection of materials with other housing units within their LTRH facility. This is to be done on a quarterly basis. The facility librarian shall rotate the selection of materials with other LTRH facilities on a biannual basis.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

    d) Second watch housing unit floor staff shall issue books on a one for one basis only. A library log shall be maintained by unit staff to assure accountability of material.

    e) Prior to receiving the books in the housing unit, the inmate will sign a CDCR Form 193 to pay for any damage/loss should it occur. The CDCR 193 will be returned to the inmate if he requests it after it has been ascertained he has not damaged any library material.

    f) Inmates abusing privileges or destroying books may have the privilege suspended by unit staff and held liable for the replacement cost of the items.

    g) Complete and current copies of the DOM, and CCR, Title 15, including "Notice of Change," documents are maintained and available for inmate access within the facility library. LTRH inmates may obtain in unit access to these documents by submitting a written request to the Law Library Officer. Inmates may review these documents within a temporary LTRH holding cell located in B2 Dining.

DD.   Mental Health Services Programs and Activities

    a. Overall institutional responsibility for the CCCMS LTRH Unit program shall rest jointly with the CEO and the Warden. Institutional operational oversight of the LTRH shall be the responsibility of the Chief of Mental Health (CMH). The Mental Health Services (MHS) will provide 90-minutes of therapeutic group activity each week for CCCMS LTRH Inmate-Patients (IP's), along with an individual initial placement, disciplinary actions, correctional counseling services, classification, inmate movement, and daily management shall rest with the Warden or designee. The assigned psychiatrist or Primary Clinician (PC) shall attend all Institutional ICC's to provide mental health input.

    b. Morning huddles will be held every morning at 0800 hours. A LTRH assigned Correctional Officer and Mental Health Personnel will be present. During the meeting, involved personnel will identify new arrivals, discuss current behavioral issues and concerns, and share any pertinent information regarding risk factors and suicide prevention strategies. This meeting shall be recorded in the LTRH Huddle Binder.

    c. LTRH MHS shall provide weekly PC contacts, crisis intervention, daily Psychiatric Technician (PT) rounds seven days per week, medication education and management, therapeutic group therapy, monitoring and assistance with daily living skills, and recreation therapy both within cell and out of cell activities.

    d. The PT shall make initial contact with each IP placed into LTRH within 24-hours of placement and begin the process of developing rapport with IP. Clinical

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**CALIFORNIA STATE PRISON, SACRAMENTO**
**OPERATIONAL PROCEDURE (OP)**

Rounds shall be conducted seven days per week in all LTRH units to attend to the mental health needs of all IP's and usually be performed by a PT. All Health Care Services Requests (CDCR 7362) (Attachment 7362) shall be collected by nursing staff daily.

e.    The Interdisciplinary Treatment Team (IDTT) shall generally be responsible for developing and updating clinical treatment plans for all identified CCCMS IP's. Initial and subsequent sessions for CCCMS IP's in LTRH will include a review of the 114-A to be informed of each IP's restricted housing unit programming. Existing clinical pre-screening and screening requirements along with clinical evaluations will be reviewed to determine if a more thorough assessment of the IP is needed within the LTRH. The IDTT shall consist of, at a minimum, the LTRH Captain, LTRH Sergeant, assigned Correctional Counselor, assigned psychiatrist, PT, PC, and Program Supervisor.

f.    Any IP requiring and inpatient placement (Mental Health Crisis Bed; MHCB) will be transferred to the appropriate level of care immediately (MHSDS Program Guide, 2009 Revision, pp. 12-7-11).

g.    Any IP in LTRH who is identified as needing EOP level of care will be transferred to an EOP ASU Hub within 30-calendar days of the identification (MHSDS Program Guide, 2009 Revision, pp 12-7-8).

h.    Mental Health Treatment Group Activities and Treatment Modules (TM) Escort Procedures

i.    MHSDS CCCMS LTRH Program will provide 90-minutes of therapeutic group activity for each IP each week. All LTRH CCCMS status IPs will be escorted to the TMs in mechanical restraints. Once secured within the TM, mechanical restraints shall be removed unless the IP is deemed to be danger to self or others based upon current behavior.

