ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
BRIAN S. CHAN, State Bar No. 299926
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA  94244-2550
 Telephone:  (916) 210-7666
 Facsimile:  (916) 324-5205
 E-mail: David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants J. Lynch, D. Garland,
M. Jordan, W. Lieber, H. Chavez, D. Sykes,
J. Gomez, J. Carothers, D. Calderon, E. Baker,
G. Herrera, M. Saavedra, and P. Brennfleck*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **MA ROSARIO BUENO ZARAGOZA, an individual; ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza,**<br><br>Plaintiffs,<br><br>v.<br><br>**JEFFREY W. LYNCH, an individual, and DOES 1 through 30, inclusive,**<br><br>Defendants. | 2:21-cv-02294 TLN-JDP<br><br>**DECLARATION OF P. BRENNFLECK IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, P. Brennfleck, hereby declare:

1. I have personal knowledge of the facts set forth in this declaration. I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

1

Case 2:21-cv-02294-TLN-JDP    Document 84-8    Filed 01/23/25    Page 2 of 6

2. During the events at issue, I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a Correctional Officer at California State Prison, Sacramento, which is located in Represa, California. During the events at issue, I was assigned to the Facility B-8 Long Term Restricted Housing (LTRH) section. As a correctional officer in the LTRH, my duties included supervising inmates and maintaining order, searching and escorting inmates to the various programs, activities, and services offered, including medical and mental health services, law library, educational services, mental health therapeutic group activities, and recreation. I was responsible for feeding inmates at their cells and conducting welfare checks on inmates within their cells every half hour. I was also responsible for escorting medical and non-custody staff through the LTRH when they needed to enter to interact with the inmates.

3. Prior to December 12, 2019, I was unaware there was any serious risk that inmates Green, Taylor, or Rodriguez would harm inmate Aguilar; I was unaware of any reason why these three inmates would want to harm Aguilar; and I did not have any advance knowledge that Green, Taylor, or Rodriguez would attack Aguilar. I was also unaware about the December 5, 2019 incident where inmate Taylor escaped his restraints in the B-8 dayroom. I only learned about the December 5 incident after the December 12, 2019 incident occurred.

4. I was present for an incident on October 10, 2019, in which Taylor and Rodriguez escaped their restraints in the dayroom and attacked another inmate. I learned that Taylor and Rodriguez had attacked the other inmate at the orders of a third inmate, Green, who claimed to be a "shot caller" and had a previous issue with the inmate from when the two had been at a different prison. After that incident, to try to prevent Taylor and Rodriguez from escaping restraints again, we began adding black box devices to the leg restraints that connected the inmates to the restart chairs. These devices blocked access to a handcuff's keyhole so the inmate could not insert a pick, shim, or other inmate-manufactured device. The black box devices are commonly used when escorting inmates in public settings outside of prison facilities.

5. On December 12, 2019, as part of my duties as a B-8 LTRH Escort Officer, I worked with Sergeant Calderon and Officers Herrera, Sykes, and Gomez in order to carry out the LTRH dayroom program that morning. As part of that process, Officers Herrera, Sykes, and I would

2

Decl. of P. Brennfleck in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

walk from cell to cell to determine if any of the inmates confined in the LTRH wanted to attend dayroom that day. Every inmate who wanted to participate in the dayroom, would be subjected to an unclothed body and cavity search, restraints would be placed on them at their cell, they would be scanned with a metal detector, and then brought to the dayroom floor. Once on the dayroom floor, the black box device was applied to their leg restraints and they were secured to the restart chairs.

6. On the morning of December 12, Aguilar, Rodriguez, and Taylor each separately indicated that they wanted to attend the dayroom, and we carried out the procedure described above for each inmate. I did not know in advance that Aguilar, Rodriguez, or Taylor would want to attend the dayroom that morning, and I did not take any action during the selection process, such as by releasing Aguilar first, in order to enable or facilitate the attack on Aguilar.

7. Calderon, Herrera, Sykes, and I searched and restrained Rodriguez and Taylor pursuant to LTRH policy, and we did not locate any contraband on their persons. At the time, I believed that Rodriguez and Taylor did not have any contraband on their bodies based on our searches. If I had known or suspected that Rodriguez and Taylor had any hidden contraband on them at that time, I would have performed another search to locate that contraband.

