ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
BRIAN S. CHAN, State Bar No. 299926
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7368
 Fax: (916) 324-5205
 E-mail: Brian.Chan@doj.ca.gov
*Attorneys for Defendants Lynch, Garland, Jordan, Lieber, Chavez, Sykes, Gomez, Carothers, Calderon, Baker, Herrera, Saavedra, Brennfleck*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **MA ROSARIO BUENO ZARAGOZA, an individual; ESTATE OF LUIS GIOVANNY AGUILAR**, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza,<br><br>Plaintiffs,<br><br>v.<br><br>**JEFFREY W. LYNCH, an individual, and DOES 1 through 30, inclusive,**<br><br>Defendants. | 2:21-cv-02294 TLN-JDP<br><br>**DECLARATION OF D. CALDERON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, D. Calderon, hereby declare:

1. I have personal knowledge of the facts set forth in this declaration. I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

2. During the events at issue, I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a Correctional Sergeant at California State Prison,

1

Decl. of D. Calderon in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

Sacramento, which is located in Represa, California. During the events at issue, I was assigned to the Facility B-8 Long Term Restricted Housing (LTRH) section.

3. As a correctional sergeant for the LTRH, my responsibilities included oversight of correctional officers in the unit, including ensuring that search and restraint procedures were followed, that programming ran on time and services were offered to the inmates pursuant to policy, responding to incidents in the unit, and providing additional supervision during the dayroom search, escort, and restraint procedures.

4. As a sergeant I was trained in CDCR's use of force and alarm response policies. CDCR's use-of-force policy requires staff to accomplish departmental functions with minimal reliance on the use of force. Staff is trained to use only reasonable force, which is the force that an objective, trained, and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order. Staff has access to various use-of-force options, including chemical agents, handheld batons, physical strength and holds, less-lethal weapons, including the 40mm direct impact launcher, and lethal weapons, such as the Mini-14 rifle. Staff are trained that use-of-force options do not have to be used in any particular sequence, but that they should use the option they reasonably believe is sufficient.

5. While staff are trained to use various force options when circumstances require, they are not extensively trained to engage in hand-to-hand or weapons-based combat with inmates. Staff are trained to use the force option that will be effective while maintaining a safe distance from the threat. Staff are trained that they must ensure their own safety, and that if they are injured or taken hostage during an incident response, it will only increase the danger and potential harm that will occur to responding staff members.

6. Staff are trained never to rush into an unknown or potentially violent situation, especially within a housing unit, without a coordinated tactical plan. In security housing units (SHU) or administrative segregation units in particular, staff are trained not to enter the dayrooms or tiers when inmates are unrestrained or armed until a tactical plan is established and it is safe to execute. Entering a SHU when inmates are unrestrained exposes staff to danger and prevents the

2

Decl. of D. Calderon in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

control booth officer from using his 40mm launcher or Mini-14 to quell an incident from a safe distance. It also prevents the use of chemical munitions to quell an incident, as the officer who entered the dayroom would likely be exposed to the effects and be unable to defend himself. If an officer were to be rendered unconscious or his movement or vision impeded, the risk of danger and the duration of the incident, could both escalate dramatically. The additional response time could also delay the victim from receiving medical care.

7. Instead, staff are trained to enter housing units in a tactical, coordinated manner, with specific roles designated, when it is safe to enter. When inmates are unrestrained, actively disobeying orders, or are in possession of weapons, staff are not trained to physically engage with the inmates directly. This is especially so in a SHU that house mentally ill inmates, whose mental health may be playing a substantial role in the incident, and who are very frequently erratic and unpredictable.

8. When staff make entry into a SHU to respond to a violent incident, the first priority, even if there is an injured victim, is to secure the inmate-assailants and ensure they do not have any other weapons that could be used to injure staff or other inmates. If inmates have access to additional weapons, or are left unrestrained near weapons, they could resume their attack against the victim or staff, which would further delay life saving measures by medical responders.

9. Prior to December 12, 2019, I was unaware there was any serious risk that inmates Green, Taylor, or Rodriguez would harm inmate Aguilar; I was unaware of any reason why these three inmates would want to harm Aguilar; and I did not have any advance knowledge that Green, Taylor, or Rodriguez would attack Aguilar. I was also unaware about the December 5, 2019 incident where inmate Taylor escaped his restraints in the B-8 dayroom. I only learned about the December 5 incident after the December 12, 2019 incident occurred.

10. Prior to December 12, 2019, I was aware of the October 10, 2019, incident in which Rodriguez and Taylor had escaped their restraints and attacked an inmate in the dayroom. I did not respond to that incident, but was informed of it in the course of my duties as a sergeant. After the incident, which appeared to have been ordered because of a previous altercation between Green and the inmate-victim, who had been transferred out of the section, the LTRH

3

implemented black boxes on the leg restraints that were used in the dayroom. The black boxes were designed to prevent the inmates from accessing the keyhole in the restraints in order to pick the locking mechanism. Black boxes are regularly used to transport inmates in public settings and were the highest-security and most restrictive restraint device available to use in the LTRH at the time.

