ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
BRIAN S. CHAN, State Bar No. 299926
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA  94244-2550
 Telephone:  (916) 210-7666
 Facsimile:  (916) 324-5205
 E-mail: David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants J. Lynch, D. Garland,
M. Jordan, W. Lieber, H. Chavez, D. Sykes,
J. Gomez, J. Carothers, D. Calderon, E. Baker,
G. Herrera, M. Saavedra, and P. Brennfleck*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **MA ROSARIO BUENO ZARAGOZA, an individual; ESTATE OF LUIS GIOVANNY AGUILAR, deceased, by his successor-in-interest Ma Rosario Bueno Zaragoza,**<br><br>Plaintiffs,<br><br>v.<br><br>**JEFFREY W. LYNCH, an individual, and DOES 1 through 30, inclusive,**<br><br>Defendants. | 2:21-cv-02294 TLN-JDP<br><br>**DECLARATION OF J. GOMEZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, J. Gomez, hereby declare:

1. I have personal knowledge of the facts set forth in this declaration. I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

1

2. During the events at issue, I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a correctional officer at California State Prison, Sacramento, which is located in Represa, California. During the events at issue, I was assigned to the Facility B-8 Long Term Restricted Housing (LTRH) unit. As a correctional officer in the LTRH, my duties included supervising inmates and maintaining order, and searching and escorting inmates to the various programs, activities, and services offered, including medical and mental health services, law library, educational services, recreation, and outside appointments and court dates. I was responsible for feeding inmates at their cells and conducting welfare checks on inmates within their cells every half hour. I was also responsible for escorting medical and non-custody staff through the LTRH when they needed to enter to interact with the inmates.

3. Prior to December 12, 2019, I was unaware there was any serious risk that inmates Green, Taylor, or Rodriguez would harm inmate Aguilar; I was unaware of any reason why these three inmates would want to harm Aguilar; and I did not have any advance knowledge that Green, Taylor, or Rodriguez would attack Aguilar. I was also unaware about the December 5, 2019 incident where inmate Taylor escaped his restraints in the B-8 dayroom. I only learned about the December 5 incident after the December 12, 2019 incident occurred.

4. I was present for an incident on October 10, 2019, in which Taylor and Rodriguez escaped their restraints in the dayroom and attacked another inmate. I learned that Taylor and Rodriguez had attacked the other inmate at the orders of a third inmate, Green, who claimed to be a "shot caller" and had a previous issue with the inmate from when the two had been at a different prison. After that incident, to try to prevent Taylor and Rodriguez from escaping restraints again, we began adding black box devices to the leg restraints that connected the inmates to the restart chairs. These devices blocked access to a handcuff's keyhole so the inmate could not insert a pick, shim, or other inmate manufactured device.

5. On December 12, 2019, as part of my duties as a B-8 LTRH Security Patrol Officer, I worked with Sergeant Calderon and Officers Herrera, Brennfleck, and Sykes in order to carry out the LTRH dayroom program that morning. I was not involved with placing Taylor, Rodriguez, and Aguilar in restraints when they exited their respective cells, and I did not observe how

2

Decl. of J. Gomez in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

Officers Herrera, Brennfleck, and Sykes placed Taylor, Rodriguez, and Aguilar in mechanical restraints that morning. For my part, I was responsible for securing inmates Taylor, Rodriguez, and Aguilar's leg restraints to their respective "restart" chairs in the B-8 dayroom, including applying the black box devices to their leg restraints. I waited in the dayroom area while Officers Herrera, Brennfleck, and Sykes placed Taylor, Rodriguez, and Aguilar in their restraints. After Taylor, Rodriguez, and Aguilar were restrained to their respective restart chairs, I exited the B-8 dayroom along with Sergeant Calderon and Officers Herrera, Brennfleck, and Sykes. I did not know in advance that Rodriguez or Taylor would escape their restraints that morning, and I did not take any action to enable or facilitate the attack on Aguilar.

