1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  JON S. ALLIN, State Bar No. 155069
   Supervising Deputy Attorney General
3  BRIAN S. CHAN, State Bar No. 299926
   Deputy Attorney General
4  DAVID E. KUCHINSKY, State Bar No. 292861
   Deputy Attorney General
5  1300 I Street, Suite 125
   P.O. Box 944255
6  Sacramento, CA  94244-2550
   Telephone:  (916) 210-7666
7  Facsimile:  (916) 324-5205
   E-mail: David.Kuchinsky@doj.ca.gov
8  *Attorneys for Defendants J. Lynch, D. Garland,*
   *M. Jordan, W. Lieber, H. Chavez, D. Sykes,*
9  *J. Gomez, J. Carothers, D. Calderon, E. Baker,*
   *G. Herrera, M. Saavedra, and P. Brennfleck*

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13                     SACRAMENTO DIVISION

14

15

16  **MA ROSARIO BUENO ZARAGOZA, an**          2:21-cv-02294 TLN-JDP
    **individual; ESTATE OF LUIS GIOVANNY**
    **AGUILAR, deceased, by his successor-in-**   **DECLARATION OF G. HERRERA IN**
17  **interest Ma Rosario Bueno Zaragoza,**       **SUPPORT OF DEFENDANTS' MOTION**
                                                 **FOR SUMMARY JUDGMENT**
18                               Plaintiffs,

19        **v.**

20
    **JEFFREY W. LYNCH, an individual, and**
21  **DOES 1 through 30, inclusive,**

22                               Defendants.

23

24

25        I, G. Herrera, hereby declare:

26        1.     I have personal knowledge of the facts set forth in this declaration.  I am competent to

27  testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

28

                                              1

2.     During the events at issue, I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a correctional officer at California State Prison, Sacramento, which is located in Represa, California.  During the events at issue, I was assigned to the Facility B-8 Long Term Restricted Housing (LTRH) section.  As a correctional officer in the LTRH, my duties included supervising inmates and maintaining order, and searching and escorting inmates to the various programs, activities, and services offered, including medical and mental health services, law library, educational services, recreation, and outside appointments and court dates.  I was responsible for feeding inmates at their cells and conducting welfare checks on inmates within their cells every half hour.  I was also responsible for escorting medical and non-custody staff through the LTRH when they needed to enter to interact with the inmates.

3.     Prior to December 12, 2019, I was unaware there was any serious risk that inmates Green, Taylor, or Rodriguez would harm inmate Aguilar; I was unaware of any reason why these three inmates would want to harm Aguilar; and I did not have any advance knowledge that Green, Taylor, or Rodriguez would attack Aguilar.  At no point during December 12, 2019, did Aguilar express any safety concerns with Taylor or Rodriguez, including any concerns with attending the dayroom with either of them.

4.     I was not working in the LTRH on October 10, 2019, but was instead working as a yard officer in the PSU facility.  I was working on December 5, 2019, but I did not see Taylor escape his restraints or fail to report or document it.  I was informed about the December 5, 2019, after it occurred, but I cannot recall the exact date.

5.     On December 12, 2019, as part of my duties as a B-8 LTRH Escort Officer, I worked with Sergeant Calderon and Officers Brennfleck and Sykes in order to carry out the LTRH dayroom program that morning.  As part of that process, I conducted a scan of the dayroom and tier area and ensured there was no trash or contraband in either of the areas, and then notified Sergeant Calderon that we were ready for dayroom.

6.     Officers Brennfleck, Sykes, and I then went from cell to cell to determine if any of the inmates confined in the LTRH wanted to come out of their cells and sit in the day room.  For each inmate who wanted to be released to the dayroom, Officers Brennfleck, Sykes, and I would

2

then perform an unclothed body search of that inmate, place the inmate in mechanical restraints, use a metal detector to check the inmate for contraband, escort them down from their cells to the dayroom area, and then restrain the inmate to one of the restart chairs in the dayroom area.

7.    On the morning of December 12, 2019, Aguilar, Taylor, and Rodriguez each separately indicated that they wanted to attend the dayroom, and we carried out the procedure described above for each inmate. I did not know in advance that Aguilar, Taylor, or Rodriguez would want to attend the dayroom that morning, and I did not take any action during the selection process, such as by releasing Aguilar first, in order to enable or facilitate the attack on Aguilar.

