1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  JON S. ALLIN, State Bar No. 155069
   Supervising Deputy Attorney General
3  BRIAN S. CHAN, State Bar No. 299926
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone:  (916) 210-7368
6    Fax: (916) 324-5205
     E-mail:  Brian.Chan@doj.ca.gov
7  *Attorneys for Defendants Lynch, Garland, Jordan,*
   *Lieber, Chavez, Sykes, Gomez, Carothers, Calderon,*
8  *Baker, Herrera, Saavedra, Brennfleck*

9

                    IN THE UNITED STATES DISTRICT COURT

10

                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

                          SACRAMENTO DIVISION

12

13

14  **MA ROSARIO BUENO ZARAGOZA, an**            2:21-cv-02294 TLN-JDP
    **individual; ESTATE OF LUIS GIOVANNY**
15  **AGUILAR, deceased, by his successor-in-**   **DECLARATION OF D. SYKES IN**
    **interest Ma Rosario Bueno Zaragoza,**       **SUPPORT OF DEFENDANTS' MOTION**
16                                                **FOR SUMMARY JUDGMENT**
                                  Plaintiffs,
17
         v.
18
19  **JEFFREY W. LYNCH, an individual, and**
    **DOES 1 through 30, inclusive,**
20
                                  Defendants.
21

22

23        I, D. Sykes, hereby declare:

24        1.    I have personal knowledge of the facts set forth in this declaration.  I am competent to

25  testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

26        2.    During the events at issue, I was employed by the California Department of

27  Corrections and Rehabilitation (CDCR) as a correctional officer at California State Prison,

28  Sacramento, which is located in Represa, California.  During the events at issue, I was assigned to

                                            1

the Facility B-8 Long Term Restricted Housing (LTRH) section. As a correctional officer in the LTRH, my duties included supervising inmates and maintaining order, and searching and escorting inmates to the various programs, activities, and services offered, including medical and mental health services, law library, educational services, recreation, and outside appointments and court dates. I was responsible for feeding inmates at their cells and conducting welfare checks on inmates within their cells every half hour. I was also responsible for escorting medical and non-custody staff through the LTRH when they needed to enter to interact with the inmates.

3.     Prior to December 12, 2019, I was unaware there was any serious risk that inmates Green, Taylor, or Rodriguez would harm inmate Aguilar; I was unaware of any reason why these three inmates would want to harm Aguilar; and I did not have any advance knowledge that Green, Taylor, or Rodriguez would attack Aguilar. I was also unaware about the December 5, 2019 incident where inmate Taylor escaped his restraints in the B-8 dayroom. I only learned about the December 5 incident after the December 12, 2019 incident occurred. I never spoke to Green, Taylor, or Rodriguez about a "test-run" or about only single-locking their restraints for a "test-run."

4.     On December 12, 2019, as part of my duties as a B-8 LTRH escort officer, I worked with Sergeant Calderon and Officers Herrera, Brennfleck, and Gomez in order to carry out the LTRH dayroom program that morning. As part of that process, Officers Herrera, Brennfleck, and I went from cell to cell to determine if any of the inmates confined in the LTRH wanted to come out of their cells and sit in the day room. For each inmate who wanted to be released to the dayroom, Officers Herrera, Brennfleck, and I would then perform an unclothed body and cavity search of that inmate, place the inmate in mechanical restraints, use a metal detector to check the inmate for contraband, escort them down from their cells to the dayroom area, and then restrain the inmate to one of the restart chairs in the dayroom area.

5.     On the morning of December 12, Aguilar, Rodriguez, and Taylor each separately indicated that they wanted to attend the dayroom, and we carried out the procedure described above for each inmate. I did not know in advance that Aguilar, Rodriguez, or Taylor would want

1   to attend the dayroom that morning, and I did not take any action during the selection process,

2   such as by releasing Aguilar first in order to enable or facilitate the attack on Aguilar.

3          6.      Officers Herrera, Brennfleck, and I performed an unclothed body search and a metal-

4   detector check on Rodriguez and Taylor before they were escorted down to the dayroom.  Our

5   unclothed body searches and metal-detector checks for Rodriguez and Taylor did not uncover any

6   contraband on their persons, and at the time, I believed that Rodriguez and Taylor did not have

7   any contraband on their bodies based on our searches.  If I had known or suspected that

8   Rodriguez and Taylor had any hidden contraband on them at that time, I would have performed

9   another search to locate that contraband.

