1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    MA ROSARIO BUENO ZARAGOZA, an
       individual; ESTATE OF LUIS
12    GIOVANNY AGUILAR, deceased, by his          No. 2:21-cv-02294-TLN-JDP
       successor-in-interest Ma Rosario Bueno
13    Zaragoza,

14              Plaintiffs,                         **ORDER**

15

16        v.

17    JEFFREY W. LYNCH, an individual; et
       al.,
18
                Defendants.
19

20

21         This matter is before the Court on Defendants' Motion for Summary Judgement. (ECF

22    No. 84.)  Plaintiffs filed an opposition.  (ECF No. 86.)  Defendants filed a reply.  (ECF No. 94.)

23    For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

24    ///

25    ///

26    ///

27    ///

28    ///

                                              1

1    **I.    FACTUAL AND PROCEDURAL BACKGROUND**[1]

2          This case arises from the fatal attack on Luis Giovanny Aguilar ("Aguilar") by fellow

3    inmates Cody Taylor ("Taylor") and Anthony Rodriguez ("Rodriguez") in the California State

4    Prison, Sacramento's Long Term Restricted Housing (LTRH) unit dayroom.

5          On December 12, 2019, Aguilar was murdered by Taylor and Rodriguez with the help of a

6    third inmate, Dion Green ("Green"), while housed in a security housing unit (SHU) called the

7    LTRH.  (ECF No. 86-2 ¶ 1.)  The LTRH unit began operation in 2019 and was designed to house

8    inmates who had committed disciplinary violations while in prison and were sentenced to serve a

9    SHU term, but who were diagnosed with psychiatric disorders and required access to mental

10   health services.  (*Id.* ¶ 12.)  The LTRH unit was located in B-facility, Building 8, and was divided

11   into three sections that each had two levels or "tiers" of ten cells and housed between twenty and

12   forty inmates.  (*Id.* ¶ 16.)  One officer was assigned to the control booth of Building 8, four

13   officers were assigned to the floor, and a sergeant was on duty for each shift.  (*Id.* ¶ 17.)  A

14   lieutenant was assigned to supervise the entire B-facility, including the LTRH unit.  (*Id.* ¶ 17.)

15         Inmates housed in the LTRH unit were generally confined to their cells but were required

16   to be offered at least three and a half hours per week of out-of-cell activity in the LTRH dayroom.

17   (*Id.* ¶ 31.)  Those who chose to attend the dayroom were subjected to an unclothed body search,

18   scanned with a metal detector, restrained, and escorted to the dayroom floor where they were

19   secured in "restart chairs," metal desks bolted to the floor with plexiglass dividers.  (*Id.* ¶ 33.)

20   Inmates were secured to their restart chairs by a metal bar locked around their leg restraints.  (*Id.*

21   ¶ 34.)

22         On October 10, 2019, Taylor and Rodriguez were participating in out-of-cell time in the

23   dayroom when they escaped their restraints and stabbed inmate Michael Britt.  (*Id.* ¶ 48.)  Green

24   claimed he had ordered the attack.  (*Id.* ¶ 50.)  On December 5, 2019, Taylor escaped his dayroom

25   restraints again, ascended the stairs to the second tier to Green's cell, returned to his chair, and

26   put his restraints back on.  (ECF No. 86-1 at 202–04; ECF No. 96 (sealed exhibit).)

27

28   [1]    The following facts are undisputed unless otherwise noted.

1     After the attack on Michael Britt, the LTRH implemented "black boxes" on the leg

2 restraints used in the dayroom.  (ECF No. 84-9 at 3–4.)  Black boxes are hard plastic or metal

3 devices that close and lock over the keyhole to the restraints, preventing inmates from accessing

4 the keyhole to pick the locking mechanism.  (ECF No. 86-2 ¶ 52.)

5     On December 12, 2019, Defendant Officer William Lieber ("Lieber"), who was employed

6 by the California Department of Corrections and Rehabilitation (CDCR) as a relief officer for the

7 control booth in a different facility of California State Prison, Sacramento, was assigned to the

8 LTRH unit.  (ECF No. 84-5 at 2–3; ECF No. 86-2 ¶ 10.)  Lieber was in the control booth

9 providing coverage while Defendant Officers Phillip Brennfleck ("Brennfleck"), Jose Gomez

10 ("Gomez"), Guillermo Herrera ("Herrera"), and Desmond Sykes ("Sykes"), and Defendant

11 Sergeant David Calderon ("Calderon"), searched and escorted Aguilar, Rodriguez, and Taylor to

12 the dayroom.  (ECF No. 86-2 ¶¶ 57–58.)  After the three inmates were secured in their chairs, the

13 officers and sergeant exited the dayroom and Lieber closed the section door.  (*Id.* ¶ 60.)  Shortly

14 thereafter, Lieber observed Rodriguez and Taylor manipulating their restraints.[2]  (*Id.* ¶ 61.)

15 Lieber notified staff at the floor level through ports on the control booth floor that Taylor and

16 Rodriguez were manipulating their restraints.[3]  (*Id.* ¶ 61.)  Lieber testified that the individual he

17

18 [2]     Plaintiffs dispute "what Lieber saw and when and his failures in his post duties" but fail to
put forward sufficient evidence substantiating a dispute.  (ECF No. 86-2 ¶ 61.)  Plaintiffs cite to
19 Lieber's testimony, which is consistent with Defendants' description, and videos that do not
contain sound or a visual on Lieber and thus do not evidence Lieber's conduct.  (*Id.* ¶ 61.)
20

21 [3]     Plaintiffs submit the Declaration of Roger Clark in support of their opposition to
Defendants' motion.  (ECF No. 86-3.)  Clark, a twenty-seven-year veteran of the Los Angeles
22 County Sheriff's Department, declares to offer expert opinion based in part on his training,
professional experience, and education.  (*Id.* at 2.)  Clark reviewed a variety of materials from this
23 case including depositions, investigation and policy documents, and surveillance videos.  (*Id.* at
3.)  Clark does not claim to have been present at the attack on Aguilar but offers testimony
24 purporting to describe the events that took place.  (*Id.* at 23–35.)  The Court will consider Clark's
declaration to the extent he provides expert opinion or presents materials, such as records from
25 the Investigative Services Unit investigation, that may be admissible in evidence.  The Court will
not credit Clark's account of events that he did not witness or otherwise have personal knowledge
26 of.  The Court will not credit Clark's statement that Lieber "watched the inmates pick their
restraints until they freed themselves for two minutes," as evidence of what in fact transpired.
27 Fed. R. Civ. P. 54(e); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial
court can only consider admissible evidence in ruling on a motion for summary judgment.").

28

1   notified was Defendant Officer Henry Chavez ("Chavez").  (ECF No. 84-1 at 140–42.)  Lieber

2   then returned to the control panel and saw Taylor and Rodriguez had escaped their restraints,

3   were out of their chairs, and Rodriguez had ascended the stairs to the second tier where it

4   appeared Green had slid an object or objects under his cell door.  (ECF No. 84-5 at 4; ECF No.

5   86-2 ¶ 61.)

6          Calderon had been talking to Sykes in the rotunda area of the building when Caldron

7   looked into the LTRH dayroom and saw Taylor and Rodriguez were out of their restraints, Taylor

8   was on the stairwell, and Rodriguez was heading to the second tier.  (ECF No. 86-2 ¶ 62.)