j.    If custody determines, with the input from clinical staff, that the IP is to remain in restraints while secured in a TM, the person making such determination shall prepare a CDCR 128B, Informational Chrono, indicating the reason why the IP was required to remain in restraints. The inmate will remain under direct observation during this time.

k.    All individual clinical contact and group therapy for IP shall be conducted in a confidential setting. The Correctional Officer(s) providing safety and security coverage will provide intermittent visual coverage, where the clinician can be seen but the clinical interaction between the IP and attending clinician cannot be overheard. All psychiatric appointments will occur in a completely confidential space.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

Psychiatric appointments will be scheduled in advance except for urgent and emergent requests. IPs scheduled to see his assigned psychiatrist and/or PC will be escorted to the treatment space and will be secured in a TM while they await their time with the psychiatrist and/or PC. Custody staff will escort the IP to and from the psychiatrist and/or PC's Office, holding space, and housing unit.

EE.    Dental Care

    a.    The inmate will inform the nursing staff of their need to see the dentist by placing their card in the cell front window.

    b.    The dentist will treat CCCMS LTRH cases by ducat ***only***.

    c.    The dentist will schedule appointments as needed.

    d.    Inmates will be escorted in the same manner as medical clinic visits.  Staff will remain with the inmate under constant supervision and ensure the inmate remains in restraint gear at all times.

FF.    Delivery of Medications

    a.    All medication shall be controlled and dispensed by Medical staff. Correctional Officers are prohibited from dispensing medication.

    b.    Nursing Staff will conduct rounds on the CCCMS LTRH tiers.  If a cell door is required to be opened the inmate will be placed in restraints prior to the opening of the door.  If a food port is required to be opened, the custodial staff will open the food port and the medical staff will issue the medication.

    c.    Certain medically prescribed life sustaining medications directly issued to inmates for an "as needed" use, such as inhalators for asthmatic difficulties, nitroglycerin tablets for heart conditions, and sterile bags for colostomies shall be issued to the inmate.

    d.    Custody staff will escort the non-custody staff member conducting medical or mental health services, the custody staff member will position himself or herself to ensure clinician/patient confidentiality. If a cell door and/or food port is required to be opened. At no time will the non-custody staff member open any food port. A custody staff will be present and will open the food port for the Non-Custody staff member.

GG.    Religious Services

    1.    LTRH inmates are afforded the right to practice their religious belief per CCR Section 3343(k).

    2.    Chapel services are not available within the LTRH.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

3. Religious Services and sacrament services shall, when necessary be conducted within the building, on an individual basis.

a) Chaplains are available to console and/or counsel LTRH inmates upon request.
- Chaplains may conduct religious activity on the LTRH tier without escort. The Chaplain must wear a protective vest.
- Chaplains will not give anything directly to inmates in the LTRH. The Chaplain will give all religious materials to the Floor Officer who will in turn give the materials to the inmate after they have been searched.

b) Volunteer religious workers will not be allowed in the LTRH without approval.

HH.  Telephone Calls

1. Parameters that would allow a phone call by a LTRH inmate.

a) Court order.

b) Correctional Counselor II (CCII) authorizes emergent phone calls. In the absence of the CCII, the Facility Lieutenant will authorize the phone call.

c) All calls will be via speakerphone to facilitate monitoring by staff.

d) Routine telephone calls will be allowed based upon privilege group status.

a) All telephone calls will be logged in the inmates CDCR 114-A, as well as the inmate phone log. The entry will identify the name and title of the person authorizing the call and circumstances (i.e., family death.). Log information will include date, time, and inmate's name, number, to whom the call was placed, the number called and the text of the conversation. The log will be signed by the staff member assisting/monitoring the call.