8. Rodriguez and Taylor were secured in mechanical waist and leg restraints before they were escorted down to the dayroom. It appeared to me that the mechanical restraints were applied correctly and double locked during that process. I did not knowingly or intentionally fail to double-lock Rodriguez's or Taylor's mechanical restraints in order to enable or facilitate their attack on Aguilar. I did not know and had no reason to believe that the mechanical restraints had not successfully been double-locked before we escorted them from their cells to the dayroom area. If I had known or suspected that Rodriguez's or Taylor's mechanical restraints were not successfully double-locked, I would have double-checked their restraints and ensured they were double-locked.

9. Rodriguez, Taylor, and Aguilar were restrained to their respective restart chairs with the black box devices on their leg irons, and I then exited the B-8 dayroom to attend to my other duties along with Sergeant Calderon and Officers Sykes, Herrera, and Gomez. Officer Lieber, the

3

control booth officer on that day, closed the B-8 section door behind us after we exited the dayroom.

10. I exited the B-8 dayroom and went directly to the program office in the rotunda. At approximately 10:05 a.m., Sergeant Calderon announced that Rodriguez and Taylor had escaped from their mechanical restraints. I did not observe Rodriguez and Taylor manipulating or escaping from their restraints. I first became aware that Rodriguez and Taylor had escaped from their restraints when Sergeant Calderon alerted us. In response, I immediately went to the rotunda window and I observed that Rodriguez and Taylor were out of their restraints and attacking Aguilar. Based on my observations and my understanding of CDCR alarm-response policy, I retrieved a shield from a nearby locker in the rotunda and returned to the rotunda window, where staff was assembling and preparing to make entry. I did not have any means to open the B-8 section door without Officer Lieber's assistance at the control panel, and based on my training and experience, I did not believe I had the authority to independently order Officer Lieber to open the B-8 section door. Nor do I believe it would have been safe at that moment to open the section door, as we had not yet been able to put on appropriate personal protective equipment, and Lieber was actively firing 40mm direct impact rounds at Rodriguez and Taylor to stop the attack. Had the door opened and we entered, we would have been in the line of fire for Lieber and would have prevented him from using his force option.

11. After Lieutenant Baker and other responding staff arrived, and after Rodriguez and Taylor had stopped their attack and were lying prone on the ground, Lieutenant Baker gave the order to open the B-8 section door and ordered me to cover Officer Herrera as he applied restraints on Rodriguez. I entered and placed a plastic shield on Rodriguez's upper back and torso while Officer Herrera applied hand restraints on Rodriguez. After securing Rodriguez, and after I determined it was safe to do so, I left the scene while the other officers were in the process of securing the crime scene and collecting evidence.

12. My actions on December 12, 2019, were based on my training and understanding of CDCR policies and procedures, and I acted in good faith and to the best of my ability during this incident. I did not take any action, refrain from taking any action, or intentionally delay taking

4

any action to enable Taylor and Rodriguez's attack on Aguilar. I did not have any prior knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

13. I have never spoken with Taylor, Rodriguez, or Green about Aguilar. I was never asked by Taylor, Rodriguez, or Green, nor did I ever agree, to take Aguilar to dayroom first, to only single-lock any of their restraints, or to ensure that the control booth officer did not use lethal force. I never heard Taylor, Rodriguez, or Green ask any other staff member, nor did I ever hear any other staff member agree to take Aguilar to dayroom first, to only single-lock any of their restraints, or to ensure that the control booth officer did not use lethal force. I never told any inmate that Aguilar was a sex offender. I have never seen Green, Taylor, or Rodriguez making weapons or using clipper heads to damage or modify items in their cells. I did not bring any inmate, including Green, Taylor, and Rodriguez, clipper heads or any other contraband. I have never seen Green, Taylor, or Rodriguez display any weapons to me from within their cells. I never assisted Green, Taylor, or Rodriguez in making weapons.

14. I have never had any conversations with Green, Taylor, Rodriguez, any inmate, or any staff member in which I instructed or agreed to violate Aguilar's rights. I have never instructed any inmate or staff member or agreed with any inmate or any staff member to harm Aguilar, or any other inmate. I did not orchestrate or play any role in Aguilar's murder. I am not aware of any other staff members orchestrating or playing any role in Aguilar's murder. Taylor, Rodriguez, and Green are responsible for Aguilar's murder.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

5

Decl. of P. Brennfleck in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

1 | I declare under penalty of perjury that the foregoing statements are true and correct.

2 | Executed: January 23, 2025, at Sacramento, California.

          **/s/ P. Brennfleck**
_____

P. Brennfleck

(Original retained by counsel.)

SA2022300303
Brennfleck Declaration.docx

6

Decl. of P. Brennfleck in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)