11. On December 12, 2019, I was carrying out my duties as the Facility B-8 sergeant by supervising Officers Brennfleck, Herrera, Sykes, and Gomez as we ran the dayroom program. At the time, I was positioned in the dayroom floor, and I observed as Officers Brennfleck, Herrera, and Sykes went from cell to cell to determine if any of the inmates wanted to come out of their cells and sit in the dayroom. I also observed as the officers performed unclothed body and cavity searches on inmates Aguilar, Rodriguez, and Taylor, placed these inmates in restraints, escorted them down to the dayroom area, Gomez applied the black box devices to the inmates leg restraints, and then restrained each of them to the restart chairs.

12. After Rodriguez, Taylor, and Aguilar were restrained to their respective restart chairs, I exited the B-8 dayroom along with Officers Brennfleck, Herrera, and Sykes. Officer Lieber, the control booth officer on that day, closed the B-8 section door behind us after we exited the dayroom.

13. I never instructed Officers Brennfleck, Herrera, Sykes, or any other officer to not double-lock Rodriguez's and Taylor's mechanical restraints. I do not know or have reason to believe any other supervising officer ever instructed Officers Brennfleck, Herrera, or Sykes to not double-lock Rodriguez's and Taylor's mechanical restraints. I do not know and have no reason to believe that Officer Sykes or any other officer intentionally failed to secure Rodriguez's and Taylor's mechanical restraints. If I knew or had reason to believe that Rodriguez and Taylor were not properly restrained to their restart chairs, I would have personally inspected and ensured that Rodriguez and Taylor were properly restrained to their restart chairs before I exited the dayroom.

14. Shortly after I exited the B-8 dayroom, at approximately 10:05 a.m., I became aware that Rodrigue and Taylor had escaped from their mechanical restraints. At the time, I was standing outside of B-8 in the rotunda area of the building, speaking with Officer Sykes. I did not

4

Decl. of D. Calderon in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)

observe Rodriguez and Taylor manipulating or escaping from their restraints. I first became aware that Rodriguez and Taylor had escaped from their restraints when I looked into the B-8 dayroom from a window in the rotunda and observed Rodriguez and Taylor running up the stairs towards Green's cell door. In response, I immediately went and alerted other nearby officers that Rodriguez and Taylor were out of their restraints. When I returned to the rotunda window and looked into B-8 from the rotunda window, I observed that Rodriguez and Taylor were running down the stairs and had weapons in their hands. At that same moment, the section door began to open, Taylor appeared to make an aggressive movement towards the section door, so I shouted up to Officer Lieber in the control booth to shut the section door.

15. I did not enter the B-8 dayroom at that moment, and I did not order any of the other officers to enter, because I did not believe based on my training and experience that there was a sufficient number of staff present to safely enter the B-8 dayroom and confront Rodriguez and Taylor while they were armed with inmate-manufactured weapons. Had we entered, I believe we would have escalated the situation to a direct physical confrontation between Rodriguez, Taylor, and staff, which would have endangered the lives of all involved. I did not know what Rodriguez or Taylor's intentions were at that point, and they had not made any indication they were going to harm Aguilar. I did not believe rushing in to engage Rodriguez and Taylor would be consistent with my training and policy and instead ordered the section door closed.

16. Rodriguez and Taylor suddenly ran toward Aguilar and began attacking him. I ordered Rodriguez and Taylor to stop their attack and get down onto the ground, and I continued to give verbal commands for Rodriguez and Taylor to stop, but they did not comply with those orders and continued to attack Aguilar. I observed Officer Lieber fire multiple 40-millimeter direct impact rounds at Rodriguez and Taylor to stop their attack while staff assembled at the section door and prepared to make entry.

17. After Taylor was struck by one of the 40mm projectiles, I observed as Rodriguez and Taylor stopped their attack and moved away from Aguilar. Shortly afterwards, Lieutenant Baker ordered the Section B door be opened, and I entered the B-8 dayroom with other responding staff members, who had donned personal protective equipment. I observed as other officers placed

5

Decl. of D. Calderon in Supp. Of Defs.' Mot. Summ. J.   (2:21-cv-02294 TLN-JDP)

Rodriguez and Taylor in restraints and began administering chest compressions on Aguilar until medical staff arrived on the scene.

18. My actions on December 12, 2019, were based on my training and understanding of CDCR policies and procedures, and I acted in good faith and to the best of my ability during this incident. I did not take any action, refrain from taking any action, or intentionally delay taking any action to enable Taylor and Rodriguez's attack on Aguilar. I did not have any prior knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed: January 23, 2025, at Sacramento, California.

    /s/ D. Calderon

D. Calderon

(Original retained by counsel.)

SA2022300303
Calderon Declaration.docx

6

Decl. of D. Calderon in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)