6.    On December 12, 2019, at approximately 10:05 a.m., while I was carrying out my duties in the custody office, Sergeant Calderon informed me that Rodriguez and Taylor had escaped from their mechanical restraints. I did not observe Rodriguez and Taylor manipulating or escaping from their restraints. I first became aware that Rodriguez and Taylor had escaped from their restraints from Sergeant Calderon. In response to Sergeant Calderon's announcement, I exited the office within seconds, and went and looked into B-8 from the rotunda window. I observed as Rodriguez climbed the left staircase in B section and picked up an unknown object from the floor near Cell B8-211, and observed as Rodriguez and Taylor ran down the section stairs. At some point during this sequence of events, I initially shouted for Officer Lieber to open the section door from the control booth. However, other officers then began shouting out that the inmates had weapons, and I believe I heard Sergeant Calderon shout for Officer Lieber to close the section door. I then observed as Rodriguez and Taylor walked towards Aguilar, who was still restrained in his restart chair, and then observed as Taylor began to rapidly strike Aguilar multiple times in the back and upper torso areas with a closed fist in an up-and-down stabbing motion. I also observed as Officer Lieber fired multiple 40mm rounds at Rodriguez and Taylor to stop their attack on Aguilar.

7.    Based on my training and understanding of CDCR policies and procedures, I waited in the area outside of B-8 for additional staff members to respond to the alarm, and prepared myself to enter the dayroom when a supervisor issued that order. I did not have any means to

3

Decl. of J. Gomez in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

open the B-8 section door without Officer Lieber's assistance in the control booth, and based on my training and experience, I did not believe I had the authority to overrule Calderon's order to close the section door.

8. After Lieutenant Baker and other responding staff arrived, and after Rodriguez and Taylor had stopped their attack and were lying prone on the ground, Lieutenant Baker gave the order to open the B-8 section door and ordered other officers to secure Rodriguez and Taylor in restraints. I entered behind these other officers and removed Aguilar's leg restraints from the restart chair in order to facilitate his medical treatment. Medical staff immediately started CPR as I removed the leg restraints from Aguilar's ankles. I then observed as Aguilar was placed on a stokes litter and transported on a gurney to the medical building for further treatment.

9. My actions on December 12, 2019, were based on my training and understanding of CDCR policies and procedures, and I acted in good faith and to the best of my ability during this incident. I did not take any action, refrain from taking any action, or intentionally delay taking any action to enable Taylor and Rodriguez's attack on Aguilar. I did not have any prior knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

10. I have never spoken with Taylor, Rodriguez, or Green about Aguilar. I was never asked by Taylor, Rodriguez, or Green, nor did I ever agree, to take Aguilar to dayroom first, to only single-lock any of their restraints, and or to ensure that the control booth officer did not use lethal force. I never heard Taylor, Rodriguez, or Green ask any other staff member, nor did I ever hear any other staff member agree to take Aguilar to dayroom first, to only single-lock any of their restraints, or to ensure that the control booth officer did not use lethal force. I never told any inmate that Aguilar was a sex offender. I have never seen Green, Taylor, or Rodriguez making weapons or using clipper heads to damage or modify items in their cells. I did not bring any inmate, including Green, Taylor, and Rodriguez, clipper heads or any other contraband. I have never seen Green, Taylor, or Rodriguez display any weapons to me from within their cells. I never assisted Green, Taylor, or Rodriguez in making weapons.

4

Decl. of J. Gomez in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)

11. I have never had any conversations with Green, Taylor, Rodriguez, any inmate, or any staff member in which I instructed or agreed to violate Aguilar's rights. I have never instructed any inmate or staff member or agreed with any inmate or any staff member to harm Aguilar, or any other inmate. I did not orchestrate or play any role in Aguilar's murder. I am not aware of any other staff members orchestrating or playing any role in Aguilar's murder. Taylor, Rodriguez, and Green are responsible for Aguilar's murder.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed: January 23, 2025, at Sacramento, California.

      **/s/ J. Gomez**

J. Gomez

(Original retained by counsel.)

SA2022300303
Gomez Declaration.docx

5

Decl. of J. Gomez in Supp. Of Defs.' Mot. Summ. J. (2:21-cv-02294 TLN-JDP)