8.    Officers Brennfleck, Sykes, and I performed unclothed body and cavity searches and metal-detector checks on Aguilar, Taylor, and Rodriguez pursuant to policy before they were escorted down to the dayroom. Our unclothed body searches and metal-detector checks did not uncover any contraband on their persons, and at the time, I believed that they did not have any contraband on their bodies based on our searches. If I had known or suspected that either Rodriguez and Taylor, or Aguilar, had any hidden contraband on them at that time, I would have performed another search to locate that contraband and, had I found any, would have immediately notified Sergeant Calderon.

9.    Officers Brennfleck, Sykes, and I also secured Aguilar, Taylor, and Rodriguez in mechanical waist and leg restraints before they were escorted down to the dayroom. It appeared to me that the mechanical restraints were applied correctly and double locked during that process. I did not knowingly or intentionally fail to double-lock Rodriguez's or Taylor's mechanical restraints in order to enable or facilitate their attack on Aguilar or for any other reason. I did not know and had no reason to believe we had not successfully double-locked Rodriguez and Taylor's mechanical restraints before we escorted them from their cells to the dayroom area. If I had known or suspected that Rodriguez's or Taylor's mechanical restraints were not double-locked, I would have double-checked their restraints and ensured they were double-locked. I did not hear Taylor say anything to Sykes or anyone else about his restraints during the search or escort.

3

10.     After Rodriguez, Taylor, and Aguilar were restrained to their respective restart chairs, I exited the B-8 dayroom along with Sergeant Calderon and Officers Brennfleck and Sykes. Officer Lieber, the control booth officer on that day, closed the B-8 section door behind us after we exited the dayroom.

11.     Shortly after I exited the B-8 dayroom, at approximately 10:05 a.m., Sergeant Calderon informed me that Rodriguez and Taylor had escaped from their mechanical restraints. I did not observe Rodriguez and Taylor manipulating or escaping from their restraints. I first became aware that Rodriguez and Taylor had escaped from their restraints from Sergeant Calderon. In response, I went and looked into B-8 from the rotunda window, and I observed that Rodriguez and Taylor were fully out of their restraints. As I observed Rodriguez and Taylor coming down the stairs inside of the dayroom, I gave multiple direct orders for Rodriguez and Taylor to get down onto the ground. I did not know what Rodriguez's or Taylor's intentions were at this point, and I did not know they were going to attack Aguilar. Aguilar did not call for help or do anything indicating to me that he thought he was in danger or believed he was about to be attacked.

12.     Rodriguez and Taylor did not obey my orders, but turned, approached Aguilar, and suddenly started stabbing him repeatedly with inmate-manufactured weapons. I immediately used my institutional radio to call for a Code 1 response, and I heard an audible alarm sound. Based on my training and understanding of CDCR policies and procedures, I waited for additional staff members to respond to the alarm, and waited for one of the supervising officers to issue the order to open the B-8 section door and enter the unit. I did not have any means to open the B-8 section door without Officer Lieber's assistance in the control panel, and based on my training and experience, I did not believe I had the authority to independently order Officer Lieber to open the B-8 section door. Nor do I believe it would have been safe at that moment to open the section door, as we had not yet been able to put on appropriate protection and weapons, and Lieber was actively firing 40mm rounds into the dayroom floor. Had the door opened and we entered, we would have been in the line of fire for Lieber and would have prevented him from using his force option.

4

13.    I continued to give loud orders to Taylor and Rodriguez to get down until Lieutenant Baker arrived.  After Lieutenant Baker and other responding staff arrived, Taylor and Rodriguez threw away their weapons and got down on the ground.  Once Rodriguez and Taylor were lying prone on the ground, Lieutenant Baker gave the order to open the B-8 section door and ordered me to apply restraints on Rodriguez.  I entered and applied hand restraints on Rodriguez while Officer Brennfleck covered me.  After securing Rodriguez, I performed a clothed body search of Rodriguez and found no contraband, and after all evidence was collected, I assisted Investigative Service Unit Officer Garland with escorting Rodriguez out of the building to a holding cell in the B Pedestrian Sallyport and conducted a search of Rodriguez.

14.    My actions on December 12, 2019, were based on my training and understanding of CDCR policies and procedures, and I acted in good faith and to the best of my ability during this incident.  I did not take any action, refrain from taking any action, or intentionally delay taking any action to enable Taylor and Rodriguez's attack on Aguilar.  I did not have any prior knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

5

1    I declare under penalty of perjury that the foregoing statements are true and correct.

2    Executed: January 23, 2025, at Sacramento, California.

3

4

5    _____/s/ G. Herrera_____

6    G. Herrera

7    (Original retained by counsel.)

8

9    SA2022300303
     Herrera Declaration.docx

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of G. Herrera in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)