10         7.      Officers Herrera, Brennfleck, and I also secured Rodriguez and Taylor in mechanical

11  waist and leg restraints before they were escorted down to the dayroom.  It appeared to me that

12  the mechanical restraints were applied correctly and double locked during that process.  I did not

13  knowingly or intentionally fail to double-lock Rodriguez's or Taylor's mechanical restraints in

14  order to enable or facilitate their attack on Aguilar or for any other reason.  I did not know and

15  had no reason to believe we had not successfully double-locked Rodriguez's and Taylor's

16  mechanical restraints before we escorted them from their cells to the dayroom area.  If I had

17  known or suspected that Rodriguez's or Taylor's mechanical restraints were not double-locked, I

18  would have double-checked their restraints and ensured they were double-locked.  In fact, shortly

19  after securing Taylor in mechanical restraints, I halted Taylor's escort to the dayroom in order to

20  confirm that Taylor's right leg restraint was properly double-locked.  We resumed escorting

21  Taylor to the dayroom after I re-restrained and double-locked Taylor's leg restraints.

22         8.      After Rodriguez, Taylor, and Aguilar were restrained to their respective restart chairs

23  with the black boxes applied, I exited the B-8 dayroom to attend to my other duties, along with

24  Sergeant Calderon and Officers Herrera and Brennfleck.  Officer Lieber, the control booth officer

25  on that day, closed the B-8 section door behind us after we exited the dayroom.

26         9.      Shortly after I exited the B-8 dayroom, at approximately 10:05 a.m., Sergeant

27  Calderon informed me that Rodriguez and Taylor were manipulating their restraints in their

28  restart chairs.  I did not observe Rodriguez and Taylor manipulating or escaping from their

3

1  restraints.  I first became aware that Rodriguez and Taylor were attempting to escape from their

2  restraints from Sergeant Calderon.  In response, I went and looked into B-8 from the rotunda

3  window, and I observed that Rodriguez and Taylor were out of their restraints and running up the

4  stairs towards Green's cell door.  I also observed as Rodriguez and Taylor ran down the stairs

5  toward the dayroom floor, Taylor approached the dayroom door in an aggressive manner, and

6  then Rodriguez and Taylor suddenly turned and ran towards Aguilar, who was still in his restart

7  chair, and began striking Aguilar.  Based on my training and understanding of CDCR policies and

8  procedures, I retrieved a plastic shield, assembled with additional staff members at the section

9  door, and waited for one of the supervising officers to issue the order to open the B-8 section door

10  and enter the unit.  I did not have any means to open the B-8 section door without Officer

11  Lieber's assistance in the control panel, and based on my training and experience, I did not

12  believe I had the authority to independently order Officer Lieber to open the B-8 section door.

13      10.    After Lieutenant Baker and other responding staff arrived, and after Rodriguez and

14  Taylor had stopped their attack and were lying prone on the ground, Lieutenant Baker gave the

15  order to open the B-8 section door and ordered me to cover Officer D. Harrington as he applied

16  restraints on Taylor.  I entered and placed a plastic shield on Taylor's upper back and torso while

17  Officer Harrington applied hand restraints on Taylor.  After securing Taylor, Officer Harrington

18  and I assisted Taylor to his feet and escorted him to the B-8 rotunda, where we were relieved by

19  other correctional staff.

20      11.    My actions on December 12, 2019, were based on my training and understanding of

21  CDCR policies and procedures, and I acted in good faith and to the best of my ability during this

22  incident.  I did not take any action, refrain from taking any action, or intentionally delay taking

23  any action to enable Taylor and Rodriguez's attack on Aguilar.  I did not have any prior

24  knowledge that there would be an attack on Aguilar, and if I had such knowledge, I would have

25  reported that information to my superiors and taken appropriate steps to ensure Aguilar's safety.

26      12.    I have never spoken with Taylor, Rodriguez, or Green about Aguilar.  I was never

27  asked by Taylor, Rodriguez, or Green, nor did I ever agree, to take Aguilar to dayroom first, to

28  only single-lock any of their restraints, or to ensure that the control booth officer did not use

4

1   lethal force.  I never heard Taylor, Rodriguez, or Green ask any other staff member, nor did I ever

2   hear any other staff member agree to take Aguilar to dayroom first, to only single-lock any of

3   their restraints, or to ensure that the control booth officer did not use lethal force.  I never told any

4   inmate that Aguilar was a sex offender.  I have never seen Green, Taylor, or Rodriguez making

5   weapons or using clipper heads to damage or modify items in their cells.  I did not bring any

6   inmate, including Green, Taylor, and Rodriguez, clipper heads or any other contraband.

7        13.   I have never had any conversations with Green, Taylor, Rodriguez, any inmate, or

8   any staff member in which I instructed or agreed to violate Aguilar's rights.  I have never

9   instructed any inmate or staff member or agreed with any inmate or any staff member to harm

10   Aguilar, or any other inmate.  I did not orchestrate or play any role in Aguilar's murder.  I am not

11   aware of any other staff members orchestrating or playing any role in Aguilar's murder.  Taylor,

12   Rodriguez, and Green are responsible for Aguilar's murder.

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1    I declare under penalty of perjury that the foregoing statements are true and correct.

2    Executed: January 23, 2025, at Sacramento, California.

3

4

5    _____/s/ D. Sykes_____

6    D. Sykes

7    (Original retained by counsel.)

8

9
     SA2022300303
10   Sykes Declaration.docx

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of D. Sykes in Supp. Of Defs.' Mot. Summ. J.  (2:21-cv-02294 TLN-JDP)