9   Calderon immediately notified the officers in the unit and gathered with Brennfleck, Gomez,

10  Herrera, and Sykes to assess the situation and prepare to respond.  (*Id.* ¶ 62.)  Lieber began

11  opening the door to allow staff to enter the dayroom, but Calderon shouted to close the door and

12  Lieber immediately did so.  (*Id.* ¶ 65.)

13         As the door was closing, Rodriguez returned to the dayroom floor, handed an object to

14  Taylor, and the two ran towards Aguilar and began to strike him with what turned out to be

15  inmate manufactured weapons.  (*Id.* ¶ 68.)  Lieber activated his alarm and ordered Rodriguez and

16  Taylor to get down on the ground.  (*Id.* ¶ 70; ECF No. 84-5 at 5.)  When Rodriguez and Taylor

17  did not obey, Lieber fired a direct impact round from his 40-millimeter launcher, striking

18  Rodriguez in the back.  (ECF No. 86-2 ¶ 70; ECF No. 84-5 at 5.)  Taylor and Rodriguez hid

19  behind the restart chairs and continued to intermittently stab Aguilar.  (ECF No. 86-2 ¶ 71.)

20  Lieber fired two additional direct impact rounds from the 40-millimeter launcher while staff

21  issued verbal orders and prepared to enter the unit.  (*Id.* ¶ 71.)

22         Lieutenant Eric Baker ("Baker") arrived to see staff gathered in front of the section door,

23  Taylor and Rodriguez pacing around the dayroom, and Aguilar appearing unconscious and

24  covered in blood.  (*Id.* ¶ 72.)  Baker called for an ambulance and ordered Taylor and Rodriguez to

25  get on the ground.  (*Id.* ¶ 72.)  Taylor moved towards Aguilar and Lieber fired a fourth direct

26  impact round, striking Taylor in the hand.  (*Id.* ¶ 73.)  Baker issued another order for Rodriguez to

27  move closer to the dayroom door and lay down, to which Rodriguez complied.  (*Id.* ¶ 74.)  Baker

28  quickly formulated a tactical plan, assigned roles to staff, ordered Lieber to open the section door,

1    and staff entered to secure Rodriguez and Taylor and provide aid to Aguilar.  (*Id.* ¶ 75.)

2    Immediately after Aguilar was killed, the Investigative Services Unit (ISU) initiated an

3    investigation and searched Rodriguez, Taylor, and Green's cells.  (*Id.* ¶¶ 195, 197.)  ISU

4    recovered contraband from each cell, including metal pieces shaped like an "E," longer metal

5    shims, and other pieces of metal.  (*Id.* ¶ 198; ECF No. 86-1 at 302–04.)

6    Rodriguez and Green later claimed staff were involved in Aguilar's murder.  (ECF No.

7    86-2 ¶ 76.)  Though Rodriguez and Green provide conflicting testimony, they implicate Baker,

8    Brennfleck, Gomez, and Sykes and allege an agreement to bring Aguilar to the dayroom, not

9    double lock the restraints, and not use lethal force from the control booth.  (*Id.* ¶¶ 77–90.)

10   Rodriguez and Green both testified that they recognized the regular officer was not in the control

11   booth but did not speak to officers about it and continued their plan without confirming whether

12   the replacement control booth officer would use only less-lethal force.  (*Id.* ¶ 90.)

13   Plaintiffs Ma Rosario Bueno Zaragoza and Estate of Luis Giovanny Aguilar ("Plaintiffs")

14   initiated this action on December 10, 2021.  (ECF No. 1.)  Plaintiffs filed the operative Third

15   Amended Complaint (TAC) on May 11, 2022, asserting the following claims pursuant to 42

16   U.S.C. § 1983 against thirteen individual defendants and Doe 1: (1) failure to protect; (2) failure

17   to intervene; (3) cruel and unusual punishment; (4) conspiracy to violate civil rights; (5) failure to

18   train and supervise; (6) interference with familial relationship/substantive due process; and (7)

19   excessive force.  (ECF No. 33.)  The Court subsequently dismissed Defendants Carothers,

20   Garland, and Jordan, as well as Plaintiffs' excessive force claim pursuant to the parties'

21   stipulation.  (ECF No. 81.)  The remaining defendants are Baker, Brennfleck, Calderon, Chavez,

22   Gomez, Herrera, Lieber, Lynch, Sergeant Matthew Saavedra ("Saavedra"), Sykes, and Doe 1

23   (collectively, "Defendants").  Defendants filed the instant motion for summary judgment on

24   January 23, 2025.  (ECF No. 84.)

25   **II.    STANDARD OF LAW**

26   Summary judgment is appropriate when the moving party demonstrates no genuine issue

27   as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

28   R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The moving party bears

1  the initial responsibility of informing the court of the basis of its motion and identifying the

2  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

3  together with affidavits, if any," that it believes demonstrate the absence of a genuine issue of

4  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party

5  will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may

6  properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and

7  admissions on file." *Id.* at 324 (quotations omitted). Summary judgment should be entered

8  against a party who does not make a showing sufficient to establish the existence of an element

9  essential to their case, and on which that party will bear the burden of proof at trial. *Id.* at 322.

10     If the moving party meets its initial responsibility, the burden then shifts to the opposing

11  party to establish that a genuine issue as to any material fact does exist. *Matsushita Elec. Indus.*

12  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv.*

13  *Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of a factual dispute,

14  the opposing party may not rely upon the denials of its pleadings but is required to tender

15  evidence of specific facts in the form of affidavits and/or admissible discovery material. Fed. R.

16  Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a

17  fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby,*

18  *Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., "the evidence is such that a

19  reasonable jury could return a verdict for the nonmoving party." *Id.* at 251–52.

20     In the endeavor to establish the existence of a factual dispute, the opposing party need not

21  establish a material issue of fact conclusively in its favor. *Id.* at 249. It is sufficient that "the

22  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

23  versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose

24  of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether

25  there is a genuine need for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule

26  56(e) Advisory Committee Notes (1963)).

27     In resolving a summary judgment motion, the court examines the pleadings, depositions,

28  answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed.

R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in their favor. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). The court relies "on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Finally, to demonstrate a genuine issue that necessitates a trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz.*, 391 U.S. at 289).

### III.  ANALYSIS

Defendants seek summary judgment on all claims as to all or a subset of defendants under Federal Rule of Civil Procedure ("Rule") 56 and based of qualified immunity, except to the extent any claim is based on an alleged conspiracy.[4] (ECF No. 84 at 2.) Defendants concede that whether Defendants Baker, Brennfleck, Gomez, and Sykes engaged in a conspiracy is a question of fact that rests on the credibility of the inmates who murdered Aguilar. (ECF No. 84-1 at 8.) The Court considers Plaintiffs' claims in turn.

#### A.  Failure to Protect and Cruel and Unusual Punishment

Defendants seek summary judgment on Plaintiffs' failure to protect (Claim One) and cruel and unusual punishment (Claim Three) claims against Officers Chavez, Herrera, and Lieber, and

---

[4]     While Defendants' Notice does not list claims against Gomez (ECF No. 84 at 2), this appears to be a typographical error and Defendants seek summary judgment on claims against Gomez in the same way they do for Baker, Brennfleck, and Sykes (*see* ECF No. 84-1 at 21, 24, 30, 36). Plaintiffs oppose summary judgment on claims against Gomez. (ECF No. 86 at 4, 10, 20, 22, 24.) The Court thus construes Defendants' motion as seeking summary judgment on the failure to protect, failure to intervene, cruel and unusual punishment, and substantive due process claims against Gomez.

1    Sergeants Calderon and Saavedra because there is no evidence they were deliberately indifferent

2    to inmates' safety in running the LTRH unit.  (ECF No. 84-1 at 17–18.)  Defendants took

3    reasonable steps to prevent Taylor and Rodriguez from escaping, and there is no evidence

4    Defendants knew of any risk of serious harm to Aguilar.  (*Id.* at 18–21.)  Defendants also ask the

5    Court to dismiss the First and Third claims against Lieutenant Baker and Officers Brennfleck,

6    Gomez, and Sykes "to the extent they are premised on anything other than the allegations that

7    they participated in or facilitated the attack."[5]  (*Id.* at 21.)