II.  Out Of Cell Activity

1. CCMS LTRH inmate will be offered three and one half hours per week of out-of-cell activity by utilizing Secure Desks. The activities will be facilitated by custody staff and the activity resources and equipment will be supplied by Mental Health designated staff. All CCCMS LTRH inmates out of cell activity time will be held in their respective section dayrooms. All inmate participants will be in state issued jumpsuits. They will be restrained with the use of waist chains and leg restraints. Staff will secure the inmate into the desk. The CCCMS LTRH inmate will remain in the modules in restraints for the duration of the session. Upon completion of the first session the CCCMS LTRH inmate will be rotated to offer each inmate the three and one half hour a week session.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

    2.Placement of an inmate into the Secure Desk

        a.    Prior to placing an inmate into the Secure Desk, escorting staff will have the inmate kneel onto the designated chair and place leg irons on the inmate, ensuring they are double locked.

        b.    Escorting staff will escort one inmate to the first open desk, having the inmate turn his back to the chair. The escort officer will maintain control of the inmate and instruct the inmate to keep one foot on each side of the foot bar. The inmate will be instructed to "back" into the Secure Desk, ensuring the leg restraint chain is under the foot bar. At this point the officer will position him/herself at the front of the Secure Desk and pushing the lever inward locking the bolt over the leg restraint chain.

        c.    When removing inmates from the chair the escort officer will proceed to the first desk containing an inmate. The escort officer will assume a position at the front of the desk unlock the front level bar and shall gain control of the inmate. The inmate will be instructed to stand up and the escort officer shall escort the inmate to his assigned cell.

JJ.    Emergency Yard Control

In the event an emergency occurs on the yard, i.e., medical and/or inmate behavior that is suspicious in nature, and indicative of a disturbance, the Exercise Yard Observation Officer, will order the occupants of the yard to sit down. If the Response Supervisor determines the magnitude of the incident is elevated, the Response Supervisor may order the inmate to lie down on their stomachs, arms out to their side, palms up, and legs crossed.

KK.    Inmate Canteen

    1.    Inmates will be permitted to draw on their trust accounts for canteen purchases. Individual draws will be scheduled in accordance with established GP canteen schedules.
- Canteen staff will post a schedule that notifies Officers of the ducat due dates.
- Canteen ducats and canteen order forms will be passed out by unit staff the week before the designated draw is to begin.
- Unit staff will collect all completed ducats and order forms and deliver them to the Canteen Manager on the posted due date.
- The Canteen Manager will confirm that the inmate has money in his account and fill each approved canteen order.
- LTRH staff will deliver canteen during the week of their respective draw (once a month).

    2.    Unit Officers will search all canteen orders in front of the inmate before being issued, and all items will be removed from packaging that represents a threat to institutional safety and security, i.e. hard plastic, Styrofoam etc.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

- The inmate will sign the master canteen list and ducat receipt form upon receipt of his order.
- Unit staff returns these forms to the Canteen Manager.
- Unit staff on Second Watch will deliver canteen to inmates when program allows.

Inmates may only purchase items on the approved LTRH Canteen List (Attachment J)

LL.    Inmate Mail

Inmate mail for the LTRH will comply with the CCR, Subchapter 2, Inmate Resources, Article 4, Mail, Article 5, Inmate Manuscripts, and Article 6 Legal Documents, as well as DOM Section 54010.1, Inmate Mail.

MM.    Shaving Procedures/ Haircuts/Nail Clippers

1.    The Yard Officer will inventory all hair clippers in the unit when assuming the post and prior to the end of the shift. Inmates may be issued a hair clipper during individual yard time (based on availability and weather conditions).

2.    The inmate will exit his assigned cell at yard release and request a hair clipper from the Yard Officer. Upon completion of his yard period, he will return the hair clipper to the Yard Officer prior to returning to his cell. The hair clipper will be inspected prior to issuance and upon return from the inmate. The Yard Officer will disinfect each trimmer prior to issuance to the next inmate as required by OP 128, Barber Tools, Equipment and Sanitation Procedure.

3.    The hair clippers will be maintained in a secured area that will be stored in the unit. Under no circumstances will inmates be allowed to take a hair clipper to his cell.