8        In opposition, Plaintiffs appear to argue that Defendants acted with deliberate indifference

9    in failing to conduct regular cell searches or audit cell search logs.  (ECF No. 86 at 15, 21.)

10   Plaintiffs also contend Defendants were on notice that inmates were regularly escaping their

11   dayroom restraints, but implementing black boxes was "too little, too late," and Defendants

12   should have known that placing Aguilar in the dayroom could lead to serious violence against

13   him.  (*Id.* at 10–11, 21–22.)  Plaintiffs also argue Chavez should have responded to Lieber's alert,

14   and Lieber should have taken other actions during the attack on Aguilar.  (*Id.* at 15–17.)

15       In reply, Defendants argue Plaintiffs' TAC does not allege any failures related to cell

16   searches, and Plaintiffs cannot raise a new theory of liability in an opposition to summary

17   judgment.  (ECF No. 94 at 3–4.)  Nevertheless, Defendants maintain that neither these failures

18   nor Chavez or Lieber's inaction constitute deliberate indifference.  (*Id.* at 5–9.)

19       "The Eighth Amendment requires prison officials to protect inmates from violence."  *Wilk*

20   *v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 833

21   (1994)).  "It is not, however, every injury suffered by one prisoner at the hands of another that

22   translates into constitutional liability for prison officials responsible for the victim's safety."

23   *Farmer*, 511 U.S. at 834.  Instead, "[t]he failure of prison officials to protect inmates from attacks

24   by other inmates may rise to the level of an Eighth Amendment violation when: (1) the

25   _____

26   [5]      Defendants make similar requests to dismiss the Second, Fourth, Fifth, and Sixth causes
     of action against Baker, Brennfleck, Gomez, and Sykes "to the extent" the claims are or are not

27   based on particular theories of liability.  (ECF No. 84-1 at 21, 24, 27, 30; ECF No. 94 at 3.)
     Though the Court does not discuss the request directly, the matter is addressed through the

28   Court's outline of the claims and theories that will proceed in its Order below.

1    deprivation alleged is 'objectively, sufficiently serious' and (2) the prison officials had a

2    'sufficiently culpable state of mind,' acting with deliberate indifference." *Hearns v. Terhune*, 413

3    F.3d 1036, 1040 (9th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834). Both elements are questions

4    of fact, "and as such must be decided by a jury if there is any room for doubt." *Lemire v.*

5    *California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075–76, 1078 (9th Cir. 2013).

6         The objective "sufficiently serious deprivation" element requires a showing that the

7    inmate "is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511

8    U.S. at 834. "[I]t is enough for the inmate to demonstrate that he was exposed to a substantial

9    risk of some range of serious harms; the harm he actually suffered need not have been the most

10   likely result among the range of outcomes." *Lemire*, 726 at 1076. It also "does not matter

11   whether the risk comes from a single source or multiple sources," nor does it matter whether the

12   inmate faced a risk "for reasons personal to him or because all prisoners in his situation face such

13   a risk." *Id.* (quoting *Farmer*, 511 U.S. at 843).

14        The subjective "deliberate indifference" element requires a showing that "the official is

15   subjectively aware of a substantial risk of serious harm to an inmate and disregards that risk by

16   failing to respond reasonably." *Wilk*, 956 F.3d at 1147. To be subjectively aware, it is not

17   enough that an official is merely "aware of facts from which the inference could be drawn that a

18   substantial risk of serious harm exists, . . . he must also draw the inference." *Farmer*, 551 U.S. at

19   837. While this "entails something more than mere negligence . . . it is satisfied by something

20   less than acts or omissions for the very purpose of causing harm or with knowledge that harm will

21   result." *Id.* at 835. Deliberate indifference can be established through an "inference from

22   circumstantial evidence" or "from the very fact that the risk was obvious." *Id.* at 842. "For

23   example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of

24   inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison

25   officials in the past, and the circumstances suggest that the defendant-official being sued had been

26   exposed to information concerning the risk and thus must have known about it, then such

27   evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual

28   knowledge of the risk." *Id.* at 842–43 (citation omitted). As with the objective element, the

1    inquiry here is whether an official was subjectively aware of a substantial risk of serious harm not

2    to the inmate specifically, but to someone in the inmate's situation.  *Lemire*, 726 F.3d at 1077–78.

3         Finally, plaintiffs alleging deliberate indifference under the Eighth Amendment must also

4    demonstrate the defendants' actions were both an actual and proximate cause of their injuries.  *Id.*

5    at 1074.

6         The parties' briefing discuss three bases for Plaintiffs' duty to protect claim: (1) failure to

7    conduct cell searches and audit cell search logs; (2) LTRH dayroom policy and protocol; and (3)

8    Chavez and Lieber's responses to the attack on Aguilar.[6]  The Court considers each in turn.

9                          *i.     Cell Searches*

10        As an initial matter, while the Court agrees with Defendants that Plaintiffs' arguments

11   about cell searches and cell search logs go beyond the TAC, the Court will consider them for

12   purposes of this motion.  There is no indication Plaintiffs acted in bad faith in not seeking to

13   amend the TAC and Defendants do not claim to be prejudiced or that they lacked prior notice.[7]

14   (ECF No. 94 at 3–4.)  The Court will construe the TAC to conform to the evidence and arguments

15   and evaluate Plaintiffs' claim on the merits.  *Desertrain v. City of Los Angeles*, 754 F.3d 1147,

16   1154 (9th Cir. 2014) (holding that where a plaintiff raises a new issue in opposition to a motion

17   for summary judgment, the court should construe the matter raised as a Rule 15(b) request to

18   amend the pleadings); *see also Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (listing

19   the five factors for assessing the propriety of leave to amend).  The Court understands Plaintiffs to

20   advance the failure to conduct cell searches or audit cell search logs as a new theory against all

21

22   ⁶    Plaintiffs' opposition does not present argument on the cruel and unusual punishment
     claim (Claim Three) independent from the failure to protect claim (Claim One).  The Court
23   therefore considers these claims together for purposes of this motion.

24   ⁷    The Court notes Defendants' opposition to Plaintiffs raising a new issue relies on
     abrogated Eleventh Circuit caselaw.  (ECF No. 94 at 4 (citing *Gilmour v. Gates, McDonald &
25   Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781
     (7th Cir. 1996), *abrogated by Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489–90 (7th Cir. 2023)
26   ("In sum, a district court retains discretion to treat new claims presented for the first time in
     briefing as a constructive motion to amend."))).)  Additionally, *Pickern v. Pier 1 Imports (U.S.),
27   Inc.*, 457 F.3d 963 (9th Cir. 2006) is distinguishable because there the appellees had no prior
     notice of new factual allegations.  The Court was unable to locate Defendants' final case cited.
28

1    Defendants except Chavez and Leiber.  (ECF No. 86 at 15, 18–20, 23–24.)  Although Lynch was

2    not named in Plaintiffs' failure to protect, failure to intervene, or cruel and unusual punishment

3    claims, the Court will construe the TAC to conform to Plaintiffs' argument against him.  (*See*

4    *generally* ECF No. 33.)  This consideration will not prejudice Lynch because as discussed below,

5    the Court grants Defendants' motion for summary judgment as to all claims against him.

6        Turning to the merits, Plaintiffs have put forward sufficient evidence from which a

7    reasonable factfinder could find Calderon and Saavedra ("Sergeant Defendants") failed to ensure

8    Rodriguez, Taylor, and Green's cells were searched, their failure subjected Aguilar to a

9    substantial risk of serious harm, and they were deliberately indifferent to that risk.  Plaintiffs fail

10   their burden to establish the same as to Brennfleck, Gomez, Herrera, and Sykes ("Officer

11   Defendants"),[8] Baker ("Lieutenant Defendant"), and Lynch ("Warden Defendant").  Turning first

12   to the objective element of the failure to protect claim, Plaintiffs' evidence demonstrates

13   employees were concerned about inmates getting out of their mechanical restraints in the LTRH

14   dayroom.  (ECF No. 86-1 at 194–96.)  There is no dispute that Rodriguez and Taylor escaped

15   their restraints and attacked Michael Britt on October 10, 2019, or Green's claimed involvement.