4.    Use of the hair clippers will be recorded on the CDC-114A Form.

5.    Nail Clippers

Inmates will be permitted to use the nail clippers during their yard time.

a)    Staff will inspect the nail clippers prior to issuing them to the inmate.

b)    Unit staff is responsible for tracking use of the nail clippers and ensuring they are returned undamaged prior to the inmate being released from yard.

c)    If the nail clippers are not intact and not all parts are accounted for, the Sergeant will be contacted immediately. The inmate will remain in handcuffs and the yard area will be searched.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

    d)   If the search of the yard does not reveal the missing piece(s), steps will be taken to determine if the inmate will undergo Contraband Surveillance Watch.

    e)   For sanitary purposes, nail clippers shall be disinfectant after each use as required by OP 153, Shaving Equipment, and Sanitation Procedures.

NN.   Inmates on Restriction/Precautious

1. Inmates who have displayed a propensity for violence or other inappropriate behavior will be identified and their special security concern will be addressed appropriately.

2. The Unit Sergeant will be immediately advised of any breaches in safety and/or security that will pose a threat to any person. The Unit Sergeant will advise the Facility Lieutenant and prepare a recommendation.

3. The Facility Lieutenant will prepare a CDCR-128-B Informational Chrono detailing the inmate's misbehavior and the new restrictive status.

The following is a list of restrictions that could result from specific inmate behavior. All restrictions shall be approved by the Facility Captain.

    a) **SPIT NET** – Inmate required to wear a Spit Net whenever out of his cell. Imposed when an inmate has attempted to, or has spit upon another person. The LTRH Captain reviews this restriction, usually imposed for a minimum of 30 days.

    b) **PAPER TRAY STATUS** – Meals served on paper trays. Imposed when an inmate has refused to relinquish his food tray, or has intentionally broken his tray. Usually imposed for a period of 30 days.

    c) **LEG IRONS** – Requires an inmate be placed in leg irons anytime he is out of his cell. Imposed when an inmate has kicked at staff during medication pass, showers, etc. The LTRH Captain reviews this restriction, usually imposed for a minimum of 30 days.

    d) **SUPERVISED ESCORT** – Supervisor is required to be present whenever inmate is under escort. Imposed when inmate has been assaultive or resistive to staff while under escort and additional supervision has been deemed necessary. Also used when an inmate has made numerous allegations of inappropriate actions. This may also require the use of a video camera. The Captain reviews this restriction, usually imposed for a minimum of 30 days.

    e) **IN-CELL SECURED MOVEMENT/ALTERNATE FEEDING STATUS** – Requires the inmate to position himself at the rear of his cell, seated on the bed with hands in plain view, prior to staff opening the tray slot. Imposed when

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA STATE PRISON, SACRAMENTO
OPERATIONAL PROCEDURE (OP)

inmate has assaulted or attempted to assault staff through the food port (gassing, etc.) or has refused to allow staff to secure the tray slot by placing his arm or another object out of the tray slot. This restriction is usually imposed for a period of 10 days.

f) **NO CUP –** Inmates will have their cups taken away. This is for inmates that use their cups to throw fluids on staff and other inmates.

Other designated program restrictions may be imposed as deemed appropriate. The details of these restrictions shall be documented on the CDC 128-B "Notice of Restriction" signed by the Program Lieutenant and Facility Captain.

ATTACHMENTS

Attachment A Inmate Segregation Record (114-A)
Attachment B Isolation Log (114)
Attachment C Clothing Shortage/Fish Slip
Attachment D Inmate Segregation Profile (114-A1)
Attachment E Interdisciplinary Progress Notes – Developmental Disability Program (MH-7230)
Attachment F Medical Classification Chrono
Attachment G Cell Search Exhibit B
Attachment H Cell Search Worksheet
Attachment I Security/Welfare Check Manual Tracking Sheet
Attachment J Canteen List
Attachment K IPTR149
Attachment L Priority Legal Users
Attachment M General Legal Users

JEFF LYNCH                    Date
Warden (A)