16   (ECF No. 86-2 ¶¶ 48–50; ECF No. 96 (sealed exhibit).)  There is also no dispute that Taylor

17   escaped his restraints again on December 5, 2019.  (ECF No. 86-1 at 202–04; ECF No. 96 (sealed

18   exhibit).)  Defendants' declarations and Plaintiffs' evidence confirm that prior to the attack on

19   Aguilar, all except Lieber (ECF No. 84-5 at 3) were aware of prior escapes.  (ECF No. 84-6 at

20   10–11 (Baker); ECF No. 84-7 at 5 (Lynch); ECF No. 84-8 at 2 (Brennfleck); ECF No. 84-9 at 3–4

21   (Calderon); ECF No. 84-10 (Chavez); ECF No. 84-11 at 2 (Gomez); ECF No. 84-12 at 2

22   (Herrera); ECF No. 84-13 at 2 (Saavedra); ECF No. 86-3 at 11 (Sykes).)

23       Despite the concerns and knowledge of actual incidents of escape, Plaintiffs' evidence

24   shows that cell searches at the LTRH unit were infrequent, cursory, or not done at all.  (ECF No.

25   86-1 at 238–39, 267–69.)  LTRH Operating Procedure required officers to search inmates' cells

26

27   [8]    Although Defendants Lieber and Chavez were also officers, because Plaintiffs' claims
     against Lieber and Chavez are based on different theories, the Court uses the term "Officer
28   Defendants" as the collective reference for Brennfleck, Gomez, Herrera, and Sykes only.

1  prior to their placement into or departure from a cell and conduct a minimum of three cell

2  searches per shift, with no cell going an entire month without being searched at least once.  (ECF

3  No. 86-1 at 13.)  Officers were also required to record searches in the unit's cell search logbook.

4  (*Id.* at 64, 68.)  At the time of the incident, there were no procedures in place to ensure each

5  inmate's cell was searched at least once a month other than cell search logs.  (*Id.* at 125–26.)

6       One of the many reasons to conduct a cell search was for security.  (*Id.* at 125.)  For

7  example, if during a cell search it appeared an inmate had been cutting metal from a shelving unit

8  or bunk, that could indicate a weapon being made.  (*Id.* at 125, 272–73.)  Officers were to make

9  random cell searches for contraband, potential weapons, and other security violations.  (*Id.* at 68.)

10      Sufficient evidence exists for a reasonable factfinder to find that no cell searches were

11  conducted for Rodriguez, Taylor, and Green in the months leading up to the attack on Aguilar.

12  Records from August to December of 2019 indicate Rodriguez's cell was searched on August 16,

13  2019; October 10, 2019, the day of the attack on Michael Britt; and December 12, 2019, after the

14  attack on Aguilar.  (*Id.* at 241, 293–94; ECF No. 86-2 ¶ 181.)  The evidence indicates that during

15  this same period, Taylor's cell was never searched, and Green's cell was only searched on

16  December 12, 2019, after the attack on Aguilar.  (ECF No. 86-1 at 295; ECF No. 86-2 ¶¶ 182–

17  83.)  The evidence presents a triable issue of fact as to whether the failure to search inmates'

18  cells, and specifically those with a history of escaping their restraints and involvement in attacks,

19  created an objectively substantial risk of harm to LTRH unit inmates like Aguilar.

20      With respect to the subjective element, the Court finds a genuine issue of fact as to

21  whether Sergeant Defendants acted with deliberate indifference to said risk of harm.  Plaintiffs

22  put forward no direct evidence that any defendant was subjectively aware of the lack of cell

23  searches or the risk that followed, and circumstantial evidence only implicates Sergeant

24  Defendants.  The defendants in this case held positions as Floor and Escort Officers (Brennfleck,

25  Chavez, Gomez, Herrera, and Sykes), Sergeants (Calderon and Saavedra), Lieutenant (Baker),

26  and Warden (Lynch).  The LTRH Post Orders for Escort Officers and Floor Officers instruct

27  officers to perform a minimum of three cell searches during their shifts and to record these

28  searches in the unit logbook.  (ECF No. 86-1 at 64, 68–69, 75.)  The LTRH Post Order for

Sergeants provides that sergeants are responsible for monitoring all internal auditing systems that pertain to cell search logs.  (*Id.* at 58.)  Sergeants are also required to "[e]nsure daily Inspection/Inventory/Cell Search/Exhibit b logs are reviewed for completeness and initial indicating so."  (*Id.* at 59.)  Sergeants are to "[a]udit all pertinent unit logs" at the 0635 hour of their shift.  (*Id.* at 60.)  Sergeants Calderon and Saavedra confirmed their knowledge of the cell search policy and their post order requirements.  (*Id.* at 259, 266–67.)  While lieutenants are responsible for supervising staff and inmates, the LTRH Post Order for Lieutenants does not mention cell searches and Lieutenant Baker did not consider reviewing cell search logbooks to be a lieutenant's duty.  (*Id.* at 54–55, 121–22.)  Similarly, while the warden is responsible for the overall operations of California State Prison, Sacramento, Warden Lynch was not involved in day-to-day implementation or execution of policy.  (*Id.* at 89; ECF No. 84-7 at 2.)

The evidence presented is sufficient for a reasonable jury to find Sergeant Defendants were aware that Rodriguez, Taylor, and Green's cells were not searched in the months leading up to the attack on Aguilar because their position required them to review cell search logs showing which inmates' cells were searched.  However, the limited information before the Court – post orders, operating procedure, and sworn statements – only supports this finding as to those in the position of Sergeant Defendants.  Plaintiffs present no evidence from which a reasonable jury could find that any individual officer knew what cells their fellow officers had or had not searched.  Nor is there evidence from which a reasonable jury could find the lieutenant or warden knew searches were not being conducted in accordance with policy.

Based on the evidence establishing cell searches were a matter of security, a reasonable jury could find Sergeant Defendants knew the failure to search Rodriguez, Taylor, and Green's cells created a risk that inmates like Aguilar could be harmed, and Sergeant Defendants disregarded that risk by failing to ensure their cells were searched.  As for proximate cause, the evidence is sufficient for a reasonable jury to find that if officers had searched Rodriguez, Taylor, and Green's cells, officers would have found the manufactured weapons and metal shims used in their escape given that the ISU recovered similar contraband during their investigation after the attack.  Plaintiffs have thus met their burden to establish a triable issue of fact as to whether

1    Sergeants Calderon and Saavedra acted with deliberate indifference.  Plaintiffs fail their burden

2    with respect to the remaining defendants.

3         Defendants' reply cites *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) and *Cousins v.*

4    *Lockyear*, 568 F.3d 1063 (9th Cir. 2009), to argue Defendants were not deliberately indifferent

5    even if they "should have known" of a risk to Aguilar's safety.  (ECF No. 94 at 6.)  However, this

6    Court's determination is not based on what Defendants should have known.  It follows from

7    finding a reasonable jury could infer from circumstantial evidence that Sergeant Defendants had

8    actual knowledge of the risk to those in Aguilar's position.  *Farmer*, 551 U.S. at 842–43.  Further,

9    unlike in the cases cited, the basis for liability is not Defendants' failure to follow procedure,

10   which in and of itself does not establish a violation of constitutional rights.  *See Peralta*, 744 F.3d

11   at 1087; *Cousins*, 568 F.3d at 1070.  Liability follows from what their failure to follow procedure

12   infers about their subjective knowledge.  *Lemire*, 726 F.3d at 1077 ("Although such standards do

13   not set the constitutional minimum for prison conditions, a jury could consider these guidelines to

14   determine whether the circumstances . . . presented an objectively substantial risk[.]")

15        For these reasons, Defendants' Motion for Summary Judgment on Plaintiffs' failure to

16   protect (Claim One) and cruel and unusual punishment (Claim Three) claims against Calderon

17   and Saavedra for their conduct related to cell searches is DENIED.  The motion is GRANTED as

18   to all other defendants on this theory.

19                   *ii.     LTRH Dayroom Policy and Protocol*

20        Defendants meet their burden of establishing that no genuine issue of material fact exists

21   and entitlement to judgment as a matter of law on the theory that Defendants acted with deliberate

22   indifference in operating the LTRH dayroom.  Plaintiffs provide no evidence or substantive

23   argument to the contrary and submit only a few conclusory statements about the LTRH dayroom.

24   While it is unclear from Plaintiffs' opposition whether Plaintiffs intend to proceed with this claim,

25   the Court considers those statements below.

26        The LTRH unit was opened pursuant to a directive from CDCR headquarters and run

27   according to Operating Procedure 046.  (ECF No. 86-2 ¶¶ 14–15.)  Operating Procedure 046

28   covered topics including inmate placement and movement, supervision, and security measures.

1   (ECF No. 86-1 at 7–39.)  Plaintiffs assert that "Brennfleck, Gomez, Sykes, Herrera, and Calderon,

2   understood that placing Mr. Aguilar in a dayroom cuffed to a chair with inmates with a history of

3   removing their restraints and attacking people could lead to serious violence against him," and

4   "[s]ubstantial evidence would support such a finding here."  (ECF No. 86 at 22.)  However,

5   Plaintiffs provide no citation to evidence, and this contention is undermined by Plaintiffs'

6   acceptance of the fact that: (1) Aguilar was correctly placed in the LTRH unit; (2) participation in

7   the dayroom was voluntary; (3) staff asked each inmate whether they wanted to be brought to the

8   dayroom that day and did not know ahead of time who would want to go to the dayroom on any

9   given day; and (4) inmates could refuse or request to be brought back to their cells at any time.

10  (ECF No. 86-2 ¶¶ 13, 32.)  There is no evidence to suggest Brennfleck, Gomez, Sykes, Herrera,

11  or Calderon had a role in Aguilar's participation in the dayroom on the day of the attack.

12       The parties do not dispute what black boxes are or the fact that they are frequently used

13  and relied upon in correctional settings.  (*Id.* ¶¶ 52–53.)  Defendants argue and submit evidence

14  establishing that implementation of the black boxes was a reasonable response following the

15  attack on Michael Britt.  (*Id.* ¶ 54; ECF No. 84-1 at 18–19.)  Plaintiffs agree the "black boxes

16  were a reasonable response," but claim they came "too little too late[.]"  (ECF No. 86-2 ¶ 54.)

17  Plaintiffs do not explain what this means.  That officers may have intentionally failed to double

18  lock inmates' cuffs in order to bypass the security feature of the black boxes as part of an alleged

19  conspiracy does not on its own, and particularly without evidence, call into question whether the

20  decision to implement black boxes was a reasonable response to the risk of future escapes.

21       Plaintiffs fail to establish a genuine issue of material fact, and the Court finds judgment as

22  a matter of law is warranted.  Defendants' Motion for Summary Judgment on Plaintiffs' failure to

23  protect (Claim One) and cruel and unusual punishment (Claim Three) claims against all

24  Defendants for their operation of the LTRH dayroom is GRANTED.

25                    *iii.      Response to the Attack on Aguilar*

26       Plaintiffs' final theory is that Lieber and Chavez acted with deliberate indifference in their

27  response to the attack on Aguilar.  Here, Defendants meet their burden for summary judgment as

28  to Lieber, but Plaintiffs have established a triable issue of material fact as to Chavez.

                                           15

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845. The Supreme Court addressed the reasonableness of a prison official's response to an ongoing security incident in *Whitley v. Albers*, 475 U.S. 312 (1986). There, "[t]he Court noted that a prison official has a duty to protect prison employees, visitors, and the inmates themselves, and it recognized the difficult balance that this duty may entail." *Jeffers v. Gomez*, 267 F.3d 895, 917–18 (9th Cir. 2001) (describing *Whitley*, 475 U.S. at 320.) When unrest and conflict occur, "the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' carries special weight," and "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Whitley*, 475 U.S. at 321–22 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14 (1981) and *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)) (modifications in original). However, that deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.* at 322. The evidence thus must "go beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.* "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain," an officer's conduct cannot be characterized as cruel and unusual punishment. *Id.* at 322.

With respect to Lieber's conduct in response to the attack on Aguilar, Plaintiffs fail to establish a genuine issue of material fact and Defendants are entitled to judgment as a matter of law. Plaintiffs do not dispute what actions Lieber took.[9] (ECF No. 86-2 ¶¶ 61–62, 65, 70–71, 73,

---

[9]    See *supra*, footnotes 2–3.

75.)  The only issue Plaintiffs raise is the amount of time that transpired before Lieber began to act.  (*Id.* ¶ 61.)  Though this fact is material, the dispute is not genuine because Plaintiffs provide no evidence from which a reasonable jury could find Lieber "watched the inmates pick their restraints until they freed themselves for two minutes," presumably doing nothing in that time.  (*Id.* ¶¶ 61, 234–38.)  Plaintiffs claim this account to be true "[p]er [Lieber's] incident report and his testimony," but do not provide said report or testimony.  (*Id.* ¶ 61.)  Plaintiffs do not cite to an incident report, testimony, or other evidence in the record.  As the nonmoving party, Plaintiffs must "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan*, 91 F.3d at 1279.  Here, Plaintiffs fail to put forth sufficient evidence to create a genuine dispute as to the actions Lieber took in response to the attack.

Plaintiffs' primary argument, however, is that Lieber's response was unreasonable.  (ECF No. 86 at 15–17.)  As detailed above, the evidence establishes that Lieber notified staff at the floor level when he observed Rodriguez and Taylor manipulating their restraints.  When Lieber returned to the control panel, he observed staff gathering outside the section door, began opening the door to allow them to enter the LTRH dayroom, and closed the door on Calderon's command.  Lieber activated his alarm when Rodriguez and Taylor began attacking Aguilar, ordered them to get down on the ground, and fired four direct impact rounds from his 40-millimeter launcher.  Instead, Plaintiffs argue Lieber should have shouted commands at Taylor and Rodriguez earlier, activated his alarm before the stabbing began, pointed the Mini-14 rifle, and used deadly force.  (ECF No. 86 at 15–17.)  But this position is a dispute over reasonableness.  Plaintiffs do not describe how a reasonable jury could infer bad faith or wantonness in the infliction of pain from the undisputed facts.  Without facts or an explanation to the contrary, the Court finds Plaintiffs have not met their burden and Lieber's actions are therefore afforded deference.[10]  *Whitley*, 475 U.S. at 321–22 (discussing deference).  For these reasons, summary judgment is appropriate.

---

[10]    Though the Court does not entertain Plaintiffs' argument about alternate actions, the Court finds it notable that while Plaintiffs claim Lieber was justified to use deadly force, Plaintiffs do not respond to Lieber's statement that he did not believe it was appropriate to deploy deadly force at any time because of the substantial likelihood that he would strike Aguilar or cause collateral damage to other inmates.  (ECF No. 84-5 at 4–7.)

1    In contrast, Plaintiffs have provided sufficient evidence to establish a dispute of material

2    fact as to whether Chavez received Lieber's warning.  Lieber testified that he alerted Chavez that

3    Rodriguez and Taylor were manipulating their restraints.  (ECF No. 86-1 at 140.)  Chavez states

4    he was in a different section of the building and did not hear Lieber's warning.  (ECF No. 84-10

5    at 2–3.)  Plaintiffs cite conflicting testimony by Chavez about his location at the time of the attack

6    on Aguilar.  (ECF No. 86-2 ¶ 242.)

7    Whether Chavez was present and heard Lieber's warning goes directly to his subjective

8    intent.  "Prison officials charged with deliberate indifference might show, for example, that they

9    did not know of the underlying facts indicating a sufficiently substantial danger and that they

10    were therefore unaware of a danger[.]"  *Farmer*, 511 U.S. at 844.  If Chavez did not act on

11    Lieber's alert because he did not receive the alert, a reasonable jury could find he was unaware of

12    Rodriguez and Taylor's escape and the resulting risk.  But if Chavez heard Lieber's alert, a

13    reasonable jury could find his decision not to respond constitutes deliberate indifference.

14    If Chavez acted with deliberate indifference, a reasonable jury could find this misconduct

15    was a proximate cause of Aguilar's injury.  Defendants claim Chavez would have been precluded

16    from entering the dayroom because Calderon had ordered the door to be closed.  (ECF No. 94 at

17    8.)  However, Lieber claims he alerted the floor staff member, who he believes was Chavez, as

18    soon as he observed Rodriguez and Taylor manipulating their restraints.  (ECF No. 84-5 at 4.)

19    Calderon claims he told Lieber to close the section door after he observed Rodriguez and Taylor

20    running down the stairs with weapons.  (ECF No. 84-9 at 5.)  Chavez claims that if he had he

21    been notified that inmates were manipulating their restraints, he would have alerted the other

22    floor staff and investigated what the inmates were doing.  (ECF No. 84-10 at 3.)  A reasonable

23    jury could thus find that if Chavez received Lieber's alert, he could have entered the dayroom

24    before Rodriguez and Taylor retrieved the weapons from Green which was before Calderon

25    ordered the door closed.

26    Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' failure to protect

27    (Claim One) and cruel and unusual punishment (Claim Three) claims against Leiber and Chavez

28    for their response to the attack on Aguilar is GRANTED as to Lieber and DENIED as to Chavez.

18

B.    Failure to Intervene

Defendants seek summary judgment on Plaintiffs' failure to intervene claim (Claim Two) against Officers Brennfleck, Chavez, Gomez, Herrera, Lieber, and Sykes, Sergeants Calderon and Saavedra, and Lieutenant Baker and on the basis that they responded reasonably to the attack on Aguilar based on the limited information available and according to policy and their training. (ECF No. 84-1 at 22–24.)

In opposition Plaintiffs appear to argue that all defendants, except Chavez and Lieber, failed to intervene by not conducting cell searches in which they would have discovered the weapons used in the attack on Aguilar.  (ECF No. 86 at 18, 22–24.)  Plaintiffs argue Lieber and Chavez failed to intervene by not adequately responding to the attack.  (*Id.* at 22–23.)

In reply, Defendants note Plaintiffs' do not present evidence of how and when the weapons used in the incident were fabricated or concealed, leaving it up to speculation whether they would have been discovered.  (ECF No. 94 at 6.)  Nor do Plaintiffs offer evidence showing Lieber or Chavez realistically could have stopped the attack on Aguilar.  (*Id.* at 7–9.)

Law enforcement officers "have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996).  In such cases, "the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows."  *Id.*  Thus, for example, in a Fourth Amendment case, "an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights."  *Id.*  However, an officer can only be held liable for failing to intervene if they had a "realistic opportunity" to do so.  *Cunningham v. Gates*, 229 F.3d 1271, 1290 (9th Cir. 2000).  "An officer has an opportunity to intercede only if he is aware of the constitutional violation as it occurs."  *Stephenson v. California*, 761 F. Supp. 3d 1242, 1265 (C.D. Cal. 2025).

Plaintiffs do not present a cognizable failure to intervene claim against any defendant. With respect to cell searches, Plaintiffs do not describe or submit evidence on the constitutional

19

1  violation each defendant failed to intervene in.  Nor do Plaintiffs show any defendant was aware

2  of another's unconstitutional conduct and had the opportunity to intervene.  The same goes for

3  Plaintiffs' claims against Lieber and Chavez.  Plaintiffs provide no argument or evidence that

4  either defendant was aware another officer was engaging in unconstitutional conduct and had an

5  opportunity to intervene.  Because Plaintiffs fail to establish the essential elements of a failure to

6  intervene claim, summary judgment is warranted.  *Celotex*, 477 U.S. at 322–23 (summary is

7  judgment mandated where there is a "complete failure of proof concerning an essential element of

8  the nonmoving party's case[.]").

9      It is unclear to the Court whether Plaintiffs' deficiencies on the failure to intervene claim

10  are due to a misinterpretation of the law or because Plaintiffs intend to proceed on an alternate

11  theory of liability.  Regardless, Plaintiffs provide no authority recognizing a standalone failure to

12  intervene claim where an officer's liability arises from inaction itself, not by virtue of its

13  connection to deliberate indifference or a failure to intercede in the unconstitutional conduct of

14  another.  The Court has considered the defendants' inaction in the context of Plaintiffs' other

15  claims, notably the failure to protect claim.  But on the failure to intervene claim, Plaintiffs do not

16  meet their burden.

17      For these reasons, Defendants' Motion for Summary Judgment on Plaintiffs' failure to

18  intervene claim (Claim Two) against Lieber and Chavez for their response to the attack on

19  Aguilar and the remaining defendants for their conduct related to cell searches is GRANTED.

20          C.      Conspiracy to Violate Civil Rights

21      Defendants seek summary judgment on Plaintiffs' conspiracy claim (Claim Four) against

22  Officers Chavez, Herrera, and Lieber, and Sergeants Calderon and Saavedra on the basis that

23  none of these defendants engaged in a conspiracy or had knowledge of a purported agreement to

24  violate Aguilar's rights.  (ECF No. 84-1 at 12–15.)  Plaintiffs' opposition does not respond to this

25  argument.  (*See generally* ECF No. 86.)  In reply, Defendants argue Plaintiffs' non-opposition is

26  effectively a waiver.  (ECF No. 94 at 2–3.)  The Court finds it need not address this argument

27

28

1  because summary judgment is warranted on the merits.[11]

2          "A civil conspiracy is a combination of two or more persons who, by some concerted

3  action, intend to accomplish some unlawful objective for the purpose of harming another which

4  results in damage." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (quoting

5  *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir. 1990)).  To prove a civil

6  conspiracy, the conspiring parties must have "reached a unity of purpose or a common design and

7  understanding, or a meeting of the minds in an unlawful agreement." *Id.* (quoting *Vieux*, 906

8  F.2d at 1343.)  Each participant "need not know the exact details of the plan" but "must at least

9  share the common objective of the conspiracy." *Id.* (quoting *United Steelworkers of Am. v.*

10 *Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989).  The participant's "knowledge of and

11 participation in a conspiracy may be inferred from circumstantial evidence and from evidence of

12 the [participant's] actions." *Id.* at 856–57.

13         Defendants have met their burden to establish the absence of any genuine issue of material

14 fact and entitlement to judgment as a matter of law with respect to the conspiracy claim against

15 Calderon, Chavez, Herrera, Lieber, and Saavedra.  Defendants cite to testimony from Green and

16 Rodriguez describing the events leadings up to the attack, and neither witness identifies Calderon,

17 Chavez, Herrera, Lieber, or Saavedra as knowing of or participating in the plan to attack Aguilar.

18 (ECF No. 84-1 at 12–15.)  The parties do not dispute Green and Rodriguez's testimony to the

19 extent it absolves Calderon, Chavez, Herrera, Lieber, or Saavedra from involvement in the

20 alleged conspiracy.  (ECF No. 86-2 ¶¶ 77–90.)  Plaintiffs put forward no other facts, evidence, or

21 argument in support of the conspiracy claim against these defendants.  (*See generally* ECF No.

22 86.)  Summary judgment is therefore warranted.

23         Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' conspiracy claim

24 (Claim Four) against Calderon, Chavez, Herrera, Lieber, and Saavedra is GRANTED.

---

[11]     A plaintiff's failure to address a claim on a motion for summary judgment may serve as an
abandonment of that claim. *Est. of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011)
(affirming summary judgment on a claim because the plaintiff "abandoned [the] claim by failing
to raise it in opposition to the [defendant's] motion for complete summary judgment").  However,
as it is unclear from the opposition what claims Plaintiffs intend to proceed with or abandon, the
Court in an abundance of caution will review this claim on the merits.

1

D.    Failure to Train and Supervise

2          Defendants seek summary judgment on Plaintiffs' failure to train and supervise claim

3   (Claim Five) against Sergeants Calderon and Saavedra, Lieutenant Baker, and Warden Lynch

4   because there is no evidence these defendants knew of or failed to prevent a constitutional

5   violation.  (ECF No. 84-1 at 25–26.)  Nor is there evidence that inmates in the LTRH were left

6   unsupervised, that the defendants knew inmates were being left unsupervised, or that Aguilar was

7   inappropriately housed in the LTRH.  (*Id.* at 26–27.)

8          In opposition, Plaintiffs argue Calderon, Baker, Lynch, and Saavedra failed to train,

9   supervise, or ensure compliance with cell search requirements.  (ECF No. 86 at 18–20.)

10         In reply, Defendants argue Plaintiffs provide no evidence of a causal connection between

11  the defendants' conduct and a constitutional violation.  (ECF No. 94 at 9.)  Plaintiffs' assertion on

12  the failure to train and supervise cell search requirements is too speculative to support a

13  reasonable inference that defendants caused the attack on Aguilar.  (*Id.* at 9–10.)

14         It is well-settled that "§ 1983 suits do not allow for the imposition of vicarious liability[.]"

15  *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011).  However, courts "have long permitted

16  plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction,

17  is directly attributed to them."  *Id.* at 1205.  This does not require the supervisor be "directly and

18  personally involved in the same way as are the individual officers who are on the scene inflicting

19  constitutional injury," rather the supervisor's participation could be their "'own culpable action or

20  inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the

21  constitutional deprivations of which the complaint is made,' or 'conduct that show[s] a reckless

22  disregard or callous indifference to the rights of others.'"  *Id.* at 1205–06 (quoting *Larez v. City of*

23  *Los Angeles*, 946 F.2d 630, 645–46 (9th Cir. 1991)).

24         "A showing that a supervisor acted, or failed to act, in a manner that was deliberately

25  indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the

26  involvement—and liability—of that supervisor."  *Id.* at 1206–07.  "Thus, when a supervisor is

27  found liable based on deliberate indifference, the supervisor is being held liable for his or her own

28  culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or

1    her subordinates." *Id.* at 1207.  A supervisor thus may be deliberately indifferent "based upon the

2    supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her

3    subordinates." *Id.*

4         "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his

5    or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

6    between the supervisor's wrongful conduct and the constitutional violation." *Id.* (quoting *Hansen*

7    *v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).  "'The requisite causal connection can be established

8    . . . by setting in motion a series of acts by others,' or by 'knowingly refus[ing] to terminate a

9    series of acts by others, which [the supervisor] knew or reasonably should have known would

10   cause others to inflict a constitutional injury[.]" *Id.* at 1207–08 (quoting *Dubner v. City & Cnty.*

11   *of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001) (alterations in original; citations omitted)).

12   "A supervisor can be liable in his individual capacity for his own culpable action or inaction in

13   the training, supervision, or control of his subordinates; for his acquiescence in the constitutional

14   deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."

15   *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).

16        While the Court previously discussed the culpability of Calderon and Saavedra for failing

17   to ensure Rodriguez, Taylor, and Green's cells were searched, this claim concerns the culpability

18   of Sergeant, Lieutenant, and Warden Defendants for failing to train and supervise their

19   subordinates.  Here, Plaintiffs fail their burden as to all.  Plaintiffs put forward no evidence of

20   inadequate training or supervision by any of these defendants.  For example, the record contains

21   no information on trainings the defendants failed to conduct, or the identity of subordinates

22   supervised by the defendants.  Plaintiffs appear to argue Baker, Calderon, Lynch, and Saavedra

23   set into motion acts which caused others to inflict constitutional injury.  (ECF No. 86 at 18 (citing

24   *Larez*, 946 F.2d at 645).)  But Plaintiffs do not identify what these defendants did to set into

25   motion unconstitutional conduct by their subordinates.

26        In lieu of evidence, Plaintiffs rely on conclusory statements that employees' general

27   failure to adhere to the LTRH policy on cell searches must have been the result of their

28   supervisors failing to train and supervise them.  Plaintiffs assert: "The failure of Sgts. Calderon

1   and Saavedra to meet the expectations of their supervisors with respect to cell searches, was a

2   failure by warden Lynch to oversee the proper operations of the LTRH unit. . . . This was also a

3   failure by Lt. Baker to supervise and train his sergeants."  (ECF No. 86 at 19.)  However,

4   Plaintiffs provide no facts or evidence from which a reasonable jury could come to the same

5   conclusion.  Plaintiffs cite to their Additional Statement of Disputed Facts (ECF No. 86-2 ¶¶ 244–

6   261), but these facts only describe the LTRH cell search policy and Calderon and Saavedra's

7   failures to fulfil their own duties of ensuring cell searches were done in accordance with policy.

8   While officers' failure to conduct cell searches could certainly be the result of their supervisors

9   not providing adequate supervision and training, Plaintiffs provide no evidence to support that

10  connection.  In other words, "the factual predicate upon which an inference can be drawn simply

11  does not exist."  *Richards*, 602 F. Supp. at 1244.

12       Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' failure to train

13  and supervise claim (Claim Five) against Baker, Calderon, Lynch, and Saavedra for failing to

14  train and supervise related to cell searches is GRANTED.

15                    E.       Interference with Familial Relationship / Substantive Due Process

16       Defendants seek summary judgment on Plaintiffs' interference with familial

17  relationship/substantive due process claim (Claim Six) against Officers Brennfleck, Chavez,

18  Gomez, Herrera, Lieber, and Sykes, Sergeants Calderon and Saavedra, Lieutenant Baker, and

19  Warden Lynch and on the basis that Defendants were not deliberately indifferent but instead took

20  reasonable measures to ensure Aguilar's safety.  (ECF No. 84-1 at 27–30.)  Defendants submit

21  that Lynch and Saavedra were not involved in the incident at all, and Chavez was not present.

22  (*Id.* at 29.)  The remaining defendants had to make split-second decisions in a rapidly escalating

23  situation where no actual deliberation was practical, and in doing so coordinated a response in

24  accordance with established procedures and their training.  (*Id.* at 29)

25       Plaintiffs' opposition does not specifically address or respond to Defendants' substantive

26  due process argument.  (*See generally* ECF No. 86.)  The Court considers Plaintiffs' deliberate

27  indifference arguments to constitute their response on this claim.  (*Id.* at 14–20.)

28       "Parents and children may assert Fourteenth Amendment substantive due process claims if

                                               24

1   they are deprived of their liberty interest in the companionship and society of their child or parent

2   through official conduct."  *Lemire*, 726 F.3d at 1075; *Sinclair v. City of Seattle*, 61 F.4th 674, 679

3   (9th Cir. 2023) (recognizing "parents maintain a constitutionally protected liberty interest in the

4   companionship of their adult children," and "the right may be violated even when the relationship

5   is not the target of state action").  However, "[o]nly official conduct that 'shocks the conscience'

6   is cognizable as a due process violation."  *Lemire*, 726 F.3d at 1075.  "Where actual deliberation

7   is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."

8   *Wilkinson*, 610 F.3d at 554.  "On the other hand, where a law enforcement officer makes a snap

9   judgment because of an escalating situation, his conduct may only be found to shock the

10  conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."

11  *Id.*

12      The Court finds the purpose to harm standard applies to Lieber as his challenged conduct

13  occurred in the midst of an escalating situation.  However, the record contains no evidence with

14  which to suggest Lieber acted with the purpose to harm.  As discussed above in the context of the

15  failure to protect claim, there is no genuine dispute as to Lieber's course of conduct in response to

16  the attack on Aguilar.  Plaintiffs only argue that Lieber should have taken other actions, including

17  deploying lethal force.  As Plaintiffs do not claim Leiber acted with a purpose to harm, summary

18  judgment is warranted.

19      As to the remaining defendants, the appropriate standard is deliberate indifference.  The

20  allegations against Chavez are that he failed to respond to the attack on Aguilar.  If he in fact

21  heard Lieber's warning but decided not to respond, that shows he acted in a context in which

22  actual deliberation was practicable and achieved.  For the remaining defendants, the challenged

23  conduct – failure to conduct cell searches and operation of the LTRH dayroom – also cannot

24  reasonably be characterized as snap judgments made in response to an escalating situation.  As

25  for whether these defendants acted with deliberate indifference, the Court's analysis from the

26  failure to protect claim applies here.  Genuine issues exist as to whether Calderon, Chavez, and

27  Saavedra acted with deliberate indifference.  Plaintiffs fail their burden with respect to the

28  remaining defendants on the cell search and LTRH dayroom theories.

1      Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' interference with

2  familial relationship/substantive due process claim (Claim Six) against Chavez for his response to

3  the attack on Aguilar and Calderon and Saavedra for their conduct related to cell searches is

4  DENIED.  The motion is GRANTED as to Lieber and the remaining defendants on the cell search

5  and LTRH dayroom theories.

6              F.       Qualified Immunity

7      Defendants move for summary judgment on qualified immunity as to all claims except as

8  to the alleged conspiracy.  Defendants argue the LTRH dayroom policies and procedures, security

9  decisions, and staff's response to the attack on Aguilar did not violate clearly established law.

10  (ECF No. 84-1 at 31–35.)  In opposition, Plaintiffs argue no defendant acted reasonably, nor can

11  any of the defendants claim ignorance to a prisoner's right to be protected from violence at the

12  hands of other inmates.  (ECF No. 86 at 21–24.)  In reply, Defendants argue this right articulated

13  by Plaintiffs is too general, and Plaintiffs cite no caselaw involving conduct similar to that

14  attributed to the various defendants.  (ECF No. 94 at 10.)

15      For claims brought under § 1983, "the doctrine of qualified immunity protects city

16  officials from personal liability in their individual capacities for their official conduct so long as

17  that conduct is objectively reasonable and does not violate clearly-established federal rights."

18  *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 964 (9th Cir. 2010).  This determination

19  involves a two-prong analysis: (1) whether facts alleged, taken in the light most favorable to the

20  injured party, show the officer's conduct violated a constitutional right; and (2) whether the right

21  was clearly established.  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012).  Courts

22  have discretion to decide which of these two prongs to address first.  *Id.*

23      "To determine whether a right was clearly established, a court turns to Supreme Court and

24  Ninth Circuit law existing at the time of the alleged act," and in the absence of binding precedent

25  may look to available decisions of other circuits and district courts.  *Cmty. House, Inc.*, 623 F.3d.

26  at 967.  In the absence of "a case directly on point," a court may compare relevant "specific

27  factors" to determine whether a reasonable officer would have known that the conduct in question

28  was unlawful.  *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017).

1    However, that caselaw clearly establishes a constitutional right is not enough on its own. *Saucier*

2    *v. Katz*, 533 U.S. 194, 202 (2001). Rather, "[t]he contours of the right must be sufficiently clear

3    that a reasonable officer would understand that what he is doing violates that right." *Id.* (quoting

4    *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry in

5    determining whether a right is clearly established is whether it would be clear to a reasonable

6    officer that his conduct was unlawful in the situation he confronted." *Id.*

7        As detailed above, the claims surviving the instant motion are the deliberate indifference

8    claims against Calderon and Saavedra for their conduct related to cell searches and Chavez for his

9    response to the attack on Aguilar. Having found a reasonable jury could find these defendants

10   violated Aguilar's constitutional rights, the Court must then consider whether the violations were

11   clearly established at the time of the incident. According to the Ninth Circuit "the law requiring

12   prison officials to take reasonable measure to abate an inmate's substantial risk of serious harm

13   from other inmates clearly was established" as early as 2011. *Fierro v. Smith*, 731 F. App'x 652,

14   653, 655 (9th Cir. 2018). The clearly established law articulated by the Ninth Circuit supports a

15   finding that it would be clear to a reasonable officer in the defendants' positions that their conduct

16   was unlawful. Accordingly, Calderon, Chavez, and Saavedra are not entitled to qualified

17   immunity from Plaintiffs' Eighth Amendment claims. Defendants' Motion for Summary

18   Judgment on qualified immunity is DENIED.

19       **IV. CONCLUSION**

20       For the foregoing reasons, Defendants' Motion for Summary Judgement is GRANTED in

21   part and DENIED in part as follows:

22       - GRANTED as to all claims against Herrera, Lieber, and Lynch.

23       - Failure to Protect (Claim One)

24           o GRANTED except as to Baker, Brennfleck, Calderon, Chavez, Gomez,

25               Saavedra, and Sykes.

26           o The claim proceeds as to Calderon and Saavedra for their conduct related

27               to cell searches; Chavez for his response to the attack on Aguilar; and

28               Baker, Brennfleck, Gomez, and Sykes for the alleged conspiracy.

27

- Failure to Intervene (Claim Two)
  - o GRANTED except as to Baker, Brennfleck, Gomez, and Sykes.
  - o The claim proceeds as to Baker, Brennfleck, Gomez, and Sykes for the alleged conspiracy.
- Cruel and Unusual Punishment (Claim Three)
  - o GRANTED except as to Baker, Brennfleck, Calderon, Chavez, Gomez, Saavedra, and Sykes.
  - o The claim proceeds as to Calderon and Saavedra for their conduct related to cell searches; Chavez for his response to the attack on Aguilar; and Baker, Brennfleck, Gomez, and Sykes for the alleged conspiracy.
- Conspiracy to Violate Civil Rights (Claim Four)
  - o GRANTED except as to Baker, Brennfleck, Gomez, and Sykes.
- Failure to Train and Supervise (Claim Five)
  - o GRANTED except as to Baker.
  - o The claim proceeds as to Baker for the alleged conspiracy.
- Interference with Familial Relationship/Substantive Due Process (Claim Six)
  - o GRANTED except as to Baker, Brennfleck, Calderon, Chavez, Gomez, Saavedra, and Sykes.
  - o The claim proceeds as to Calderon and Saavedra for their conduct related to cell searches; Chavez for his response to the attack on Aguilar; and Baker, Brennfleck, Gomez, and Sykes for the alleged conspiracy.
- Qualified Immunity is DENIED.

The parties are ordered to file a Joint Notice of Trial Readiness within thirty (30) days of the electronic filing date of this Order indicating their readiness to proceed to trial on Plaintiffs' remaining claims.

//

//

//

IT IS SO ORDERED.

DATE: September 30, 2025

_____
TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE